UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:20-CV-00003-BJB-CHL

JOHN H. SCHNATTER,                                                    Plaintiff,

v.

247 GROUP, LLC , et al.,                                           Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is a motion to compel production of documents in compliance with a third

party subpoena filed by Defendants 247 Group, LLC and Wasserman Media Group, LLC

(collectively "Defendants").   (DN 99.)   Plaintiff John H. Schnatter ("Schnatter") and the

subpoenaed third party Freeh Sporkin & Sullivan LLP ("FSS") have filed briefs opposing the

motion.  (DN 98; DN 100.)  This matter is now ripe for review.

I.      BACKGROUND

Schnatter is the founder of Papa John's International ("Papa John's") and served as its CEO

and Chairman until 2018.  (DN 1-1, at PageID # 12, 17.)  On May 22, 2018, Schnatter participated

in a call with Defendant 247 Group, LLC, which provided marketing services to Papa John's.  (*Id.*,

at PageID # 16.)  During the call, Schnatter made controversial comments about racial issues and

uttered a racial slur.  (*Id.*)  Unbeknownst to Schnatter, that call was recorded, and the audio was

subsequently disclosed to *Forbes Magazine*.  (*Id.*, at PageID # 16–17.)  On July 11, 2018, *Forbes*

published details about the call, and Schnatter resigned as Chairman of Papa John's the same day.

(*Id.*, at PageID # 17.)  Schnatter filed suit against Defendants in state court on December 5, 2019,

and the case was removed to this Court on January 2, 2020.  (DN 1; DN 1-1.)  Schnatter's claims

arise from the disclosure to *Forbes*.  (DN 1-1.)

Schnatter apparently began exploring potential avenues for litigation beginning in late 2018. (DN 98, at PageID # 883.) Additionally, a shareholder derivative action related to the *Forbes* publication was filed in the Southern District of New York on August 30, 2018, and Schnatter was named as a defendant. *Danker v. Papa John's International, Inc.*, 1:18-cv-7927-KMW (S.D.N.Y.). Schnatter retained the law firms Glasser Weil Howard Avchen & Shapiro LLP ("Glasser Weil") and Hughes Hubbard & Reed LLP ("Hughes Hubbard") in late 2018 or early 2019, both as a part of his legal defense team in the derivative suit and to determine a strategy for pursuing his own causes of action. (DN 98, at PageID # 883.) At the recommendation of Glaser Weil, Schnatter retained the law firm FFS in May 31, 2019. (*Id.*, at PageID # 884.) At some point during the course of FSS's work for Schnatter, either FSS or Hughes Hubbard retained consulting firm Freeh Group International Solutions, LLC ("FGIS")[1] on Schnatter's behalf. (DN 100, at PageID # 1070; DN 98-2, at PageID # 933.) FGIS worked with Hughes Hubbard to conduct an independent investigation of Schnatter's background, comments about race Schnatter had made to friends and co-workers, and media coverage of Schnatter's comments about race. (*Id.*, at PageID # 1071; DN 98-3.) The investigation included a review of media reports and other publicly available information and interviews with Schnatter and Schnatter's professional and personal associates. (DN 98-3, at PageID # 933.) By July 1, 2021, FGIS had drafted a formal report of its findings titled "Review of John Schnatter Statements and Media Response," referred to by the Parties and throughout this order as the "Freeh Report." (*Id.*) Schnatter published the report on a dedicated website on December 7, 2020. (*Id.*) On January 14, 2021, Schnatter updated his initial disclosures, identifying Louis J. Freeh ("Freeh") as an individual likely to have discoverable information that Schnatter may use to support his claims. (DN 99-1, at PageID # 1025.) Freeh

---

[1] In 2020, FGIS was acquired by AlixPartners, LLP, of which Louis J. Freeh is a managing partner. (DN 100-1, at PageID # 1085.)

was the chairman of FGIS and a senior partner at FSS at the time Schnatter retained their services.

(DN 100-1, at PageID # 1085.)   On March 12, 2021, Defendants served FFS with a subpoena,

seeking production of:

1. All Documents and Communications that relate to the Freeh Report, including but not limited to, all drafts, all interview notes, and all Documents or Communications reviewed or relied upon in drafting the Freeh Report.

2. The Curriculum Vitae and/or resume of Louis Freeh.

3. All Documents related to and Communications with Plaintiff.

4. All Documents and Communications with Aaron Thompson.

5. All Documents and Communications with Plaintiff's PR Team.

6. All Documents and Communications that relate to the May 22 Conference Call.

7. All Documents and Communications that relate to the Forbes Articles.

8. All Documents and Communications with Timotheus Polder.

9. All Documents and Communications with Simon Smith.

10. All Documents and Communications with Dr. Kevin Cosby.

11. All Documents and Communications with Dr. Sam Tolbert.

12. All Documents and Communications that relate to the Action.

13. All Documents and Communications that relate to the website, https://papajohnschnatter.report/, including the video interview of Louis Freeh available thereon.

(DN 100-2, at PageID # 1101–02.)

On February 12, 2021 and again on March 3, 2021, Schnatter indicated to Defendants that

he did not intend to call Freeh as a witness and did not intend to introduce the Freeh Report as

evidence in this case.  (DN 98-4, at PageID # 945; DN 98-5, at PageID # 949.)  However, Schnatter

did not amend his initial disclosures to remove Louis Freeh until June 14, 2021, the same day the instant briefs were filed.  (DN 98-2.)  On April 9, 2021, FFS noticed their objections; for all but one request, FSS objected on grounds that Defendants sought "information protected by the attorney-client privilege, the common interest doctrine, the work product doctrine, or any other applicable privilege or protection."   (DN 100-2, at PageID # 1109–13.)   In a subsequent communication with Defendants on May 13, 2021, FSS further expressed that the subpoena was improper because Defendants "were expressly advised that plaintiff would not be relying on the [Freeh Report] in the litigation."   (DN 99-1, at PageID # 1062.)

