# EXHIBIT 8

**FILED REDACTED PER DN 184**

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION


JOHN H. SCHNATTER,            )
                             )
          Plaintiff,         )        Case No.:
                             )    3:20-CV-00003-BJB-CHL
v.                           )
                             )    JUDGE BENJAMIN BEATON
247 GROUP, LLC,              )
d/b/a LAUNDRY SERVICE        )      MAGISTRATE JUDGE
and WASSERMAN MEDIA          )      COLIN H. LINDSAY
GROUP, LLC,                  )
                             )
          Defendants.        )


CONFIDENTIAL


     The video deposition of CASEY WASSERMAN,

taken pursuant to notice by the Plaintiff on May 17,

2021, via Zoom videoconference with participants in

various locations due to the coronavirus state of

emergency.



LAURA J. KOGUT, RMR, CRR, CRC
McLendon-Kogut Reporting Service, LLC
Anchorage Office Plaza
2525 Nelson Miller Parkway, Suite 204
Louisville, Kentucky  40223
(502) 585-5634
lkogut@mclendon-kogut.com
www.mclendon-kogut.com

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 9

1    A.    Yes.

2    Q.    And you notice there in the third paragraph

3    of Mr. Stein's email to you, it says, (Reading) A

4    critical/transformative opportunity for Laundry

5    Service.

6          In October of 2017, from your perspective,

7    was that a fair description of what the Papa John's

8    account represented for Laundry Service?

9    A.    I'm probably not close enough to answer that,

10   whether it was transformative.  It was certainly a

11   significant account --

12   Q.    And --

13   A.    -- a key account.

14   Q.    Okay.  I'm sorry.  I didn't mean to cut you

15   off.

16         And you see there at the end Mr. Stein ended

17   his email with "Fingers crossed"?

18   A.    Correct.

19   Q.    And your response was, "Anything I can cross

20   is crossed," right?  This was an account that you

21   really wanted for Laundry Service to get, correct?

22   A.    Well, if one of my employees wants their

23   fingers crossed, it's a simple response that

24   anything I can cross is crossed.  I have replied to

25   that kind of note for something that was $███████ or,

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 10

1    **in this case -- as it's described here, it's very**

2    **substantial.**

3    Q.    And then -- but he was keeping you advised of

4    this contract.

5         MR. MURRELL:  In fact, if we could put up

6    slide three, which we'll mark as Exhibit 3 to your

7    deposition.

8         (Wasserman Deposition Exhibit 3 was marked

9    for identification and is filed with this

10   transcript.)

11   Q.    And do you see, if we look again at the top

12   two emails -- oh.

13        MR. MURRELL:  There.  Perfect.

14   Q.    And can you read that as well, Mr. Wasserman,

15   where he sends -- where Jason Stein first sends an

16   email to the group within Laundry Service, (Reading)

17   Congrats, we are now creative AOR for Papa John's.

18   Just got off the call.

19        And then he forwards it to you that same day,

20   7:21 a.m., saying "Congrats," and you responded

21   saying "Congrats to you" as well, correct?

22   **A.    Correct.**

23   Q.    Is that correct?

24   **A.    Correct.**

25   Q.    Now, shortly after that announcement there

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 35

1    A.     It's just my -- at the time my assistants, so

2    that --

3    Q.     All right.  So -- go ahead.  I'm sorry.

4    A.     Assistants.

5    Q.     Assistants.  So how many people would that be?

6    A.     I believe I had two at the time.

7    Q.     And then we come down then to the blind copy.

8    And so this was sent also to everybody else who's

9    listed as a BCC; is that accurate?

10   A.     That's what this says, correct.

11          MR. MURRELL:  Then let's look at the actual

12   letter again, the third page of this exhibit,

13   Amanda.

14   Q.     And first of all, the letter is -- begins in

15   all caps with "Confidential."

16          MR. MURRELL:  Actually, the actual letter.

17   The next page.  I'm sorry.  There we go.  And just

18   the first couple paragraphs.  Perfect.  Thank you.

19   Q.     Now, why was this marked confidential in all

20   caps, sir?

