# EXHIBIT 9

## FILED UNREDACTED PER DN 184

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JOHN H. SCHNATTER,            )
                             )
          Plaintiff,         )          Case No.:
                             )     3:20-CV-00003-BJB-CHL
v.                           )
                             )     JUDGE BENJAMIN BEATON
247 GROUP, LLC,              )
d/b/a LAUNDRY SERVICE        )      MAGISTRATE JUDGE
and WASSERMAN MEDIA          )      COLIN H. LINDSAY
GROUP, LLC,                  )
                             )
          Defendants.        )

CONFIDENTIAL

The video deposition of JASON WAYNE STEIN, taken pursuant to notice by the Plaintiff on May 6, 2021, via Zoom videoconference with participants in various locations due to the coronavirus state of emergency.

LAURA J. KOGUT, RMR, CRR, CRC
Anchorage Office Plaza
McLendon-Kogut Reporting Service, LLC
2525 Nelson Miller Parkway, Suite 204
Louisville, Kentucky  40223
(502) 585-5634
lkogut@mclendon-kogut.com
www.mclendon-kogut.com

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 35

Mr. Leon, who is he?

**A.     He ran strategy and media buying.**

Q.     Okay.  And Ms. Stephens?

**A.     I believe she worked in strategy.**

Q.     All right.  And so this is you telling those people, (Reading) Congrats, we are now creative AOR for Papa John's.  Just got off the call.  He wants to announce at 11:30 a.m. today to beat Halloween and earnings call.

What was the earnings call there, do you recall?

**A.     I believe that's in reference to the Papa John's upcoming earnings call.**

MR. MURRELL:  All right.  And if we can flip back out.

Q.     And then you forward this on to Mr. Wasserman. You said "Congrats" and he said "Congrats to you," correct?

**A.     Yes, that's what it appears to be.**

Q.     Can we agree that landing the Papa John's account was a significant contract for Laundry Service?

**A.     Can you define "significant"?**

Q.     That it was -- that it was -- I think the words in your prior email were transformative, that

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 36

it put you -- put Laundry Service on the record as being an AOR for a large national account.

**A.      Okay.   So what's the question exactly?**

Q.      I mean, was that not a significant moment for Laundry Service to land this contract?

**A.      I think it was.**

Q.      All right.

**A.      Well, winning any contract was significant, but this was a significant one for sure.**

MR. MURRELL:  All right.  Then if we can go to Exhibit 4, Lori.

(Stein Deposition Exhibit 4 was marked for identification and is filed with this transcript.)

Q.      And then are you looking, sir, at a document that's been marked as Deposition Exhibit 4 that begins in the bottom right-hand corner with a Bates stamp WMG19880 and goes through 19881?

**A.      Yes.**

Q.      And if we -- this was Brandon Rhoten's -- you were sending Mr. Rhoten a letter of intent for the arrangement between Laundry Service and Papa John's; is that correct?

**A.      It appears that way based on the subject line, although I don't recall this specific email or what was attached to it.**

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 62

for the founder and chairman of the board of directors, founder of Papa John's International, John Schnatter?

A.    "Whereas, John Schnatter resides" -- it's a -- can -- it's a little cut off, if you don't mind.

Q.    Okay.  Oh, yeah.

MR. MURRELL:  Can you move it to the side a little bit?

Q.    Is that better?

A.    Yeah.  So what do you -- what is the question?

Q.    Did you recognize -- do you recognize that this is an agreement that's designed to protect Mr. Schnatter personally --

A.    I haven't --

Q.    -- as the founder and chairman --

A.    I haven't -- yeah, I haven't --

MR. SPIRO:  Objection.  Calls for a legal conclusion.

Q.    You can still answer it if you can.

A.    I can't.  I don't recall ever seeing this and I have not read it, so, I mean, I don't -- I can't comment.

Q.    So Mr. Mikho or Ms. White did not share with everyone that Laundry Service had signed this

Schnatter v. 247 Group, LLC 05/06/2021         Jason Stein, Vol I

Page 63

agreement with Mr. Schnatter?

A.    I can't comment if they've shared it with everyone.  I can say I don't recall ever seeing this.

Q.    All right.  So you see there "Covenants of Team Member."  You were not aware there was an agreement between --

MR. MURRELL:  Bottom paragraph, Lori, number one.

