# EXHIBIT 11

## FILED UNREDACTED PER DN 184

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION


JOHN H. SCHNATTER,    )
                      )
        Plaintiff,    )
                      )
vs.                   ) CASE 3:20-CV-00003-BJB-CHL
                      )
                      ) JUDGE BENJAMIN BEATON
                      ) MAGISTRATE JUDGE COLIN LINDSAY
247 GROUP, LLC,       )
d/b/a LAUNDRY         )
SERVICE and           )
WASSERMAN MEDIA       )
GROUP, LLC            )
                      )
        Defendants.   )


**CONFIDENTIAL DRAFT**

*         *         *

The videotaped deposition of **MIKE MIKHO**, taken
pursuant to notice via Zoom by the Plaintiff on July
16, 2021, with participants at various locations due
to the Kentucky Coronavirus State of Emergency.




JENNIFER R. JANES, RPR, CRR
McLendon-Kogut Reporting
Anchorage Office Park
2525 Nelson Miller Parkway, Suite 204
Louisville, Kentucky 40223-3153
(502) 585-5634
jjanes@mclendon-kogut.com
www.mclendon-kogut.com

A.    I don't recall receiving or reviewing the agreement, but I generally am in the practice of reviewing contracts before I sign them.

Q.    All right.  That was going to be my next question.  Do you know if you -- do you have any recollection of discussing the founder agreement with anyone?

A.    No.

Q.    Do you know if anyone else read it?

A.    No.

Q.    Did you have the authority by Laundry Service to approve the signing of agreements?

A.    I'm not sure I understand the question.

Q.    Sure.  Let me ask a better question.  Did you have the authority in April 2018 to approve the signing of the founder agreement?

MR. DEIXLER:  That calls for a legal conclusion, but if you had a business understanding of whether you could do that, I guess you can answer this vague question.

A.    I will try to answer.  My response may be a bit vague.

Q.    Okay.

A.    When we would receive a document like that, as you saw it was forwarded to our legal team in the

event that a legal opinion is needed on a contract, and we'll get that opinion, and once we -- once we feel comfortable as a company that the contract makes sense legally and is legally sound, then yes, I have the authority to sign that contract.

Q.    All right.  And in this instance you authorized the signing of the founder agreement on behalf of Laundry Service, correct?

A.    I authorized somebody on my team to use my digital signature.

Q.    All right.  And, to your knowledge, Samantha did use your digital signature to sign the founder agreement on behalf of Laundry Service, correct?

A.    I don't recall the instance, nor do I see an attachment to this file, but I would assume that is the case.

Q.    All right.  Do you have any reason to believe that wasn't the case?

A.    No.

      MS. GRAY:  And let's bring up the attachment to this email, tab 3.  And again, we'll put it in the chat.  While she's doing that, for the record what we'll mark as Exhibit 3 is WMG 16253 to WMG 16256.

      (Mikho Deposition Exhibit 3 was marked for identification and is filed with this transcript.)

Q.    Okay.    In this instance you felt comfortable providing the authority to sign on behalf of Laundry Service, correct?

A.    It seems so.    I don't recall the instance, but it seems to be the case.

Q.    Is this one of the documents you used to refresh your recollection during your deposition preparation, the agreement, what we've marked as Exhibit 3?

A.    I don't recall reviewing this document.

Q.    Do you recall whether any Laundry Service employee discussed this document with you at any time?

A.    No, I don't recall.

Q.    Mr. Mikho, did you have any role in discussions about Laundry Service being told to use John Schnatter in advertising on behalf of Papa John's?

MR. DEIXLER:    Object to the form of the question.    It's vague.    Can you fix the time?

Q.    In 2018 did you have any involvement in discussions about Laundry Service being told to use John Schnatter in advertising for Papa John's?

A.    Can you clarify the question, and the specific confusion that I have is are you asking if I participated in discussions through which Laundry

Q.    Do you recall anything else about the May 14th meeting?

A.    I recall at one point John, when referencing some comments he had made about the NFL, used the phrase, "I meant what I said.  I regret how I said it."  Something of that nature.

Q.    Do you know what he was referencing?

A.    Yes, he was referencing comments he made about the NFL players kneeling for the National Anthem.

Q.    Do you recall anything else about the May 14th meeting?

A.    No.

Q.    Would you agree that at least part of the purpose of the May 14th meeting was a discussion on bringing John Schnatter back into the marketing and advertising of Papa John's?