On May 24, 2021, the Court held a telephonic status conference with the Parties and FSS to discuss the dispute.  (DN 92.)  During the conference, the Court granted leave for the Parties and FSS to proceed to motion practice.  (*Id.*)

## II.    LEGAL STANDARD

Rule 26(b) of the Federal Rules of Civil Procedure governs the scope of discovery.  Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).

### a.  Relevance and Proportionality

Relevance under Rule 26(b) is broadly construed by the federal courts to include "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  "When faced with questions over, or disputes about, what information or documents may be obtained based on their relevancy, it is axiomatic that the trial court is afforded broad discretion to determine the boundaries of inquiry."  *Janko Enters. v. Long John Silver's, Inc.*, No. 3:12-cv-345-

S, 2013 WL 5308802, at *2 (W.D. Ky. Aug. 19, 2013) (citing *Chrysler v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)).   In 2015, Rule 26 was amended to require that all discovery be "proportional" in nature.   In assessing whether a discovery request is proportional, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."   Fed. R. Civ. P. 26(b)(1).

### b.  Attorney-Client Privilege

The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law.   *Upjohn Co. v. United States*, 449 U.S. 383,389 (1981).   "While the purpose of the attorney-client privilege is to encourage clients to communicate freely with the attorneys, the privilege is narrowly construed because it reduces the amount of information discoverable during the courts of the lawsuit."   *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997); *see also Frankfort Reg'l. Med. Ctr. v. Shepherd*, No. 2015-SC-438, 2016 WL 3376030, at *12 (Ky. Jun. 16, 2016) ("[P]rivileges of all stripes are to be strictly construed.").   "[T]he burden of establishing the existence of [the] privilege rests with the party asserting the privilege."   *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 454 (6th Cir. 1983).

### c.  Work Product Doctrine

The work product doctrine, or "work product privilege" as it is sometimes known, was first recognized by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).   While the work product doctrine has some conceptual overlap with the attorney-client privilege, it "is distinct from and broader than the attorney-client privilege."   *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *In re Antitrust Grand*

*Jury*, 805 F.2d at 163.   The attorney-client privilege operates to protect only confidential communications between an attorney and a client, while the work product doctrine exists to protect any document prepared by or for an attorney in anticipation of litigation.  *Id.* (citing *In re Special September 1978 Grand Jury*, 640 F.2d 49, 62 (7th Cir.1980)).

Federal courts apply the federal work product doctrine.  *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir. 2006).  The doctrine is currently incorporated in Rule 26(b)(3) to protect from discovery those documents or tangible things prepared in anticipation of litigation by or for a party or the party's representative absent a showing by the party seeking production of substantial need and the unavailability of such information from another source.  Fed. R. Civ. P. 26(b)(3).

Rule 26(b)(3) protects: (1) a document or tangible thing; (2) prepared in anticipation of litigation or for trial; (3) by or for a party or its representative.  *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009).  The federal common law under Hickman and its progeny protects both tangible and intangible information.  *One Tract of Real Property*, 95 F.3d 422, 427– 28 & n.10 (6th Cir. 1996).  "Anticipation of litigation" must both subjectively exist when the document is prepared and be objectively reasonable.  *Professionals Direct*, 578 F.3d at 439.  "[T]he burden is on the party claiming protection to show that anticipated litigation was the driving force behind the preparation of each requested document."  *Id.* (internal quotation marks omitted).  An ordinary business purpose does not suffice.  *Id.*

The work product privilege is not absolute.  For example, it can be waived by a disclosure that "substantially increases the opportunity for potential adversaries to obtain the information." *Equal Employment Opportunity Comm'n v. Wal-Mart Stores, Inc*., No. CV 01-339-KKC, 2008 WL 11344709, at *4 (E.D. Ky. Feb 19, 2008) (citing *JA Apparel Corp. v. Abboud*, 2008 WL

111006, at *3 (S.D.N. Y January 10, 2008)).  "Other than the fact that the initial waiver must be to an adversary, there is no compelling reason for differentiating waiver of work product from waiver of attorney-client privilege."  *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 306 (6th Cir. 2002).

## III.    DISCUSSION

### a.  Relevance and Proportionality

Schnatter argues that the documents at issue are not discoverable under Rule 26(b)(1) both because the documents are not relevant and because Defendants' requests are not proportional to the needs of the case.  (DN 98, at PageID # 887–89.)  Schnatter notes that neither Freeh nor any FSS employee will be called as witnesses in this case and argues that Defendants have made no showing that the documents at issue bear on Defendants' alleged misconduct, the *Forbes* article, or Schnatter's alleged damages.  (*Id.*, at PageID # 887–88.)  Regarding proportionality, Schnatter asserts that "Defendants have the same access to [] information as FSS did."  (*Id.*, at PageID # 888.)  Schnatter notes that the report was based on a review of media reports that are publicly available as well as interviews with individuals that Defendants are able to interview themselves, two of whom Defendants have already subpoenaed.  (*Id.*)  Schnatter argues that compelling FSS to produce its files related to work it did for Schnatter while providing legal and consulting services would offend the spirit of Rule 26(b)(4)(D), which provides special discovery protections to consulting expert witnesses.  (*Id.*)

Defendants assert that the documents at issue contain "material facts at the core of this case, including statements by Schnatter and percipient witnesses."  (DN 99, at PageID # 964.)  Defendants argue that they are entitled to discover the comments the individuals interviewed for the Freeh Report made about the leaked phone call, their interactions with Schnatter, and their

7

opinion of Schnatter, especially given that Schnatter claims reputational damages. (*Id.*) Defendants note that Schnatter has named two of the individuals Freeh interviewed as character witnesses and argue that they are entitled to discovery about what information relevant to this case FSS shared with these witnesses. (*Id.*)