21   A.     Because we keep our -- our matters of the

22   work we do for our clients, we take that

23   confidentiality seriously, and this was obviously a

24   conversation that happened to a large group of

25   people, so our ability to address it and reinforce

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 36

1    **the fact that it needed to remain confidential**

2    **amongst ourselves, if you will, and other people who**

3    **were exposed to the call it was important to**

4    **reinforce to our employees.**

5    Q.    Now, I want to understand that, because

6    without counting it up, it seems to me there were

7    six or eight people from Laundry Service on the call

8    May 22nd.  You are obviously sending this -- I've

9    not added it up, I won't do it during the

10   deposition, but to a lot more people than that.  Why

11   did you send this letter, if it was supposed to be

12   confidential, to so many people who were not

13   involved in the call on May 22nd?

14   **A.    Well, I'm not looking at the list of who it**

15   **was sent to.  Mike -- Mike Watts was on the list,**

16   **and he was president of the company.  It's obviously**

17   **an important matter, so the president of the company**

18   **needs to be involved.  And I saw a couple lawyers on**

19   **there from our legal team, so --**

20   Q.    All right.

21         MR. MURRELL:  Well, let's go back to the

22   first page, if we can, Amanda.  And if we could blow

23   up the first half of the BCC.  There you go.

24   Q.    All right.  So Mike Pickles, we already

25   talked about, is general counsel.  Who is Wendy

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 40

1   Ritchie sends an email on June 1st to Jason Stein,

2   says, (Reading) Jason:  This is a follow up to our

3   call a couple of days ago.  During the call, you and

4   Casey told me Laundry Service could no longer

5   service the Papa John's account.  You offered to --

6   you offered a to agree -- to-be-agreed-upon

7   transition period but indicated you were walking

8   away from the business.  If I somehow misunderstood

9   what I thought was a very clearly communicated

10  message, then please let me know.  John, the team

11  and I will be happy to come to your office to meet

12  next week to do further --

13       MR. MURRELL:  If we could go to the next

14  page.

15  Q.   Further planning.  Please let me know by the

16  end of the day if you would like to discuss.  Best,

17  Steve.

18       Did I -- did I read that correctly?

19  **A.   I believe so.**

20       MR. MURRELL:  And Mr. Ritchie's description,

21  if you could go back to that, the bottom of the

22  first page, Amanda.  There you go.

23  Q.   His description of the conversation, was that

24  accurate, of what happened on May 30th in your call?

25  **A.   That is what I recall.  I don't believe we**

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 41

1    used the exact words "walking away from the

2    business."  The way I described it to you earlier is

3    how I remember communicating to him.

4    Q.    All right.  And that May 30th meeting, did you

5    make a demand for money to -- for the -- to

6    transition the account and terminate the relationship

7    during that call?

8    A.    We discussed the financial implications of us

9    walking away, and there was money owed to Laundry

10   Service from the company.  There was a transition

11   period that had to be accounted for.  And I was very

12   concerned about terminating a large team of people

13   based on the reprehensible comments of our client

14   that made it untenable for us to continue the work

15   and didn't think our employees should be harmed and

16   wanted to make that transition as -- given how

17   difficult it was for them, as easy -- as easy as

18   possible for them to transition from losing their

19   jobs, so that we could pay them severance.

20   Q.    And just -- and there were -- by the way,

21   just so that we're clear, there were other accounts

22   lost by Laundry Service during this same time period

23   in April and May of 2018, true?

24   A.    I don't recall.  I don't have a recollection

25   of wins and losses of accounts on any -- on any part

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 44

1        MR. DEIXLER:  Object to the form of the

2    question.  He specifically said he was briefed by

3    his general counsel, so please don't mischaracterize

4    the witness' testimony.

5        MR. MURRELL:  I don't care who briefed him, I

6    care about the substance of it.

7    Q.    Is what you're describing, Mr. Wasserman, a

8    calculation of the amounts owed to Laundry Service

9    because of the termination?