Q.    That there was an agreement between Mr. Schnatter and Laundry Service that provided that any information that he provided to them, any communications would be kept confidential and not disclosed?  You were not aware of that?

A.    I do not recall ever seeing this document.

Q.    Did Mr. Mikho have authority to sign agreements on behalf of Laundry Service as the chief marketing officer?

A.    I don't know.

Q.    You don't know that?  I mean, you were the CEO of Laundry Service, correct, at the time?

A.    I was the CEO of Laundry Service in March of 2018.

Q.    Okay.  And in April of 2018?  This is actually dated in April.

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 64

A.      Okay.  Got it.

Q.      All right.  But you were -- you were still CEO of Laundry Service in April of 2018, correct?

A.      Yes.

Q.      When you're dealing with a customer -- set aside whether you knew of the agreement or not. When you're dealing with a customer, a client, and they share information with you, and they share their perspective with you, is it your belief that, in your profession, you have the duty to keep that information confidential --

        MR. SPIRO:  Objection to --

Q.      -- unless authorized by them to disclose or use the information?

        MR. SPIRO:  Objection to form.  It's like triply compound.  If you can answer that.

        MR. DEIXLER:  I join.

A.      I'm not sure what the question is.

Q.      My question:  So you -- let's go back to John Schnatter, right?  If you're dealing with Papa John's and in the course of that you're talking to John Schnatter and he tells you his perspective or view on something, do you agree that in your profession, in what you do for a living, that you have a duty to keep that confidential unless you

Schnatter v. 247 Group, LLC 05/06/2021        Jason Stein, Vol I

Page 71

So this is Wednesday, May 9th.  The way I do math, that makes Monday May 14th.  Do you -- does that refresh your recollection that the first meeting with Mr. Schnatter in Brooklyn was on Monday, May 14th?

A.    I don't remember the exact date of the meeting.  I hope we do math the same way, but --

Q.    Yeah.  I hope we do too.

So prior to that meeting, and let's say that the meeting was on May 14th, were you aware that Zimmerman was becoming a competitor of Laundry Service for some or all of the work that Laundry Service was doing for Papa John's?

A.    The way it was presented to me, to the best of my recollection, was not that they were implicitly becoming a competitor to Laundry Service.

Q.    What did you understand Zimmerman's role was -- could be, then, if not as a competitor?

A.    My understanding was that Mr. Schnatter had a close relationship with the CEO, I believe, or whoever was in charge of Zimmerman, a very close personal relationship, and that Mr. Schnatter was considering using that agency for some marketing for him personally.

MR. MURRELL:  All right.  And then if we can

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 85

Papa John's, true?

A.      Yes.

Q.      And here in April of 2018, almost to May, Jordan Fox is reporting to Casey Wasserman with a copy to you that there's a key board meeting this coming week to determine the fate of the new CMO versus John Schnatter, right?

A.      Yes, it appears that way.

Q.      That was of concern to Laundry Service and to Mr. Wasserman in terms of what would happen with Mr. Rhoten, true?

        MR. DEIXLER:  Calls for speculation.  No foundation.

        MR. SPIRO:  Join that objection.

Q.      You can still answer if you can, sir.

A.      I can't speak to how Mr. Wasserman felt.

Q.      Well, you knew that Mr. Rhoten, soon after this email, left his job as chief marketing officer at Papa John's, true?

A.      I don't know the exact dates, but I'm aware that he left.

Q.      And was that -- wasn't that of concern to you that the chief marketing officer, who is the primary relationship at Papa John's for Laundry Service, was terminated?

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 86

A.      Yeah, anytime a CMO leaves a brand, it presents a risk to an agency.

Q.      Right.  So you knew when Mr. Rhoten left that that created a risk to Laundry Service and that the relationship between Laundry Service and Papa John's was at risk, true?

A.      I did not know that the Laundry Service and Papa John's relationship was at risk.  I knew that a CMO leaving any client would always present a risk.  Sometimes it was no risk and sometimes it was a meaningful risk.

Q.      And have --

        MR. MURRELL:  And, in fact, if we can turn to -- if we can put up Deposition Exhibit 18, Lori.