A.    I remember that was a topic of discussion.  I don't recall what our recommendation was.

Q.    Do you recall any specifics of the discussion surrounding bringing John Schnatter back into the marketing and advertising for Papa John's at the May 14th meeting?

A.    No.

Q.    Do you recall that part of the May 14th meeting related to helping John Schnatter with his image, his

*** DRAFT ***

74

public image?

A.    Yes.

Q.    What kind of discussion do you recall surrounding assisting John Schnatter with his public image?

A.    Earlier when I referenced the comment John made, that was part of that discussion.  It was in the context of him looking to kind of seize control of his own narrative, and that's when he said, "I meant what I said, but I regret how I said it," or something of that nature.  That's really all I recall about the discussion.

Q.    And at this time, May 14, 2018, was part of Laundry Service's role to help John Schnatter with his public image?

A.    That was not part of the scope, but he did ask us for that.

Q.    All right.  And is it your understanding that Laundry Service was helping John Schnatter with his public image in May 2018?

A.    At the time of that meeting, that was the first that we had been -- that that had been brought up, to my knowledge.  And I don't know what the corresponding conversations were about having that scoped into our relationship.

\* \* \* DRAFT \* \* \*

83

anyone else?

A.    No, I do not.

Q.    Do you recall discussing the May 22nd call with anyone outside of Laundry Service?

A.    No.

Q.    At some point did you learn that Laundry Service was terminating the agreement with Papa John's?

MR. DEIXLER:  Object to the form of the question.  Assumes facts not in evidence.

To the extent you learned anything from counsel regarding the manner in which the agreement was settled, you ought to exclude that from any answer you might give.

A.    I don't know the specifics of how the agreement -- that the relationship came to an end, and I don't recall any conversations about that.

Q.    Do you recall receiving any correspondence about the termination of the Papa John's relationship?

A.    I may have, but I don't recall any specifics around like a, you know, formal letter or email that I received.  Only because it was so long ago, I don't remember the specifics.

Q.    You recall that Laundry Service terminated the

relationship with Papa John's, correct?

A.   That's my understanding.

Q.   What is your understanding of how the relationship between Laundry Service and Papa John's ended?

MR. DEIXLER:  Set aside anything you learned from lawyers in answering that question.

A.   My understanding is that we decided to end our relationship and gave them the appropriate notice and, yeah, that's really all I recall about the way that relationship ended.

Q.   All right.  But you recall that it was Laundry Service's decision to terminate the relationship, correct?

MR. DEIXLER:  Objection, foundation.

You can answer if you know.

A.   I am not aware of the specifics of how the relationship formally came to an end.

Q.   So you weren't involved in that in your role overseeing business development for Laundry Service?

A.   I was not involved in those specific conversations, no.

Q.   Okay.  Were you involved in negotiating any termination fees with Papa John's?

A.   No.

was coming out prior to receiving this Slack message?

A.    I don't recall that, and I believe earlier I stated that I thought that I learned about it the day that it came out.

Q.    Does this Slack message help refresh your recollection of any discussions you had about the Forbes article?

A.    It does not.

Q.    Have you ever had any discussions with anyone about who may have leaked the information to Forbes?

MR. DEIXLER:  Other than lawyers.

A.    Oh, thank you.  No, other than lawyers, not that I recall.

Q.    Do you agree that the May 22nd conversation should have been kept confidential?

MR. DEIXLER:  Object to form of the question. It's vague.  Confidential from whom?

Q.    You can answer, Mr. Mikho.

A.    Yes.

Q.    And why is that?

A.    Generally speaking, any conversations that we have with any of our clients are part of our business and not public unless the client chooses to make it public.

Q.    Okay.  And you agree with me that the contents

of the May 22nd conversation should not have been leaked to Forbes, correct?

A.   I would have preferred that it not been, yes, I agree with you.

Q.   Okay.  Who do you believe was the leak of the information to Forbes?

MR. DEIXLER:  Foundation, calls for speculation.

You can answer if you know.

A.   I personally believe somebody at Papa John's leaked it.

Q.   Why do you believe that?

A.   Two reasons.  One, there was no incentive whatsoever for Laundry Service as a business to do this.  This actually caused us a lot of pain.  Like, this is a very bad occurrence for us.

We were receiving threatening emails from people that suggested to be John supporters.  We had to increase security in our office for fear that somebody may try and harm our employees.  We had to try and explain this distraction to our clients.  It was a very difficult period at Laundry Service and not one that I wanted to have.

And two, I don't recall the exact dates, but I believe that very quickly after the article came out,