It is difficult to imagine that FSS possesses no responsive documents that are relevant to this case. After all, according to the Freeh declaration, "FSS regularly consulted with Mr. Schnatter and Hughes Hubbard regarding this litigation . . . [and] had outlined information gathered by FSS and FGIS for use by counsel in evaluating [Schnatter's claims] . . . ." (DN 100-1, at PageID # 1087–88.) Schnatter also asserts that Defendants' requests cover "communications with Schnatter and or his agents in connection with the rendering of legal advice" and documents "generated by FSS during the course of preparing for and assisting Schnatter and his legal team in defending or prosecuting claims related to Defendants; misconduct at issue in this case." (DN 98, at PageID # 889, 894.) Freeh states that FSS's efforts "included identifying and interviewing potential witnesses in the first half of 2020 *who may have had information relevant to the subject matter of the claims Mr. Schnatter had asserted in this case*." (DN 100-1, at PageID # 1088) (emphasis added). Of course, Schnatter leaves these assertions out of his relevance objection, and only flips the script when arguing for privilege, but he can't have it both ways. The core allegation giving rise to Schnatter's claims against Defendants is as follows: "By disclosing information related to the May 22 call to Forbes and/or other third parties, Defendants breached the Services Agreement and the Confidentiality & Non-Disparagement Agreement. And by providing this information maliciously and out of context, Defendants interfered with Mr. Schnatter's valid business relationships and prospective economic advantages." (DN 111, at PageID # 1294.) Many of Defendants' requests relate to the May 22, 2018 call that Defendants are alleged to have leaked

to have maliciously leaked to *Forbes.* For example, Requests 6 and 7 explicitly seek all documents and communications related to the May 22, 2018 call and the *Forbes* article. (DN 100-2, at PageID # 1102.) The Court has already ordered Schnatter to produce undisclosed information concerning the May 22, 2018 call, which is relevant to Plaintiff's breach of contract claims. (DN 89, at PageID # 858.) Similarly, the requests related to the Freeh Report cover information about the May 22, 2018 call and the alleged leak to *Forbes*, which is clear from the contents of the Freeh Report. For example, the report contains over three pages describing and analyzing the May 22, 2018 call, including Defendant 247 Group, LLC's involvement in the call. (DN 98-3, at PageID # 937–40.) Additionally, statements in the report bear on Schnatter's allegation the Defendants disclosed information about the call "maliciously and out of context." (DN 111, at PageID # 1294.) For example, the report alleges, albeit without naming the Defendants, that Schnatter's comments on the call "were later used by some to characterize Mr. Schnatter as having intended to express racially biased and prejudicial sentiments." (DN 98-3, at PageID # 933.) The report also alleges that numerous actors *other than Defendants* mischaracterized Schnatter's comments by reporting them without proper context. (*See generally id.*, at PageID # 933–44.) Specifically, the report points to the media in general, but also cites to specific news reports as well as his own "company-drafted" public apology. (*Id.*) The bases of these allegations would be helpful to Defendants in determining the scope of their alleged misconduct and formulating possible defenses. Schnatter also claims that Defendants are liable for reputational damages. (DN 111, at PageID # 1307.) The requested documents and communications related to the Freeh report will shed light on those alleged damages. Indeed, the Freeh Report summarizes an investigation into Schnatter's reputation both before and after the publication of the *Forbes* article. (DN 98-3, at PageID # 940–44.) The report discusses evidence that "Schnatter had, and continues to have, a very positive

reputation in the business and social communities," evidence that could affect the scope of his alleged damages. (*Id.*, at PageID # 941.) To the extent that this evidence was uncovered through communications with witnesses, some of whom Schnatter intends to call as witnesses at trial, those communications are material to a core issue in dispute. In sum, the Court finds that the requested communications and documents are relevant for discovery purposes.

The Court also finds Schnatter's proportionality objection unpersuasive. The mere fact that a document is located in an attorney's files does not confer a consecrated status in discovery; unless a privilege applies, it is treated no differently than any other document. The amount in controversy and importance of the issues favor permitting broad discovery. Indeed, this case has generated substantial public interest, and millions of dollars are at stake. While, some of Defendants' requests, particularly the contention requests, might be overbroad, FSS and Schnatter were free to object to disclosing documents that are not subject to discovery, and indeed, they did. The Parties and FSS are highly sophisticated, and given FSS's relationship with Schnatter, it is not unreasonable to require it to submit to discovery in the form of document production. As to Schnatter's assertion that production would allow Defendants to benefit from his trial preparation materials, that concern is addressed in the Court's discussion of work product protection and waiver below.

### b. Attorney-Client Privilege

Schnatter asserts that Defendants subpoena requests cover information protected by attorney-client privilege. (DN 98, at PageID # 889–91.) For example, Schnatter notes that the requests seek communications between FSS and Schnatter, Schnatter's agent, and Schnatter's public relations team. (*Id.*, at PageID # 899.) Schnatter argues that such communications are protected by Kentucky's general rule of privilege, KRE 503(b). (*Id.*, at PageID # 889–90.)