10   **A.    Well, what was -- as I recall, what I was**

11   **briefed on was the amounts we were owed, the**

12   **expenses that would -- the run -- and the -- the**

13   **sort of -- the run rate, if you will, the transition**

14   **period to transition the business out, because I**

15   **don't believe it was a termination.**

16       **And as well, I was solely looking to protect**

17   **my employees from losing their jobs based on nothing**

18   **they had done.**

19   Q.    Did that number come to $██████?

20   **A.    I recall that number.  I don't recall if we**

21   **discussed it in a phone call.  I certainly remember**

22   **it being a number that I have heard.**

23   Q.    Okay.  During that call did you address what

24   could happen to Mr. Schnatter if the story of what

25   he said on May 22nd became public in any way, shape,

Schnatter v. 247 Group, LLC 05/17/2021                Casey Wasserman

Page 49

1  **A.    I do.**

2       MR. MURRELL:  And then the next page.

3  Q.    If we go to the next page, it's got a

4  description of this.  (Reading) Comprised of --

5  yeah.  Comprised of equitable compensation for opex,

6  rent expense, production staffing costs, employee

7  transition/migration costs, liquidated

8  costs/expenses/damages and the like.

9       Do you see that?

10 **A.    I do.**

11 Q.    Do you know how in the world that amount of

12 ████████████   was arrived?

13      MR. DEIXLER:  Object to the form of the

14 question.  One, as clearly stated, it violates

15 Federal Rule of Evidence of 408.  Secondly, to the

16 extent this is information communicated by

17 Mr. Pickles, general counsel to Mr. Wasserman, you

18 should set that aside.  That's attorney-client

19 privilege.

20      But if you had some other source or

21 understanding of the basis upon which Mr. Pickles

22 calculated this, you could certainly testify to

23 that, subject to my prior objections.

24 Q.    Well, let me ask it this way, Mr. Wasserman:

25 That $████████   which, when you add it to the other

REDACTED

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 50

1   numbers, miraculously comes to ███████ --

2          MR. DEIXLER:  Object to the form of the

3   question.  It's argumentative.

4   Q.     -- do you know --

5          MR. MURRELL:  Let me finish the question.

6   Q.     Do you know if Mr. Pickles or somebody else

7   working for you came up to that exact number

8   somehow?

9          MR. DEIXLER:  Object to the form of the

10  question.  The witness is, not a word often required

11  in an objection, of doing basic, basic arithmetic,

12  so the question is argumentative, it's vague in its

13  form, and it's improper.

14  Q.     That means you can still answer it,

15  Mr. Wasserman.  Do you know how that ████████ was

16  calculated other than if it was provided to you by

17  your counsel?

18  **A.     I don't.**

19  Q.     If you wanted to know, other than your

20  counsel, if somebody internally at Wasserman Media

21  Group or someone internally at 247 or Laundry

22  Service put pen to paper to come up with the amount

23  of ██████, if you wanted to know who did it and

24  how they did it, who would you ask?

25  **A.     Given the severity of the situation, I almost**

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 51

1   **certainly only would have dealt through our general**
2   **counsel.**

3   Q.    All right.  And other than Mr. Pickles, you
4   don't know who would have worked at calculating that
5   number, correct?

6   **A.    Specifically?  At that time?**

7   Q.    Yes.

8   **A.    (No audible response.)**

9         THE REPORTER:  Was there a response?

10        MR. MURRELL:  I didn't hear one.

11   Q.    Mr. Wasserman, did you respond?

12   **A.    Sorry.  I said specifically, like who**
13   **specifically at that time would have worked on it, I**
14   **can't tell you.**

15   Q.    All right.

16   **A.    Sorry.**

17   Q.    No problem.  This is the -- the up -- the
18   challenges of Zoom depositions.

19   **A.    I think when you're flipping pages and I'm**
20   **answering at the same time, we get lost.**

21        MR. MURRELL:  All right.  Let's take a short
22   break and I'll -- and I can tell you, Mr. Deixler,
23   we will not be using the full two hours, I don't
24   suspect.  Okay?

25        MR. DEIXLER:  Good news.  Thank you.

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 58

1          MR. MURRELL:  All right.  I'm going to ask

2     you if we can now turn to Deposition Exhibit 15

3     [sic], which should be slide 17 for you, Amanda.