        (Stein Deposition Exhibit 15 was marked for identification and is filed with this transcript.)

Q.      Sir, are you looking at a document that's been marked as Deposition Exhibit 18, which is an email from you to Steve Ritchie dated May 15th of 2018 that has, if you can still read that, a Bates stamp in the bottom right-hand corner of WMG20801?

A.      Yes, sir.

Q.      And this is May 15th.  You said, "Steve, Thank you again for helping us organize and deliver yesterday."

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 98

Q.    And you don't remember what you discussed or whether there was any conversation about giving John rope to hang himself or anything like that, correct?

A.    **I'm -- as I said before, I've never heard Mr. Ritchie use those words.**

Q.    What about expressing a similar sentiment, even if not using those words?  Did he ever tell you that it was a good idea to give John room and opportunity to make statements that would harm Mr. Schnatter?

MR. SPIRO:  Objection.  Asked and answered four times.

A.    **Can you repeat the question?**

Q.    Sure.  Do you remember any conversation that you had with Mr. Ritchie where Mr. Ritchie suggested that it would be best to let John have room to talk and express his views, because if allowed to have that time and room, John would do -- would say something that would hurt him or his reputation?

MR. SPIRO:  Objection.

A.    **To be clear, it was neither, you know, the recommendation of Steve, you know, or Laundry Service, to my recollection, that John be involved in media or press or advertising because of the damage that had been caused.**

Schnatter v. 247 Group, LLC 05/06/2021        Jason Stein, Vol I

Page 99

**It was discussed in that meeting in New York, when the team came up, including John, that any media was high risk with John involved and the outcome would be binary, meaning he could explain himself authentically and, you know, attempt to make people feel that he was mischaracterized after the earnings call, or he would say something again, similar to the earnings call or worse, that made even bigger problems for the company.**

**So if you're asking, you know -- that was a risk that was well known, but it's not one that Steve wanted. To my understanding, you know, based on my conversation, he did not want to have John in the advertising.**

Q.    Did he tell you that he didn't want John running the company anymore as CEO or chairman of the board?

**A.    I don't recall Steve ever saying that.**

Q.    Anything like that?

**A.    No, sir.**

Q.    At the -- and again, I want to understand the situation Laundry Service was in prior to that May 22nd call. In that prior year, in the prior six months or so, had Laundry Service lost any significant accounts?

Schnatter v. 247 Group, LLC 05/06/2021        Jason Stein, Vol I

Page 109

Do you remember a phone call where Steve Ritchie called to discuss that topic with you, or topics similar to that?

A.    **I'm not sure I know exactly what the topic at hand is.**

Q.    Right.  Well, that's what I'm trying to ask.  I've got this document.  Do you remember Steve Ritchie ever calling to say, "Hey" -- something to the effect of, "Jason, I know we were going to make you-all the creative agency of record for TV buys, TV spend, but we're going to delay that and we're not going to roll that out now"?

Do you remember having a call like that with Steve Ritchie?

A.    **Maybe I'm just confused because it's agency -- or industry nomenclature, but creative AOR and media work wouldn't be things that are connected.**

Q.    Okay.  And that may be my ignorance, and I apologize if it is.  From being in the business, what do you understand that sentence to be there under Next Steps?

A.    **This, I would imagine, pertains to the media buying portion, because it says "B. Cox will then re-negotiate media SOW."**

Q.    Right.  And so do you recall having a

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 110

conversation on these topics with Steve Ritchie

calling you to discuss them?

A.    Yes.

Q.    Tell me about that conversation, what you

recall.

A.    **I recall that Steve said that even though**

**they awarded us the media buying for TV, they were**

**not going to go forward with Laundry Service doing**

**the TV media buying.  This was -- I don't recall**

**exactly when -- what the dates are in all this.**

Q.    And if we look at the top of this page -- and

this document, unfortunately, itself isn't dated,

but we see Creative Agency there.  Do you see,

(Reading) Zimmerman to come to Louisville for a full

pitch week of May 21st.  Weigh Zimmerman pitch

versus Laundry Service pitch from May 14th.

A.    **Correct.**

Q.    If I were to read this, it would indicate to

me this is between you having provided your pitch on

May 14th and Zimmerman coming the week of May 21st.