10

Likewise, FSS asserts that "FFS's communications with Mr. Schnatter and his representatives satisfy the legal standards . . . to qualify as attorney-client communications."  (DN 100, at PageID # 1080.)  FSS says that when it made the communications with Schnatter, his agent, and his public relations team, it "was engaged to provide legal advice to Mr. Schnatter in connection with pending and anticipated litigation."  (*Id.*)

Defendants argue that attorney-client privilege does not cover any of the documents at issue because no attorney client relationship between Schnatter and FSS existed.  (DN 99, at PageID # 975–78.)  Defendants assert that Schnatter's relationship with Freeh and FSS did not involve legal advice or services.  (*Id.*, at PageID # 974, 976–78.)  Defendants note that in FGIS's press release announcing the Freeh Report identifies Freeh as "a third-party expert" rather than a lawyer and that the Freeh Report includes no legal analysis.  (*Id.*, at PageID # 976.)  Defendants point out that the Freeh Report itself says Freeh's investigation was commissioned by Hughes Hubbard, while FSS has also represented that FFS commissioned the Freeh investigation.  (*Id.*, at PageID # 978.)  Defendants argue that "[t]hese contradictory explanations demonstrate that despite Schnatter's attempts to conceal the contents of interviews and other materials created while trying to rehabilitate his image, Freeh was not actually engaged in anticipation of litigation or for the provision of legal services."  (*Id.*)

Kentucky Rule of Evidence ("KRE") 503 governs the Commonwealth's equivalent of the attorney-client privilege (here termed the lawyer-client privilege).[2]  It safeguards a client's ability "to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client[.]"   KRE 503(b). KRE 503 extends to communications:

---

[2] "In a diversity case, the court applies . . . state law to resolve attorney-client clams."  *Powerhouse Licensing*, 441 F.3d at 472.

> Between the client or a representative of the client and the client's lawyer or a representative of the lawyer;
>
> Between the lawyer and a representative of the lawyer;
>
> By the client or a representative of the client or the client's lawyer or a representative of the lawyer representing another party in a pending action and concerning a matter of common interest therein;
>
> Between representatives of the client or between the client and a representative of the client; or
>
> Among lawyers and their representatives representing the same client.

*Id.* The privilege may be claimed by the client, or by the lawyer at the time of the communication on behalf of the client. KRE 503(c). The Kentucky Supreme Court has observed that KRE 503 "bear[s] striking similarities" to the parallel attorney-client privilege enshrined in federal law. *Reynolds v. Wells*, No. 2016-SC-000134-MR, 2016 WL 7330067, at *3 (Ky. Dec. 15, 2016). For example, both systems adhere to "the almost universally accepted rule that testimonial privileges are generally disfavored and should be strictly construed." *Stidham v. Clark*, 74 S.W.3d 719, 722–23 (Ky. 2002) (citation omitted). *See United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) ("[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for the truth.").

Critically, "the privilege 'protects only those disclosures necessary to obtain legal advice which might not have been made absent the privilege and is triggered only by a client's request for legal, as contrasted with business, advice." *Univ. of Kentucky v. Lexington H-L Servs., Inc.*, 579 S.W.3d 858, 864 (Ky. Ct. App. 2018) (quoting *Lexington Pub. Library v. Clark*, 90 S.W.3d 53, 60 (Ky. 2002) (cleaned up)). Determining whether the privilege applies is a two-prong inquiry. "First, the statements must actually be confidential, meaning they are 'not intended to be disclosed

to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.'" *Id.* (quoting *Collins v. Braden*, 384 S.W.3d 154, 161 (Ky. 2012)). Disclosure of a covered to a communication to a third-party may result in waiver of the privilege. *See 3M Co. v. Engle*, 328 S.W.3d 184, 189 (Ky. 2010). "Second, the statements must be made for the purpose of obtaining or furthering the rendition of legal services to the client." *Univ. of Kentucky*, 579 S.W.3d at 864.

"[T]he burden is on the party claiming the privilege to prove that it exists as to the communications so claimed." *The St. Luke Hosps., Inc. v. Kopowski*, 160 S.W.3d 771, 775 (Ky. 2005) (footnote omitted); *accord Grand Jury Investigation No. 83-2-35*, 723 F.2d at 454. *See also Reynolds*, 2016 WL 7330067, at *3 ("[I]t is the proponent's duty to offer sufficient detail to each supposedly privileged document to persuade the court that the information in question is not discoverable."). Though intended to facilitate free and open communication between attorney and client, "the privilege is narrowly construed because it reduces the amount of information discoverable during the courts of the lawsuit." *Carr v. Lake Cumberland Reg'l Hosp.*, No. CV 15-138-DLB-HAI, 2017 WL 5490916, at *2 (E.D. Ky. Nov. 15, 2017) (quoting *Collis*, 128 F.3d at 320); *see id.* (citing *Frankfort*, 2016 WL 3376030, at *12). "[A] claim of privilege can be defeated by proof by a preponderance of the evidence . . . that the privilege has been waived or that the communication or material is either outside the scope of . . . the privilege." *Stidham*, 74 S.W.3d at 727. However, once its applicability to a communication is established, the attorney-client privilege "may not be overcome by a showing of need by an opposing party to obtain the information contained in the privileged communication." *St. Luke Hosps.*, 160 S.W.3d at 777.

The Court finds that Schnatter and FSS have failed to establish that all communications between FSS and Schnatter and other individuals employed by him are covered by attorney-client privilege.  With respect Defendants' request for communications between FSS and Schnatter, FSS asserts that "Schnatter retained FSS to provide legal advice and therefore the request on its face is improper."  (DN 100, at PageID # 1080.)  However, the mere existence of an attorney-client relationship does not render all communications shared between the attorney and client are privileged.[3]  Additionally, Freeh's "belief and intent that FSS was acting as attorneys rather than as non-attorney consultants" does not deem all communications with Schnatter privileged.  (DN 100-1, at PageID # 1086.)  "Rather, the purpose of the client in making the statement controls the applicability of the privilege." *Frankfort Reg'l Med. Ctr.*, 2016 WL 3376030, at *8.  *See Lexington Public Library*, 90 S.W.3d at 59 ("Whether a particular communication is privileged depends (absent waiver) not on what use was ultimately made of the communication, but on the facts and circumstances under which the communication was made.").  And while communications between FSS and individuals employed by Schnatter may be covered by privilege as communications with client representatives, these communications must have been made "in the course and scope of [their] employment," about "the subject matter of [their] employment," and "to effectuate legal representation of the client."  KRE 503(a)(2)(B).  This distinguishes between employees who are actually acting in a representative capacity (and thus whose statements are cloaked by the privilege) and those who are "mere eyewitnesses," whose statements are not protected.  *Collins*, 384 S.W.3d at 162.  "In other words, an employee representative must know that his statement is being given to obtain legal advice, or it is not privileged under the attorney-client privilege as set forth in the rule itself." *Frankfort Reg'l Med. Ctr.*, 2016 WL 3376030, at *6.  The Kentucky

---

[3] Assuming *arguendo* that Schnatter and FSS share an attorney-client relationship.