4          (Wasserman Deposition Exhibit 14 was marked

5     for identification and is filed with this

6     transcript.)

7     Q.    Mr. Wasserman, are you looking at an email

8     that at the top on the first page --

9          MR. MURRELL:  If you can blow it up.

10    Q.    -- is from you to Adam Silver dated July 15th

11    of 2018?

12    **A.    Yes.**

13    Q.    And for the record, who is Mr. Silver?

14    **A.    He's the commissioner of the National**

15    **Basketball Association.**

16    Q.    Right.  And we look here.  So this is

17    July 15th.  This would have been about four days

18    after the Forbes article runs, and Mr. Silver is

19    forwarding you an email -- I mean an article from

20    Deadspin about the incident, correct?

21    **A.    It appears that way, but the article is cut**

22    **off.**

23    Q.    Right.  Well, actually it continues to run

24    over on the next pages, but I'm not as focused on

25    the article.  If we can go above it to the text

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

```
                                                   Page 59
 1    between you and Mr. Silver.  He forwards it to you
 2    and you respond July 15th, 2018, at 9:40 a.m., "I
 3    broke the news to Laura that we are going together
 4    next year."  Smiley face emoji.  Then you say, "This
 5    guy is insane, imagine if he knew I had a recording
 6    of the call."
 7          The person you're referring to is insane is
 8    Mr. Schnatter; is that correct?
 9    A.     Correct.
10    Q.     And you say, "if he knew I had a recording of
11    the call."
12          What recording of the call were you
13    referencing?
14    A.     I was informed by my general counsel that
15    there had been a recording of that call between
16    Mr. Schnatter and the Papa John's executives and the
17    Laundry Service team.
18    Q.     Have you ever listened to a copy of the
19    recording?
20    A.     No.
21    Q.     Was that a no?
22    A.     No.
23    Q.     Have you ever read a transcript of that
24    recording?
25    A.     No.
```

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 64

1  client's representatives tell you should be kept

2  confidential, correct?

3          MR. DEIXLER:  Object to the form of the

4  question.  It's vague and overstates the witness'

5  testimony.

6  **A.      No, I believe what I said is we take client**

7  **confidentiality seriously.**

8  Q.    Right.  The -- what John Schnatter said in

9  the May 22nd call that was a media planning session,

10  should those comments have been disclosed by anyone

11  at Laundry Service?

12          MR. DEIXLER:  Object to the form of the

13  question.  Calls for speculation.  No foundation.

14  **A.      I don't understand the question.**

15  Q.    Well, Mr. Schnatter made comments during a

16  training session, right?  Someone told Forbes about

17  those comments, right?  At least from the Laundry

18  Service side and the Wasserman Media Group side, can

19  we agree that none of your employees should have

20  disclosed the comments about those conversations to

21  Forbes?

22          MR. DEIXLER:  Calls for speculation, but you

23  can speculate.

24  **A.      We can agree that my employees would know**

25  **that they wouldn't share any client confidential**

Schnatter v. 247 Group, LLC 05/17/2021          Casey Wasserman

Page 65

1    **information with anybody.**

2    Q.    All right.

3    **A.    Irrespective of the client.**

4    Q.    And if a jury determines that Laundry Service

5    was the source to Forbes, you agree that Laundry

6    Service should be held accountable for that?

7          MR. DEIXLER:  Calls for speculation.  No

8    foundation.  Calls for a legal conclusion on top of

9    it.  Completely improper.

10         You can, I guess, guess or speculate or

11   imagine.

12   **A.    I can't -- I can't imagine to speculate what**

13   **a theoretical jury would or wouldn't do, so sorry.**

14   Q.    All right.  But if you found out tomorrow

15   that Laundry Service was the source to Forbes, would

16   you agree that Laundry Service should be held

17   responsible for the results of that?

18         MR. DEIXLER:  Object to the form of the

19   question.  Calls for speculation.  There is no

20   foundation.  Pure hypothetical, and an incomplete

21   hypothetical at that.  It's an improper question.

22         If you have an opinion, you can offer your

23   opinion; if not, then you can --

24   **A.    I don't have an opinion to offer.**

25   Q.    One way or the other?