A.    **Yes.**

Q.    And --

A.    **That would be correct.**

Q.    -- does that sound about right to you in

terms of the timing of when Steve Ritchie would have

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 111

called you about the delay in transferring over the media buy?

A.      No.   I seem to remember that he made that call after the May 22nd call.

Q.      Okay.  So the night before -- and we looked earlier at that, like, 19-minute call the night of May 21st.  You don't remember him bringing that up during that call?

A.      No, I don't recall that.  I mean, I don't believe that, to my recollection, we had actually had a -- that we had a -- Laundry Service had a contract to do the media work.  It had been verbally awarded.  I don't believe the work actually began, to the best of my recollection.

Q.      In the May 14th meeting --

MR. MURRELL:  Lori, if we can put up Exhibit 24.

(Stein Deposition Exhibit 20 was marked for identification and is filed with this transcript.)

Q.      And, sir, are you looking at a document that's been marked for identification purposes as Deposition Exhibit 24 that is, at the top, an email from Daniel Nunez to himself, with a copy to other people within Laundry Service, and that at the bottom has a Bates stamp of WMC -- G894?

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 121

A.     (Reading) Does this part happen as a part of the equity work?  Do we do something now?  What do we suggest?  How do we suggest doing it?

Q.     Right.

A.     It seems like she's asking for, you know, a point of view on how John should do that.

Q.     And then in there there is no discussion, "Hey, at the next meeting we're going to talk to you about your views on your race and your prior statements on race," is there?

A.     I believe it was discussed in the meeting, as I mentioned just before, that, you know, there would need to be preparation, and around these questions which, you know, we should expect to ask.

And I had also mentioned earlier, you know, it was discussed, you know, as far as I recall, in this meeting that the outcome of any such interview, which we were not in favor of, would be binary, meaning John could, you know, help reveal, you know, truly his thoughts or views on the protesting, you know, the systematic racism in the country in general, and come out positive from it or have another situation where, you know, commentary made by Mr. Schnatter would result in worse problems for the company.

Schnatter v. 247 Group, LLC 05/06/2021        Jason Stein, Vol I

Page 122

Q.    So as of May 14th, 2018, you understood any additional commentary from John about race would have a binary effect.  It would either be positive for him or it could be very negative for him and the company, true?

      MR. DEIXLER:  Misstates the witness' testimony.  He was speaking about the effect on Papa John's.

      MR. MURRELL:  Stop speaking objections.  Your objection is noted for the record.

Q.    My question to you, Mr. Stein, is:  As of May 14th, 2018, you knew that any further commentary by Mr. Schnatter about race would have a binary effect.  It could either be positive or it could be viewed very negatively for both him and the company, true?

      MR. DEIXLER:  Object to --

A.    **You said I viewed --**

      MR. DEIXLER:  Object to the form of the question.

Q.    You still answer it, sir.

A.    **Can you ask -- can you repeat it, 'cause there was a couple things in there that I was confused about.**

Q.    Sure.  As of May 14th, this meeting, you knew

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 137

conversation in a place where John can be his most authentic and unstaged self.  He'll be interviewed by Steven [sic] A. Smith on national television and Darren Rovell" -- that is how it's pronounced, Rovell?

A.    Yes.

Q.    "On Facebook Live."

First of all, who came up with the idea of being interviewed by Stephen A. Smith?

A.    I believe that came out of Papa John's and the relationship they had there.

Q.    All right.  And then Darren Rovell?

A.    I think that came from our team.

Q.    And Stephen A. Smith, did you know Mr. Smith?

A.    No.

Q.    All right.  Mr. Rovell, you know him, yes?

A.    Yes.

Q.    And how do you know Mr. Rovell?

A.    What do you mean?

Q.    I mean how do you know him?  How did you first meet him?

A.    We had a mutual friend who introduced us.

Q.    All right.  And how long have you known him?

A.    I believe we met in 2015 at some point.

Q.    All right.  Do you consider him a friend?

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 138

A.     Yes.

Q.     And, (Reading) Questions will zero in on the major controversies John has faced in the past years and the truth behind what his values are, right? That's what this was written.  Do you remember this document being discussed during your meeting on May 22nd?