Supreme Court has refused privilege protection where "the record [wa]s silent as to . . . whether, at the time the communications were made, the persons who made them were aware that the communications were being elicited to effectuate legal, as opposed to business, advice." *Lexington Public Library*, 90 S.W.3d at 63.

Here, the Court has not reviewed the communications with Schnatter and individuals he employed, and no detailed description of these communications has been provided.  Thus, the Court cannot say whether all of these communications were confidential and made for the purposes of obtaining legal advice.  While the scope of FSS's legal work for Schnatter is disputed, even FSS admits that its relationship with Schnatter did not solely involve legal representation.  Freeh's declaration states that FSS was retained "to provide general legal advice *and consulting services*" and that FSS retained FGIS to "support to FSS in providing the general legal advice *and consulting services*."  (DN 100-1, at PageID # 1086) (emphasis added).  The description of the communications provided in the Freeh declaration suggests that some of the communications fall outside the scope of attorney-client privilege.  Specifically, Freeh asserts that attorney-client privilege precludes disclosure of "communications with the client or the client's representatives, including other counsel, in connection with the seeking or providing legal advice to Mr. Schnatter, *or the gathering of factual information to enable FSS or other counsel to be more informed when providing legal advice to Mr. Schnatter.*"  (DN 100-1, at PageID# 1089) (emphasis added).  However, attorney-client privilege "does not protect any facts or claims reported to the attorney in [] communications from all discovery."  *Collins*, 384 S.W.3d at 159.  To the extent that FSS possesses responsive communications that were neither confidential nor shared solely between FSS and Schnatter or a representative of Schnatter for the purpose of providing legal advice to Schnatter, disclosure is required.

### c. Work Product Protection

Schnatter asserts that other than the request for Freeh's resume, all the subpoena requests cover documents protected by work product privilege because they "seek FSS' interviews, statements, memoranda, correspondence, and mental impressions as well as FSS' assembly of information and sifting of relevant from irrelevant facts." (DN 98, at PageID # 892.) Schnatter argues that FSS cannot be compelled to produce this information because Defendants have not shown a substantial need for the information nor that they can't obtain the information through other means. (*Id.*, at PageID # 892–93.) Likewise, FSS asserts that "[i]t is abundantly clear from the Declaration of Louis J. Freeh submitted with [its] memorandum that FSS was engaged to provide legal advice to Mr. Schnatter in conjunction with at least two other law firms in connection with both pending and anticipated litigation." (DN 100, at PageID # 1074–75.) FSS therefore argues that "[a]ll of the work performed as a result of FSS's engagement, and all of the documents generated or gathered by FSS or FGIS personnel in connection with that engagement by definition constitute work product." (*Id.*, at PageID # 1075.) Defendants argue that the requested documents are not work product because they were not created because of or in anticipation of litigation. (DN 99, at PageID # 979.) Defendants argue that the work done by Freeh and FSS was solely a public relations effort. (*Id.*) Defendants cite to *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000), illustrating that court's finding that public relations advice is not protected by work product protections. (*Id.*)

The claims of work product protection asserted here can be separated into two categories. First, there is the specific claim of work product related to the Freeh Report, and second, there is a general claim of work product related to pending or anticipated litigation. Requests 1, 2, 9, 10, 11, and 13 fall squarely into the first category. (*See* DN 100-2, at PageID # 1101–02.)

Whether documents and communications related to the Freeh Report constitute work product turns on whether they were created in anticipation of litigation.   In *United States v. Roxworthy*, 457 F.3d 590 (6th Cir. 2006), the Sixth Circuit Court of Appeals adopted the "because of" test to determine the applicability of the work product doctrine.   *See also Guardsmark, Inc. v. Blue Cross & Blue Shield of Tenn.*, 206 F.R.D. 202, 209 (W.D. Tenn. 2002).   In other words, if a document were prepared "because of" the prospect of litigation, it is protected work product, but, if the document was prepared in the ordinary course of business, because of public requirements unrelated to litigation or for other non-litigation purposes, the work product doctrine does not apply.

In *Roxworthy*, an accounting firm had prepared memoranda analyzing tax consequences of certain transactions including arguments that the IRS might raise about the tax treatment and arguments that could be raised by the defendant in response to the IRS.   The Sixth Circuit reversed the district court's finding that the memoranda was not work product.   In addressing a dual purpose related to litigation and non-litigation purposes, the court held that "a document will not be protected if it would have been prepared in substantially the same manner irrespective of the anticipated litigation."   *Id.* at 593-94.   On the other hand, even if documents "were prepared in part [in anticipation of litigation], the documents do not lose their work product privilege 'merely because [they were] created in order to assist with a business decision,' unless the documents 'would have been created in essentially similar form irrespective of the litigation.'"   *Id.* at 598-99 (citations omitted).   Applying this to the memoranda, the court determined that it would not have been generated in the normal course of business of preparing tax returns and avoiding underpayment penalties if the defendant were audited and would have been prepared irrespective of any litigation.

Under *Roxworthy*, Schantter has the burden of showing that the anticipated litigation was the "driving force" behind the preparation of the documents. *Professionals Direct*, 578 F.3d at 439. Schnatter may meet his burden of showing "in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories[.]" *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 381 (6th Cir. 2009) (quoting *Roxworthy*, 457 F.3d at 597) (internal quotation marks omitted). A specific and detailed affidavit establishing that a document was prepared in anticipation of litigation is sufficient to meet this burden. *Id.* "However, application of the privilege will be rejected where the only basis for the claim is an affidavit containing conclusory statement[s]." *Roxworthy*, 457 F.3d at 597 (quoting *Guardsmark, Inc.*, 206 F.R.D. at 209, 210).