A.     What do you mean "discussed"?

Q.     Well, first of all, the meeting itself, did you take any notes from the meeting yourself on May 22nd?

A.     I don't recall taking any notes.

Q.     All right.  Who led the meeting?

A.     What do you mean by "led"?

Q.     From Laundry Services, who was the person who started the meeting and controlled the dialogue on your side?

A.     I'm not sure who started it.  I'm aware I responded to a lot of, you know, the comments from John and tried to guide him.

Q.     All right.  And so at the meeting, at least, you were acting as the CEO for Laundry Service, true?

A.     I'm not sure that's something a CEO would typically do.  I was -- I was acting as someone who

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 149

A.      Sorry.  What's the question?

Q.      Weren't you, or your group, suggesting a one-off interview with Stephen A. Smith?

A.      So as -- we were recommending that John not do interviews and not be in the media or be in the press.  We were not being given a choice about this, so we were doing our best to help him.

Q.      And my question was much simpler than that, sir.  I've heard you.  My question was:  Wasn't the advice in this memo for the May 22nd meeting to have an interview, a one-off interview with Stephen A. Smith on ESPN?

        MR. DEIXLER:  Object to the form of the question.

        MR. MURRELL:  I gotta ask:  What's the basis?  What's the form that's improper?

        MR. DEIXLER:  I don't know what "one-off" means.

        MR. MURRELL:  Really?

        MR. DEIXLER:  I don't know what --

        MR. MURRELL:  Really?

        MR. DEIXLER:  Yeah, really.  Really.

        MR. MURRELL:  Huh.

        MR. DEIXLER:  I don't know what "one-off" means in the context of the memo.  I don't know what

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 153

that's on digital, you know, showing up on Facebook, showing up on Google as a paid search result, whatever, or paid media, running an advertisement on TV, versus earned media where you're out giving interviews and earning it as opposed to paying for it.  Is that a distinction you recognize?

A.    **Yes.  I would say the line is gray and continues to get more and more gray, but I understand the concept of what you're describing.**

Q.    And for Laundry Service's background, was it mostly paid media or earned media?

A.    **We did a good amount of both.**

Q.    Good amount of both.  Did you consider yourself qualified to provide advice on how to handle the NFL earnings issues and the race issues represented in 26A in media interviews?  Did you consider yourself qualified to give advice to Mr. Schnatter on how to best do that?

A.    **Yes.  Our review was -- you know, we were being asked to do this because we represented how people on social media would react to John doing an interview that would likely be picked up on social media.  And given the outrage on social media toward John's comments on the earnings call, our goal was to try to prevent that again so that sales didn't**

Schnatter v. 247 Group, LLC 05/06/2021          Jason Stein, Vol I

Page 154

get even worse or that John's reputation didn't get worse.  And that's specifically what these bullets are attempting to do is to help prevent that from occurring again and prevent an outrage on social media or maybe even have social media reaction be positive.

Q.    And you thought putting John in front of Stephen A. Smith or Darren Rovell for a discussion about past events was a good way of going forward with that?

A.    Our recommendation, again, as I've said a few times, was that John not do a media interview.  We did not recommend Stephen A. Smith, from my recollection, it was from Papa John's itself.

Darren we recommended only because John had worked with him and it seemed as though he was comfortable working with him again, from our understanding.

So, I mean, that -- no, it's not what we recommended, it's what we were being asked to do and forced to do and our hands were tied here, and we did the best we -- we were doing the best we could to try to help the company, the person, and the -- and the client.

Q.    How -- I mean, Mr. Rovell, you mentioned that

Schnatter v. 247 Group, LLC 05/06/2021        Jason Stein, Vol I

Page 163

worked in the executive office there.  I don't -- it
sounds familiar, but I don't recall exactly.

Q.    All right.  So do you remember having a
conference call with Mr. Wasserman -- and I'm not
actually exactly May 24th, but like in the day or
two after the May 22nd call and after learning about
the change in scope, do you remember having a call
with Mr. Wasserman about either of those topics?