The Court finds that Schnatter has not met his burden of showing that the communications and documents related to the Freeh Report were created in anticipation of litigation. The Freeh Report was generated by FGIS, which is described as a "global risk management firm," not a provider of legal professional services.[4] Neither Freeh nor FSS have appeared as counsel of record in court on behalf of Schnatter, and Freeh states that they never intended to. (DN 100-1, at PageID # 1087.) The Freeh Report itself includes no legal analysis or conclusions. Finally, the report was published on a dedicated website with a press release drafted by FGIS and is repeatedly cited by Schnatter in media appearances. Notwithstanding Freeh's vague assertions about FSS advising counsel on Schnatter's legal strategy, Freeh does not say how an investigation and report on media coverage was thought to benefit counsel in pursing pending litigation. In fact, other than conclusory statements in Freeh's declaration, the record contains no specific facts that connect Freeh's investigation to any of FSS's or Hughes Hubbard's efforts in litigation. Based on the

---

[4] ALIXPARTNERS: INVESTIGATIONS & COMPLIANCE, https://www.alixpartners.com/services/investigations-disputes-risk/investigations-compliance/

evidence presented, the Court concludes that the driving force behind creating the Freeh Report and related documents and communications was to serve a public relations function and not to assist with litigation. *See Calvin Klein Trademark Trust*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) ("as a general matter public relation advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called work product . . . because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally.")

The Court now turns to the second category of alleged work product, documents and communications generally related to pending or anticipated litigation. Both Schnatter and FSS assert that all requested documents and communications other than Request 2 are covered by work product protection. (DN 98, at PageID # 891–92; DN 100, at PageID # 1075.) However, other than those related to the Freeh Report, neither Schnatter nor FSS have provided any specific information about the documents and communications over which Schnatter asserts work product protection. The Court is skeptical that work product protection covers *all* responsive documents. Regardless, Schnatter "bears the burden of showing that 'anticipated litigation was the driving force behind the preparation of each requested document.'" *Gruenbaum v. Werner Enterprises, Inc.*, 270 F.R.D. 298, 304 (S.D. Ohio 2010) (quoting *Professionals Direct*, 578 F.3d at 439). With respect to the documents that aren't otherwise related to the Freeh Report, that burden went unmet.

### i.  Waiver

Even assuming that some documents or communications related to the Freeh report were protected from discovery, that protection would be waived. Schnatter argues that there was no waiver of privilege, notwithstanding the fact that Schnatter published the Freeh Report. (DN 98, at PageID # 894–96.) Schnatter cites to cases from other districts in support of his claim that

publication of a report or filing an affidavit does not waive attorney-client privilege over prior drafts. (*Id.*, at PageID # 895–96.) Schnatter further argues that no privilege was waived in identifying Freeh in his initial disclosures. (*Id.*, at PageID # 896–98.) Schnatter states that at the time of the disclosure, he believed that Freeh may have had discoverable information but did not cite any information covered by the subpoena and expressly noticed that his disclosures did not constitute a waiver of privilege. (*Id.*, at PageID # 897.) Schnatter says that he removed Freeh from his initial disclosures upon realizing that Freeh did not have any non-privileged, relevant information. (*Id.*) For their part, FSS's brief does not address the question of waiver. (*See generally* DN 100.)

Defendants argue that even if attorney-client privilege or work product protection applies to any of the requested documents, those privileges were "waived when Schnatter and Freeh intentionally published the Freeh Report, further publicized the Freeh Report through the Press Release, and continued discussing Freeh's investigation and interviews publicly, including in videos posted online." (DN 99, at PageID # 980.) Defendants note the standard for waiver of privilege under the Federal Rules of Evidence, which requires: (1) an intentional waiver; (2) the disclosed information is the same subject matter as the undisclosed information sought; and (3) the disclosed and undisclosed information in fairness should be considered together. (*Id.*, at PageID # 982.) *See* Fed. R. Evid. 502(a). Defendants assert that the first requirement is satisfied because Schnatter voluntarily created a website dedicated to the Freeh Report, published the report, issued a press release announcing the report, and posted a video in which Freeh discusses his investigation and findings in the report. (*Id.*) Defendants assert that the second requirement is satisfied because the subpoena "sought only communications that concerned the Freeh Report or were with those individuals FSS interviewed to produce it, along with other material relevant to

Freeh's conclusions about this case." (*Id.*)  Finally, Defendants assert that the third requirement is met because disclosure of the Freeh report to the public and potential jurors "demands that Defendants be able to see the bases for Freeh's very public statements on Schnatter's behalf." (*Id.*)

Establishing that a privilege exists does not end the inquiry as to whether the information it protects is discoverable.  Regarding attorney-client privilege or work product protection, "[l]ike other qualified privileges, it may be waived." *Nobles*, 422 U.S. at 239.  Indeed "disclosure of once-protected material to a third-party waives work product protection as to the disclosed material." *In re Columbia*, 293 F.3d at 307.  As the Sixth Circuit has explained:

> Even more than attorney-client privilege, waiver of the protections afforded by the work product doctrine is a tactical litigation decision. Attorney and client both know the material in question was prepared in anticipation of litigation; the subsequent decision on whether or not to "show your hand" is quintessential litigation strategy. Like attorney-client privilege, there is no reason to transform the work product doctrine into another "brush on the attorney's palette," used as a sword rather than a shield.

*Id.* at 306–07.