A.    I remember a group call.  Is that what this
is?

Q.    I don't know.  All I see on it is you and --
do you know who Mr. Dammert is?

A.    He was an admin at -- an administrative
assistant at Laundry Service.

Q.    Okay.

A.    Can I see the full exchange, please?

Q.    Yeah.  I think I just -- I did just show you
the full exchange, but absolutely.

A.    Okay.  So, yeah, this is -- this is a
group -- it looks like it's -- it is --

Q.    Okay.

A.    It is a group call.  CW.  MW is Mike Watts.
Pickles is Mike Pickles, a lawyer.  Jordan Fox is
CEO from Laundry Service --

Q.    Okay.

Schnatter v. 247 Group, LLC 05/06/2021        Jason Stein, Vol I

Page 164

A.      -- who takes over for me.

Q.      And I want to be very careful here since you've identified that Pickles was on the call.  He is in-house counsel for Wasserman Group; is that right?  Is that your understanding?

A.      Yes.

Q.      And so I don't want you -- I was not going to ask you about the contents of that call, then, if you remember Mr. Pickles being on the call.  Do you remember him being on the call, the group call?

A.      Yes.

Q.      All right.

        MR. MURRELL:  So let's go to Exhibit 33, Lori.

        (Stein Deposition Exhibit 28 was marked for identification and is filed with this transcript.)

Q.      And so, sir, are you looking at a document that's been marked for identification purposes as Exhibit 33, which at the top is an email from you to Mr. Dammert and others with the date of May 29th, 2018, which has a Bates stamp on the first page of WMG880 going through 881?

A.      Okay.  Got it.

Q.      All right.  If we go to the first page, May 29th, 2018, at 5:25.  So 22nd's the meeting, the 23rd's the 2:00 a.m. email you would have been

Page 166

Right?  That's what the emails show?

A.    Yes.

Q.    And then you forward that email on to the group above.

Do you remember the -- having a call with Mr. Ritchie on May 30th?

A.    Yes.

Q.    Tell me what you recall about that call.

A.    Casey told -- Casey Wasserman told Mr. Ritchie that because of what was said on the call by Mr. Schnatter throughout the call, we would not be able to continue working with Papa John's in any capacity and that we needed to work on a transition plan for the -- for -- to end the business together.

Q.    What was Mr. Ritchie's response?

A.    He was very -- he was disappointed.  He was aware of what was said on the call and acknowledged that it was inappropriate.  I think he wanted -- he was hoping we would continue working with them, but he understood.  And I think that was it on that call, on that specific call.

Q.    And Mr. Ritchie had been present for the May 22nd meeting, true?

A.    I believe so.  To the best of my recollection, yes.

Page 175

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JOHN H. SCHNATTER,          )
                            )
            Plaintiff,      )          Case No.:
                            )     3:20-CV-00003-BJB-CHL
v.                          )
                            )     JUDGE BENJAMIN BEATON
247 GROUP, LLC,             )
d/b/a LAUNDRY SERVICE       )      MAGISTRATE JUDGE
and WASSERMAN MEDIA         )      COLIN H. LINDSAY
GROUP, LLC,                 )
                            )
            Defendants.     )

CONFIDENTIAL

        The continued video deposition of JASON WAYNE
STEIN, taken pursuant to notice by the Plaintiff on
May 7, 2021, via Zoom videoconference with
participants in various locations due to the
coronavirus state of emergency.

LAURA J. KOGUT, RMR, CRR, CRC
Anchorage Office Plaza
McLendon-Kogut Reporting Service, LLC
2525 Nelson Miller Parkway, Suite 204
Louisville, Kentucky  40223
(502) 585-5634
lkogut@mclendon-kogut.com
www.mclendon-kogut.com^ INDEX

Schnatter v. 247 Group, LLC 05/07/2021          Jason Stein, Vol II

Page 236

The Forbes article runs on July 11th.  We just saw it.  We have your text number saying "He's still tell people I leaked papa John's."

Do you see that?

A.    Yes.

Q.    How could he be telling -- and by the way "Mike," when he says "Mike laid off 1/2 his team last week" and "Mike is such a," that's Mike Mikho?

A.    Yes.

Q.    So before the Forbes article runs on July 11th, how could Mike Mikho be telling people that you leaked Papa John's?

MR. SPIRO:  Objection to form.  How does he know that?

A.    **Sir, I just said I believe that these text messages occurred at a much, much, much later date. It may have even been the following year.**

Q.    Oh, later date.  Oh, you don't think it was -- you think it was later, after 2018 is what you're saying, after July of 2018?