The Freeh Report contains a heading on each page disclaiming: "*Attorney Client Privilege Attorney Work Product Privileged and Confidential*." (DN 98-3.)  Yet that report's cover page states, "For Release: December 7, 2020" and was published online at Schnatter's behest at a web address, "https://papajohnschnatter.report/", dedicated to making the report publicly available.  As a result, Schnatter has no serious basis to claim work product protection over the Freeh Report. *See* THOMAS E SPAHN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK PRODUCT DOCTRINE § 48.402 ("Disclosure to the public through testimonial use of work product always causes a waiver.").  Whether such a waiver would extend to Freeh's earlier drafts, witness communications and interview notes, and all other documents or communications reviewed or relied upon in

drafting the report is not as simple a question.  Sixth Circuit precedent guides the Court's determination.

In *In re Grand Jury Proc. Oct. 12, 1995*, the president and the owner of a laboratory had obtained legal advice about a marketing plan targeted toward nursing homes.  78 F.3d 251, 252 (6th Cir. 1996).  Government investigators looking into allegations that the laboratory was improperly soliciting business from nursing homes and seeking reimbursement from Medicare met with the president and owner who informed the investigators that they had discussed the marketing plan with an attorney specializing in Medicare law.  *Id.* at 253.  They claimed that the attorney advised them that its arrangements with nursing homes were legal.  *Id.*  When the attorney was called to testify before a grand jury, the president and owner objected on privilege grounds.  *Id.*  The district court compelled the attorney to testify, finding that in discussing the details of the attorney's advice to the investigators, attorney-client privilege was waived.  *Id.*  On appeal, the Sixth Circuit affirmed the finding of subject matter waiver because "[t]he information the owner and president gave to the investigators revealed their attorney's legal conclusions and the facts on which those conclusions were based."  *Id.* at 254.

In *Powerhouse Licensing*, a creditor sued several individuals and corporate entities alleging that the defendants participated in fraudulent asset transfers in order to avoid paying a $1 million judgment.  441 F.3d at 469.  The plaintiff subpoenaed a law firm that assisted the defendants with the disputed transactions resulting in the firm producing all non-privileged responsive documents.  *Id.* at 470.  The Plaintiff moved for summary judgment, and in their response, defendants asserted that the asset transfers were not fraudulent because they relied on the advice of counsel.  *Id.*  They also attached as an exhibit an affidavit by the partner at the firm in which he stated that the defendants obtained an independent expert valuation of the assets at issue and that he was not

aware of any efforts by the defendants to conceal their transactions from creditors. *Id.* The plaintiff then sought to compel further disclosures from the law firm, including documents related to the asset transfers. *Id.* The district court found that the "affidavit and related disclosures constitute a waiver of the attorney-client privilege." *Id.* at 471. On appeal, the Sixth Circuit affirmed that attorney-client privilege was waived by publicly filing the firm partner's affidavit because "certain statements contained in the affidavit represented opinions, based upon confidential communications between attorney and client, that go to the heart of the legal claims at issue." *Id.* at 473. The court further found that when defendants "elected to interject [the firm partner] into these proceedings . . . the work product privilege was waived as well." *Id.* at 474.

In *New Phoenix Sunrise Corp. v. Comm'r of Internal Revenue*, the defendant corporation appealed the decision of the tax court upholding a tax deficiency and imposition of penalties against the defendant based on its inflated claim of losses on its 2001 tax return from transactions structured to evade taxes. 408 F. App'x 908, 910 (6th Cir. 2010). Prior to filing its return, the defendant retained a law firm to draft an opinion supporting the legitimacy of the transactions to provide to the IRS with its 2001 return. *Id.* at 913. The tax court upheld the IRS's assessment of deficiency and imposition of penalties, relying in part on documents related to the law firm's opinion. *Id.* at 914. Although the defendant had objected to disclosing and entering into evidence those documents based on attorney-client and work product privileges, the tax court found that the defendant waived the privileges "by asserting its reliance on that opinion as a defense to the imposition of the penalty." *Id.* On appeal, the Sixth Circuit affirmed the tax court's finding that the defendant's claim that it reported its losses from the disputed transactions in reliance on the law firm's opinion "waives its claims of work-product protection and attorney-client privilege with respect to any material concerning the subject matter of the tax opinion." *Id.* at 919. Over the

defendant's argument that its use of the law firm's opinion did not constitute a subject-matter waiver of all the documents it was compelled to produce, the court found that "the majority of the challenged documents were related to the [law firm's] opinion . . . As such, any privilege attached to them was waived by the reliance on that opinion to avoid the assessment of penalties." *Id.*

Here, like in each of the cases above, following a voluntary disclosure of allegedly protected information, further discovery related to that disclosure is sought. Consistent with those cases, here, Schnatter cannot assert privilege to resist the further discovery that "pertain[s] to the subject matter of the specific points on which a waiver did occur." *Grand Jury Proc.*, 78 F.3d at 256. In publishing the Freeh Report, Schnatter revealed: (1) the purpose and scope of Freeh's investigation' (2) the investigation's methodology; (3) an overall summary of numerous witness interviews; (4) detailed descriptions of interviews of three named witnesses; (4) Freeh's expert conclusions; and (5) the facts upon which he based those conclusions. (DN 98-3.) On the website that hosts the report, Schnatter also published testimonial videos of Freeh explaining the investigation and the report' findings and of the three named witnesses describing their relationship and impression of Schnatter. Defendants' subpoena seeks to discover information of the same character and regarding the same subject matter as that which Schnatter intentionally disclosed.