A.    **Yes.  I believe this was, to the best of my recollection, a conversation that occurred at a much, much later date.**

Q.    Later date.  Okay.  And at that later date Mike Mikho was telling people that you had leaked

Schnatter v. 247 Group, LLC 05/07/2021      Jason Stein, Vol II

Page 237

Papa John's.  That's what you're telling Jamal,
correct, Mr. Salim?

A.      Yes.

Q.      And at that point in time when you're having
this conversation with Mr. Salim, he was an officer
for Laundry Service, true?

A.      Who was?

Q.      You're right.  Mr. Mikho was an officer for
Laundry Service at the time that you were sending
this text, true?

A.      I believe so.  I'm not -- I'm not certain.

Q.      And you understand that Mr. Polder has
testified that he was told by Randi White that you
were the source of the leak as well, right?

        MR. DEIXLER:  Misstates --

        MR. SPIRO:  Objection to form.  Improper
question.

        MR. DEIXLER:  Misstates the witness'
testimony.  Object to the form of the question.

Q.      Sir, are you aware that Mr. Polder has
testified that he was told by Randi White, also in
management at Laundry Service, that you were the
source of the leak?

A.      I'm not aware.

Q.      All right.  So --

Schnatter v. 247 Group, LLC 05/07/2021        Jason Stein, Vol II

Page 245

**A.      What, specifically, are you referring to happening to John?**

Q.     Well, I mean the public -- the binary reaction, right?  The public reaction to that being leaked, the fact that he then lost his position with the company, all of the media hits he took as a result of it, the characterizations of him in the press, all because of that May 22nd meeting details were leaked.  Are you sorry that that happened to John Schnatter?

MR. SPIRO:  Objection.  Form.  It assumes that it's all because of that one meeting, which is, in fact, not in evidence and it mischaracterizes the stated facts.  You can answer that if you can answer it.

MR. DEIXLER:  Also irrelevant.  I join the other objection as well.

**A.      I'm not -- I'm not sure what your question is.**

Q.     Well, you've seen what happened to John Schnatter in the press as a result of the May 22nd statements being leaked in the fashion they were leaked to Forbes.  You've watched that happen.  When you've watched it, have you felt sorry for Mr. Schnatter and what has happened to him because of that leak?

Schnatter v. 247 Group, LLC 05/07/2021          Jason Stein, Vol II

Page 246

MR. DEIXLER:  Objection.

MR. SPIRO:  Objection to form.  Same objections already stated.

MR. DEIXLER:  And I join.

A.     **I'm not sure specifically what you are referring to happening to Mr. Schnatter.  Are you referring to him resigning and apologizing?**

Q.     No, I'm referring to what -- all that has happened to him, all the bad media that was -- you know, went national and international because of the -- because of the leak that resulted in that Forbes article on July 11th.

When you've watched that, are you sorry about what has happened to Mr. Schnatter?

MR. DEIXLER:  Object to the form of the question.  Assumes facts not in evidence.  Argumentative and irrelevant.

MR. SPIRO:  Same objections as stated earlier, and I'll join in those objections.

A.     **Which media are you referring to?**

Q.     Mr. Stein, did you not, after you read the Forbes article and you saw it run, you saw that it ran nationally in the news, correct?

A.     **Yes.**

Q.     You saw the characterizations of Mr. Schnatter

Schnatter v. 247 Group, LLC 05/07/2021      Jason Stein, Vol II

Page 247

because it was reported -- and we would say misreported, but reported about his use of the N-word during that meeting.  You saw the public reaction to that, yes?

A.    Yes.

MR. DEIXLER:  Objection.  Form of the question.

Q.    And watching what that -- watching that media, watching that reaction to Mr. Schnatter, when you watched it, were you sorry for him that that happened because of a leak of a meeting with Laundry Service?

MR. SPIRO:  Objection.  Same objection.

MR. DEIXLER:  Object to the form of the question.  I join.

A.    So there was some media that was negative and some that was positive.  Which are you referring to?

Q.    The negative.

A.    Okay.  And which ones?  Because I recall some that spoke -- there was an article in -- you know, somewhere that, you know, Colonel Sanders' family said they were very -- it was a lie and not true and that's a negative article, right?  It's not necessarily, you know, the same thing as someone saying the N-word is bad, so can you specify?