Schnatter argues that disclosing the Freeh Report did not constitute a subject matter waiver for all related documents and communications because the disclosure was not in the context of litigation. (DN 98, at PageID # 898.) However, disclosure in the litigation context is not a requirement for waiver. *See, e.g*, *Grand Jury Proc.*, 78 F.3d at 252. Still, the Court recognizes distinction, specifically that unlike the disclosing parties in *Grand Jury Proc.*, *Powerhouse Licensing*, and *New Phoenix*, Schnatter has not directly cited the Freeh Report to support the merits of his claims. The Court does not question Schnatter's pledge not to enter the Freeh Report into

evidence or call Freeh to testify. Still, fairness principles dictate that the disclosed and undisclosed information be considered together in this case. *Grand Jury Proc.*, 78 F.3d at 256 (citing *In re Dayco Corp. Derivative Securities Litigation*, 99 F.R.D. 616, 619 (S.D. Ohio 1983); *In re Von Bulow*, 828 F.2d 94, 102 (2nd Cir. 1987)). Schnatter engaged in a campaign to expose members of the public to the Freeh Report, including potential jurors for in this case. In doing so, Schnatter has also repeatedly used the Freeh Report to galvanize the legitimacy of his claims against Defendants.[5] *See* Fed. R. Evid. 502 advisory committee's note ("[F]airness requires a further disclosure of related, protected information, *in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary*.") (emphasis added). For example, the press release announcing the report, which is available on the website dedicated to the report states that "[t]he Laundry Service meeting had been secretly recorded by a disgruntled service provider to Papa John's and was used to create a false narrative about Mr. Schnatter's character."[6] In other words, Schnatter has enjoyed a "benefit from using evidence from which the [Defendants]

---

[5] *See, e.g.*, John Schnatter, *Statement by Papa John Schnatter on Investigation Conducted by Former FBI Director Louis Freeh*, CISION PR NEWSWIRE (Dec. 8, 2020), https://www.prnewswire.com/news-releases/statement-by-papa-john-schnatter-on-investigation-conducted-by-former-fbi-director-louis-freeh-301188830.html ("While Judge Freeh's report is important for detailing the facts of what really happened, there's a lot more of the story to come. For instance, we now know unequivocally through my lawsuit that the effort to destroy my character was a malicious set-up perpetrated by executives at the Papa John's ad firm, Laundry Service, actively supported by certain board members of Papa John's International. There's much more to be revealed in the near future about their motives and ill intent."); John Schnatter, *Federal Court Unseals Complaint Detailing Secret Plot To Damage Papa John's Founder And Company Brand*, CISION PR NEWSWIRE (Mar 3, 2021), https://www.prnewswire.com/news-releases/federal-court-unseals-complaint-detailing-secret-plot-to-damage-papa-johns-founder-and-company-brand-301239896.html ("The chilling details from this taped conversation make clear the intent of *Laundry Service* to destroy my reputation, as well as the Papa John's brand, harming our employees and franchisees in the process. A recent investigative report by former FBI Director Louis Freeh showed there was nothing racist in my words or actions on the conference call with our ad firm and also proves there has never been in my history. *With this and the evidence coming forth in our litigation, it's time for Laundry Service to be held accountable*, and for Papa John's to correct the record and apologize to me for validating the media frenzy that led to my forced departure as the company Chairman.") (emphasis added); Talia Kaplan, *Papa John's founder says he was 'set up' by company board amid racial bias claims*, FOX BUSINESS (Dec. 10, 2020), https://www.foxbusiness.com/business-leaders/papa-johns-founder-on-racism-allegations-ex-fbi-director-report-completely-exonerates-me (Reporting that Schnatter alleged in an interview that he was "set up" by Papa John's board of directors and Laundry Services executives, but the Freeh Report "completely exonerates" him).
[6] FGIS, *Former FBI Director Freeh Releases Investigative Report on Papa John's Founder*, PAPAJOHNSCHNATTER.REPORT: PRESS RELEASE (Dec. 8, 2020), https://papajohnschnatter.report/press-release.

had been excluded." *U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 440 (6th Cir. 2005). "The benefit was for control of the airwaves and print media, which [Schnatter] hoped to profit." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 142 (N.D.N.Y. 2007). Schnatter's counsel must have been aware that publishing the Freeh Report and the testimonial videos and in various media outlets ran the risk of waiving some privilege. "Presumably, a conscious decision was made that the rewards outweighed the risks. In the end, perhaps they will." *Powerhouse Licensing*, 441 F.3d at 474 (citation omitted). For the reasons discussed above, the Court finds that Schnatter has any privilege or protection claims over documents and communications related to the Freeh Report.

### d. Conclusion

Defendants' motion will be granted in part and denied in part. As was discussed *supra*, the Court has made a finding that Schnatter failed to establish that any documents covered by the subpoena are protected by attorney-client privilege or work product protection and that he waived any claim for protection for documents and communications related to the Freeh Report. As to whether any other documents covered by the subpoena are discoverable, the Court lacks sufficient information to decide. There are several alternatives to resolve the issues. For example, given that the burden was on Schnatter and FSS to show with specificity that the withheld documents were entitled to protection, the Court could also order FSS to produce all documents covered by Defendants' request. However, given that Defendants chose to craft some of its requests overbroadly,[7] that would likely lead to disclosure of documents to which Defendants are not entitled to discover and prejudice Schnatter and FSS. The Court could order that the documents be submitted for *in camera* review, but that would further delay discovery and prolong an issue

---

[7] *See, e.g.*, DN 100-2, at PageID # 1101 (Request 3 for "[a]ll Documents related to and Communications with Plaintiff").

that arose over seven months ago.  The Court finds that a more favorable remedy is to permit FSS to complete a privilege log that considers the guidance set forth in this order before complying with the subpoena.  To the extent that further disputes arise, the Court encourages the Parties to work with one another in an effort to resolve them and will provide further assistance to the extent that they are unable to do so.

## IV.    ORDER

Accordingly,

IT IS HEREBY ORDERED as follows:

1. DN 99 is **GRANTED in part and DENIED in part**.

2. On or before **November 22, 2021**, FSS shall disclose a privilege log accounting for all documents withheld as privileged or subject to work product protection.

3. On or before **November 29, 2021**, FSS shall produce all discoverable responsive documents and communications requested by the subpoena consistent with this order.

Colin H Lindsay, Magistrate Judge
United States District Court

October 28, 2021

cc:  Counsel of record

27