Schnatter v. 247 Group, LLC 05/07/2021        Jason Stein, Vol II

Page 248

Q.    No.  I mean, I'm asking the question.  Can you not answer that question?

**A.    I'm not sure what the question is, sir.**

Q.    The question is:  When you've watched what's happened to Mr. Schnatter because of what was discussed in that May 22nd meeting being leaked to the press, when you've watched what happened to him, the totality of it, the good, the bad, the ugly, when you've watched all of that, have you felt sorry for him?  That's the question.

MR. DEIXLER:  Same objections.

MR. SPIRO:  Same objections.

**A.    Same question.  What happened?  Again, he resigned, he apologized, he's had good press and bad press.  I'm not trying to be difficult, sir, I'm just not clear on what, specifically, you're asking.**

Q.    Have you felt ever -- when you've seen what he's had to go through, have you ever felt, when you've watched it and go, "Boy, I feel sorry that that happened because of an interview that happened at Laundry Service that was then leaked to the press"?

MR. SPIRO:  Same --

Q.    Have you ever had that emotion is what I'm asking you.

Schnatter v. 247 Group, LLC 05/07/2021       Jason Stein, Vol II

Page 249

MR. SPIRO:  Same objection.  Also assumes facts.

MR. DEIXLER:  I join.

Q.    The question is on the table, Mr. Stein.  Can you answer it?

A.    **What is the question?**

Q.    I've asked the question five times.

A.    **I've asked questions to ask you to clarify the question.  You haven't done that yet.**

Q.    And my question is:  Can you answer that question?  Knowing -- watching the totality of what happened to Mr. Schnatter, right, the good, the bad, the ugly that came as a result of his conversations with Laundry Service on May 22nd being leaked to the press, when you've watched the totality of all of that, have you ever felt sorry for him?

A.    **So --**

MR. SPIRO:  Same objection.

MR. DEIXLER:  Join.

A.    **The good things that happened I would not be sorry about.**

Q.    And the bad things that happened to him?

A.    **Which bad thing?**

MR. SPIRO:  Same.

Q.    The ones you observed.

Schnatter v. 247 Group, LLC 05/07/2021        Jason Stein, Vol II

Page 250

**A.    Which ones?**

MR. SPIRO:  Same objection.

**A.    I don't know what's bad.**

Q.    You don't know what's bad about what's happened to Mr. Schnatter as a result of that being leaked?

**A.    Can you be specific, please?**

MR. MURRELL:  I'm done with my questions for today, or for now.

MR. DEIXLER:  I'd like to ask some questions. Is this an opportune time to do so?

MR. MURRELL:  It is for me.

MR. SPIRO:  Fine for me.

MR. DEIXLER:  Okay.  Well, as long as everybody's here.

UNIDENTIFIED SPEAKER:  (Indiscernible) one.

MR. DEIXLER:  I'm sorry.  Who's --

MR. MURRELL:  Sorry.

MR. DEIXLER:  Who's voice that's come in Call-In User 2, do we know who that is?

MR. MURRELL:  John, is that you dialing back in as User 2?  Who's User 2?

MR. DEIXLER:  Well, I guess I might as well begin.

MR. MURRELL:  Yeah, you might as well begin.

Schnatter v. 247 Group, LLC 05/07/2021          Jason Stein, Vol II

Page 264

how to do that as soon as possible.

Q.   Was the subject matter of him being interviewed raised at that meeting in Brooklyn?

A.   Yes.

Q.   And as best you can recall, what was said on that topic by the participants?

A.   I think everyone agreed completely that it wasn't something that was, you know, advisable if you wanted to be conservative from a PR perspective, but if it was something that people felt -- John felt needed to be done, the outcome would be very binary, meaning if John could, you know, genuinely, naturally speak from the heart about the issues around race in America, around police brutality, around ways that he has, could, would take action to help around these issues, you know, then the outcome would be very positive.  But if John were to make insensitive remarks similar to those on the earnings call, then the outcome would be very negative.

Q.   And when that -- when those circumstances were presented to Mr. Schnatter, what, if anything, did he say in response?

A.   He said he understood is my recollection.

Q.   And was it his view that he should continue pressing to have himself be the face of the brand?