# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF KENTUCKY AT LOUISVILLE**

*John H. Schnatter*

Plaintiff

v.

*247 Group, LLC d/b/a Laundry Service, et al*

Defendant

Case No. 3:20-cv-000003-BJB-CHL

NEVIUM
Intellectual Property Consultants

# EXPERT REPORT OF DOUG BANIA

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

February 23, 2023

**Table of Contents**

I. EXPERT REPORT INFORMATION ..... 5
A. The Assignment ..... 5
B. The Plaintiff ..... 6
C. The Defendant ..... 7
D. Case Background ..... 7
E. The Claims ..... 10
F. Documents Reviewed ..... 11
II. SUMMARY OF DAMAGES ..... 11
III. CORPORATE GOVERNANCE & OWNERSHIP ..... 12
A. Papa John's Board of Directors ..... 13
B. ISS Governance QualityScore ..... 14
C. Officers ..... 15
D. Voting Structure ..... 16
E. Ownership ..... 17
IV. ECONOMIC PRINCIPLES FOR DAMAGES CALCULATIONS ..... 18
A. Causation ..... 18
B. Mitigation ..... 19
V. MR. SCHNATTER DAMAGES CATEGORIES ..... 19
VI. CAUSATION AND MITIGATION ..... 20
A. Founder and Chairman Agreements ..... 20
(i) Chairman Agreement ..... 21
(ii) Founder Agreement ..... 22
B. Reimbursable Expenses ..... 23
C. Mitigation Expenses ..... 24
(i) Legal ..... 24
(ii) Consulting ..... 26
(iii) Investment Banking ..... 26
(iv) Public Relations ..... 27
D. Reputational Harm ..... 27
E. Naming Rights ..... 31

F. Causation – Other Factors ....................32
(i) [redacted] ....................32
(ii) Stepping Down as CEO ....................33
(iii) Obamacare Comments ....................34
(iv) Alleged Involvement in a Toxic Work Culture ....................34
(v) Earnings Call NFL Comments ....................35
(vi) [redacted] ....................36
(vii) Other Unwarranted Comments ....................37
G. Summary ....................39
VII. FOUNDER AND CHAIRMAN AGREEMENTS DAMAGES ....................41
A. Calculating Damages using Before-and-After Method ....................43
B. Defining the Damages Periods ....................43
(i) Chairman Agreement Damages Period ....................44
(ii) Founder Agreement Damages Period ....................44
C. Mr. Schnatter's As-Is Performance ....................45
D. Mr. Schnatter's But-For Calculation ....................46
(i) Lost Income from Founder Agreement and Chairman Agreement ....................46
(ii) Additional Lost Income from Compensation Committee ....................47
(iii) Summary of but-for income under Founder and Chairman Agreements ....................47
(iv) Present Value Calculation ....................49
E. Calculating Lost Profits of Mr. Schnatter ....................50
VIII. REIMBURSABLE EXPENSE DAMAGES ....................51
A. Defining the Damages Period ....................51
B. Mr. Schnatter's As-Is Reimbursements ....................51
C. Mr. Schnatter's But-For Calculation ....................52
D. Calculating Mr. Schnatter's Lost Profits ....................53
IX. MITIGATION EXPENSE DAMAGES ....................53
X. REPUTATIONAL HARM DAMAGES ....................54
A. Forbes Article ....................55
B. Reputational Harm Damages ....................55
XI. NAMING RIGHTS DAMAGES ....................58
A. Value of Mr. Schnatter's Naming Rights ....................58
B. Value of Comparable Naming Rights ....................59

C. Calculation of Damages ....................60

XII. CONCLUSION ....................61

XIII. EXHIBIT A: DOCUMENTS RELIED UPON ....................62

XIV. EXHIBIT B: DOUG BANIA CV ....................70

# I. EXPERT REPORT INFORMATION

1. I, Doug Bania of Nevium LLC ("Nevium"), have been engaged by Gray Ice Higdon ("Counsel") in the case *John H. Schnatter v. 247 Group, LLC d/b/a Laundry Service*, Civil Action No.: 3:20-cv-000003-BJB-CHL, filed in United States District Court, Western District of Kentucky at Louisville (the "Case"). The date of this report is February 23, 2024 (the "Report Date"). My analysis and opinions are based on the information and documents I have received as of the Report Date, as well as my experience and training as set forth below. A numbered list of the documents I relied upon is provided at Exhibit A.

2. My qualifications, including a list of publications and expert testimony experience pursuant to information required by Federal Rule of Civil Procedure 26(a)(2)(B), are provided at Exhibit B.

3. I am a Certified Licensing Professional ("CLP") and an intellectual property ("IP") expert with more than twenty years of experience in IP valuation, management, damage calculations, and internet and social media analytics evaluation. As the founding principal of Nevium Intellectual Property Consultants, I have extensive experience providing valuation, causation, and damages opinions for intellectual property and breach of contract cases related to celebrities and other public figures. I have been named an expert in over one hundred cases, have been deposed thirty-four times, and provided trial testimony for ten cases. I received a Bachelor of Arts in Cinema from San Francisco State University and a Master of Arts in Television, Film, and New Media Production from San Diego State University. I am a former member of the INTA Right of Publicity Committee and a current member of the American Bar Association ("ABA") Copyright & Social Media Committee.

## A. The Assignment

4. For this assignment, I was asked to calculate economic damages for John H. Schnatter ("Mr. Schnatter" or "Plaintiff") as it relates to the breach of contract claim in the Second Amended Complaint filed January 18, 2023, against 247 Group, LLC d/b/a Laundry Service ("Laundry Service" or "Defendant").[1]

5. Specifically, my assignment includes:

[1] Document 1a: Second Amended Complaint.

Determining if the Forbes Article caused economic or reputational harm to Mr. Schnatter; and

If it did, provide a calculation of economic damages and reputational damages for Mr. Schnatter arising from such harm.

6. I have not provided any opinions regarding liability of any parties in the Case. The review and analysis of economic and reputational damages in this report assumes Plaintiff is able to establish liability and the court finds that Plaintiff is entitled to damages. I understand if liability is not established, a calculation of economic damages related to the Plaintiff's breach of contract claim would not be necessary. Also, I have not confirmed the accuracy of the information provided to me.

7. Nevium is being compensated on an hourly basis. My rate for non-testimony-related services is $650 an hour, and $750 an hour for time at deposition and trial. Nevium charges $450 an hour for support staff. Nevium's compensation is not, and will not be, based on the outcome of the Case.

8. The analysis and conclusions in this report are based upon the documents and information reviewed as of the Report Date, as well as my background in financial analysis, intellectual property valuation, and economic damages calculations. I reserve the right to revisit this analysis and amend these conclusions and opinions should additional information and/or documents become available for review. I further reserve the right to respond to opinions and issues presented by any other experts in the Case. Also, I reserve the right to use demonstratives and other exhibits to present the opinions expressed in this report or any supplemental, amended, or rebuttal report.

### B. The Plaintiff

9. John H. Schnatter is the founder and former Chief Executive Officer and Chairman[2] of Papa John's International, Inc. ("Papa John's"), one of the largest pizza delivery restaurants in the world.[3] Mr. Schnatter founded Papa John's in 1984 in the backroom closet in his father's tavern in Jeffersonville, Indiana. After operating the pizza restaurant for nine years, Mr. Schnatter took Papa John's public in 1993 and over the following year opened his 500th store.[4] During his time developing Papa John's, Mr. Schnatter acted as the face and primary spokesman for the company. As a result of Mr.

[2] Document 1a: Second Amended Complaint, paragraph 11.
[3] Document 1a: Second Amended Complaint, paragraph 1.
[4] Document 1a: Second Amended Complaint, paragraph 1.

Schnatter's contributions to Papa John's, he was able to scale the pizza restaurant to 5,000 locations in 45 countries and territories across the world.[5]

10. In addition to running one the largest pizza chain restaurants in the world, Mr. Schnatter was also a key constituent in the development of the football stadium and other amenities at the University of Louisville. In 1996, Mr. Schnatter pledged $4,000,000 of his personal funds to name the football stadium "Papa John's Cardinal Stadium."[6] A few years later, in 2000, Mr. Schnatter donated an additional $4,000,000 to help the University of Louisville construct the Cardinal Park.[7] Finally, in 2007, Mr. Schnatter pledged $6,000,000 more to the University of Louisville to expand the football stadium.[8] In total, Mr. Schnatter pledged to donate $14,000,000 to the University of Louisville.

### C. The Defendant

11. Laundry Service is a full-service creative/marketing agency that helps brands create meaningful roles in culture.[9] Laundry Service utilizes social media platforms to create branded effects for consumer products. For example, when the Jordan sneaker brand launched its AJ36s on TikTok, Laundry Service created a challenge with the hashtag #36SecondsOfLightWork where they asked TikTok users to demonstrate their special talent within 36 second while wearing the AJ36s. Professional athletes like Jayson Tatum and Te'a Cooper participated in the challenge by posting a 36 second TikTok of them wearing the sneakers.[10] Laundry Service was acquired by Wasserman Media in 2015.[11]

### D. Case Background

12. In October 2017, Laundry Service pursued the opportunity to handle Papa John's marketing needs.[12] Jason Stein ("Mr. Stein"), who was Laundry Service's CEO at the time, worked with Brandon Rhoten ("Mr. Rhoten"), the Chief Marketing Officer (CMO) of Papa John's, to present a pitch for the account.[13]

---

[5] www.papajohns.com/company/
[6] Document 2a.
[7] Document 2b.
[8] Document 2e.
[9] https://www.linkedin.com/company/laundry-service/
[10] 247laundryservice.com/case-study/jordan-brand-36-seconds-of-light-work/
[11] Document 1a: Second Amended Complaint, paragraph 13.
[12] Document 1a: Second Amended Complaint, paragraph 33.
[13] Document 1a: Second Amended Complaint, paragraph 34.

13. Effective January 1, 2018, Papa John's and Laundry Service executed the Services Agreement.[14] As part of the Services Agreement, Laundry Service was assigned to provide *"any Services which the Client desires to be performed by Laundry Service."*[15] Upon becoming the agency on record for Papa John's, Laundry Service took the initiative to scale up their operations by hiring a team of approximately 20 to 40 people specifically assigned to handling this account.[16]

14. On April 9, 2018, Laundry Service signed a confidentiality agreement specific to Mr. Schnatter (the "Schnatter NDA")[17] which stated Laundry Service would not *"convey, divulge, make available or communicate such information to any third party or assist others in using, copying, duplicating, posting or disclosing any of the foregoing."*[18]

15. In the spring of 2018, Papa John's specifically instructed Laundry Service to work towards improving Mr. Schnatter's public image, with the intention of featuring him in commercials as part of the company's rebranding efforts.[19] In April 2018, Laundry Service became aware of Mr. Rhoten's upcoming departure from Papa John's.[20] As it is common practice to sever ties with accounts and companies endorsed by an existing CMO, Mr. Rhoten's upcoming departure raised concerns within Laundry Service.[21]

16. On May 2, 2018, during a scheduled Board of Directors meeting, Mr. Schnatter received unanimous re-election by the Board, further solidifying his position as the Chairman of the Board.[22]

17. In May 2018, following his re-election as Chairman, Papa John's expressed a desire to bring Mr. Schnatter back into their advertising campaigns, aiming to position him as a focal point and spokesperson for the brand.[23] As a result, on May 14, 2018, Mr. Schnatter met with then Laundry Service CEO, Mr. Stein, and other representatives of Laundry Service, to discuss a new advertising

[14] Document 1a: Second Amended Complaint, paragraph 41. Agreement at Document 5a.
[15] Document 1a: Second Amended Complaint, paragraph 57.
[16] Document 1a: Second Amended Complaint, paragraph 40.
[17] Document 1a: Second Amended Complaint, paragraph 47 and Document 5c.
[18] Document 5c: Section 1a.
[19] Document 1a: Second Amended Complaint, paragraph 60.
[20] Document 1a: Second Amended Complaint, paragraph 62.
[21] Document 1a: Second Amended Complaint, paragraph 65.
[22] Document 1a: Second Amended Complaint, paragraph 67.
[23] Document 1a: Second Amended Complaint, paragraph 69.

campaign for the company.[24] As Laundry Service was not a public relations company, Papa John's had hired a public relations firm, Olson Engage, to assist in improving Mr. Schnatter's image.[25]

18. During the May 14, 2018, meeting, Mr. Schnatter and Laundry Service employees arranged a follow-up meeting to discuss marketing activities.[26] The meeting was scheduled for May 22, 2018, via telephone (the "May 22 Call").[27]

19. On May 22, 2018, Mr. Schnatter joined the call with Laundry Service where Mr. Schnatter believed the meeting would be focused on new marketing initiatives.[28] Instead, Laundry Service used this time to ask Mr. Schnatter questions related to his views on race.[29] At the end of the call, Mr. Schnatter voiced his concerns about how the media improperly reported on his comments about the NFL on a previous earnings call to paint him as somebody who he is not.[30]

20. During the May 22 Call, Mr. Schnatter addressed the issue of racism and distanced himself from it. He specifically criticized the usage of the N-word by Colonel Sanders and emphasized he had never used that word himself.[31]

21. Without informing Mr. Schnatter, Laundry Service recorded the entire conversation.[32] Even after Mr. Schnatter hung up the phone, Laundry Service continued to record its own private conversations between senior Laundry Service employees, where Mr. Stein stated *"I hope he gets fuckin' sent out to the pasture on this shit. I really, really fuckin' do."*[33]

22. In June 2018, Laundry Service and Papa John's were in a commercial dispute regarding payments outlined in the Master Services Agreement ("MSA") and Casey Wasserman, CEO of Laundry Service and owner of Wasserman Media Group, LLC, said he would "*bury the founder*" if Papa John's did not pay $6,000,000.[34] Laundry Service's last day of service to Papa John's was on July 2, 2018, and on July 23, 2018, Papa John's terminated its contract with Laundry Service.[35] At the time of termination,

[24] Document 1a: Second Amended Complaint, paragraph 72.
[25] Document 1a: Second Amended Complaint, paragraph 74.
[26] Document 1a: Second Amended Complaint, paragraph 94.
[27] Document 1a: Second Amended Complaint, paragraph 95.
[28] Document 1a: Second Amended Complaint, paragraph 94.
[29] Document 1a: Second Amended Complaint, paragraph 96.
[30] Document 1a: Second Amended Complaint, paragraph 109.
[31] Document 1a: Second Amended Complaint, paragraph 109.
[32] Document 1a: Second Amended Complaint, paragraph 102
[33] Document 1a: Second Amended Complaint, paragraph 111 photograph.
[34] Document 1b: Plaintiff's Redacted Response to Motion to Dismiss, Counterstatement N.
[35] Document 5d.

Papa John's owed Laundry Service approximately $1.3 million. However, upon the conclusion of their contract, Papa John's made a payment of $2.3 million to Laundry Service.[36]

23. On July 10, 2018, Mr. Schnatter received a call from Papa John's General Counsel informing him that somebody at Laundry Service had been in touch with Forbes.[37] The next morning, on July 11, 2018, Forbes published an article titled "Papa John's Founder Used N-Word on Conference Call" (the "Forbes Article").[38] On the same day, Mr. Schnatter was forced to resign as Chairman of Papa John's, resulting in the termination of his agreement for service as chairman (the "Chairman Agreement.")[39]

24. On July 13, 2018, Papa John's announced that Mr. Schnatter would no longer appear in marketing or advertising campaigns on behalf of the pizza restaurant,[40] and the University of Louisville removed the "Papa John's" sign from the football stadium.[41]

25. On July 15, 2018, Papa John's terminated its Agreement for Service as Founder (the "Founder Agreement") with Mr. Schnatter.[42] Finally, on May 7, 2019, Papa John's terminated its Amended and Restated Exclusive License Agreement with Mr. Schnatter (the "License Agreement").[43]

### E. The Claims

26. According to the Complaint, Plaintiff claims Defendant breached the Schnatter NDA by leaking selected contents of conversation from the May 22 Call to Forbes magazine.[44] The Schnatter NDA had the following provisions:[45]

> Prohibited Laundry service and its employees from *"us[ing], copy[ing], duplicat[ing], post[ing], or disclos[ing] any information … including the substance of conversations or any information whatsoever of a personal or business nature regarding [Schnatter] . . . ."*;

[36] Document 5d: Mutual Termination Letter between Papa John's and Laundry Service.
[37] Document 1a: Second Amended Complaint, paragraph 140 and 141.
[38] Document 1a: Second Amended Complaint, paragraph 142.
www.forbes.com/sites/noahkirsch/2018/07/11/papa-johns-founder-john-schnatter-allegedly-used-n-word-on-conference-call/?sh=56e85174cfc4
[39] Document 1a: Second Amended Complaint, paragraph 159. Document 2c.
[40] Document 1a: Second Amended Complaint, paragraph 159.
[41] Document 1a: Second Amended Complaint, paragraph 159.
[42] Document 1a: Second Amended Complaint, paragraph 159.
[43] Document 2j.
[44] Document 1a: Second Amended Complaint, paragraph 174.
[45] Document 5c.

Required Laundry Service to return any information it obtained about Mr. Schnatter to Mr. Schnatter upon separation;

Required Laundry Service *"not to disparage or make derogatory comments, verbal or written, regarding . . . [Schnatter] . . . ."*

27. Each of these provisions covered communications between Mr. Schnatter and Laundry Service on the May 22 Call. Between May 22, 2018, and July 11, 2018, Defendant leaked selected contents of conversations that occurred during the May 22 Call (the "leaked confidential information") to Forbes Magazine.[46] Forbes Magazine then published this information in the Forbes Article on July 11, 2018.[47]

28. Following the release of the Forbes Article, Mr. Schnatter resigned as Chairman on July 11, 2018.[48] Shortly after, on July 15, 2018, Papa John's terminated Mr. Schnatter's Founder Agreement.[49] As a result of Defendant's breach of the Schnatter NDA, and subsequently the publication of the Forbes Article, Mr. Schnatter incurred both economic and reputational harm.

### F. Documents Reviewed

29. As stated, a full list of the documents reviewed in preparation of this report is listed in Exhibit A. I had video conference conversations with Mr. Schnatter's business manager, Aaron Thompson, from August 2022 through February 2024. I also had a video conference with Mr. Schnatter on February 19, 2024. All the information I rely on from these phone calls is incorporated in this report.

## II. SUMMARY OF DAMAGES

30. For this Case, I evaluated the economic and reputational harm to Mr. Schnatter caused by Defendant's breach of contract and the subsequent release of the Forbes Article. An evaluation of the facts and documents provided to me in this case indicate five categories of damages. A summary of my opinions related to each bucket of damages are as follows:

Founder Agreement and Chairman Agreement Damages **($12,995,620)**: These represent damages for Mr. Schnatter's lost income from his Founder and Chairman Agreements. Had

[46] Document 1a: Second Amended Complaint, paragraph 174.
[47] Document 1a: Second Amended Complaint, paragraph 142.
[48] Document 1a: Second Amended Complaint, paragraph 159.
[49] Document 1a: Second Amended Complaint, paragraph 159.

the Forbes Article not come out, Mr. Schnatter would have been compensated under each of these agreements.

Reimbursable Expense Damages **($5,770,690)**: These represent damages Mr. Schnatter incurred by the loss of access to reimbursement for expenses related to security and assistants. Had the Forbes Article not come out, the Founder and Chairman Agreements would not have been terminated, and Mr. Schnatter would not have lost access to this benefit.

Mitigation Expense Damages **($15,690,900)**: These represent expenses Mr. Schnatter incurred to mitigate harm caused by the Forbes Article. Had the Forbes Article not come out, Mr. Schnatter would not have incurred these expenses.

Reputational Harm Damages **($6,106,436)**: These represent the damage to Mr. Schnatter's reputation. These damages are calculated by considering the amount of money Mr. Schnatter would have to pay for a reputational repair campaign via Google Pay-Per-Click (PPC) to correct the negative publicity caused by the leaked confidential information described in the Forbes Article. Had the Forbes Article not come out, Mr. Schnatter would not need to conduct a reputational repair campaign.

Naming Rights Damages (**$37,614,255**): These represent the fair market value of the naming rights Mr. Schnatter held for the University of Louisville's football stadium. Had the Forbes Article not come out, the naming rights would not have been terminated and Mr. Schnatter would not have lost this asset.

31. Each of the five buckets of damage described above are additive, thus, in the event Mr. Schnatter prevails in his breach of contract claim, total damages are **$78,177,901**.

## III. CORPORATE GOVERNANCE & OWNERSHIP

32. In the context provided, my expertise lies in damages analyses for breach of contract cases. As it relates to this Case, Mr. Schnatter previously served as the Chairman of the Board of Directors at Papa John's – a publicly traded company with outlined corporate governance practices. Corporate governance is a system of rules, practices and procedures that govern how a company operates and

is controlled.[50] Therefore, as part of rendering my damages opinion for this Case, I examined the corporate governance procedures at Papa John's.

33. Specifically, I reviewed Papa John's (A) Board of Directors; (B) ISS Governance QualityScore; (C) Officers; (D) Voting Structure; and (E) Ownership.

**A. Papa John's Board of Directors**

34. The core of a company's corporate governance lies within the board of directors. The board of directors is responsible for the governance of the company, including setting the company's strategic goals, providing leadership, overseeing the management of the business, and reporting to shareholders.[51]

35. According to Papa John's corporate governance guidelines, the Board of Directors is elected by the stockholders to oversee the company's management, safeguarding the long-term interests of the stockholders. In this pursuit, they also prioritize the interests of other stakeholders, including employees, franchisees, and the communities in which the company operates.[52]

36. Pursuant to Papa John's Amended and Restated By-Laws, which were approved on October 30, 2015, the Board of Directors at Papa John's can range from a group of three to fifteen individuals at any given time.[53]

37. As of May 2, 2018, prior to Mr. Schnatter's resignation as Chairman, Papa John's had a board consisting of seven directors. Out of the seven directors, six were considered "independent" based on both applicable law and NASDAQ listing standards.[54] An independent director is someone who does not have any material ties to the company.[55] Meanwhile, Mr. Schnatter was the sole "dependent" director, indicating he had a material relationship with Papa John's.[56]

38. Figure 1 shows Papa John's Board of Directors as of May 2, 2018.

[50] Document 20a.
[51] Document 20a.
[52] Document 20b.
[53] Document 4g: Amended and Restated By-Laws of Papa John's International, Inc., Article III, Section 1.
[54] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 19.
[55] Document 20c.
[56] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 21.

*Figure 1: Board of Directors as of May 2, 2018*[57]

| Name | Status | Description of Role |
|---|---|---|
| Christopher L. Coleman | Independent | Provides expertise in finance and international business. Serves on the Audit and Corporate Governance & Nominating Committees |
| Olivia F. Kirtley | Independent | Provides expertise in audit, risk management, and public company corporate governance and compensation. Serves as Chair of the Compensation Committee. |
| Laurette T. Koellner | Independent | Provides expertise in complex business operations, finance and accounting, and international business. Serves on the Compensation Committee and as Chair of the Audit Committee. |
| Sonya E. Medina | Independent | Provides leadership, strategy, and multi-cultural marketing experience. Serves on the Corporate Governance & Nominating Committee. |
| Mark S. Shapiro | Independent | Provides business acumen, operational expertise, and insight in creation, marketing, and branding. Serves on the Audit Committee and as Chair of the Corporate Governance & Nominating Committee. |
| W. Kent Taylor | Independent | Provides expertise in the restaurant industry. Serves on the Compensation Committee. |
| John H. Schnatter | Dependent | Founder and brand spokesperson. Serves as Founder and Chairman. |

## B. ISS Governance QualityScore

39. The ISS Governance QualityScore is a data-driven scoring and screening solution designed to enable reviews of corporate governance across four areas, including (1) board structure, (2) compensation, (3) shareholder rights, and (4) audit and risk oversight.[58] Governance QualityScore uses a decile-based score, where 1 indicates a low governance risk and 10 indicates a high governance risk.[59] As of February 1, 2018, prior to the publication of the Forbes Article, Papa John's ISS Governance QualityScore was a 2.[60]

40. Compared to other companies in its 2018 Peer Group,[61] Papa John's possessed a lower overall governance risk than the average company and ranks lower than or equal to the average when considering each category. See Figure 2 and Schedule 7.

57 Document 4o.
58 Document 20d.
59 Document 20d.
60 Document 20e: Wayback Machine, Yahoo Finance Papa John's International, Inc., February 20, 2018.
61 Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 20.
The companies in the peer group share many characteristics with Papa John's, including a common industry, similar market capitalization and other financial criteria, and are an appropriate group of comparable companies with which Papa John's compete for executive talent.

*Figure 2: ISS Governance QualityScore*[62]

| Company Name | Date of Score | Audit | Board | Shareholder Rights | Compensation | Overall Score |
|---|---|---|---|---|---|---|
| The Cheesecake Factory, Inc. | 10/27/2018 | 1 | 5 | 5 | 1 | 3 |
| Chipotle Mexican Grill, Inc. | 2/1/2019 | 5 | 9 | 4 | 8 | 8 |
| Domino's Pizza, Inc. | 10/8/2018 | 2 | 4 | 5 | 5 | 4 |
| Jack in the Box Inc. | 10/11/2018 | 1 | 3 | 1 | 3 | 1 |
| Texas Roadhouse, Inc. | 2/1/2019 | 2 | 6 | 2 | 5 | 3 |
| The Wendy's Company | 10/4/2017 | 1 | 5 | 1 | 1 | 1 |
| Papa John's International, Inc. | 2/20/2018 | 1 | 2 | 3 | 3 | 2 |
| **Average** | | **2** | **5** | **3** | **4** | **3** |

41. As presented in Figure 2, during Mr. Schnatter's tenure as Chairman of the Board of Directors, Papa John's ISS Governance Quality Score ranked higher than many of its peers, implying a low corporate governance risk. In other words, under Mr. Schnatter's leadership, the company's structure met, and in some categories exceeded, governance best practices compared to other companies in Papa John's peer group.

### C. Officers

42. Separate from the Board of Directors, every publicly traded company has a set of officers, which typically includes top level management such as a Chief Executive Officer and Chief Financial Officer.

43. At Papa John's, the Officers are elected by the Board of Directors and include (1) a Chairman of the Board, (2) a President, (3) one or more Vice Presidents (including Senior, Executive Vice Presidents or other classifications of Vice Presidents), (4) a Secretary, and (5) a Treasurer. If the Board of Directors requests, it may also elect other officers including a Chief Executive Officer, one or more Assistant Treasurers, and one or more Assistant Secretaries.[63] Additionally, the Amended and Restated By-Laws of Papa John's state "*Any officer of the Corporation may be removed, either with or without cause, at any time, by the Board of Directors.*"[64]

44. At the time the Forbes Article was released, the Officers at Papa John's included:

[62] The companies were selected using Papa John's Peer Group provided in its 2018 Proxy Statement. The Peer Group list is narrowed down to include only publicly traded companies with available ISS Governance QualityScore's within one year of the date of the Papa John's score, or February 20, 2018.
[63] Document 4g: Amended and Restated By-Laws of Papa John's International, Inc., Article IV, Section 1.
[64] Document 4g: Amended and Restated By-Laws of Papa John's International, Inc., Article IV, Section 3.

*Figure 3: Papa John's Officers as of July 10, 2018*[65]

| Name | Title |
|---|---|
| Steve M. Ritchie | President and Chief Executive Officer |
| John H. Schnatter | Founder, Chairman, and Former Chief Executive Officer |
| Caroline Miller Oyler | Chief Legal Officer |
| Michael R. Nettles | Senior Vice President, Chief Information and Digital Officer |
| Joseph H. Smith | Senior Vice President, Chief Financial Officer |
| Timothy C. O'Hern | Senior Vice President and Chief Development Officer |

45. Although there have been subsequent changes in these positions, the Officers outlined in Figure 3 provide the most pertinent information for this Case, as they correspond to the timeframe immediately preceding the publication of the Forbes Article.

**D. Voting Structure**

46. At Papa John's Annual Meeting of Stockholders, stockholders are asked to vote on certain matters including (1) the election of directors to the Board of Directors, (2) ratification of the selection of Papa John's independent auditors, (3) an advisory approval of executive compensation, and (4) an advisory vote on the frequency of future advisory votes on executive compensation.[66]

47. Each stockholder is entitled to one vote on each matter for each share of capital stock of the corporation held by the stockholder on the record date for the meeting.[67] To elect a Director to the Board, a majority of votes cast is required. A majority of the votes cast means that the number of shares voted "FOR" a director must exceed the number of votes cast "AGAINST" that director. A majority vote is also required to ratify the selection of independent auditors, approve incentive plans, and the advisory approval of the Company's executive compensation.[68]

48. Figure 4 shows stockholder voting patterns for Mr. Schnatter from 2014 to 2018:

[65] Document 4s.
Document 4t.
[66] Document 4n: Papa John's International Inc. 2017 Schedule 14A, page 1.
[67] Document 4g: Amended and Restated By-Laws of Papa John's International, Inc., Article II, Section 9.
[68]Document 4o: Papa John's International, Inc. 2018 Schedule 14A.

*Figure 4: Stockholder Votes for the Election of Directors*[69]

| Director | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | FOR | AGAINST | FOR | AGAINST | FOR | AGAINST | FOR | AGAINST | FOR | AGAINST |
| John H. Schnatter | 38,035,158 | 396,616 | n/a | n/a | n/a | n/a | 33,652,905 | 41,733 | 28,185,139 | 63,999 |

49. There are no votes for 2015 and 2016 because Mr. Schnatter's election in 2014 was for a term expiring in 2017.[70] Mr. Schnatter also held the position of Chairman of the Board of Directors in 2014 and 2017, and in 2018, as of the May 2, 2018, Annual Meeting of Stockholders,[71] just weeks prior to the release of the Forbes Article.

50. During the May 2, 2018, Annual Meeting of Stockholders, prior to the release of the Forbes Article, Mr. Schnatter received 99.77% of votes "FOR" and just 0.23% of votes "AGAINST."[72] Additionally, the 2018 Proxy Statement states "*The Board of Directors believes that Mr. Schnatter is best suited to serve as Chairman because, as our Founder, he is the director most familiar with our business, industry, and franchise system, and can lead the Board in identifying and prioritizing our strategies and initiatives.*"[73] The statement by the Board of Directors paired with Mr. Schnatter's 2018 voting patterns indicate the Board of Directors and the shareholder of Papa John's were satisfied with Mr. Schnatter's performance as of May 2, 2018, just months prior to the release of the Forbes Article.

### E. Ownership

51. As of May 2, 2018, Mr. Schnatter owned 30.3% of Papa John's common stock followed by Black Rock, Inc. owning 9.0%, Eminence Capital, LP owning 6.5%, The Vanguard Group owning 5.9%, and JPMorgan Chase & Co owning 5.1%. All other individuals on the Board of Directors at Papa John's and/or Officers at Papa John's owned less than 1% of common stock outstanding.[74] The ownership summary of Papa John's Common Stock is shown at Figure 5.

[69] Documents 4b – 4f.
[70] Document 4k: Papa John's International, Inc. 2014 Schedule 14A, page 29.
Document 4l: Papa John's International, Inc. 2015 Schedule 14A, page 31.
[71] Document 4k: Papa John's International, Inc. 2014 Schedule 14A, page 10.
Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 24.
[72] 28,185,139 ("FOR" Votes) + 63,999 ("AGAINST" Votes) = 28,249,138 (Total Votes)
28,185,139 ("FOR" Votes) ÷ 28,249,138 (Total Votes) = 99.8% ("FOR" Votes)
63,999 ("AGAINST" Votes) ÷ 28,249,138 (Total Votes) = 0.2% ("AGAINST" Votes)
[73] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 8.
[74] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 1.

*Figure 5: Ownership of Papa John's Common Stock as of May 2, 2018*[75]




52. In Papa John's 2023 Schedule 14A, Mr. Schnatter was not named as a beneficial owner of capital stock. Therefore, it can be concluded Mr. Schnatter owned less than 5% of outstanding common stock as of April 25, 2023.[76]

## IV. ECONOMIC PRINCIPLES FOR DAMAGES CALCULATIONS

53. I understand Mr. Schnatter is seeking damages he suffered as a result of Defendant's breach of contract. In breach of contract disputes, two economic principles must be established for the plaintiff to receive an award of monetary recovery: causation and mitigation.

### A. Causation

54. The first economic principle an expert must analyze is causation. Causation in breach of contract cases pertains to establishing that the defendant's breach of contract was the direct cause of damages suffered by the plaintiff. This is commonly referred to as the "proximate cause" and academic literature provides the following definition of the proximate cause element:[77]

> *"The proximate cause element requires that the plaintiff tie damages to the wrongful act; lost profits are recoverable only when they can be traced to, and result directly from, the wrong to be redressed. This makes establishing causation essential to the plaintiff's case because lost profit damages are not recoverable unless they are directly and proximately caused by a defendant's wrongful act. When the profits are lost as a consequence of a 'completely voluntary and independent*

[75] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 1.
[76] Document 4r: Papa John's International, Inc. 2023 Schedule 14A, page 16.
[77] Dunitz, Johanthan and Tyler Farmer, Chapter 10 "Context of the Lost Profits Damages Claim" from *The Comprehensive Guide to Economic Damages*, Sixth Edition, Business Valuation Resources, Edited by Nancy Fannon and Jonathan Dunitz; 2020, pages 229 – 230. Document 23a.

*business decision' the plaintiff may not be able to meet this burden even if the defendant's actions are a contributing factor underlying the plaintiff's decision."*

55. In other words, for Mr. Schnatter to be entitled to an award of monetary recovery, the damages he sustained must be due to the confidential information that was leaked as a result of Defendant's breach of contract.

### B. Mitigation

56. The second economic principle an expert should consider for a damages calculation is mitigation. Typically, the defendant has the burden of proving mitigation under the doctrine of avoidable consequences, which is also known as the doctrine of mitigation. According to the doctrine of avoidable consequences, a plaintiff must take reasonable steps to avoid further losses from the breach.[78]

57. The point of this doctrine is based upon the principle that a plaintiff should not be allowed to profit from their own lack of action. For example, if a plaintiff could have taken reasonable steps to minimize their damages, but did not, a plaintiff typically cannot recover those damages that could have been avoided.

58. Mitigation efforts may include retaining the services of an investment bank to explore alternative options or seeking strategic advice from a public relations firm to handle an ongoing crisis. Thus, any calculation of damages for Mr. Schnatter should address causation and mitigation.

## V. MR. SCHNATTER DAMAGES CATEGORIES

59. As part of my analysis, I reviewed potential damages categories for Mr. Schnatter and determined if the Forbes Article is the proximate cause of the economic loss. Each category of damages is identified below:

> (1) Founder Agreement and Chairman Agreement Damages: Damages related to the Founder and Chairman Agreements represent the lost income Mr. Schnatter incurred because of the termination of the Founder and Chairman Agreements.

[78] www.law.cornell.edu/wex/mitigation_of_damages

(2) Reimbursable Expense Damages: Damages related to reimbursable expenses represent Mr. Schnatter's loss of access to reimbursement for expenses related to security and assistants. Mr. Schnatter received these reimbursements as a benefit under the Founder and Chairman Agreements and he lost this benefit once the agreements were terminated.

(3) Mitigation Expense Damages: Mitigation damages represent the amount Mr. Schnatter spent mitigating any harm that ensued from the release of the Forbes Article.

(4) Reputational Harm Damages: Reputational harm damages represent the amount Mr. Schnatter would have to spend on a reputational repair campaign via Google PPC to correct the negative publicity caused by the information exposed from the breach of contract.

(5) Naming Rights Damages: Damages resulting from the termination of the University of Louisville's stadium naming rights represent the fair market value of Mr. Schnatter's naming rights. Had the Forbes Article not come out, the naming rights would not have been terminated and Mr. Schnatter would not have lost this asset.

60. I will evaluate each category in the subsequent sections of my report. First, I will address causation and mitigation.

## VI. CAUSATION AND MITIGATION

61. I conducted a causation investigation for each damages category listed above to determine whether the Forbes Article is the proximate cause of the damages sustained by Mr. Schnatter. My causation investigation involves an analysis of publicly available information, deposition testimonies, and an evaluation of other potential contributing factors that could have led to Mr. Schnatter sustaining damages.

### A. Founder and Chairman Agreements

62. Based on Plaintiff's document production, Mr. Schnatter had two distinct agreements with Papa John's for which he would receive compensation. Although Mr. Schnatter's Founder Agreement and Chairman Agreement were separate agreements, Mr. Schnatter's compensation earned under each agreement was lumped together. According to Papa John's Schedule 14A, under the Founder, Chairman, and License Agreements, Mr. Schnatter earned annual grants of stock options with a

minimum value of $600,000, or such greater amount determined by the Compensation Committee.[79] As presented at Schedule 2, Mr. Schnatter earned an average annual income of $1,004,519 between 2009 and 2018 under these agreements.[80] Upon the termination of these agreements, Mr. Schnatter stopped receiving this annual income, resulting in an economic loss. Regarding causation, the question remains whether these agreements were terminated due to the information leaked as a result of the breach of contract.

#### *(i) Chairman Agreement*

63. On July 11, 2018, the same day the Forbes Article was published, Mr. Schnatter resigned as Chairman of Papa John's. Evidence indicates Mr. Schnatter stepped down at the direction of the other members of the Board of Directors. For example, Sonya Medina, board member of Papa John's, testified that in a meeting on July 11, 2018,[81] members of the Board asked Mr. Schnatter to step down from his position as Chairman.[82] Further, in a letter from Mr. Schnatter to the other members of the Board of Directors dated July 14, 2018, Mr. Schnatter stated "*The Board asked me to step down as chairman without apparently doing any investigation.*"[83]

64. The facts and evidence in this Case indicate Mr. Schnatter's decision to step down as Chairman stemmed from the fact that the Board of Directors was capable of removing him as Chairman, had he not stepped down voluntarily. The Board of Directors was capable of the removal of Mr. Schnatter as explained in Papa John's Amended and Restated By-Laws, which state "*Any officer of the Corporation may be removed, either with or without cause, at any time, by the Board of Directors.*"[84]

65. As a result, it is reasonable to assume that, had Mr. Schnatter not voluntarily resigned, the Board of Directors would have likely taken action to remove him as Chairman. In either scenario, whether Mr. Schnatter resigned voluntarily or had been terminated from his role as Chairman, the outcome was the Board of Directors' decision to disassociate Mr. Schnatter from Papa John's due to the Forbes Article.

[79] Document 4n: Papa John's International Inc. 2017 Schedule 14A, page 29.
[80] Schedule 2a.
[81] Document 16d: Deposition Transcript of Sonya Medina, page 48 at 16-19.
[82] Document 16d: Deposition Transcript of Sonya Medina, page 53 at 1-5.
[83] Document 6b.
[84] Document 4g: Amended and Restated By-Laws of Papa John's International, Inc., Article IV, Section 3.

66. This is supported by the deposition testimony of Sonya Medina, which stated that when the Forbes Article was published "*the company was hemorrhaging*" and the Board of Directors "*felt the need to take action.*"[85] Furthermore, there are an additional four pieces of evidence that further indicate the Forbes Article is the proximate cause of Mr. Schnatter no longer being Chairman:

(1) Papa John's then CEO, Steve Ritchie, testified that as of July 10, 2018, just one day prior to the release of the Forbes Article, he was not aware of any plans or discussions by members of the Board of Directors to remove Mr. Schnatter as chair.[86]

(2) Sonya Medina testified that when she went to bed on July 10, 2018, she did not "*envision any world where [she] would be asking John to resign as chair of the board in the near future.*"[87]

(3) Shareholders of Papa John's were satisfied with Mr. Schnatter's performance as Chairman of the Board of Directors prior to the Forbes Article. Mr. Schnatter received 99.8% of votes "FOR" and just 0.2% of votes "AGAINST" in the May 2018 Annual Meeting of Shareholders.[88]

(4) In the May 2018 Proxy Statement, the Board of Directors stated they believe "*Mr. Schnatter is best suited to serve as Chairman because, as our Founder, he is the director most familiar with our business, industry, and franchise system, and can lead the Board in identifying and prioritizing our strategies and initiatives.*"[89]

67. In other words, prior to the publication of the Forbes Article, both the CEO and shareholders approved of Mr. Schnatter's performance as Chairman, and there were no deliberations concerning his removal from this role. These findings demonstrate the Forbes Article is the proximate cause of any losses suffered by Mr. Schnatter under the Chairman Agreement.

***(ii) Founder Agreement***

68. On July 15, 2018, the members of the Papa John's Board of Directors, excluding Mr. Schnatter, formed a special committee (the "Special Committee"). The Special Committee was made up of all

[85] Document 16d: Deposition Transcript of Sonya Medina, page 53 at 10-19.
[86] Document 16b: Deposition Transcript of Steve Ritchie, page 107 at 14-19.
[87] Document 16d: Deposition Transcript of Sonya Medina, page 184 at 18-22.
[88] Document 4f: Papa John's International, Inc. 2018 Form 8-K, page 2.
[89] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 8.

the independent directors of Papa John's at the time,[90] including Christopher L. Coleman, Olivia F. Kirtley, Laurette T. Koellner, Sonya E. Medina, and Mark S. Shapiro.[91] The purpose of the special committee was to make determinations regarding any agreements between Papa John's and Mr. Schnatter, which includes the Founder Agreement.[92]

69. After forming the Special Committee on July 15, 2018, Steve Ritchie sent Mr. Schnatter a letter titled "Notice of Termination of Agreement For Service As Founder" in which Steve Ritchie notified Mr. Schnatter "*that the Company is terminating the Agreement.*"[93] According to deposition testimony of Sonya Medina, the decision to terminate the Founder Agreement was a result of the Forbes Article.[94]

70. On July 16, 2018, Papa John's released the following statement in a press release:

> *"The special committee approved and directed the company to terminate Mr. Schnatter's Founder Agreement, which defined his role in the company, among other things, as advertising and brand spokesperson for the company."*[95]

71. As a result of these findings, it is evident the Forbes Article is the proximate cause of any losses Mr. Schnatter sustained under the Founder Agreement. In both instances, Mr. Schnatter took steps to mitigate his damages as discussed below. However, considering the breach of contract involved allegedly racist content that caused Mr. Schnatter to be removed from him own company, it is highly unlikely that any other organization would have considered offering Mr. Schnatter a similar position. This is further supported by the discussion in section VI.D, where I showcase how 20 organizations distanced themselves from Mr. Schnatter following the publication of the Forbes Article.

### B. Reimbursable Expenses

72. As an additional benefit under the Founder and Chairman Agreements, Mr. Schnatter was entitled to "*reimbursement of expenses incurred in connection with Company business pursuant to Company policy.*"[96] From 2015 to 2018 (partial year), Mr. Schnatter received reimbursement for expenses related to an administrative assistant, security detail, and security upgrades.[97] Following Mr. Schnatter's

---

[90] Document 6a.
[91] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, pages 13-16.
[92] Document 6a.
[93] Document 6c [JHS021668].
[94] Document 16d: Deposition Transcript of Sonya Medina, page 61 at 20-25.
[95] Document 6a.
[96] Document 2c: paragraph 3 and Document 2d: paragraph 3.
[97] Documents 23a – 23c.

termination in 2018, he incurred expenses related to items such as security and an administrative assistant that would have been reimbursed but-for Defendant's conduct.

73. Mr. Schnatter's loss of reimbursement for his expenses related to items such as security and assistants can be attributed to Defendant's conduct. Since Mr. Schnatter received reimbursements under the Founder and Chairman Agreements, which were terminated as a result of Defendant's conduct, Mr. Schnatter therefore lost these expense reimbursements as a result of Defendant's conduct.

### C. Mitigation Expenses

74. In breach of contract cases, mitigation expenses are the costs a plaintiff incurs in an attempt to reduce their losses. This is the point where the two economic principles of causation and mitigation intersect.

75. I understand a plaintiff is eligible to recover mitigation expenses if they were reasonably incurred to correct any harm caused from the breach of contract. Based on my review of Plaintiff's document production, Mr. Schnatter incurred four categories of expenses following the publication of the Forbes Article to mitigate further damages. These expenses include (1) Legal; (2) Consulting; (3) Investment Banking; (4) Public Relations.

76. I review each firm Mr. Schnatter retained and provide an explanation as to why the expense was incurred because of the Forbes Article:

#### *(i) Legal*

Bayard, P.A. ("Bayard"): On July 18, 2018, Mr. Schnatter retained Bayard to serve as Delaware counsel in connection with Mr. Schnatter's relationship with Papa John's. Bayard's role included (1) advising Mr. Schnatter on his rights in connection with actions taken by the Special Committee of the Board of Directors of Papa John's, (2) pursuing Mr. Schnatter's rights as a director of Papa John's to inspect its books and records, and (3) potentially commencing litigation against Papa John's and the members of its Board of Directions to enforce Mr. Schnatter's inspection rights or other rights he may have.[98] Given the nature of Bayard's work and its relation to the rehabilitation and protection of Mr. Schnatter in the

Schedule 2d.
[98] Document 15a: Bayard Agreement for Legal Services, July 18, 2018 [JHS036529].

aftermath of Defendant's conduct, Mr. Schnatter should be eligible to recover these expenses in the form of monetary recovery.

Glaser Weil Fink Howard Avchen & Shapiro LLP ("Glaser Weil"): On July 16, 2018, Mr. Schnatter engaged Glaser Weil to provide legal representation for "*possible Board disputes related to the resolution establishing the Papa John's Board Special Committee dated July 15, 2018.*"[99] I understand the Special Committee was formed in response to the Forbes Article and its purpose was to make determinations regarding any agreements between Papa John's and Mr. Schnatter.[100] Considering the purpose of the Special Committee and the services Glaser Weil was providing Mr. Schnatter in response to the formation of the Special Committee, it can be concluded that Mr. Schnatter would not have retained Glaser Weil and incurred the associated expenses but-for Defendant's Conduct. Therefore, Mr. Schnatter should be eligible to recover these expenses in the form of monetary recovery.

Hunton Andrews Kurth LLP: On October 5, 2018, Mr. Schnatter engaged Hunton Andrews Kurth LLP to represent him "*as transactional counsel to provide corporate law and securities law advice regarding a potential strategic transaction involving, or potential a potential proxy contest for board representation at, Papa John's.*"[101] Given the timing and nature of Hunton Andrews Kurth LLP's engagement, Mr. Schnatter should be eligible to recover these expenses in the form of monetary recovery.

UnitedLex: On July 26, 2018, Mr. Schnatter entered into an agreement with UnitedLex wherein United Lex would perform services for Mr. Schnatter including (1) data preservation: electronic discovery and forensic examiner consultation, and (2) data collection and interviews: electronic discovery and forensic examiner consultation.[102] I understand United Lex was to provide litigation support services following the release of the Forbes Article relating to anticipated litigation which ultimately became *John H. Schnatter v. Mark S. Shapiro et al*, filed September 5, 2018.[103] But-for Defendant's conduct leading to the release of the Forbes Article, Mr. Schnatter would not have entered into an agreement with United

[99] Document 15b: Glaser Weil Engagement Agreement, July 16, 2018 [JHS036535].
[100] Document 6a.
[101] Document 15c: Hunton Andrews Kurth Engagement Letter, October 5, 2018 [JHS036545].
[102] Document 15d: UnitedLex Statement of Work, July 26, 2018 [JHS036579].
[103] Document 1d: Plaintiff's Seventh Amended Initial Disclosures, page 26.

Lex. Therefore, Mr. Schnatter should be eligible to recover these expenses in the form of monetary recovery.

***(ii) Consulting***

Innisfree M&A Incorporated ("Innisfree"): On August 10, 2018, Mr. Schnatter retained Innisfree to provide consulting, analytic, and proxy solicitation services in connection with Mr. Schnatter's investment in Papa John's.[104] Innisfree was to provided proxy solicitation services in the event of a proxy contest at Papa John's.[105] Considering a proxy contest would not have occurred at Papa John's but-for Defendant's conduct, it is reasonable to conclude Innisfree's services would not have been needed had Defendant not breached the contract. Therefore, Mr. Schnatter should be eligible to recover these expenses in the form of monetary recovery.

***(iii) Investment Banking***

Moelis & Company LLC ("Moelis"): On November 30, 2018, Mr. Schnatter engaged Moelis to act as his "*exclusive financial advisor in connection with a proposed Acquisition Transaction or Sale Transaction.*"[106] As outlined in the Engagement Letter dated November 30, 2018, and in the Amended Engagement Letter dated October 30, 2019, Moelis assisted Mr. Schnatter in conducting business and financial analyses, developing strategies, and evaluating and negotiating potential options related to acquiring Papa John's or selling interest in Papa John's.[107]

Email correspondence occurring prior to Mr. Schnatter's engagement of Moelis between Steve Ritchie and Roger Matthews of Bank of America Merrill Lynch demonstrates Papa John's and its affiliates' concerns over Mr. Schnatter's ability to "*take the company private*" following the release of the Forbes Article. Roger Matthews suggested Mr. Schnatter was "*incredibly angry at what has transpired…, especially if he was nudged by the board to resign,*" and he

[104] Document 15e: Innisfree M&A Incorporated Agreement, August 10, 2018 [JHS036552].
[105] Document 15e: Innisfree M&A Incorporated Agreement, August 10, 2018, paragraph 2 [JHS036552].
[106] Document 15g: Moelis & Company Engagement Letter, November 30, 2018 [JHS036556].
[107] Document 15g: Moelis & Company Engagement Letter, November 30, 2018, paragraph 1(a) – 1(e).
Document 15f: Moelis & Company Amended Engagement Letter, October 30, 2019.

"*may seek to regain control.*"[108] In response, I understand Papa John's put a poison pill in place on July 22, 2018, to prevent Mr. Schnatter from taking control of the company.

Mr. Schnatter engaged Moelis to protect his own interests in the event Steve Ritchie, Roger Matthews, and others at Papa John's and its affiliates attempted to disrupt his ownership of the company. I understand Mr. Schnatter has never previously hired an investment bank to assist him with his personal stock holdings. Therefore, Mr. Schnatter's consideration of potential acquisitions and sales only occurred because of the Forbes Article, indicating the expenses incurred by Mr. Schnatter in connection with Moelis were a result of Defendant's conduct. Therefore, Mr. Schnatter should be eligible to recover these expenses in the form of monetary recovery.

***(iv) Public Relations***

Sitrick and Company ("Sitrick"): On July 14, 2018, Mr. Schnatter and his counsel, Glaser Weil, entered into an agreement with Sitrick "*to provide consulting advice and public relations services, which services are intended to facilitate legal advice being given to [Mr. Schnatter] and provided by [Glaser Weil].*"[109] In other words, but for the Defendant's breach of contract, Mr. Schnatter would not have incurred these expenses. Therefore, Mr. Schnatter should be eligible to recover these expenses in the form of monetary recovery.

77. After reviewing the four categories of mitigation expenses outlined above, it is clear Mr. Schnatter incurred each of these expenses in an effort to mitigate further harm that resulted from the Forbes Article. The strategic decision to retain the services of each respective firm directly resulted from the publication of the Forbes Article, establishing both economic principles of causation and mitigation. Based on this information, it is reasonable to assert Mr. Schnatter should be entitled to reimbursement for these expenses in the form of monetary recovery.

**D. Reputational Harm**

78. In breach of contract cases, reputational harm refers to the damage of a plaintiff's public perception that resulted from the breach.[110] In this case, Mr. Schnatter suffered reputational damage from

[108] Document 17a [PJI-LS_00003212].
[109] Document 15h: Sitrick and Company Agreement, July 14, 2018 [JHS036565].
[110] Document 18w: Contract Damages for Injury to Reputation, page 596-597.

Defendant's breach of contract which resulted in Forbes publishing an article describing the leaked confidential information from the May 22 Call.

79. I understand previous comments made by Mr. Schnatter on an earnings call on November 1, 2017, related to the NFL protests appeared to have impacted his reputation. The impact of these comments was evident by Papa John's decision to hire Laundry Service "*to help Papa John's address the public perception of Schnatter and his comments regarding the NFL*," and rebuild Mr. Schnatter's reputation and image.[111]

80. However, it's worth noting that Mr. Schnatter's comments were not the sole factor in impacting on his reputation. The failure of Papa John's, along with their public relations firm, to effectively address the situation following the earnings call also played a role. Irrespective of any previous impact on Mr. Schnatter's reputation, my causation and damages opinion focuses solely on the reputational damages resulting from the Forbes Article.

81. As part of my causation investigation, I identified 20 organizations that cut ties, suspended their relationship with Papa John's, or publicly reacted to the leaked confidential information regarding Mr. Schnatter in the Forbes Article. A list of the organizations that cut ties with Mr. Schnatter are shown in Figure 6 below:

*Figure 6: Examples of Harm to Mr. Schnatter's Reputation*[112]

| Count | Date of Statement | Organization |
|---|---|---|
| 1 | 7/11/2018 | NAACP |
| 2 | 7/12/2018 | Miami Marlins |
| 3 | 7/12/2018 | Houston Astros |
| 4 | 7/12/2018 | Kansas City Royals |
| 5 | 7/12/2018 | AMB Sports and Entertainment |
| 6 | 7/13/2018 | New York Yankees |
| 7 | 7/13/2018 | Seattle Mariners |
| 8 | 7/13/2018 | DC Breeze |
| 9 | 7/13/2018 | Monumental Sports |

[111] Document 1a: Second Amended Complaint, paragraphs 58 and 59.
[112] Schedule 4b.

| | | |
|---|---|---|
| 10 | 7/13/2018 | Orlando Magic |
| 11 | 7/13/2018 | FC Dallas |
| 12 | 7/13/2018 | Texas Rangers |
| 13 | 7/13/2018 | MLB |
| 14 | 7/13/2018 | Baltimore Orioles |
| 15 | 7/16/2018 | Washington Nationals |
| 16 | 7/16/2018 | Oregon State |
| 17 | 7/18/2018 | Tampa Bay Rays |
| 18 | 7/19/2018 | Utah Jazz |
| 19 | 7/19/2018 | University of Utah |
| 20 | 8/3/2018 | Purdue University |

82. The statements provided by these organizations demonstrate that the leaked confidential information about Mr. Schnatter is the sole reason for the organizations' decisions to suspend and/or terminate their contracts with Papa John's. Schedule 4b showcases the statements provided by each organization. A few examples include:

> NAACP (National Association for the Advancement of Colored People): "Much to our dismay it is now reported that a community business leader and member of the University of Louisville Board of Trustees has used the word which should not be in his vocabulary and never voiced anywhere, public or private. While the culture and climate of his company may allow the use of such language, the University of Louisville Board of Trustees is not the place for an individual holding views denoted by such word usage. We, the Louisville Branch NAACP call on John Schnatter to step down from the U of L Board of Trustees or be removed. In the place where high ideals are developed, taught, practiced and expected to be emulated and modelled, there is no place or role for a person who uses the n-word knowing what its usage has denoted."[113]

[113] Document 18c.

New York Yankees: "In response to the reprehensible remarks made by Papa John's founder and owner, the New York Yankees are suspending their relationship with the company."[114]

Miami Marlins: "Mr. Schnatter's derogatory and insensitive comments are not at all reflective of the values of our organization. As such, the Marlins are immediately suspending our relationship and promotions with the Papa John's brand."[115]

Houston Astros: "The Astros are incredibly disappointed with the statements made by Papa John's founder John Schnatter. We do not condone discrimination in any context and his comments do not reflect the mission, vision and values of our organization."[116]

Tampa Bay Rays: "We support the recent actions taken by Papa John's corporate headquarters to remove John Schnatter from the company. Racism has no place in society, and we condemn Mr. Schnatter's remarks."[117]

83. As shown above, each organization specifically cited John Schnatter in their decision to suspend or terminate the relationship with Papa John's. Furthermore, each of the statements mentioned above and in Schedule 4b are directly linked to the Forbes Article in which Mr. Schnatter quoted the N-word to condemn racism. In other words, these organizations released these statements solely due to the unauthorized disclosure of confidential information in the Forbes Article, rather than for any other reason.

84. These statements detailing the organizations' decisions to suspend and/or terminate their contracts with Papa John's demonstrate entities no longer wanting to be affiliated with Mr. Schnatter as a result of his allegedly racist remarks. In addition, these statements further perpetuated a false impression of Mr. Schnatter, causing a change in his public perception. Therefore, it is appropriate to calculate damages related to Mr. Schnatter's reputational harm.

[114] Document 18g.
[115] Document 18d.
[116] Document 18e.
[117] Document 18o.

### E. Naming Rights

85. Another aspect of Mr. Schnatter's harm is attributable to the economic value associated with his naming rights at the University of Louisville. On May 16, 1996, the University of Louisville and Mr. Schnatter individually entered into an agreement to name the University's football stadium "Papa John's Cardinal Stadium."[118] On July 13, 2018, two days after the release of the Forbes Article, the University of Louisville removed Papa John's from the name of their football stadium, making it "Cardinal Stadium."[119] On October 24, 2019, Mr. Schnatter and the University of Louisville entered into an agreement that terminated the Stadium Agreement and any amendments to the Stadium Agreement that granted Mr. Schnatter naming rights to the University of Louisville Cardinal's stadium.[120]

86. Statements made by the University of Louisville and staff indicate their inclination to alter the naming rights in response to the release of the Forbes Article. For example, on July 13, 2018, University of Louisville President Neeli Bendapudi announced that she had decided, with the support of the university's board of trustees, to rename the football stadium to "Cardinal Stadium," effective immediately. In her press conference she stated, *"over the last 24 hours our community has been fractured by the comments made by former UofL trustee John Schnatter."*[121]

87. Furthermore, Cardinals coach Bobby Petrino issued the following statement *"In light of recent events, I am pleased that our university made the correct decision to remove 'Papa John's' from the name of our stadium. Our football team and our city all promote environments of inclusiveness. The University's quick action to rename our stadium has only reaffirmed its commitment to such inclusiveness. I applaud their decision."*[122]

88. These findings establish that the statements released in the Forbes Article are the proximate cause of Papa John's removal from Cardinal Stadium's name. While Mr. Schnatter did receive a $9.5 million reimbursement for these rights,[123] this reimbursement does not accurately reflect the fair market value of the naming rights at the time the University of Louisville decided to discontinue Papa John's association with its football stadium. Therefore, to replace the intangible asset he lost as a result of

[118] Document 2a [JHS035442].
[119] Document 19f.
[120] Document 2h: Mutual Termination Agreement [JHS035412].
[121] Document 19f.
[122] Document 19g.
[123] Document 2h: Mutual Termination Agreement [JHS035412].

Defendant's conduct, Mr. Schnatter would have to purchase naming rights at the current fair market value, which is greater than the $9.5 million reimbursement he received.

**F. Causation – Other Factors**

89. To further explore whether the Forbes Article is the proximate cause of the economic and reputational harm Mr. Schnatter incurred, I identified several other factors that Defendant has asserted could have caused economic harm to Mr. Schnatter.

90. The factors include (i) [redacted] Mr. Schnatter in 1999 and 2009; (ii) Mr. Schnatter stepping down as the CEO of Papa John's in 2005; (iii) Mr. Schnatter's comments regarding Obamacare in 2012; (iv) An uncorroborated news story about Mr. Schnatter's involvement in the allegedly toxic work culture at Papa Johns; (v) Mr. Schnatter's comments about the failure of NFL leadership to properly manage the player protests in a 2017 earnings call; (vi) Mr. Schnatter's [redacted]; and (vii) other unwarranted comments.

91. Following these events (except for Mr. Schnatter's alleged toxic work culture),[124] Mr. Schnatter was re-elected to the Board of Directors on May 2, 2018, securing 28,185,139 shareholder votes in favor, while receiving only 63,999 shareholder votes against. After re-securing a position on the Board of Directors, Mr. Schnatter was unanimously elected as Chairman of the Board of Directors by his fellow Board members. Despite none of these events resulting in any damages Plaintiff is seeking, the purpose of investigating all of them is to ensure a thorough assessment in my causation opinion.

***(i) [redacted] Matters***

92. In 1999 and 2009, Mr. Schnatter was involved [redacted]. A 1999 [redacted]. Mr. Schnatter [redacted].[125] In 2009, there was [redacted].[126] Both the 1999 and 2009 matters ended [redacted].[127]

---

[124] Mr. Schnatter's alleged toxic work culture was published July 19, 2018, after the Forbes Article.
[125] Document 21a.
[126] Document 16c: Deposition Transcript of Aaron Thompson, pages 292-293 at 18-7.
[127] Document 16c: Deposition Transcript of Aaron Thompson, pages 290-293 at 15-7.
Document 21b.

93. I was provided with a Separation and General Release Agreement between [redacted] dated December 24, 2009.[128] [redacted].[131] Mr. Schnatter was not named [redacted], nor does [redacted] describe the underlying facts that gave rise [redacted].

94. Overall, there is no evidence any [redacted] had an impact on Mr. Schnatter's role at Papa John's or resulted in any economic or reputational harm. Further, these matters occurred in 1999 and 2009 prior to Defendant's conduct, thus if there was any potential harm to Mr. Schnatter, it would have already occurred.

***(ii) Stepping Down as CEO***

95. In 2005, Mr. Schnatter voluntarily stepped down as CEO of Papa John's to bring in "*professional management from the outside*."[132] Three years later, in December 2008, Papa John's named Mr. Schnatter as Interim CEO.[133] In April 2010, Mr. Schnatter became co-CEO along with Jude Thompson, former Chief Operating Officer.[134]

96. After examining Mr. Schnatter's voluntary step down as CEO, it is evident this did not cause any economic or reputational harm. If anything, Mr. Schnatter's acceptance back as CEO in 2008 and co-CEO in 2010 demonstrates his good standing with Papa John's at the time.

[128] Document 21o: [redacted] [JHS035539].
[129] Document 21p.
[130] Document 21o: [redacted] [JHS035539-JHS035540].
[131] Document 21o: [redacted] [JHS035541].
[132] Document 21c.
[133] Document 21d.
[134] Document 21e.

### *(iii) Obamacare Comments*

97. In August 2012, Mr. Schnatter made comments regarding Obamacare on a conference call with shareholders. Mr. Schnatter said that *"[Papa John's] is not supportive of Obamacare, like most businesses in [its] industry,"* and "*if Obamacare is in fact not repealed, [Papa John's] will find tactics to shallow out any Obamacare costs and core strategies to pass that cost onto consumers in order to protect [its] shareholders' best interests.*"[135] Mr. Schnatter went on to say that the cost of providing health insurance for all of Papa John's full time, uninsured employees will translate to an approximate 14 cent price increase for all large pizzas.[136]

98. In response to the backlash from the Obamacare comments, Mr. Schnatter hired a public-relations firm to assist in restoring his image. The firm helped release PR articles on behalf of Mr. Schnatter, highlighting positive comments he has made, including it is "*good news*" that "*100% of the population is going to get health insurance,*" and he has "*always wanted 100% of [Papa John's] employees on health care.*"[137]

99. Overall, the Obamacare comments had no impact on Mr. Schnatter's role at Papa John's or his Stadium Agreement. Furthermore, Mr. Schnatter's engagement of a public relations firm likely countered any negative public perception.

### *(iv) Alleged Involvement in a Toxic Work Culture*

100. Mr. Schnatter was in a news story written by Forbes accusing him of allegedly contributing to a toxic work culture at Papa John's. According to a July 19, 2018, Forbes Article, interviews with 37 current and former employees revealed that Mr. Schnatter's behavior allegedly consisted of spying on employees and sexually inappropriate conduct.[138] None of these interview subjects were identified by name in the story nor provided on-the-record testimonials.[139]

101. Mr. Schnatter allegedly recruited Papa John's employees to spy on one another. Further, Mr. Schnatter is accused of reading employees' emails and conducting business from disposable phones. Mr. Schnatter has denied accessing workers' emails and recruiting employees to spy on one another. However, he has admitted to using disposable phones for reasons of "*corporate security.*"[140]

135 Document 21f.
136 Document 21f.
137 Document 21g.
138 Document 21h.
139 Document 21h.
140 Document 21h.

102. The article featured in Forbes describing the allegedly toxic work culture at Papa John's and Mr. Schnatter's involvement was published on July 19, 2018, following the publication of the Forbes Article.[141] Therefore, Mr. Schnatter's involvement in the allegedly toxic work culture at Papa John's could not have contributed to the termination of his Founder and Chairman Agreements, Stadium Agreement, or reputational harm from the Forbes Article.

***(v) Earnings Call NFL Comments***

103. In 2016 and 2017, protests took place within the NFL involving players kneeling during the National Anthem. Players knelt during the National Anthem to protest police shootings of African American men and other social injustices faced by people of color in the United States. Protests began during the 2016 football season and continued into the 2017 season.[142]

104. Following the first protests in 2016, the NFL responded by releasing statements saying players were encouraged, but not required, to stand for the National Anthem.[143]

105. At the time, Papa John's was the official pizza of the NFL and had been since 2010.[144] In a Papa John's quarterly earnings call on November 1, 2017, Mr. Schnatter stated that "*by not resolving the current debacle to the player and owners' satisfaction, NFL leadership has hurt Papa John's shareholders.*"[145]

106. Approximately two weeks after the earnings call, Papa John's tweeted saying "*the statements made on our earnings call were describing factors that impact our business and we sincerely apologize to anyone that thought they were divisive,*" and the company supports the "*players' movement to create a new platform for change.*"[146]

107. In December 2017, following the earnings call comments, there were discussions of reintroducing Mr. Schnatter back into the company advertising once his "*reputation on behalf of the company had improved.*"[147] Additionally, the deposition testimony of Steve Ritchie explains that in the Spring of 2018, there was "*hope and optimism*" that "*things would improve [for Mr. Schnatter] if we followed the right*

[141] Document 21h.
[142] Document 21i.
[143] Document 21i.
[144] Document 21j.
[145] Document 21k.
[146] Document 21l.
[147] Document 16b: Deposition Transcript of Steve Ritchie, page 37 at 14-24.

*process,*"[148] indicating that Steve Ritchie expected Mr. Schnatter to remain with Papa John's, even after the earnings call comments.

108. Mr. Schnatter stepped down as CEO of Papa John's effective January 1, 2018. At the time, Mr. Schnatter remained Chairman of the board of Papa John's and his Founder agreement remained in place.[149]

109. Additionally, at Papa John's 2018 Annual Meeting of Stockholders on May 2, 2018, following the earnings call NFL comments, Mr. Schnatter received 28,185,139 "FOR" votes and just 63,999 "AGAINST" votes for his position as a director on the Board of Directors.[150] Considering all votes, Mr. Schnatter received approximately 99.77% "FOR" votes and just 0.23% "AGAINST" votes.[151]

110. While the earnings call comments occurred shortly before Mr. Schnatter stepped down as CEO, I understand this event was not the primary reason for his resignation. According to the deposition testimony of Steve Ritchie, there had been a succession plan in place prior to the fourth quarter of 2017 that outlined changes to the leadership team, including the CEO.[152] Additionally, there is no evidence these comments impacted Mr. Schnatter's earning potential or future at the company regarding his role as Chairman or Founder. Furthermore, even if this resulted in reputational harm, it is not pertinent to my calculation of reputational harm damages, which is specifically focused on the negative videos and articles that discuss the leaked confidential information.

***(vi)*** [redacted]

111. I understand Mr. Schnatter [redacted]. Deposition testimony of Steve Ritchie states that "[redacted]."[153] Mr. Ritchie further testified his belief that later in 2017, Mr. Schnatter [redacted].[154]

[148] Document 16b: Deposition Transcript of Steve Ritchie, pages 38-39 at 21-2.
[149] Document 21m.
[150] Document 4f: Papa John's International, Inc. 2018 Form 8-K.
[151] 28,185,139 ("FOR" Votes) + 63,999 ("AGAINST" Votes) = 28,249,138 (Total Votes)
28,185,139 ("FOR" Votes) ÷ 28,249,138 (Total Votes) = 99.8% ("FOR" Votes)
63,999 ("AGAINST" Votes) ÷ 28,249,138 (Total Votes) = 0.2% ("AGAINST" Votes)
[152] Document 16b: Deposition Transcript of Steve Ritchie, pages 24 at 3-21.
[153] Document 16b: Deposition Transcript of Steve Ritchie, page 170 at 5-9.
[154] Document 16b: Deposition Transcript of Steve Ritchie, page 175 at 7-23.

112. Deposition testimony of Mr. Schnatter clarifies this by explaining that he brought his friend, [redacted] and Mr. Schnatter himself never [redacted].[155]

113. Regardless, Steve Ritchie testified in deposition that [redacted]."[157]

114. Also, Mr. Schnatter's [redacted] was not public knowledge. In fact, deposition testimony of Aaron Thompson, Mr. Schnatter's business manager, indicates he was unaware of Mr. Schnatter's [redacted] prior to reading Steve Ritchie's deposition testimony.[158] Further, I am unable to locate any public information online regarding Mr. Schnatter's [redacted]. Therefore Mr. Schnatter's [redacted] abuse did not impact Mr. Schnatter's earning potential, the Stadium Agreement, or his reputation in any capacity.

115. Additionally, I understand the admissibility of the data related to Mr. Schnatter's [redacted] is pending further ruling from the judge in this Case. Therefore, it may not bear relevance to my causation analysis. Regardless, there is no evidence Mr. Schnatter's [redacted] had any impact on Mr. Schnatter's earning potential, the Stadium Agreement, or his reputation.

***(vii) Other Unwarranted Comments***

Comments on Wages: According to the deposition testimony of Steve Ritchie, Mr. Schnatter made statements at a speaking engagement about "*wages to employees of Papa John's or its franchisees*" that "*have led to criticism of the company.*"[159] An article from October 2014 explains that "*Papa John's founder John Schnatter has found himself in some hot water recently over the wages and benefits his pizza chain pays to workers.*" During a video interview at Inc.'s GrowCo Conference, Mr. Schnatter raised the topic of minimum wage.[160] Mr. Schnatter's comments occurred during a time when several of Papa John's "*New York franchisees received subpoenas from New York State Attorney General Eric Schneiderman as part of a larger probe into fast-food restaurants underpaying workers.*"[161] Mr. Schnatter attempted to combat the wage comments by stating "*if*

[155] Document 16a: Deposition Transcript of John Schnatter, page 123-125 at 6-18.
[156] Document 16b: Deposition Transcript of Steve Ritchie, page 187 at 13-14.
[157] Document 16b: Deposition Transcript of Steve Ritchie, page 184 at 15-23.
[158] Document 16c: Deposition Transcript of Aaron Thompson, page 85 at 2-7.
[159] Document 16b: Deposition Transcript of Steve Ritchie, page 155 at 8-12.
[160] Document 21n.
[161] Document 21n.

*we're not taking care of our people, then we're going to lose good talent, at every level*," and "*I have a goal to get the average store manager to 75,000 bucks*."[162] Overall, the comments on wages did not result in either economic or reputational harm to Mr. Schnatter, nor did they impact the Stadium Agreement.

Comments on a Woman Looking Beautiful: In a meeting on May 14, 2018, with Laundry Service, Mr. Schnatter commented on the attractiveness of a woman, Victoria Russell.[163] At the time, Victoria Russell worked for Papa John's in diversity, equity, and inclusion.[164] Victoria Russell was present at the May 14, 2018, meeting. During the meeting, Mr. Schnatter was discussing a Cowboys game that Victoria Russell and another employee accompanied him to, and he stated something to the effect of "*you know the only reason I brought you to the game is because you're beautiful*."[165] However, Mr. Ritchie testified that he took these comments as a joke and that he "*didn't think it was derogatory in nature*."[166] Further, during a Laundry Service visit, Mr. Schnatter allegedly "*stated a preference to have [Victoria Russell] placed at the desk outside his office as his second personal assistant so that people would be greeted with an 'attractive black woman,' and therefore be less inclined to think of him as bigoted accordingly*."[167] According to Steve Ritchie's deposition transcript, Mr. Schnatter had made comments about the appearance of women in the past,[168] but there is no evidence to suggest these were public knowledge or that the Board of Directors intended to remove him for these comments. Also, the two comments made by Mr. Schnatter during meetings with Laundry Service would have been protected under the NDA that is at issue in this Case.

Comments on James Byrd Incident: I understand during the May 22 Call,[169] Mr. Schnatter made a comment "*about his experience in Indiana of black people being dragged behind trucks*."[170] Mr. Schnatter shared this story in response to a question asking him, "*How would you distance yourself from the racist groups online?*"[171] I understand Mr. Schnatter "*intended for remarks to convey*

[162] Document 21n.
[163] Document 16b: Deposition Transcript of Steve Ritchie, page 161 at11-17.
[164] Document 16b: Deposition Transcript of Steve Ritchie, page 162 at 11-14.
[165] Document 16b: Deposition Transcript of Steve Ritchie, page 162 at 18-24.
[166] Document 16b: Deposition Transcript of Steve Ritchie, page 162 – 163 at 18-3.
[167] Document 16b: Deposition Transcript of Steve Ritchie, page 285 at 1-7.
[168] Document 16b: Deposition Transcript of Steve Ritchie, page 164 at 6-7.
[169] Document 16b: Deposition Transcript of Steve Ritchie, page 191 at 7-11.
[170] Document 16b: Deposition Transcript of Steve Ritchie, page 165 at 19-22.
[171] Document 16c: Deposition Transcript of Aaron Thompson, page 258 at 1-3.

*his antipathy to racism.*"[172] Mr. Schnatter's comments reference the James Byrd incident that occurred in the 1990s in Texas.[173] Mr. Schnatter referenced this incident to "*point out the severity of the history of race in this country that [he] found horrific and unfathomable.*"[174] These comments were later published in the July 19, 2018, Forbes Article "*The Inside Story Of Papa John's Toxic Culture.*"[175] Since these comments were not released to the public until after the termination of the Founder and Chairman Agreements, they cannot be the cause of the Mr. Schnatter's lost earnings from either agreement. Regardless, because these comments were made by Mr. Schnatter on the May 22 Call and were protected under the NDA, any economic harm Mr. Schnatter incurred because of the release of these comments is due to Defendant's breach of contract.

**G. Summary**

116. After reviewing the several other factors, it is clear none of them resulted in an economic loss or reputational harm for Mr. Schnatter. My findings for each event are summarized below:

[redacted] Matters: There is no evidence the [redacted] matters impacted Mr. Schnatter's role as Founder or Chairman at Papa John's or the Stadium Agreement. Even if the [redacted] matters did impact Mr. Schnatter, the cases occurred in 1999 and 2009, which is prior to the release of the Forbes Article. Additionally, any negative shift in public perception of Mr. Schnatter resulting from these matters does not bear relevance to my calculation of reputational harm.

Stepping Down as CEO: Mr. Schnatter stepping down as CEO of Papa John's in 2005 did not impact his earning potential or future with the company or the Stadium Agreement. In fact, Mr. Schnatter's return to Papa John's in 2010 demonstrates his value and good standing with the company. Further, even if there was a negative shift in public perception of Mr. Schnatter, it is important to clarify this does not bear relevance to my calculation of reputational harm.

[172] Document 16c: Deposition Transcript of Aaron Thompson, page 258-259 at 25-2.
[173] Document 16a: Deposition Transcript of John Schnatter, page 322 at 19-25.
Document 16c: Deposition Transcript of Aaron Thompson, page 258 at 4-12.
[174] Document 16a: Deposition Transcript of John Schnatter, page 323 at 8-11.
[175] Document 21h

Obamacare Comments: There is no evidence the comments impacted Mr. Schnatter's role at Papa John's or the Stadium Agreement. Additionally, the Obamacare comments occurred in 2012. Further, if there was a negative shift in public perception of Mr. Schnatter because of these comments, it is important to clarify that it does not bear relevance to my calculation of reputational harm.

Involvement in a Toxic Work Culture: Mr. Schnatter's alleged involvement in a toxic workplace culture did not contribute to his termination or the removal of Papa John's name from the University of Louisville Stadium because the article announcing the toxic workplace culture was published after the Founder and Chairman Agreements were terminated and the name was removed. Any negative shift in public perception of Mr. Schnatter resulting from this article does not bear relevance to my calculation of reputational harm.

Earnings Call NFL Comments: The earnings call comments did not have an impact on Mr. Schnatter's role as Chairman or Founder and did not result in the termination of the Stadium Agreement. Even if there was a negative shift in public perception of Mr. Schnatter following the earnings call comments, it is important to clarify this does not bear relevance to my calculation of reputational harm.

[redacted]: Mr. Schnatter's [redacted] was not public knowledge and thus had no impact on his economic losses and reputational harm. Further, I understand the admissibility of the data related to Mr. Schnatter's [redacted] is pending further ruling from the judge in this Case. Therefore, it may not bear relevance to my causation analysis.

Other Unwarranted Comments: Mr. Schnatter's unwarranted comments regarding (1) wages, (2) women, and (3) black people had no impact on Mr. Schnatter's role as Chairman or Founder at Papa John's or the Stadium Agreement. Additionally, the comments about women and black people occurred during calls with Laundry Service, therefore, they are protected under the NDA and any potential impact would be due to a breach of contract. Regardless, any negative shift in public perception of Mr. Schnatter resulting from his unwarranted comments does not bear relevance to my calculation of reputational harm.

## VII. FOUNDER AND CHAIRMAN AGREEMENTS DAMAGES

117. According to Papa John's 2019 proxy statement, "*[t]he actual total grant date fair value of Mr. Schnatter's award made in February 2018 under the Chairman Agreement and the Founder Agreement was $660,000.*"[176] Therefore, for my analysis, I considered the Founder Agreement and Chairman Agreement as one source of lost income for Mr. Schnatter.

> Founder Agreement: On August 9, 2007, Papa John's and Mr. Schnatter executed the Founder Agreement.[177] According to the terms of the agreement, Papa John's agreed to compensate Mr. Schnatter annual grants of stock options with a minimum aggregate value of $300,000 in exchange for specific duties and responsibilities.[178] The duties and responsibilities outlined in the Founder Agreement include, but are not limited to, (1) attending major corporate and franchise operations functions, (2) making between eight and sixteen appearances at domestic and international franchise locations, (3) participating in monthly quality meetings with Papa John's management, and (4) participating in commercials and other high profile public location events.[179]

> Chairman Agreement: On August 9, 2007, Papa John's and Mr. Schnatter executed the Chairman Agreement.[180] According to the terms of the agreement, Papa John's agreed to compensate Mr. Schnatter annual grants of stock options with a minimum aggregate value of $300,000 in exchange for specific duties and responsibilities.[181] Mr. Schnatter's duties and responsibilities outlined in the Chairman Agreement include, but are not limited to, (1) Chair meetings of the Company's Board of Directors, (2) attend quarterly meetings with the CEO, and (3) provide information and insights to Papa John's Board of Directors and CEO.[182]

118. In addition to Mr. Schnatter's base compensation from the Founder and Chairman Agreements, Papa John's proxy statements indicate Mr. Schnatter earned additional option awards.[183] Papa John's

---

[176] Document 4p: Papa John's International, Inc. 2019 Schedule 14A, page 39.
[177] Document 2d.
[178] The value of the stock options were to be calculated by using Black-Scholes method, the binomial options model, or any other method agreed upon by the compensation committee.
[179] Document 2d: paragraph 1.
[180] Document 2c.
[181] The value of the stock options were to be calculated by using Black-Scholes method, the binomial options model, or any other method agreed upon by the compensation committee.
[182] Document 2c: paragraph 1.
[183] Documents 4h – 4q.

proxy statements indicate Mr. Schnatter earned between $849,971 and $1,160,047 per year in total option awards from 2009 to 2017, including the $600,000 to $660,000 from the Founder and Chairman Agreements. Considering the value of Mr. Schnatter's base compensation, this translates to Mr. Schnatter earning between $249,971 and $500,047 per year in additional compensation from option awards.[184]

119. The amounts presented as option awards reflect the aggregate grant date fair value related to stock options granted in the respective fiscal year.[185] According to Papa John's Schedule 14A, Mr. Schnatter earned these options in connection with his role as Founder and Chairman.[186] Therefore, additional option awards are also a lost source of income for Mr. Schnatter following Defendant's conduct.

120. Figure 7 below shows Mr. Schnatter's historical total compensation for the Founder and Chairman Agreements and the additional option awards.

*Figure 7: Mr. Schnatter's Total Income from Option Awards*[187]




121. Based on Figure 7, Mr. Schnatter earned an average income of $1,004,519 from the Founder and Chairman Agreements from 2009 – 2018. After the Forbes Article was released, Mr. Schnatter no

[184] Schedule 2a.
[185] Document 4i: Papa John's International, Inc. 2011 Schedule 14A, page 22.
[186] Document 4n: Papa John's International Inc. 2017 Schedule 14A, page 29
[187] Documents 4h – 4q.

longer received income from these agreements, thus he is seeking to recover the actual damages he sustained.

### A. Calculating Damages using Before-and-After Method

122. In this Case, the lost profits calculation will quantify Mr. Schnatter's economic losses from the Founder and Chairman Agreement using a Before-and-After Method. The Before-and-After Method determines economic revenues during the damages period by comparing the plaintiff's income before and after the breach of contract. As I have been provided with Mr. Schnatter's past income from the Founder Agreement and Chairman Agreement, this is the most appropriate method to use.

123. Before performing the calculation, an expert must define a time period in which the harm started and when the harm is reasonably expected to end. This is called the damages period and should indicate the time needed to make the plaintiff whole for its legally recognized economic losses.

124. An expert must then forecast the financial performance of the plaintiff in two scenarios. The first scenario is an "as-is" forecast, where the expert projects the plaintiff's financials based on its current operations. Under this scenario, the breach of contract has already occurred, thus the forecasted results will typically be lower.

125. The second scenario is a "but-for" forecast, where the analyst forecasts the plaintiff's financials as if the breach of contract had never occurred.[188] Under this scenario, the underlying assumption is that the plaintiff would have continued to achieve similar levels of profitability as it did prior to the breach of contract. The difference between the but-for profits and the as-is profits is lost profits.

### B. Defining the Damages Periods

126. Considering the Forbes Article was published on July 11, 2018, the damages period begins on the same day and continues until Mr. Schnatter's reasonable retirement from his positions as Founder and Chairman. Because of the distinct responsibilities outlined in the Chairman and Founder Agreements, and the variations of workload, individual damages periods have been defined for each agreement.

[188] Robert P. Gray, Robert B. Kester, and Karl G. Dial, Chapter 11 "Planning Credible Lost Profits Analyses for Financial Experts" from the Comprehensive Guide to Economic Damages, Sixth Edition, Business Valuation Resources, Edited by Nancy Fannon and Jonathan Dunitz; 2020, pages 247–256. Document 24a.

### *(i) Chairman Agreement Damages Period*

127. As of the Report Date, Mr. Schnatter is 62 years old and according to Plaintiff's Seventh Amended Initial Disclosures, Mr. Schnatter expected to continue in his role as Chairman until he was 71 years old, or until 2033.

128. A list of comparable individuals from companies listed in Papa John's Peer Group is listed in Figure 8.

*Figure 8: Comparable Individuals*[189]

| Company | Name | Position | Age |
|---|---|---|---|
| The Cheesecake Factory | David Overton | Chairman | 76 |
| Domino's Pizza | David A. Brandon | Executive Chairman | 70 |
| Texas Roadhouse | Gregory N. Moore | Chairman | 73 |
| The Wendy's Company | Nelson Peltz | Chairman | 81 |
| Denny's Corporation | Brenda J. Lauderback | Chair | 71 |
| Cracker Barrel Old Country Store, Inc. | William W. McCarten | Chair | 74 |
| **Average** | | | **74** |

129. After conducting a search of the chairmen of companies Papa John's considers comparable,[190] it can be determined that it is not uncommon for a chairman to continue serving their position into their 70s. In fact, Mr. Schnatter's expected retirement age of 71 is on the lower end considering the individuals in Figure 8. Therefore, it is reasonable, and even conservative, to assume Mr. Schnatter would have remained as Chairman until the age of 71. Thus, the Chairman Damages Period runs until 2033.

### *(ii) Founder Agreement Damages Period*

130. Meanwhile, I understand Mr. Schnatter's duties as Founder were less intensive than his duties as Chairman. Therefore, it is reasonable to assume Mr. Schnatter would have been able to fulfill his duties as Founder throughout the remainder of his life expectancy.

---

[189] Schedule 6.
[190] Document 4o: Papa John's International, Inc. 2018 Schedule 14A, page 20.
Papa John's lists the companies I rely on in its Peer Group I understand there are companies in Papa John's Peer Group that are not listed. This is because I could not locate publicly available information on the companies' chairmen.

131. As of the Report Date, Mr. Schnatter is 62 years old. According to the Social Security Administration, Mr. Schnatter's life expectancy is 81.5 years old. Therefore, he would have remained Founder until 2042.[191] Thus, the Founder Damages Period runs until 2042.

## C. Mr. Schnatter's As-Is Performance

132. To calculate lost profits, I first projected Mr. Schnatter's income based on his current level of income and expenses from the Founder and Chairman Agreements, which is $0.

133. In this Case, the historical financial period for Mr. Schnatter is from 2018, the year of Defendant's breach of contract, to 2022, the last period in which financial information regarding Mr. Schnatter was provided. The historical period represents Mr. Schnatter's actual financial performance.

134. Mr. Schnatter earned $660,018 in income in 2018 related to the Founder Agreement and Chairman Agreement. Mr. Schnatter earned this income because the Founder Agreement and Chairman Agreement were terminated after Mr. Schnatter's compensation for 2018 was approved.

135. Mr. Schnatter and Papa John's entered into an Amended and Restated Exclusive License Agreement (the "License Agreement") on May 14, 2008.[192] According to the terms of the License Agreement, Mr. Schnatter agreed to let Papa John's use his name, image, and likeness ("NIL") up until 50 years after his death. In exchange for his NIL, Papa John's was to compensate Mr. Schnatter $300,000 per year, but only if the Founder Agreement was no longer in effect. Pursuant to the License Agreement, when the Founder Agreement was terminated, Mr. Schnatter was paid $300,000 in 2019, 2020, and 2021.[193] On May 7, 2019, Papa John's and Mr. Schnatter terminated the License Agreement, and the last payment of $300,000 took place in May of 2021.[194]

136. In total, Mr. Schnatter earned $1,560,018 in income from 2018 through 2022 from the Founder, Chairman, and License Agreements. As presented in Schedule 2b, I forecasted Mr. Schnatter's income earned under the Founder and Chairman Agreements from 2023 to 2042. I forecast Mr. Schnatter's income under the Founder and Chairman Agreements through 2042 because, but-for Defendant's conduct, Mr. Schnatter would have held his position as Chairman until 2033 and his position as Founder until 2042. However, due to Defendant's conduct, Mr. Schnatter earned $0

[191] Document 1d: Plaintiff's Seventh Amended Initial Disclosures, page 19.
[192] Document 2i.
[193] Document 1c: Plaintiff's Sixth Amended Initial Disclosure, Disclosure No. 3 License Agreement.
[194] Document 2j.

under the Founder and Chairman Agreements past 2018. Therefore, Mr. Schnatter's as-is income is from 2023 to 2042 is $0.

### D. Mr. Schnatter's But-For Calculation

137. The second scenario is a but-for calculation, where the expert forecasts the subject business' financials as if the breach of contract had never occurred. Under this scenario, the underlying assumption is that the plaintiff would have continued to achieve similar levels of sales and profitability as it did prior to the breach of contract.

138. In order to render my damages opinion, I projected Mr. Schnatter's income assuming the contract was not breached and the Forbes Article was not published. As presented in Schedule 2b, I created financial projections for both the historical period and the future period.

139. Absent the publication of the Forbes Article, Mr. Schnatter would have generated income from two business activities:

(1) The Founder Agreement; and

(2) The Chairman Agreement.

140. The assumptions I used to quantify lost income for each activity are presented at Schedule 1b. The lost income sources used in my but-for forecast are quantified in subsequent sections of this report.

#### *(i) Lost Income from Founder Agreement and Chairman Agreement*

141. Had the Forbes Article not been published, Mr. Schnatter would still have earned income under the Founder and Chairman Agreements. Mr. Schnatter would have reasonably continued to hold the position of Founder for the remainder of his life, or until 2042, and the position of Chairman until 2033.

142. Under the Founder Agreement, Mr. Schnatter earned annual grants of stock options with a minimum value of $300,000.[195] Under the Chairman Agreement, Mr. Schnatter earned annual grants of stock options with a minimum value of $300,000.[196]

[195] Document 2d.
[196] Document 2c.

143. Although Mr. Schnatter's Founder Agreement and Chairman Agreement were separate agreements, Mr. Schnatter's compensation earned under each agreement was lumped together. Under both agreements, Mr. Schnatter earned between $600,000 to $660,000 annually. Therefore, from 2018 through 2033, Mr. Schnatter incurred a loss of $600,000 per year from the Founder and Chairman Agreements. Due to the anticipated retirement of Mr. Schnatter in 2033, which marks the conclusion of the Chairman Agreement Damages Period, there will be no lost profits incurred from this agreement thereafter.

144. Considering Mr. Schnatter's anticipated fulfillment of duties outlined in the Founder Agreement in 2042, the annual loss from this agreement totals $300,000 per year until 2042.

***(ii) Additional Lost Income from Compensation Committee***

145. According to company filings from 2009 through 2017, Mr. Schnatter earned additional option awards in excess of $600,000 from the Founder and Chairman Agreements. These additional option awards are outlined in Schedule 2a and considered for the calculation of actual damages.

146. From 2009 through 2018, Mr. Schnatter earned a total of $6,480,000 in base pay under the Founder and Chairman Agreements. Additionally, from 2009 through 2018, Mr. Schnatter earned a total of $3,565,187 in additional option awards from the Compensation Committee.

147. Since Mr. Schnatter had earned income from additional option awards every year up until Defendant's conduct, they are considered a lost source of income. I calculate Mr. Schnatter's lost income from additional option awards from 2018 through 2033. Since it is not specified what portion of the additional option awards are linked to the Founder Agreement versus the Chairman Agreement, I conservatively only include it as a source of lost income for the Chairman Agreement Damages Period, or until 2033. In total, from 2018 through 2033, Mr. Schnatter's but-for income from additional option awards is $7,024,745.

***(iii) Summary of but-for income under Founder and Chairman Agreements***

148. A summary of Mr. Schnatter's but-for income is shown at Figure 9.

*Figure 9: Mr. Schnatter's But-for Income from Founder and Chairman Agreements*

| Year | But-for Income from Founder Agreement | But-for Income from Chairman Agreement | But-for Income from Additional Option Awards |
|---|---|---|---|
| 2018 | $330,000 | $330,000 | $382,797 |
| 2019 | $300,000 | $300,000 | $442,797 |
| 2022 | $300,000 | $300,000 | $442,797 |
| 2021 | $300,000 | $300,000 | $442,797 |
| 2022 | $300,000 | $300,000 | $442,797 |
| 2023 | $300,000 | $300,000 | $442,797 |
| 2024 | $300,000 | $300,000 | $442,797 |
| 2025 | $300,000 | $300,000 | $442,797 |
| 2026 | $300,000 | $300,000 | $442,797 |
| 2027 | $300,000 | $300,000 | $442,797 |
| 2028 | $300,000 | $300,000 | $442,797 |
| 2029 | $300,000 | $300,000 | $442,797 |
| 2030 | $300,000 | $300,000 | $442,797 |
| 2031 | $300,000 | $300,000 | $442,797 |
| 2032 | $300,000 | $300,000 | $442,797 |
| 2033 | $300,000 | $300,000 | $442,797 |
| 2034 | $300,000 | $0 | $0 |
| 2035 | $300,000 | $0 | $0 |
| 2036 | $300,000 | $0 | $0 |
| 2037 | $300,000 | $0 | $0 |
| 2038 | $300,000 | $0 | $0 |
| 2039 | $300,000 | $0 | $0 |
| 2040 | $300,000 | $0 | $0 |
| 2041 | $300,000 | $0 | $0 |
| 2042 | $300,000 | $0 | $0 |
| **Total** | **$7,530,000** | **$4,830,000** | **$7,024,745** |

149. Therefore, Mr. Schnatter's total but-for income under the Founder and Chairman Agreements is $19,384,745.

***(iv) Present Value Calculation***

150. I calculated the present value of future lost income from (1) the Founder Agreement, (2) the Chairman Agreement, and (3) additional option awards from the Compensation Committee. A present value calculation converts a future income stream to an equivalent value received in the present while accounting for the risk of that future income stream.

151. I utilized a discount rate of 7.04%, which represents Papa John's weighted average cost of capital (WACC) as of January 1, 2024.[197] Papa John's WACC as of January 1, 2024, is used because it represents the company's WACC as of the date of discounting. In other words, the future income streams presented in this report are adjusted to reflect the present value as of January 1, 2024. It is appropriate to use Papa John's WACC as opposed to the WACC for an individual because Mr. Schnatter's income under the Founder and Chairman Agreement's was tied to Papa John's performance as a company.

152. I discounted the future income streams in the but-for scenario to calculate the present value at Figure 10.[198]

*Figure 10: Present Value of Mr. Schnatter's But-for Income from Founder and Chairman Agreements:*

| Year | PV But-for Income from Founder Agreement | PV But-for Income from Chairman Agreement | PV But-for Income from Additional Option Awards |
|---|---|---|---|
| 2018 | $330,000 | $330,000 | $382,797 |
| 2019 | $300,000 | $300,000 | $442,797 |
| 2020 | $300,000 | $300,000 | $442,797 |
| 2021 | $300,000 | $300,000 | $442,797 |
| 2022 | $300,000 | $300,000 | $442,797 |
| 2023 | $300,000 | $300,000 | $442,797 |
| 2024 | $280,269 | $280,269 | $413,674 |

[197] Document 25a.
[198] Schedule 2b.

| | | | |
|---|---|---|---|
| 2025 | $261,836 | $261,836 | $386,467 |
| 2026 | $244,615 | $244,615 | $361,049 |
| 2027 | $228,527 | $228,527 | $337,303 |
| 2028 | $213,496 | $213,496 | $315,118 |
| 2029 | $199,455 | $199,455 | $294,393 |
| 2030 | $186,337 | $186,337 | $275,031 |
| 2031 | $174,081 | $174,081 | $256,942 |
| 2032 | $162,632 | $162,632 | $240,043 |
| 2033 | $151,936 | $151,936 | $224,256 |
| 2034 | $141,943 | $0 | $0 |
| 2035 | $132,607 | $0 | $0 |
| 2036 | $123,886 | $0 | $0 |
| 2037 | $115,738 | $0 | $0 |
| 2038 | $108,126 | $0 | $0 |
| 2039 | $101,014 | $0 | $0 |
| 2040 | $94,371 | $0 | $0 |
| 2041 | $88,164 | $0 | $0 |
| 2042 | $82,366 | $0 | $0 |
| **Total** | **$4,921,399** | **$3,933,184** | **$5,701,055** |

153. In total, the present value of Mr. Schnatter's but-for income is $14,555,638.

### E. Calculating Lost Profits of Mr. Schnatter

154. The purpose of using a two-model approach is to measure the difference between the but-for forecast and the as-is forecast. Lost profits are calculated by taking the income Mr. Schnatter would have achieved but-for Defendant's breach of contract and subtracting the income Mr. Schnatter achieved operating as-is.

155. Therefore, Mr. Schnatter's lost profits resulting from lost income form the Founder and Chairman Agreements are $12,995,620. The calculation is summarized in Figure 11 and detailed at Schedule 2b.

*Figure 11: Calculation of Lost Profits from Founder and Chairman Agreements*

| **Scenario** | **Value** |
|---|---|
| But-For | $14,555,638 |
| As-Is | $1,560,018 |
| **Lost Profits** | **$12,995,620** |

156. Again, my analysis and calculation of lost profits assume Mr. Schnatter prevails in the claims. If Mr. Schnatter does not prevail in his claims, economic damages would be $0.

## VIII. REIMBURSABLE EXPENSE DAMAGES

157. I quantify Mr. Schnatter's lost profits from his loss of reimbursable expenses using a Before-and-After Method.

### A. Defining the Damages Period

158. Considering the Forbes Article was published on July 11, 2018, the damages period begins on the same day and continues until Mr. Schnatter's reasonable retirement from his positions as Chairman in 2033. Although Mr. Schnatter received reimbursement for his expenses under both the Founder and Chairman Agreements, and Mr. Schnatter expected to remain in his position as Founder through 2042, the agreements do not clearly state what would happen to Mr. Schnatter's reimbursements if one agreement is terminated and not the other. Therefore, I conservatively end the damages period for reimbursable expense damages at the end of 2033 when Mr. Schnatter anticipated retiring as Chairman.

### B. Mr. Schnatter's As-Is Reimbursements

159. To calculate lost profits, I first projected Mr. Schnatter's reimbursements from Papa John's based on his current reimbursements, which are $0.

160. Data provided to me in this Case indicates the last year Mr. Schnatter was reimbursed for any type of expense in relation to his positions as Founder and Chairman was 2018. In 2018, Mr. Schnatter

was reimbursed for expenses he incurred in connection with security and his administrative assistant in the amount of $295,261.[199]

161. From 2019 through 2023, Mr. Schnatter received $0 in reimbursements from Papa John's.

162. Further, as presented in Schedule 2c, I forecasted Mr. Schnatter's reimbursements from 2024 through 2033 assuming his reimbursement remain constant. I forecast Mr. Schnatter's reimbursements through 2033 because, but-for Defendant's conduct, Mr. Schnatter would have remained Founder and Chairman and received reimbursements until 2033 at least. However, due to Defendant's conduct, Mr. Schnatter received $0 in reimbursements past 2018. Therefore, Mr. Schnatter's as-is reimbursements from 2024 to 2033 are $0.

163. In total, Mr. Schnatter's as-is reimbursable expenses during the damages period are $295,261.

### C. Mr. Schnatter's But-For Calculation

164. The second scenario is a but-for calculation, where the expert forecasts the subject business' financials as if the breach of contract had never occurred. Had the Forbes Article not come out and Mr. Schnatter was not terminated from his positions as Founder and Chairman, he would have reasonably continued to receive reimbursements for his expenses until at least 2033 when he retired as Chairman.

165. According to the Founder and Chairman Agreements, Mr. Schnatter was "*entitled to reimbursement of expenses that were incurred in connection with Company business pursuant to Company Policy.*"[200]

166. Historically, from 2012 through 2023, the period in which I was provided with reimbursement related data, Mr. Schnatter incurred an average of $462,489 in expenses related to assistants and security. Therefore, to project Mr. Schnatter's but-for reimbursements, I assume he would have incurred $462,489 per year in expenses that qualify for reimbursement through 2033.

167. Considering Mr. Schnatter's anticipated end to reimbursements in 2033, the total present value of the but-for reimbursements during the damages period is $6,065,950. I discounted Mr. Schnatter's future income back to January 1, 2024, using a discount rate of 7.04% to determine the present value of that income stream while accounting for risk.

[199] Schedule 2d.
[200] Document 2c: paragraph 3 and Document 2d: paragraph 3.

### D. Calculating Mr. Schnatter's Lost Profits

168. Mr. Schnatter's lost profits from his loss of reimbursement for expenses are calculated by taking the reimbursements Mr. Schnatter would have achieved but-for Defendant's conduct and subtracting the income Mr. Schnatter achieved operating as-is following the conduct.

169. Therefore, Mr. Schnatter's lost profits resulting from his loss of reimbursement for expenses are $5,770,690. The calculation is presented at Schedule 2c and summarized in Figure 12.

*Figure 12: Calculation of Lost Profits from Reimbursable Expenses*

| Scenario | Value |
|---|---|
| But-For | $6,065,950 |
| As-Is | $295,261 |
| **Lost Profits** | **$5,770,690** |

170. Again, my analysis and calculation of lost profits assume Mr. Schnatter prevails in the claims. If Mr. Schnatter does not prevail in his claims, economic damages would be $0.

## IX. MITIGATION EXPENSE DAMAGES

171. As stated, Mr. Schnatter incurred four categories of mitigation expenses following Defendant's breach of contract. The four categories of expenses were all incurred as a result of the publication of the Forbes Article and include (1) Legal; (2) Investment Banking; (3) Public Relations; and (4) Consulting. A summary of each vendor and respective payment is summarized below and a full breakdown of each vendor and the expense is presented at Schedule 3.

Legal Expenses: Mr. Schnatter incurred $3,318,122 in legal expenses between 2018 and 2021 related to Defendant's conduct.[201] Mr. Schnatter would not have incurred these expenses but for Defendant's breach of contract, therefore, they are included as damages.

[201] The legal fees considered in this analysis do not include the legal fees Mr. Schnatter has and continues to incur in relation to this Case.

Consulting Expenses: Mr. Schnatter incurred $77,625 in consulting expenses between 2018 and 2019 related to Defendant's conduct. Mr. Schnatter would not have incurred these expenses but for Defendant's breach of contract, therefore, they are included as damages.

Investment Banking Expenses: Mr. Schnatter incurred $11,506,998 in investment banking expenses between 2018 and 2020 related to Defendant's conduct. Mr. Schnatter would not have incurred these expenses but for Defendant's breach of contract, therefore, they are included as damages.

Public Relations Expenses: Mr. Schnatter incurred $788,155 in public relations expenses between 2018 and 2020 in an attempt to mitigate the damage resulting from Defendant's conduct. Mr. Schnatter would not have incurred these expenses but for Defendant's breach of contract, therefore, they are included as damages.

172. In total, Mr. Schnatter incurred $15,690,900 in mitigation expenses after the Forbes Article. These expenses were incurred to mitigate any further harm to Mr. Schnatter and his image. Because the Forbes Article is the proximate cause of these expenses, Mr. Schnatter should be entitled to receive $15,690,900 in the form of monetary recovery.

## X. REPUTATIONAL HARM DAMAGES

173. The release of the Forbes Article resulted in negative publicity that caused harm to Mr. Schnatter's reputation. Individuals who read the Forbes Article were led to believe a narrative that portrayed Mr. Schnatter in a negative light.

174. I understand that following the release of the Forbes Article on July 14, 2018, Mr. Schnatter hired Sitrick and Company "*to provide consulting advice and public relations services, which services are intended to facilitate legal advice being given to [Mr. Schnatter] and provided by [Glaser Weil].*"[202] In other words, Sitrick and Company assisted Mr. Schnatter in legal recourse, rather than repairing any reputational harm that Mr. Schnatter incurred from the Forbes Article.

175. I included the Sitrick and Company expenses as part of my mitigation expense damages. However, it is important to clarify that these expenses did not contribute to the repair of Mr. Schnatter's reputational harm. Additionally, none of the mitigation expense damages were incurred for the

[202] Document 15h: Sitrick and Company Agreement, July 14, 2018.

purpose of addressing Mr. Schnatter's image restoration. To account for the cost associated with a reputational repair campaign, a separate calculation is necessary, as this cost has not been accounted for within the scope of mitigation expenses. Therefore, in this section, I calculated the cost Mr. Schnatter would incur repairing the harm to his reputation caused by the release of the Forbes Article.

### A. Forbes Article

176. In this case, I was provided with viewership data from Forbes for the Forbes Article. The viewership data contains the number of page views and unique page views from July 11, 2018, the day the article was released, through January 10, 2024. Specifically, I relied on the unique page views metric, meaning the value I relied on excludes repeated exposure by a single individual. According to the data, the Forbes Article achieved 1,313,212 unique page views.[203]

### B. Reputational Harm Damages

177. The financial investment required by Mr. Schnatter to rectify the information in the Forbes Article can be determined by creating a reputational repair campaign using Google Ads and a corresponding website that corrects the false impression created by the Forbes Article. This means that Mr. Schnatter would bid for a sponsored ad on Google that is triggered when a Google user searches for the term "papa john founder." Thus, when a user enters a Google search query for the term "papa john founder," a sponsored ad from Mr. Schnatter would be displayed, and when clicked, it would take Google users to a website that clarifies the false impression created by the Forbes Article.

178. As it relates to this Case, a sponsored ad, which leads to a corrective website, would provide clarity and context surrounding the leaked confidential information described in the Forbes Article. The website would explain that Mr. Schnatter denounces the use of the N-Word. More specifically, it would state that Forbes only published select portions of the May 22 Call and failed to provide sufficient information about the context of the conversation. Further, the website would reveal that the information originated from a confidential call with Mr. Schnatter's public relations firm and by releasing it, Plaintiff is claiming Defendant breached the NDA.

179. The reputational repair campaign provides Mr. Schnatter with an opportunity to direct users to a website that clarifies the false impression created by the Forbes Article. The campaign would also

[203] Document 24a [FORBES-0001-32].

benefit Mr. Schnatter by placing his Google Ad at the top of the Google search engine results page (SERP).

180. Cost-per-click (CPC) is the financial metric used to measure the cost each time a user clicks on a Google ad. Google's Keyword Planner shows advertisers the CPC for select keywords and terms. Considering the Forbes Article is titled "Papa John's Founder Used N-Word On Conference Call," we rely on the keyword "papa john founder" because it is most representative of the language used in the Forbes Article.

*Figure 13: "Papa John Founder" Google Keyword Planner*[204]

| Keyword (by relevance) | Avg. monthly searches | Three month change | YoY change | Competition | Ad impression share | Top of page bid (low range) | Top of page bid (high range) |
|---|---|---|---|---|---|---|---|
| Keywords you provided | | | | | | | |
| john schnatter | 10K – 100K | +900% | 0% | Low | – | – | – |
| john schnatter n word | 100 – 1K | 0% | 0% | Low | – | – | – |
| papa john's n word | 1K – 10K | 0% | 0% | Low | – | – | – |
| papa john founder | 1K – 10K | 0% | 0% | Low | – | $0.37 | $2.73 |
| papa john ceo | 1K – 10K | 0% | 0% | Low | – | – | – |
| schnatter | 100 – 1K | +900% | 0% | Low | – | – | – |

181. The page bid amount indicates advertisers have paid as low as $0.37 and as high as $2.73 for a Google Ad using the keyword "papa john founder" which resulted in the sponsored ad showing at the top of the SERP.

182. Generally speaking, "*the ad with the highest Ad Rank gets shown in the top position and the ad with the second-highest Ad Rank gets shown in the second position.*"[205] Ad rank is based on several factors including but not limited to bid, quality of ad, and competitiveness of an auction. Therefore, considering there are uncontrollable factors that impact Ad Rank in addition to the bid amount, I utilize the average of the low and high range bid for "papa john founder," which is $1.55.

183. Additionally, I applied an attitude change multiplier to account for the fact it takes multiple impressions to change an existing attitude. In other words, a person exposed to the Forbes Article may need to be exposed to a reputational repair campaign multiple times to repair their beliefs about Mr. Schnatter.

[204] Document 18a.
[205] Document 18b.

184. Due to confirmation bias, or the idea that individuals naturally look for information that confirms their existing beliefs,[206] repeat exposures to the reputation repair is even more important. Individuals who viewed the Forbes Article likely formed negative beliefs about Mr. Schnatter based on the leaked confidential information. Therefore, because they have pre-existing beliefs, those individuals will be less interested in viewing a reputational repair campaign that contradicts the narrative in the Forbes Article.[207] For this reason, it is important to expose those individuals to the reputational repair campaign multiple times to counteract their confirmation bias and change their preexisting beliefs.

185. Research indicates repetition is a key factor in achieving branding objectives and persuading individuals through advertising. For example, research on the effectiveness of internet-based advertising demonstrates "*banner advertising had its greatest impact between one and seven exposures*," and "*80% of the effect was achieved by the time site visitors had seen seven ads.*"[208] Further, psychological literature demonstrates an increase in persuasiveness going from one exposure to three exposures.[209] Therefore, I utilized an attitude change multiplier of three in my analysis.

186. Thus, to clarify the leaked confidential information put forth in the Forbes Article, Mr. Schnatter would need to run a reputational repair campaign that reaches 1,313,212 people at three exposures per person for $1.55 per click. Therefore, Mr. Schnatter's reputational harm damages are $6,106,436. This calculation is shown at Figure 14.

*Figure 14: Reputational Harm Damages Calculation*

| **Description** | **Value** |
|---|---|
| Total Unique Forbes Article Visitors | 1,313,212 |
| CPC Price | $1.55 |
| Attitude Change Multiplier | 3 |
| Reputational Harm Damages | **$6,106,436** |

[206] Document 18x: Nickerson, Raymond S. (1998), "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises," Review of General Psychology, 2 (2), 175-220.
[207] Document 18x: Nickerson, Raymond S. (1998), "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises," Review of General Psychology, 2 (2), 175-220.
[208] Document 18v: Broussard, G. (2000). How Advertising Frequency Can Work to Build Online Advertising Effectiveness. International Journal of Market Research, 42(4), 1-13.
See also: Document 18u: Cacioppo, John T and Richard E Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change," Current issues and research in advertising, 3 (1), 97-122.
"Message repetition through moderate exposure levels affects attitude change"
[209] Document 18t: Weiss, Robert Frank (1969), "Repetition of Persuasion," Psychological Reports, 25 (2), 669-70.

## XI. NAMING RIGHTS DAMAGES

187. Under the initial Stadium Agreement executed on May 16, 1996, the University of Louisville would name the stadium in honor of Mr. Schnatter, "*or a person or entity closely affiliated with him*."[210] Further, "*not more frequently than once every five years*", Mr. Schnatter has the ability to "*request that University change the acknowledgment of the gift by changing the Stadium name*" to "*that of Contributor, a person or entity closely affiliated with Contributor, or his or its successor or assigns*."[211]

188. Considering Mr. Schnatter's ability to request a change to the name of the stadium to "*a person or entity closely affiliated with him*,"[212] following the release of the Forbes Article, Mr. Schnatter could have retained the naming rights and changed them to an entity other than Papa John's. As such, Mr. Schnatter would still have had use for these rights following his separation with Papa John's.

189. Therefore, Mr. Schnatter experienced damage from the loss of the intangible asset because it is an asset he could have continued to make use of. The damage represents the cost to replace the intangible asset in accordance with its current fair market value ("FMV"), less Mr. Schnatter's reimbursement.

### A. Value of Mr. Schnatter's Naming Rights

190. First, I calculated the average yearly value of Mr. Schnatter's naming rights deal. According to the Second Amendment to the Stadium Agreement executed on August 27, 2007, Mr. Schnatter agreed to contribute an additional $6 million, and the term was extended by 7 years from December 31, 2033[213] to December 31, 2040.[214] This implies a payment of $857,143 for each additional year of naming rights.[215] In other words, in 2007, Mr. Schnatter agreed to pay $857,143 per year for the naming rights.

191. The agreed upon value in 2007 is over four times larger than the agreed upon value in 2000 according to the First Amendment to the Stadium Agreement, indicating the value of those naming rights were increasing. According to the First Amendment to the Stadium Agreement, Mr. Schnatter agreed to

---

[210] Document 2a: Stadium Agreement [JHS035444].
[211] Document 2a: Stadium Agreement [JHS035445].
[212] Document 2a: Stadium Agreement [JHS035444].
[213] Document 2b: Amendment to the Stadium Agreement.
[214] Document 2e: Second Amendment to the Stadium Agreement.
[215] $6,000,000 ÷ 7 years = $857,143 per year.

contribute $4 million for a 20-year extension of the naming rights,[216] indicating a yearly value of $200,000.[217]

### B. Value of Comparable Naming Rights

192. For my calculation of damages relating to the termination of naming rights, I considered the market value of naming rights for other college football stadiums. I identified 12 comparable college football stadiums that sold their naming rights in or after 2007, which is the year Mr. Schnatter made his final donation to the University of Louisville and extended the term of the naming rights to 2040.[218] The data indicates the average yearly value of naming rights for college football stadiums is $2.22 million. However, of the 12 comparable stadiums, just one is structured as a yearly payment, while the remaining 11 consist of one-time payments for the entire length of the contracts.

193. See Figure 15 and Schedule 5b for a list of college stadiums relied upon.

*Figure 15: Comparable College Stadium Naming Rights Agreements*

| College | Sponsor | Year of Purchase | Legnth of Contract (years) | Cost | Payment Frequency | Yearly Value |
|---|---|---|---|---|---|---|
| The University of Miami | Sun Life Financial | 2010 | 5 | $ 7,500,000 | Yearly | $ 7,500,000 |
| University of Minnesota, Twin Cities | TCF Bank | 2008 | 25 | $ 35,000,000 | One time | $ 1,400,000 |
| University of Houston | TDECU | 2014 | 10 | $ 15,000,000 | One time | $ 1,500,000 |
| Arkansas State | Centennial Bank | 2012 | 15 | $ 5,000,000 | One time | $ 333,333 |
| Rutgers | High Point Solutions | 2021 | 10 | $ 6,500,000 | One time | $ 650,000 |
| The University of Washington | Alaska Airlines | 2015 | 10 | $ 41,000,000 | One time | $ 4,100,000 |
| Boise State | Albertsons | 2014 | 15 | $ 9,000,000 | One time | $ 600,000 |
| University of Kentucky | Kroger | 2017 | 12 | $ 22,200,000 | One time | $ 1,850,000 |
| University of Southern California | L.A. Coliseum | 2016 | 15 | $ 70,000,000 | One time | $ 4,666,667 |
| University of North Texas | Apogee | 2010 | 20 | $ 20,000,000 | One time | $ 1,000,000 |
| University of Central Florida | Charter Commmunications | 2007 | 15 | $ 15,000,000 | One time | $ 1,000,000 |
| University of Louisville | L&N Federal Credit Union | 2023 | 20 | $ 41,300,000 | One time | $ 2,065,000 |
| | | | Average Yearly Value: | | | $ 2,222,083 |

194. For my analysis, I looked at the value of University of Louisville's most recent naming rights deal with L&N Federal Credit Union for the stadium that was previously Papa John's Cardinals Stadium. The University of Louisville's deal is informative because it indicates the exact value of the naming rights Mr. Schnatter owned. The yearly value of $2.1 million for the University of Louisville stadium confirms the reasonableness of the $2.2 million average I rely on for my analysis.

216 Document 2b: Amendment to the Stadium Agreement [JHS035379].
217 $4,000,000 ÷ 20 years = $200,000 per year.
218 Document 2e: Second Amendment to the Stadium Agreement.

## C. Calculation of Damages

195. On October 24, 2019, Mr. Schnatter and the University of Louisville entered into an agreement that terminated the Stadium Agreement and any amendments to the Stadium Agreement that granted Mr. Schnatter naming rights to the University of Louisville Cardinal's stadium in return for certain contributions.[219] Despite Mr. Schnatter receiving a total of $9.5 million reimbursement for these rights, this does not represent the lost FMV of the asset.

196. The agreements entered into by Mr. Schnatter and the University of Louisville undervalued the naming rights asset. When the agreements were terminated, Mr. Schnatter received a reimbursement less than the fair market value of that asset. Had the Forbes Article not come out, the agreements would not have been terminated. Therefore, I determine Mr. Schnatter's economic harm by calculating the lost value of the asset upon termination of the agreements.

197. To calculate damages related to the termination of naming rights, I multiply the fair market value of the naming rights asset by the number of years that would have remained in the term, had the agreement not been terminated.

198. Because Mr. Schnatter was paid a total of $9.5 million by the University of Louisville upon termination, this amount is subtracted from the damages number. Mr. Schnatter's damages resulting from the termination of naming rights are $37.6 million. See Figure 16 for the calculation of damages related to the termination of naming rights.

*Figure 16: Termination of Naming Rights Damages*[220]

| | Value |
|---|---|
| Yearly Value of Comparable Naming Rights | $2,222,083 |
| Remaining Years in Term After Termination | 21.2 |
| Total Lost Value | $47,114,255 |
| Mr. Schnatter's Payments Upon Termination | $ 9,500,000 |
| **Termination of Naming Rights Damages** | **$37,614,255** |

[219] Document 2h: Mutual Termination Agreement.
[220] Schedule 5a.

199. Therefore, should Mr. Schnatter prevail in his breach of contract claim, he should receive an award of monetary recovery of $37.6 million damages related to the stadium naming rights.

## XII. CONCLUSION

200. After reviewing the documentation listed at Exhibit A and performing research and analysis supported by my experience in intellectual property analysis and valuation, I arrived at the following conclusions in this Case:

Mr. Schnatter's damages related to the Founder and Chairman Agreements are $12,995,620.

Mr. Schnatter's damages related to his loss of reimbursement for expenses are $5,770,690.

Mr. Schnatter's damages related to Mitigation Expenses are $15,690,900.

Mr. Schnatter's Reputational Harm damages are $6,106,436.

Mr. Schnatter's damages related to the termination of the Louisville stadium agreement are $37,614,255.

201. The amounts listed above are additive. Therefore, if the trier of fact determines each of them appropriate, Mr. Schnatter's total damages amount to $78,177,901. Should additional information and/or documents become available for review, I reserve the right to update this analysis, and if necessary, update any opinions offered here. Further, I reserve the right to respond to opinions and issues raised by any opposing experts. Finally, I reserve the right to use demonstratives and other exhibits to present the opinions expressed in this report and/or any supplemental, amended and/or rebuttal reports.

Submitted by:



## XIII. EXHIBIT A: DOCUMENTS RELIED UPON

1a Second Amended Complaint, dated January 1, 2023
1b 2022-02-04 - DN 187 - Plaintiff's Redacted Response to Motion to Dismiss (Per DN 184)
1c 2021-07-27 - Plaintiff's Sixth Amended Initial Disclosures
1d 2023-03-07 Schnatter's Seventh Amended Initial Disclosures
1e Supplemental Response in Support of Opposition to Motion 11-14-22
2a 1996-05-16 - Stadium Agreement - JHS035442
2b 2000-09-26 - Amendment to Stadium Agreement - JHS035378
2c 2007-08-09 - Agreement for Service as Chairman - JHS007864
2d 2007-08-09 - Agreement for Service as Founder - JHS007868
2e 2007-08-27 - Second Amendment Stadium Agreement - JHS035381
2f 2011-11-23 - Confidentiality, Non-Disparagement and Dispute Resolution Agreement - JHS031124
2g 2016-03-04 - Third Amended Stadium Agreement - JHS035383
2h 2019-10-24 - Mutual Termination Agreement - JHS035412
2i 2008-05-14 - Amended and Restated Exclusive License Agreement - JHS007876
2j 2019-05-07 - Termination Agreement - JHS009607
2k 2016-10-24 - Founder, Chairman and Chief Executive Officer Compensation Review - JHS035360
2l 2018-03-14 - Talent fee-image Agreement Letter - JHS035632
2m 2018-04-09 - Confidentiality, Non-Disparagement and Dispute Resolution Agreement - JHS004005
2n 2019-04-26 - Mutual Termination Agreement - JHS002617
3a Celebrity DBI Review - John Schnatter - WMG0003913
3b Excel Sports Management - Endorser Assessment - JHS002521
4a Papa John's Form 8-K (Dec-21-2017)
4b Papa John's Form 8-K 2014 Votes (April 29, 2014)
4c Papa John's Form 8-K 2015 Votes (April 28, 2015)
4d Papa John's Form 8-K 2016 Votes (April 28, 2016)
4e Papa John's Form 8-K 2017 Votes (April 27, 2017)
4f Papa John's Form 8-K 2018 Votes (May 2, 2018)
4g Papa John's 10-Q 2015
4h Schedule 14a - 2011 - 2009_2010 Compensation
4i Schedule 14a - 2012 - 2011 Compensation
4j Schedule 14a - 2013 - 2012 Compensation
4k Schedule 14a - 2014 - 2013 Compensation
4l Schedule 14a - 2015 - 2014 Compensation
4m Schedule 14a - 2016
4n Schedule 14a - 2017
4o Schedule 14a - 2018 - 2015_2016_2017 Compensation
4p Schedule 14a - 2019 - 2018 Compensation
4q Schedule 14a - 2020

| | |
|---|---|
| 4r | Schedule 14a - 2023 |
| 4s | Papa John's Senior Leadership 6.23.2018 Wayback Machine |
| 4t | Papa John's Senior Leadership 7.14.2018 Wayback Machine |
| 5a | Master Service Agreement 2018-01-01 |
| 5b | NDA -Laundry_Service_and_Papa_Johns 2017-09-12 |
| 5c | NDA for John Schnatter 2018-04-08 |
| 5d | Mutual Termination Letter with PJ and LS |
| 6a | Special Committee of Papa John's Board Approves Company Actions with Respect to John H. Schnatter |
| 6b | Mr. Schnatter Letter to the Board [JHS007448 - JHS007450] |
| 6c | Termination of Founder Agreement Letter Sonya.Medina EXHIBIT 642 |
| 7a | Wayback Machine Yahoo Finance Papa John's 2-20-2018 |
| 7b | Wayback Machine Yahoo Finance Texas Roadhouse 2-20-2019 |
| 7c | Wayback Machine Yahoo Finance Wendy's 10-16-2017 |
| 7d | Wayback Machine Yahoo Finance Cheesecake Factory 10-27-2018 |
| 7e | Wayback Machine Yahoo Finance Chipotle 2-16-2019 |
| 7f | Wayback Machine Yahoo Finance Domino's Pizza 10-8-2018 |
| 7g | Wayback Machine Yahoo Finance Jack in the Box 10-11-2018 |
| 8a | JHS036445 |
| 8b | JHS036454 |
| 8c | JHS036459 |
| 8d | JHS036462 |
| 8e | JHS036467 |
| 8f | JHS036477 |
| 8g | JHS036488 |
| 8h | JHS036492 |
| 8i | JHS036500 |
| 8j | JHS036503 |
| 8k | JHS036505 |
| 8l | JHS036508 |
| 8m | JHS036511 |
| 8n | JHS036513 |
| 8o | JHS036515 |
| 8p | JHS036518 |
| 8q | JHS036519 |
| 8r | JHS036520 |
| 8s | JHS036521 |
| 8t | JHS036522 |
| 8u | JHS036523 |
| 8v | JHS036524 |

| | |
|---|---|
| 8w | JHS036525 |
| 8x | JHS036526 |
| 8y | JHS036527 |
| 8z | JHS036528 |
| 9a | JHS036581 |
| 9b | JHS036591 |
| 9c | JHS036600 |
| 9d | JHS036605 |
| 9e | JHS036611 |
| 9f | JHS036618 |
| 9g | JHS036626 |
| 9h | JHS036632 |
| 9i | JHS036634 |
| 9j | JHS036636 |
| 9k | JHS036639 |
| 9l | JHS036644 |
| 9m | JHS036649 |
| 9n | JHS036653 |
| 9o | JHS036657 |
| 9p | JHS036660 |
| 9q | JHS036663 |
| 9r | JHS036667 |
| 9s | JHS036670 |
| 9t | JHS036676 |
| 9u | JHS036679 |
| 9v | JHS036682 |
| 9w | JHS036685 |
| 9x | JHS036688 |
| 9y | JHS036691 |
| 9z | JHS036694 |
| 9aa | JHS036697 |
| 9ab | JHS036698 |
| 9ac | JHS036699 |
| 9ad | JHS036700 |
| 9ae | JHS036701 |
| 9af | JHS036702 |
| 9ag | JHS036703 |
| 9ah | JHS036704 |
| 9ai | JHS036705 |
| 9aj | JHS036706 |

| | |
|---|---|
| 9ak | JHS036707 |
| 9al | JHS036708 |
| 9am | JHS036709 |
| 10a | JHS036710 |
| 10b | JHS036725 |
| 10c | JHS036733 |
| 10d | JHS036739 |
| 10e | JHS036746 |
| 10f | JHS036751 |
| 10g | JHS036755 |
| 10h | JHS036767 |
| 10i | JHS036775 |
| 10j | JHS036783 |
| 10k | JHS036792 |
| 10l | JHS036797 |
| 10m | JHS036801 |
| 10n | JHS036808 |
| 10o | JHS036814 |
| 10p | JHS036818 |
| 10q | JHS036819 |
| 10r | JHS036820 |
| 10s | JHS036821 |
| 10t | JHS036822 |
| 10u | JHS036823 |
| 10v | JHS036824 |
| 10w | JHS036825 |
| 10x | JHS036826 |
| 10y | JHS036827 |
| 10z | JHS036828 |
| 10aa | JHS036829 |
| 11a | JHS036830 |
| 11b | JHS036831 |
| 11c | JHS036832 |
| 11d | JHS036833 |
| 11e | JHS036834 |
| 11f | JHS036835 |
| 11g | JHS036836 |
| 11h | JHS036837 |
| 11i | JHS036838 |
| 11j | JHS036839 |

| | |
|---|---|
| 11k | JHS036840 |
| 12a | JHS036841 |
| 12b | JHS036842 |
| 12c | JHS036843 |
| 12d | JHS036844 |
| 12e | JHS036845 |
| 12f | JHS036846 |
| 12g | JHS036847 |
| 12h | JHS036848 |
| 12i | JHS036849 |
| 12j | JHS036850 |
| 12k | JHS036851 |
| 12l | JHS036852 |
| 12m | JHS036853 |
| 12n | JHS036854 |
| 12o | JHS036855 |
| 12p | JHS036856 |
| 12q | JHS036857 |
| 12r | JHS036858 |
| 12s | JHS036859 |
| 12t | JHS036860 |
| 12u | JHS036861 |
| 12v | JHS036862 |
| 13a | JHS036863 |
| 13b | JHS036864 |
| 13c | JHS036865 |
| 13d | JHS036866 |
| 13e | JHS036867 |
| 13f | JHS036868 |
| 13g | JHS036869 |
| 13h | JHS036870 |
| 13i | JHS036871 |
| 13j | JHS036872 |
| 13k | JHS036873 |
| 13l | JHS036874 |
| 13m | JHS036880 |
| 13n | JHS036884 |
| 13o | JHS036887 |
| 13p | JHS036893 |
| 13q | JHS036909 |

| | |
|---|---|
| 13r | JHS036918 |
| 13s | JHS036921 |
| 13t | JHS036923 |
| 13u | JHS036925 |
| 13v | JHS036927 |
| 13w | JHS036932 |
| 13x | JHS036936 |
| 13y | JHS036939 |
| 13z | JHS036942 |
| 13aa | JHS036944 |
| 13ab | JHS036946 |
| 13ac | JHS036949 |
| 14a | JHS036954 |
| 14b | JHS036955 |
| 14c | JHS036956 |
| 14d | JHS036957 |
| 14e | JHS036958 |
| 14f | JHS036959 |
| 14g | JHS036960 |
| 14h | JHS036961 |
| 14i | JHS036962 |
| 14j | JHS036963 |
| 14k | JHS036964 |
| 14l | JHS036965 |
| 14m | JHS036966 |
| 14n | JHS036967 |
| 14o | JHS036968 |
| 14p | JHS036969 |
| 14q | JHS036970 |
| 14r | JHS036971 |
| 14s | JHS036972 |
| 14t | JHS036973 |
| 14u | JHS036974 |
| 15a | Bayard Engagement Letter [JHS036529] |
| 15b | Glaser Weil Engagement Letter [JHS036535] |
| 15c | Hunton Andrews Kurth Engagement Letter [JHS036545] |
| 15d | UnitedLex Engagement Letter [JHS036572] |
| 15e | Innisfree Agreement Letter [JHS036552] |
| 15f | Moelis & Company Engagement Letter [JHS036554] |
| 15g | Moelis & Company Engagement Letter [JHS036556] |

| | |
|---|---|
| 15h | Sitrick and Company Engagement Letter [JHS036565] |
| 16a | Deposition Transcript of John H. Schnatter |
| 16b | Deposition Transcript of Steve Ritchie |
| 16c | Deposition Transcript of Aaron Thompson |
| 16d | Deposition Transcript of Sonya Medina |
| 17a | BAML Email [PJI-LS_00003212] |
| 18a | Google Keyword Planner Search Results |
| 18b | About Ad Rank - Google Ads Help |
| 18c | NAACP Announcement |
| 18d | Miami Marlins Announcement |
| 18e | Houston Astros Announcement |
| 18f | AMB Announcement |
| 18g | NY Yankees Announcement |
| 18h | Seattle Mariners Announcement |
| 18i | DC Breeze Announcement |
| 18j | Monumental Sports and Entertainment & Orlando Magic Announcement |
| 18k | Texas Rangers & FC Dallas Announcement |
| 18l | MLB Announcement |
| 18m | Washington Nationals Announcement |
| 18n | Oregon State Beavers Announcement |
| 18o | Tampa Bay Rays Announcement |
| 18p | Utah Jazz & Univ of Utah Announcement |
| 18q | Kansas City Royals Announcement |
| 18r | Baltimore Orioles Announcement |
| 18s | Purdue University Statement |
| 18t | Weiss, Robert Frank (1969), "Repetition of Persuasion" |
| 18u | Cacioppo, John T and Richard E Petty (1980), "Persuasiveness of Communications Is Affected by Exposure Frequency and Message Quality: A Theoretical and Empirical Analysis of Persisting Attitude Change" |
| 18v | Broussard, G. (2000). How Advertising Frequency Can Work to Build Online Advertising Effectiveness. International Journal of Market Research, 42(4), 1-13. |
| 18w | Contract Damages for Injury to Reputation |
| 18x | Nickerson, Raymond S. (1998), "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises" |
| 19a | Sports Facility Reports |
| 19b | Business of College Sports, Naming Rights |
| 19c | Seattle Times, Naming Rights |
| 19d | Watch Stadium, Naming Rights |
| 19e | SBJ Louisville Cardinal Stadium |
| 19f | Courrier Journal, U of L President made a tough call |
| 19g | Courrier Journal, Louisville football players applaud |

| | |
|---|---|
| 20a | Cornell Law, Corporate Governance |
| 20b | Corporate Governance Guidelines |
| 20c | CFI, Independent Director |
| 20d | Governance QualityScore _ ISS |
| 20e | Wayback Machine Yahoo Finance Papa John's 2-20-2018 |
| 21a | USA Today, How rich is 'Papa John' Schnatter |
| 21b | Papa John's Founder Accused of Sexual Misconduct - Eater |
| 21c | Courier Journal, The real Papa John Pizza entrepreneur John Schnatter |
| 21d | Papa Johns, Board of Directors of Papa John's Names CEO |
| 21e | Papa Johns, Papa John's Names Jude Thompson Co-CEO |
| 21f | Papa John's CEO Says Obamacare Will Up Pizza Price - ABC News |
| 21g | Papa John makes no apology for wealth, Obamacare remarks - USA Today |
| 21h | The Inside Story of Papa John's Toxic Culture - Forbes |
| 21i | CNN, National Anthem protests |
| 21j | SI, Papa Johns, NFL end sponsorship deal |
| 21k | npr, Papa John's Founder Quits as Chairman after using the n-word |
| 21l | Papa John's apologizes for criticizing NFL anthem protests - CNBC |
| 21m | Papa John's founder exiting as CEO weeks after NFL comments - NBC |
| 21n | Inc., Papa John's CEO_ I Pay Above Minimum Wage |
| 21o | Separation and General Release Agreement JHS035539-035545 |
| 21p | Preferred Marketing Solutions |
| 22a | The Cheesecake Factory |
| 22b | Domino's Pizza |
| 22c | Texas Roadhouse |
| 22d | Wendy's Company |
| 22e | Denny's Corp |
| 22f | Cracker Barrel |
| 23a | Exec Asst Compensation |
| 23b | Security expenses 2009-2018 |
| 23c | Security upgrade reimbursements 2009-2018 |
| 23d | Admin Assist pay info |
| 23e | Security expense 2018-2023 - REDACTED |
| 23f | Executive Assistant reimbursement 2018-2023 |
| 24a | FORBES_00001-134 DMFIRM_410951104(1) |
| 25a | Papa John's WACC 1-1-2024 |

# XIV. EXHIBIT B: DOUG BANIA CV

**Expert Witness History**

Domino's Pizza LLC v. Francis I. Borges, Arbitration No. 01 23 0002 1612, filed with the American Arbitration Association in Michigan. Defamation Damages and Social Media Analytics, Expert Report, 2024

Anthony Aiello, an individual; Anthony's Worldwide Promotions, LLC, a limited liability company v. Sommer Ray Beaty et al., filed in the Superior Court of the state of California. **Economic Damages**, Expert Consulting, 2024

Smartmatic USA Corp. et al. v. Newsmax Media, Inc., Case No. N21C-11-028 EMD, filed in the Superior Court of the state of Delaware. **Defamation, Internet, and Social Media Analytics**, Expert Report, 2023

Waya Productions LLC and Kevin Pace v. Creative Post Inc., Court File No. CV-20-00648910-0000, Ontario Superior Court of Justice. **Breach of Contract, Economic Damages**, Expert Report, 2023

Moxie Pest Control (Utah), LLC, et al. v. Kyle Nielsen, an individual, et al., Case No. 2:21-CV-00240, USDC, District of Utah, Central Division. **Trade Secret Damages**, Expert Report, Deposition 2023

StreetTrend LLC vs. Good American LLC, Arbitration expert consulting. **Damages in Retail Marketing**, 2023

Macy's IP Holdings, LLC, v. Aroma360, LLC, Case No. 1-21-CV-9631, USDC, Southern District of New York. **Trademark Damages**, Expert Report, 2023

Smartmatic USA Corp. et al. v. Michael J. Lindell and My Pillow, Inc., Case No. 22-cv-0098-WMW-JFD, USDC for the District of Minnesota. **Defamation, Internet, and Social Media Analytics**, Expert Report, 2023

Patrice Gordon v. Board of Education for the City of Chicago, et al., Case No. 1:21-CV-00549, USDC for the Northern District of Illinois, Eastern Division. **Defamation, Internet, and Social Media Analysis**, Expert Report, Deposition, 2023

Softwave Tissue Regeneration Technologies, LLC v. Thomas Kostopoulos and Kostopoulos Investment Holdings, LLC d/b/a Scale Marketing and Consulting, Case No. 1:22-cv-03392-SCJ, USDC, Northern District of Georgia, Atlanta Division. **Trademark Damages**, Expert Consulting, 2023

BakeMark USA, LLC, v. Clark Associates, Inc., The Webstaurant Store, d/b/a Webstaurantstore.com et al., Case No. 2:22-cv-03737, USDC, Central District of California. **Trademark, Reverse Confusion Damages**, Expert Consulting, 2023

Berookhim Royal Catering, Inc., d/b/a Beverly Catering, and Mehran Berookhim v. Shahbaz Farnad, et al., Case No. 20STCV15941, Superior Court of the State of California County of Los Angeles, Central District. **Defamation, Internet, and Social Media Analysis,** Expert Consulting, 2023

Halo Beauty Partners, LLC v. Clark Swanson, Swanson Global Enterprises Inc., et al., Case No. A-21-837645-B, Eighth Judicial District Court, Clark County, Nevada. **Breach of Contract, Economic Damages**, Expert Report and Deposition, 2023

John Johnson and Donovan Robinson v. Board of Education for the City of Chicago, et al., Case Nos. 2021-L-001072 and 2021-L-001047, Circuit Court of Cook County, Illinois, County Department, Law Division. **Defamation, Internet, and Social Media Analysis**, Expert Report, 2023

Adriana's Insurance Services Inc., and Adriana Gallardo v. Auto International Insurance Agency, Inc., Eric Pena, Richard Wetzel, and Outfront Media LLC, Case No. 8:22-cv-00174-JLS-ADS, USDC, District of California. **Right of Publicity Damages**, Expert Report, Deposition, 2023

Eric Coomer, PhD., v Michael J. Lindell, Frankspeech LLC, and MyPillow, Inc., Case No. 1:22-cv-01129, USDC, District of Colorado. **Defamation, Internet, and Social Media Analytics**, Expert Report, 2023

Derek Jaeschke vs. Bella+Canvas, LLC and Color Image Apparel, Inc., Case No. 19SMCV01008, Superior Court of the State of California County of Los Angeles, West District. **Right of Publicity**, Deposition, 2023

Tireboots by Universal Canvas, Inc. v. Tiresocks, Inc., et al, Case No. 1:20-cv-07404, USDC, Northern District of Illinois. **Trademark Damages**, Expert Report, Deposition 2023

Hubert Hansen Intellectual Property Trust vs. The Coca-Cola Company, Superior Court of the State of California for the County of San Diego, Case No. 37-2016-00021046-CU-MC-CTL. **Right of Publicity**, Deposition, 2023

Global Apogee v Sugarfina, Inc., Joshua Resnick, Rosie O'Neill, et al., Case No. 2:18-cv-05162 RSWL (Ex), USDC, Central District of California, Western Division (Los Angeles). **Trademark Damages and Google Search Analysis,** Expert Report, 2023

S10 Entertainment & Media LLC, v. Samsung Electronics Co., LTD.; and Samsung Electronics America, Inc, Case No. 2:21-cv-2443, USCD, Central District of California. **Trademark Damages**, Expert Report, Deposition, Trial 2023

World Axe Throwing League, Inc, and Lincoln Chicago Holdings, Inc. v. Cold Steel, Inc., Lynn Thompson, and GSM LLC d/b/a GSM Outdoors, Case No. 2:20-cv-11407 JAK (Ex), filed in USDC, Central District of California, Western Division. **Trademark Damages, Causation**, Expert Report, Deposition, Trial 2023

Garth Fisher, M.D., d/b/a Garth Fisher Skin Care, LLC, v. Rexford Surgical Institute, Inc., et al., Case no. 2:21-cv-05795-DSF-JPR, USDC, Central District of California, Western Division. **Trademark Damages and Google Search Analysis,** Expert Consulting, 2023

Fit Tea, LLC, v. Alani Nutrition, LLC, Case No. 1:22-cv-21568-JEM, USDC, Southern District of Florida, Miami Division. **Trademark Damages**, Expert Report, 2023

Mend Health, Inc., v. Carbon Health Technologies, Inc., Case No. 2:21-cv-06142 AB (MRWx), USDC, Central District of California. **Internet Trademark Investigation,** Expert Report, 2023

Flexware International LLC, v. AT&T Corp., Case No. 2:21-cv-07223 GW (ASx), USDC, Southern District of California, Western Division. **Trademark Damages,** Expert Consulting, 2023

John C. Depp, II, Counterclaim Defendant v. Amber Laura Heard, Counterclaim Plaintiff, Circuit Court of Virginia, Fairfax County, No. CL-2019-0002911. **Defamation, Causation, Damages, Internet, Media and Social Media Analytics**, Rebuttal Expert, Deposition, Trial Testimony 2022

John C. Depp, II v. Amber Laura Heard, Circuit Court of Virginia, Fairfax County, No. CL-2019-0002911. **Defamation, Damages, Internet, Media and Social Media Analytics**, Rebuttal Expert, Deposition, Trial 2022

Linda Fairstein v. Netflix, Inc., Ava Duvernay, and Attica Locke, USDC, Middle District of Florida, Fort Myers Division, case 2:20-cv-00180. **Defamation Damages**, Expert Report, 2022

Harman International Industries v. Jem Accessories d/b/a Xtreme Cables, Case No. 2:20-CV-0822, USDC, Central District of California, No. 2:20-CV-08222. **Trademark Damages**, Expert Report, 2022

Rodney Smith LTD., v. Sugar Factory, LLC, Case No. 2:20-cv-06854-ODW-JEM, USDC, Central District of California. **Copyright Damages**, Expert Report, 2022

John R. Vivian, Jr., Esquire v. Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital & Health Network; filed in the Court of Common Pleas, Philadelphia County, Pennsylvania, March 2012: No. 3376. **Defamation Damages**, Expert Report, 2022

Athos Overseas, Ltd v. YouTube, Inc., YouTube, LLC, and Google, LLC, Case 1:21-cv-21698, USDC, Southern District of Florida. **Copyright Damages**, Expert Report, Deposition, 2022

Eddy Martinez v. Miami Children's Health System, Inc. and Nicklaus Children's Health System Executive Severance Policy, Case 1:21-cv-22700, filed in the circuit court of the eleventh judicial circuit in and for Miami-Dade County, Florida. **Defamation Damages**, Expert Report, 2022

My First Shades, Inc. and SLP Enterprises, LLC v. Solarna, LLC, George Granoff and Bernard Kossar; Commonwealth of Massachusetts, Case No. 1884-CV-708-BLS1. Rebuttal opinions related to economic damages and online advertising. **Trademark Damages and Google Search Results**, Expert Report, Deposition, Trial 2022

PARTS iD, LLC v. IDParts LLC, USDC, District of Massachusetts, Case 1:20-cv-11253. **Trademark Damages**, Expert Report, 2022

Edison Brewing Company LLC v. Gourmet Fresh LLC, USDC for the Southern District of Ohio Eastern Division, Case No. 2:21-cv-00876-EAS-CMV. **SEO and Competitive Analysis**, Expert Report, Deposition 2022

Meribear Productions, Inc. dba Meridith Baer Home vs. Brett Baer, City Lights Staging, Inc., Jamie Baer, Caleb Morse, Superior Court of the State of California, County of Los Angeles, Norwalk, Case No. VC065653. **Intellectual Property and Intangible Asset Consulting**, Expert Report and Deposition, 2021

Paul Nicklen v. Sinclair Broadcast Group, Inc., Sinclair Television Media, Inc., et al., USDC for the Southern District of New York, Case No. 1:20-cv-10300-JSR. **Copyright Damages**, Expert Report, 2021

Eric Coomer, Ph.D. vs. Donald J. Trump for President, Inc. Sidney Powell, Rudolph Giuliani, et al. District Court, Denver County, Colorado. Case Number 2020CV34319. **Defamation, Internet and Social Media Investigation Damages**, Expert Consulting, 2021

Reflex Media, Inc. and Clover8 Investments, PTE. LTD. v. Luxy Limited, Jason Qiang DU, et al., USDC Central District of California, Case No. 2:20-cv-00423-RGK-KS. **Trademark Damages, Internet and Social Media Investigation**, Expert Consulting, 2021

National Rifle Association of America v. Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, and Jesse Greenberg, USDC for the Northern District of Texas Dallas Division, Case No. 3:19-cv-02074-G. **Internet and Social Media Investigation**, Expert Consulting, 2021

Reaves Law Firm, PLLC v. Tiger Sports Properties, LLC, USDC for the Western District of Tennessee Western Division, Case No. 2:19-cv-2465. **Right of Publicity Valuation for Penny Hardaway**, Expert Report, 2021

PetConnect Rescue Inc., Lucky Pup Dog Rescue.com, et al. v. David Salinas, Veronica Salinas, et al. USDC Southern District of California, Case No. 3:20-cv-00527-H-KSC. **Trademark Damages**, Expert Consulting, 2021

Andy's Frozen Custard, Inc. and Andy's Frozen Custard Franchising, LLC v. Andrew A. Naeger, Beth Johnston, St Robert Pizza, Inc., and Camden Pizza Inc. USDC Western District of Missouri Central Division, Case No. 2:20-cv-04258-MDH. **Trademark Damages and Likelihood of Confusion**, 2021

Heartland Payment Systems, LLC v. Robert O. Carr and Kathie Hanratty. USDC for the District of New Jersey, Case No. 3:18-cv-09764-BRM-DEA. **Defamation Investigation and Damages**, 2021.

Bismarch Alternative Health LLC d/b/a Pure Health and Cass County Enterprises LLC d/b/a Dakota Health v. Vicente Sederberg LLC, Brian Vicente and Sally Peebles, District Court, Denver County, State of Colorado. **Forecast and valuation of cannabis dispensary operations**, Expert Report, 2021

Samantha Childs vs. Benjamin Polansky, DVM, California Veterinary Specialists, Superior Court of the State of California, County of San Diego North County Division, Case No. 37-2019-00040629-CU-PN-NC. **Social Media Valuation**, Expert Consulting, 2021

Sandro Nardone v. Ital Pizza, Inc., et al., Superior Court of The State of California, County of Orange, Central Justice Center, Case No.: 30-2016-00884748-CU-BT-CJC. **Brand Valuation and Reasonable Royalty Analysis**, Expert Consulting, 2021

Insurance King Agency, Inc. vs. Just Auto Insurance, Inc., USDC Central District of California, Case No. 2:2020-cv-05944. **Trademark Damages**, Expert Consulting, 2021

The Music Force, LLC v. Sony Music Entertainment, Montero Lamar Hill, aka Lil Nas X, et al. USDC Central District of California, Case No. 2:19-cv-06430-FMO (RAOx). **Copyright Damages**, Expert Report, Deposition, 2020

Music Specialist, Inc. and Sherman Nealy v. Atlantic Recording Corporation, Warner Chappell Music, Inc., and Artist Publishing Group, LLC.; USDC Southern District of Florida, Case No: 1:18-cv-25474-RAR. **Copyright Damages**, Expert Report, 2020

Kabushiki Kaisha Too Marker Products, Inc. v. Imagination International Incorporated and John Darland; In the International Chamber of Commerce, Case No. ICC 24464/MK (EA). **Website Traffic and Social Media Damages**, Expert Report, 2020

Rousselot B. V. vs. St. Paul Brands, Inc., Advanced Pharmaceutical Services, Inc., et al. USDC Central District of California Southern Division, Case No. 8:19 cv-00458-DOC-ADS. **Trademark Damages**, Expert Consulting, 2020

P8H, Inc., d/b/a Paddle8; United States Bankruptcy Court, Southern District of New York, Case No. 20-1089 (smb). **Sales Advisor and Consultant to Chapter 11 Trustee** for Intellectual Property and Related Intangible Asset Sale, 2020

Kevin Michael Brophy, Jr. v. Belcalis Almanzar aka Cardi B; KSR Group LLC, Washpoppin, Inc., et. al.; USDC Central District of California, Case Number: 8:17-cv-01885. **Right of Publicity Damages**, Expert Report, Deposition, 2020

Atari Interactive, Inc. v. OoShirts, Inc., USDC for the Northern District of California San Francisco Division; Case No. 3:19-cv-00264-JST. **Trademark Damages for Apparel**, Expert Report, 2020

Annette Navarro McCall and Navarro Photography, LLC v. Walmart Inc. and The Procter & Gamble Company; USDC for the Southern District of Ohio Western Division – Cincinnati, Case Number: 1:17-cv-00406-TSB. **Copyright Damages for Photographs used on Product Packaging**, Expert Report, Deposition, 2020

My First Shades, Inc. and SLP Enterprises, LLC v. Solarna, LLC, George Granoff and Bernard Kossar; Commonwealth of Massachusetts, Case No. 1884-CV-708-BLS1. Rebuttal opinions related to economic damages and online advertising. **Trademark Damages and Google Search Results**, Expert Report, Deposition, 2020

Jane Doe vs. Walgreen Co., 11th Judicial Circuit in and for Miami Dade County, Florida. Right of Publicity, **Social Media Investigation**, Expert Consulting, 2020

Wiseau Studio, LLC and Tommy Wiseau d.b.a. Wiseau-Films and Richard Harper, Fernando Forero McGrath, Martin Racicot d.b.a. Rockhaven Pictures, Room Full of Spoons Inc., Parktown Studios Inc., Richard Stewart Towns, Ontario Superior Court of Justice, Court File No. CV-17-577020. **Copyright Damages for documentary film**, Expert Report, Trial Testimony, 2020

Phunware, Inc. vs. Uber Technologies, Inc. Superior Court of the State of California County of San Francisco; Case No. GGC-17-561546. **Brand Valuation**, Expert Consulting, 2020

Routes for Sale, LLC v. Spencer Patton and Route Consultant, Inc., In the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida; Cases No. 19-CA-007665. **Defamation Damages**, Expert Report, 2020

Nikki Giavasis; Taylor Giavasis and Josephine Robertson v. Star Returns, LLC, Superior Court of the State of California County of Los Angeles; Case No. BC628277. **Social Media and Right of Publicity Damages**, Expert Consulting, 2019

Adam Sandoval and Ashley Watson v. The Parking Spot Irving, LLC, ABM Aviation Incorporated, Derrick Eugene White and Judy Ann Sanders Miles, District Court of Dallas County, Texas, Cause No. DC-17-17314. **Social Media and Right of Publicity Damages**, Expert Consulting, 2019

Zeetogroup, LLC; Tibrio, LLC v. Nicholas Fiorentino; Sabiha Tudesco; Internet Things, LLC; Simply Sweeps, LLC; Crediready, LLC; Two Minute Media Topics, LLC, United States District Court Southern District of California; Case No. 19CV0458. **Website comparison and html investigation**, Expert Report, 2019

Move Press, LLC v. Peloton Interactive, Inc. USDC Central District of California, Western Division, Case No. 2:18-cv-1686. **Trademark Damages**, Expert Consulting, 2019

Stockdale Investment Group, Inc. v. Stockdale Capital Partners LLC, et. al, Expert report and Deposition Testimony regarding **Google Search Results**; Case 4:18-cv-02949, 2019

Chad Marlow v. Business Financial Services, Inc. and Adquadrant, Inc., Superior Court of the State of California, County of Orange; Case No. 30-2017-00923885-CU-NP-CJC. **Right of Publicity Damages**, Expert Consulting, 2019

Merck & Co., Inc. and Merck Sharp & Dohme Corp. v. Merck KGAA, USDC District of New Jersey; Case No. 16-cv-00266. **Google Ads Investigation**, Expert Report, Deposition, 2019.

Platinum Logistics WY, Inc. vs. Platinum Cargo Logistics, Inc. DBA Platinum Cargo; et al., USDC Southern District of California; Case No. 13-cv-1819. **Trademark Damages**, Expert Report, 2019.

Thelonious Sphere Monk, Jr. as Administrator of and on behalf of the Estate of Thelonious Sphere Monk vs. North Coast Brewing Co., Inc., USDC Northern District of California; Case No. 17-cv-05015. **Trademark and Right of Publicity Damages**, Expert Report, Deposition, 2018.

GOLO, LLC v. Zoco Productions; Mehmet Oz, M.D.; and Keri Glassman, USDC for the Eastern District of Pennsylvania; Case No. 1:17-cv-08461-KBF. **Unfair Competition and False Advertising**, Expert Report, 2018.

Lauren Mountain v. Mehron, Inc.; Martin Melik; Michael Costello and Stephanie Costello, USDC Central District of California Western Division; Case No. 2:18-cv-00080-JAK-MRW. **Copyright Damages**, Expert Consulting, 2018

Big League Analysis, LLC vs. The Office of the Commissioner of Baseball, The United States Baseball Federation, Inc., and Noah Garden; Supreme Court of the State of New York County of New York; Case No. 152702/2017. **Website, SEO Analysis, Internet Impressions, Visits and Damages**, Expert Report, Mediation Testimony, 2018

PS1, Inc., vs. TTL Automotive Enterprises, Inc., American Arbitration Association, Case No.: 01-17-0005-3284. **Trade Dress Investigation**, Expert report, 2018

North Carolina, Craven County, Jones County v. Beer Army, LLC, Dustin J. Canestorp, Beer Army Productions, LLC, and Ribeyes Steak House of New Bern 2, LLC and Bad Boy Foods, LLC. The General Court of Justice Superior Court Division; File No.: 15-CVS-1236. **Trademark Damages**, Expert report, 2018

Leandro Sorice vs. Trendy Butler, Inc. and Ali Najafian; Superior Court for the State of California County of Los Angeles; Case No. BC635770. **Copyright Damages**, Expert report, 2018

Colonel David Randolph Scott vs. Citizen Watch Company of America, Inc. (successor to Bulova Corporation); Sterling Jewelers, Inc., dba Kay Jewelers; USDC Northern District of California San Jose Division; Case No. 17-cv-00436-NC. **Right of Publicity Damages**, Expert report, Deposition, 2018

Ghostbed, Inc.; and Werner Media Partners, LLC d/b/a/ Nature's Sleep, LLC v. Casper Sleep, Inc.; Philip Krim; Red Antler, LLC; and ICS Inc.; Case No. 0:15-cv-62571. **Google Ads, SEO Analysis, Internet Website Traffic Investigation**, Expert Reports, Deposition, 2018

Heron Development Corporation vs. Vacation Tours, Inc. d/b/a Vacation Store of Miami, Media Insight Group, Inc., d/b/a Media Insight Group, Rosanna M. Mendez and George A. Alvarez; USDC Southern District of Florida Miami Division; Case No. 1:16-cv-20683-Moreno/O'Sullivan. **Website, SEO Analysis, Internet Impressions, Visits and Damages**, Expert Report, 2017

Entrepreneur Media, Inc. v. Scott Smith; Domains by Proxy, LLC; GoDaddy.com, LLC and Karen Mix; Case No. CGC 13 530730. **Domain Name Valuation**, Expert Report, 2017

Jukin Media, Inc. v. QWorldstar, Inc. d/b/a Worldstar, Worldstar Hip Hop, Worldstar Candy; Case No. 2:16-cv-6800-JFW; USDC Central District of California. **Copyright & Trademark Damages**, Expert Report, 2017

Aardwolf Industries, LLC v. Abaco Machines USA, Inc. Ausavina Co. LTD, et. al.; Case No. 2:16-cv-01968-GW-JEM; Central District of California**. Domain Name and SEO Analysis Investigation**, Expert Report & Deposition, 2017

Winston Smith v. Chapter 4 Corp., "Supreme"; Blackrock Creative Management Company and DEAD KENNEDYS; USDC Central District of California, Case No. 2:16-cv-03910-GW-AS. **Copyright Apportionment Damages**, Expert Report & Deposition, 2017.

Andre Khazraei vs. Christopher Brown, CBE Merchandising LLC, CBE Apparel LLC, Konfuzed LLC, Maxima Operating X LLC; USDC Central District of California, Case No. 2:16-cv-02341 SJO (JCx). **Trademark, Licensing & Social Media Analysis**, Expert Report & Mediation Testimony, 2017

IDX System Technology, Inc. vs. Timothy Arasheben dba Cinoflex; TM Camera Solutions, LLC; Superior Court of the State of California for the County of Los Angeles, Case No. BC610537. **Defamation Damages**, Expert Consulting, 2017

Uncommon, LLC vs. Spigen, Inc.; USDC Northern District of Illinois Eastern Division, Case No. 15-cv-10897. **Trademark Damages, Website Analysis**, Expert Report & deposition, 2016

The Julia Child Foundation for Gastronomy and the Culinary Arts v. Airbnb, Inc., Superior Court of the State of California for the County of Santa Barbara, Case No. 16CV02626. **Right of Publicity & SEO Analysis**, Expert Report & Mediation Testimony, 2016

Pines International, Inc. v. Suja Life, LLC, USDC Southern District of California, Case No. 3:16-cv-00985-GPC-WVG. **Trademark Damages**, Settlement Brief Testimony, 2016

Unicolors, Inc. v. Kohl's Department Stores, Inc.; Fashion Life Inc.; Jes Apparel, L.L.C., USDC Central District of California, Case No. 2:16-cv-00393-RGK-SS. **Copyright Damages**, Expert Report, 2016

Timed Out, Inc. vs. Crazy Horse, Inc., Superior Court of the State of California, County of San Francisco – Civic Center Courthouse, Case No. CGC-15-547904. **Right of Publicity & SEO Analysis**, Expert Report, 2016

Adobe Systems Incorporated v. A&S Electronics, Inc., dba Trustprice; Alan Z. Lin; et. al., USDC Northern District of California Oakland Courthouse, Case No. 4:15-cv-02288-SBA. **Trademark & Copyright Damages**, Expert Report, 2016

Ronald Greenspan, D.D.S. v. Mary Polomares, Randolph F. Alexander, D.D.S., M.S. and Leslie Alexander, Superior Court of the State of California County of San Diego – Central Division, Case No. 37-2014-00029393-CU-DF-CTL. **Defamation & SEO Analysis**, Expert Report & Deposition, 2016

Nina Pham v. Texas Health Resources, Inc., District Court of Dallas County, Texas 68th Judicial District, Cause No. DC-15-02252. **Right of Publicity Damages & SEO Analysis**, Expert Report & Deposition, 2016

Christopher Gordon v. Drape Creative, Inc.; Papyrus-Recycled Greetings, Inc. USDC Central District of California, Case No. CV 15-04905 JFW (PLAx). **Trademark Damages**, Expert Report, 2016

Adobe Systems Incorporated v. David Far, aka Davit Far, doing business as AllMacDirect, USDC Central District of California, Case No. CV15-06192 AB AJW. **Trademark & Copyright Damages**, Expert Report, Deposition, 2016

Mark Spitz v. New Vitality LLC, NAC Marketing Company, Superior Court of California County of Los Angeles, Case No. SC121977. **Right of Publicity Damages & SEO Analysis**, Expert Consulting, 2016

Global Tobacco, LLC vs. R.K. Co., dba Cigar Cartel, USDC Central District of California Western Division, Case No. 2:15-CV-05227. **Trade Dress Damages**, Expert Report, 2016

Ryoo Dental, Inc. v. Thomas D. Han DMD, dba Beach Dental Care, USDC Central District of California, Southern Division, Case No. 8:15-cv-00308-JLS-RNB. **Copyright Damages & SEO Analysis**, Expert Report, 2016

Joel Zimmerman p/k/a "deadmau5" and Ronica Holdings Limited vs. Play Records, Inc., Ontario Superior Court of Justice, Court file No. CV-15-539129. **Trademark & Copyright Damages**, Expert consulting, 2016.

Reese Witherspoon v. Sears Holdings Management and Sears Brands LLC, et al., Case No. SC120883, Superior Court of the State of California, County of Los Angeles, West District. **Right of Publicity Damages & SEO Analysis**, Expert Report, 2016

Reese Witherspoon v. LNT Acquisition LLC, et al., Case No. SC120883, Superior Court of the State of California, County of Los Angeles, West District. **Right of Publicity Damages**, Expert Report, 2016

Pharrell Williams, et al. v. Bridgeport Music, Inc., et al., Case No. CV13-06004-JAK (AGRx), USDC, Central District of California, Western Division. **Copyright Damages & Social Media Analysis**, Expert Report, Deposition and Trial Testimony, 2015

Cynara Busch v. Jakov Dulcich and Sons, LLC, Sunlight International Sales, Inc., Case No. CIV 1404125, Superior Court of the State of California, County of Marin, **Right of Publicity Damages**, Expert Consulting, 2015

Markwins Beauty Products, Inc. v. Krystal Ball Productions, Inc. and Fergie Duhamel, Arbitration, Pasadena, CA**. Right of Publicity Damages**, Expert Report, 2015

Stone Creek, Inc. vs. Omnia Italian Design, Inc., Case No. CV-13-00688-PHX-DLR, USDC, District of Arizona, **Trademark Damages & SEO Analysis**, Expert Report, Deposition and Trial Testimony, 2015

Unicolors, Inc. v. Urban Outfitters, Inc., dba Free People; Century 21 Department Stores, LLC, Case No. CV14-1029 SJO (VBK) USDC, Central District of California, **Copyright Damages**, Expert Report and Trial Testimony, 2015

Matthew C. Morin v. Cindy Marabito, Case No. RG14747850, California Superior Court, Alameda County. **Defamation Damages**, Expert Consulting, 2015

Richard Guthrie v. Hobby Lobby Stores, Inc., Case No. 1:15-cv-00195-WDQ, United States District Court, District of Maryland. **Copyright Damages**, Expert Consulting, 2015

Scott Ehredt vs. Medieval Knights, LLC, Case No. BC530275, Superior Court for the State of California, County of Los Angeles, **Right of Publicity Damages**, Expert Report, 2015

Radix Textile, Inc. v. Anthropologie, Inc., Case No. CV14-04272-BRO (EX), USDC, Central District of California, **Copyright Damages**, Expert Report, 2015

Unicolors, Inc. v. Urban Outfitters, Inc., dba, Free People, Case No. 2:14-cv-03217-R-AGR, USDC, Central District of California, **Copyright Damages**, Expert Report, 2014

The Pond Guy, Inc. et al. v. Aquascape Designs, Inc., et al., Case No. 2:13-cv-13229-NGE-DRG, USDC, Eastern District of Michigan. **Trademark & SEO Analysis Investigation**, Expert Report, Deposition and Trial Testimony 2014

Bruce L. Lamb, dba Lamb Productions U-Tile It Videos v. Floor and Decor Outlets of America, Inc., Case No. 3:13-cv-00390-JAH-BLM, USDC, Southern District of California. **Copyright Damages**, Expert Consulting, 2014

Reese Witherspoon v. Marketing Advantages International, Inc., et al., Case No. SC120883, Superior Court of the State of California, County of Los Angeles, West District. **Right of Publicity Damages & SEO Analysis**, Expert Report, 2014

Jason Olive vs. General Nutrition Centers, Inc., Case No. BC482686, Superior Court for the State of California, County of Los Angeles. **Right of Publicity Damages**; Expert Consulting, 2014

Amini Innovation Corporation vs. McFerran Home Furnishings, Inc., Case No. CV13-06496-RSWL(SSx), USDC, Central District of California. **Trade Dress and Copyright Damages**, Expert Report, 2014

One Beacon Insurance Company v. National Casualty Company, Case No. CV 06342-550-JC, USDC, Central District of California. **Copyright Damages**; Expert Opinion, 2014

Star Fabrics, Inc. vs. Joyce Leslie, Inc., N.Y. Invasion Inc., Myletex International, Inc., Case No. 13-CV-02771-CAS, USDC, Central District of California – Western Division. **Copyright Damages**; Expert Report, 2014

Cengage Learning, Inc., et al., United States Bankruptcy Court Eastern District of New York. Copyright Damages; Expert Opinion and Rebuttal Opinion regarding **valuation of higher education textbook copyrights** on behalf of the Second Lien Indenture Trustee in Chapter 11 bankruptcy cases, 2014

The Julia Child Foundation for Gastronomy and the Culinary Arts v. DGWB Advertising and Communications, Case No. 8:12-CV-1402SJO, USDC, Central District of California. **Right of Publicity Damages & SEO Analysis**; Expert Report and Deposition, 2013

United Fabrics International, Inc. vs. G-III Apparel Group, LTD; dba Wilsons Leather; Mcklein Company, LLC, USDC, Central District of California. **Copyright Damages**; Expert Report, 2013

David Wolfe, v. Sunfood, LLC, et al.; Case No. 37-2011-00066729-CU-CO-CTL, Superior Court of the State of California for the County of San Diego. **Right of Publicity Damages**; Deposition, 2013

Brady Industries, LLC v. Waxie's Enterprises, Inc., 2:12-cv-00777-PMP-VCF, USDC, District of Nevada. **Copyright Damages and SEO Analysis**; Expert Report and Deposition, 2013

Rawlings Sporting Goods Company, Inc., v. Wilson Sporting Goods, 4:12-cv-01204-01204, USDC, Eastern District of Missouri. **Trademark Damages**; Expert Opinion, 2013

Rebel Media, No Good Entertainment v. Jay Vir, No Good Digital; CV12-04602-R-JC, USDC, Central District of California, Western Division. **Trademark Damages & YouTube SEO Analysis Investigation**; Expert Opinion, 2013

Marona Photography, Inc. v. Los Altos Boots, Wild West Boots. 12-CV-00163-WYD-MJW, USDC, District of Colorado. **Copyright Damages**; Expert Report, 2012

Ricky D. Ross v. William Leonard Roberts, II; CV10-4528-PA (RZx), The USDC, Central District of California, Western Division – Los Angeles. **Right of Publicity Damages**; Rebuttal Opinion, 2012

L.A. Printex Industries, Inc. v. Macy's Retail Holdings, Inc., et al.; CV09-3978 DSF (AJWx), USDC, Central District of California. **Copyright Damages**; Expert Report, 2011

John Frederick Dryer, et al. v. National Football League; 0:09-cv-02182-PAM-AJB, USDC, District of Minnesota. **Right of Publicity Damages**; Expert Opinion, 2009

## Education & Certifications

**Certified Licensing Professional** (CLP); 2011
**San Diego State University**; Masters, Television, Film, New Media Production; 2000
**San Francisco State University**; Bachelor of Arts, Cinema; 1997

## Employment Experience

**Nevium Intellectual Property Consultants;** San Diego, CA; 2012 – present
Founding Principal: Provide IP strategy, licensing, valuation, and expert services

**CONSOR Intellectual Asset Management;** La Jolla, CA; 2002 – 2012
Principal: Managed client & firm relations and provided expert witness services

**Independent Film Producer;** Los Angeles, CA; 2000 – 2003
Producer for two award winning short films: Boundaries and Passing Through.

## Associations & Memberships

Licensing Executives Society (LES)
International Trademark Association (INTA)
INTA Right of Publicity Committee (2020 -2023 terms)
INTA Internet Committee (2016 -2019 terms)
Member, Copyright Society of the United States
ICANN Compliance and Domain Name Industry Subcommittee (2016 -2019 terms)
American Bar Association (ABA), Section of Intellectual Property Law
American Bar Association (ABA), Copyright & Social Media Committee
Copyright Society, Website & Social Media Committee

## Publications & Presentations

"Profit Apportionment in Intellectual Property Infringement Cases – Part I: A Comparative Analysis Using Google Ads and Conversion Ratios." les Nouvelles, 2023

"Tools of the Trade: Trends and Developments in IP Valuation and Dealmaking Data and Internet Tools." Panel presentation at the LES 2022 Annual Meeting, 2022

"Profit Apportionment in Intellectual Property Infringement Damages Calculations" Intellectual Property Valuation Case Law Compendium, Fourth Edition. Business Valuation Resources (BVR), 2022

"Tools of the Trade: Trends and Developments in IP Valuation and Dealmaking Data and Internet Tools." Panel presentation at the LES 2022 Annual Meeting, 2022

"Using Internet and Social Media Analytic Tools for Valuation and Damages Calculations" Presentation at the NACVA Business Valuation & Financial Litigation Hybrid & Virtual Super Conference, 2022

"Introduction to Copyright Valuation" Chapter 3 in the Practical Guide to Successful Intellectual Property Valuation and Transactions by Kluwer Law International, 2022

"Profit Apportionment for Intellectual Property Valuation" Chapter 7 in the Practical Guide to Successful Intellectual Property Valuation and Transactions by Kluwer Law International, 2022

"Can Trademark Infringement Be a Victimless Crime?" Table Topic for the International Trademark Association (INTA), 2021

"Defamation Investigations: A Big Leap in Fighting Back" published in The Intellectual Property Strategist, 2021

"Proving Online Defamation: No Longer a Black Box" published in Law.com: Legaltech News, 2021

"Valuing Brands in the Tech Sector Using an Apportionment Framework" published in the National Association of Certified Valuators and Analysts (NACVA) The Value Examiner, 2021

"Using Internet Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases" published as a chapter in The Comprehensive Guide to Economic Damages book by Business Valuation Resources (BVR), 2021

"Profit Apportionment in Intellectual Property Infringement Damages Calculations" published as a chapter in The Comprehensive Guide to Economic Damages book by Business Valuation Resources (BVR), 2021

"Trademark and Brand Valuation" webinar for the Confederation of Indian Industry (CII), 2021

"What to Look for When Valuing a Cannabis Business" Cannabis Business Times, 2019

"Internet Tools for Intellectual Property Analysis" presented as a webinar for the Certified Patent Valuation Analyst certification, 2019

"Investigating Online IP Infringement and Calculating Damages for Internet Related Disputes" presented at the University of San Diego School of Law, 2019

"Nevium: Influencer Marketing Meets Intellectual Property" Forbes, 2019

"Calculating the Value of Influencer Marketing and Impact of Infringement" Attorney at Law Magazine, 2019

"Building Cannabis IP Includes Both Your Brand and Your Technology" Entrepreneur, 2019

"Can Trademark Infringement Be a Victimless Crime? The Stone Creek v. Omnia Case" International Journal of Law and Public Administration, Redfame Publishing Inc., 2018

"Apportionment Models: Valuing the Contribution of Intangible Property and Assets in Disputes" A Special Series Webinar on New Economic Damages Guide. Business Valuation Resources (BVR), 2018

"Using Internet Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases" published as a chapter in The Comprehensive Guide to Economic Damages book by Business Valuation Resources (BVR), 2018

"Profit Apportionment in Intellectual Property Infringement Damages Calculations" published as a chapter in The Comprehensive Guide to Economic Damages book by Business Valuation Resources (BVR), 2018

The Florida Bar Business Law Section, 9th Annual Intellectual Property Symposium. Panel on the Blurred Lines trial – Speaking as the copyright damages and apportionment expert. St. Pete Beach, FL, April 2018

"Proving Infringement in Online Trademark Disputes" Luncheon Table Topic at the 140th Annual International Trademark Association (INTA) Meeting, Seattle, WA May 2018

"Building Brands and Maximizing Value" Workshop Session presented at the Licensing Executive Society (LES) 2017 Spring Meeting entitled Stronger Economies Through Licensing, Washington, DC, May 2017

"Blurred Lines – Music Industry Damage Calculations" Panel Session presented at SXSW, Austin, TX, March 2017

"Non-Traditional Marks and the Traditional Practice" Luncheon Table Topic for the International Trademark Association (INTA), San Diego, CA, February 2017

The Use of Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases" published as a chapter in Calculating Economic Damages in Intellectual Property Infringement Cases book by Business Valuation Resources (BVR), October 2016

"Misuses of IP Over the Internet: Searching for Value." Business Valuation Resources (BVR) Special Series Webinar: The Comprehensive Guide to Economic Damages, July 2016

"The Use of Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases" published as a chapter in The Comprehensive Guide to Lost Profits and Other Commercial Damages book by Business Valuation Resources (BVR), May 2016

"Brand Valuation and Techniques" presented at the Conference on Brand Valuation; University of New Hampshire School of Law and The Franklin Pierce Center for Intellectual Property. Concord, New Hampshire, April 2016

"Valuation and Damages Calculations in Cases Involving Internet IP Infringement and Defamation." NACVA Webinar Series, April 2016

"Brand Due Diligence: Tools and Techniques for Supporting Successful Brand Driven Transactions" Luncheon Table Topic at the International Trademark Association (INTA) Annual Meeting, Orlando, FL, May 2016

"Employing Internet and Social Media Analytical Tools in Valuation and Damages Calculations" Featured Presenter at the NACVA and the CTI's 2016 Annual Conference. San Diego, CA, June 2016

"Apportioning Copyright Damages: The Case of Blurred Lines" published in the Journal of Intellectual Property Law and Practice, Vol. 10, No. 12, November 2015

"Intellectual Property Valuation: Methodologies and Case Studies" presented at the American Society of Appraisers (ASA), San Diego Chapter monthly meeting, San Diego, 2015

"Blurred Lines or Fuzzy Math: How Did They Come Up with $7.3 Million or was it $5.3 Million? – Damage Calculations in the Music Industry, New York State Bar – Entertainment Business Law Seminar in Association with CMJ Music Marathon, New York, 2015

"Internet Analytic Tools for Brand Valuation, Damages and Defamation" Luncheon Table Topic at the International Trademark Association (INTA) 2015 Annual Meeting, San Diego, CA

"Valuation and Damages Calculations in Cases Involving Internet IP Infringement and Defamation" presented at the NACVA and the CTI's 2015 Annual Conference, June 2015

"How to Calculate Damages for Internet and Social Media Infringement" presented at the 36th Annual BAA/PMA Marketing Law Conference, 2014

"Calculating Damages from Internet IP Infringement and Defamation" presented at the Internet Law Leadership Summit, 2014

"Estimating and Managing the Economic Impact of Brand Disparagement" published in the World Trademark Review, 2014

"SFIA Legal Task Force Series: Intellectual Property Litigation & Valuation" presented to the Sports & Fitness Industry Association members, 2013

"Copyright Valuation and Damages: Different Tools for Different Challenges" presented to The State Bar of California, Intellectual Property Law Section, 2013

"Key Concepts in Intellectual Property Valuation" presented to various law firms, 2012

"Intellectual Property Valuation," presented to various law firms, 2011

"Valuing Your Brand for Sale or Securitization", presented to LIMA members, 2011

"Valuing the Intangible: Where to Start? The Full Family of Intellectual Property and Other Intangibles," CLE presented to various law firms, 2010

"Valuation, Licensing, Damages and Expert Witnesses," CLE presented to various law firms, 2009

"Brand Leverage and Valuation" presented to various corporations, 2008

"Deceptive Product Endorsement: Unauthorized Use of a Celebrity's Name and Likeness," published in Total Licensing Magazine, 2006

NEVIUM
Intellectual Property Consultants

# Schedules for Doug Bania - Nevium Expert Report

**John H. Schnatter**

**v.**

**247 Group, LLC d/b/a Laundry Service**

**CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

*List of Schedules*


| | |
|---|---|
| Schedule 1a | Summary of Damages |
| Schedule 1b | Founder and Chairman Agreements Lost Profits Assumptions |
| Schedule 2a | Mr. Schnatter's Historical Income Earned under Founder and Chairman Agreements |
| Schedule 2b | Mr. Schnatter Lost Profits from Founder and Chairman |
| Schedule 2c | Mr. Schnatter's Lost Profits from Reimbursable |
| Schedule 2d | Mr. Schnatter's Historical Reimbursable Expenses (Pre Termination) |
| Schedule 2e | Mr. Schnatter's Historical Reimbursable Expenses (Post Termination) |
| Schedule 3a | Summary of Invoice Payments |
| Schedule 3b | Bayard Invoices |
| Schedule 3c | Glaser Weil Invoices |
| Schedule 3d | Hunton Andrews Kurth Invoices |
| Schedule 3e | UnitedLex Invoices |
| Schedule 3f | Innisfree Invoices |
| Schedule 3g | Moelis & Company Invoices |
| Schedule 3h | Sitrick and Company Invoices |
| Schedule 4a | Reputational Harm Damages |
| Schedule 4b | Evidence of Reputational Harm |
| Schedule 5a | Termination of Naming Rights Damages |
| Schedule 5b | Football Stadium Naming Rights Deals |
| Schedule 6 | Chairman Comparable to John Schnatter |
| Schedule 7 | ISS Governance QualityScore |

Nevium Intellectual Property Consultants

**Summary of Damages** *Schedule 1a*

| Damages Summary | | | |
|---|---|---|---|
| Count | Damages Category | Calculation | Damages Amount |
| 1 | Founder & Chairman Agreements Damages | Total But-for Profits | $14,555,638 |
| | | Total As-is Profits | $1,560,018 |
| | | **Total Lost Profits** | **$12,995,620** |
| 2 | Reimbursable Expense Damages | Total But-for Profits | $6,065,950 |
| | | Total As-is Profits | $295,261 |
| | | **Total Lost Profits** | **$5,770,690** |
| 3 | Mitigation Expense Damages | Public Relations Expenses | $788,155 |
| | | Investment Bank Expenses | $11,506,998 |
| | | Legal Expenses | $3,318,122 |
| | | Consulting Expenses | $77,625 |
| | | **Total** | **$15,690,900** |
| 4 | Reputational Harm Damages | Pay-Per-Click Price | $1.55 |
| | | Total Views | 1,313,212 |
| | | Attitude Change Multiplier | 3 |
| | | **Total** | **$6,106,436** |
| 5 | Naming Rights Damages | Yearly Lost Value | $2,222,083 |
| | | Number of Years | 21.20 |
| | | Payments Upon Termination | 9,500,000 |
| | | **Total** | **$37,614,255** |
| | | **Total Damages** | **$78,177,901** |

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Nevium Intellectual Property Consultants

**Founder and Chairman Agreements Lost Profits Assumptions** ***Schedule 1b***

| | | |
|---|---|---|
| **Forecast Period** | | |
| Start of Forecast Period for Founder and Chairman Agreements | 2018 | As a result of the Forbes Article, the Chairman and Founder Agreements were terminated in July 2018 and Mr. Schnatter received partial compensation. |
| End of Forecast Period for Founder and Chairman Agreements | 2033; 2042 | According to the Seventh Amended Initial Disclosure, Mr. Schnatter would have continued to be Chairman's Agreement until 2033, and under the Founder's Agreement until 2042. Therefore, it is assumed that the end of the forecast period will be 2042, which is supported by data from the Social Security. |
| Papa John's Weighted Average Cost of Capital (WACC) | 7.0% | Assumes forecasted expenses and option award income to be discounted at Papa John's WACC as of January 1, 2024. |
| **Founder and Chairman Agreement But-For Analysis** | | |
| Option Award from Founder's and Chairman's Agreements (2019 - 2033) | $600,000 | Plaintiff earned $300,000 a year from the Chairman Agreement and $300,000 a year from the Founder Agreement ($600,000 combined). Plaintiff expected to continue his role as Chairman until he was 71, or until 2033, according to the Seventh Amended Initial Disclosure. Research indicates chairmen for similar companies are at least 71, if not older, therefore, this model reasonably assumes Plaintiff will remain as Chairman and continue earning $300,000 a year until 2033. Plaintiff expected to continue his role as Founder until his death. According to the Social Security Administration, Plaintiff's life expectancy is 81.5 years old, meaning he will live and remain Founder until 2042. Therefore, Mr. Schnatter would have earned a combined $600,000 under the Founder and Chairman Agreements from until 2033. |
| Option Award from Founder's and Chairman's Agreements (2034 - 2042) | $300,000 | After retiring from the position of Chairman, Plaintiff expected to remain in the position of Founder for the remainder of his lifetime, and would have earned at least $300,000 a year under the Founder's Agreement. Considering Plaintiff's life expectancy, he would have remained Founder until 2042. |
| Total Option Award | $1,042,797 | As Mr. Schnatter did not receive full compensation in 2018, beginning in 2018, Mr. Schnatter would achieve the average total option award compensation from the period of 2009 - 2017, $1,042,797, until 2033 when he would have retired from the position of Chairman. |

Notes:

Source for WACC: Document 25a

Nevium Intellectual Property Consultants

**Mr. Schnatter's Historical Income Earned under Founder and Chairman Agreements** *Schedule 2a*

| Mr. Schnatter's Historical Income under Founder and Chairman Agreements | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **Total** |
| Option Awards under Founder and Chairman Agreement | 600,000 | 600,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 6,480,000 |
| Additional from Compensation Committee | 249,990 | 249,971 | 300,061 | 265,012 | 500,041 | 500,011 | 500,019 | 500,017 | 500,047 | 18 | 3,565,187 |
| **Total Compensation** | **$849,990** | **$849,971** | **$960,061** | **$925,012** | **$1,160,041** | **$1,160,011** | **$1,160,019** | **$1,160,017** | **$1,160,047** | **$660,018** | **$10,045,187** |

**Other Key Stats**

| | |
|---|---|
| Total Compensation (2009 - 2018) | $10,045,187 |
| Average Compensation (2009 - 2018) | $1,004,519 |

Notes:

Source: Document 4h - 4q, 1c

Nevium Intellectual Property Consultants

**Mr. Schnatter Lost Profits from Founder and Chairman Agreements**

*Schedule 2b*

| Founder and Chairman Agreement - As-Is | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Option Awards under Founder and Chairman Agreement | 600,000 | 600,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | | | |
| Additional from Compensation Committee | 249,990 | 249,971 | 300,061 | 265,012 | 500,041 | 500,011 | 500,019 | 500,017 | 500,047 | 18 | | | |
| License Agreement | | | | | | | | | | | 300,000 | 300,000 | 300,000 |
| **Total As-Is Profits** | **$849,990** | **$849,971** | **$960,061** | **$925,012** | **$1,160,041** | **$1,160,011** | **$1,160,019** | **$1,160,017** | **$1,160,047** | **$660,018** | **$300,000** | **$300,000** | **$300,000** |

| Founder and Chairman Agreement - But-For | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Option Awards under Founder and Chairman Agreement | 600,000 | 600,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 660,000 | 600,000 | 600,000 | 600,000 |
| Additional from Compensation Committee | 249,990 | 249,971 | 300,061 | 265,012 | 500,041 | 500,011 | 500,019 | 500,017 | 500,047 | 382,797 | 442,797 | 442,797 | 442,797 |
| License Agreement | | | | | | | | | | | | | |
| **Total** | **$849,990** | **$849,971** | **$960,061** | **$925,012** | **$1,160,041** | **$1,160,011** | **$1,160,019** | **$1,160,017** | **$1,160,047** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** |
| Period | | | | | | | | | | | | | |
| Discount Factor | | | | | | | | | | | | | |
| **Total PV of But-For** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** |

| Lost Profits | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Total But-For | | | | | | | | | | 1,042,797 | 1,042,797 | 1,042,797 | 1,042,797 |
| Total As-Is | | | | | | | | | | 660,018 | 300,000 | 300,000 | 300,000 |
| Total Lost Profits | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$382,779** | **$742,797** | **$742,797** | **$742,797** |

Notes:

Source: Document 4h - 4q, 1c

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Nevium Intellectual Property Consultants

**Mr. Schnatter Lost Profits from Founder and Chairman Agreements**

*Schedule 2b*

| Founder and Chairman Agreement - As-Is | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **2032** | **2033** | **2034** |
| Option Awards under Founder and Chairman Agreement | | | | | | | | | | | | | |
| Additional from Compensation Committee | | | | | | | | | | | | | |
| License Agreement | | | | | | | | | | | | | |
| **Total As-Is Profits** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Founder and Chairman Agreement - But-For | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **2032** | **2033** | **2034** |
| Option Awards under Founder and Chairman Agreement | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 300,000 |
| Additional from Compensation Committee | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | 442,797 | |
| License Agreement | | | | | | | | | | | | | |
| **Total** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$1,042,797** | **$300,000** |
| Period | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Discount Factor | | | 0.93 | 0.87 | 0.82 | 0.76 | 0.71 | 0.66 | 0.62 | 0.58 | 0.54 | 0.51 | 0.47 |
| **Total PV of But-For** | **$1,042,797** | **$1,042,797** | **$974,212** | **$910,138** | **$850,279** | **$794,356** | **$742,111** | **$693,303** | **$647,704** | **$605,105** | **$565,307** | **$528,127** | **$141,943** |

| Lost Profits | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **2032** | **2033** | **2034** |
| Total But-For | 1,042,797 | 1,042,797 | 974,212 | 910,138 | 850,279 | 794,356 | 742,111 | 693,303 | 647,704 | 605,105 | 565,307 | 528,127 | 141,943 |
| Total As-Is | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Lost Profits | **$1,042,797** | **$1,042,797** | **$974,212** | **$910,138** | **$850,279** | **$794,356** | **$742,111** | **$693,303** | **$647,704** | **$605,105** | **$565,307** | **$528,127** | **$141,943** |

Notes:

Source: Document 4h - 4q, 1c

Nevium Intellectual Property Consultants

**Mr. Schnatter Lost Profits from Founder and Chairman Agreements** *Schedule 2b*

| Founder and Chairman Agreement - As-Is | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2035** | **2036** | **2037** | **2038** | **2039** | **2040** | **2041** | **2042** |
| Option Awards under Founder and Chairman Agreement | | | | | | | | |
| Additional from Compensation Committee | | | | | | | | |
| License Agreement | | | | | | | | |
| **Total As-Is Profits** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Founder and Chairman Agreement - But-For | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2035** | **2036** | **2037** | **2038** | **2039** | **2040** | **2041** | **2042** |
| Option Awards under Founder and Chairman Agreement | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| Additional from Compensation Committee | | | | | | | | |
| License Agreement | | | | | | | | |
| **Total** | **$300,000** | **$300,000** | **$300,000** | **$300,000** | **$300,000** | **$300,000** | **$300,000** | **$300,000** |
| | | | | | | | | |
| Period | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| Discount Factor | 0.44 | 0.41 | 0.39 | 0.36 | 0.34 | 0.31 | 0.29 | 0.27 |
| **Total PV of But-For** | **$132,607** | **$123,886** | **$115,738** | **$108,126** | **$101,014** | **$94,371** | **$88,164** | **$82,366** |

| Lost Profits | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2035** | **2036** | **2037** | **2038** | **2039** | **2040** | **2041** | **2042** |
| Total But-For | 132,607 | 123,886 | 115,738 | 108,126 | 101,014 | 94,371 | 88,164 | 82,366 |
| Total As-Is | - | - | - | - | - | - | - | - |
| Total Lost Profits | **$132,607** | **$123,886** | **$115,738** | **$108,126** | **$101,014** | **$94,371** | **$88,164** | **$82,366** |

| | |
|---|---|
| Total PV of But-For Profits | 14,555,638 |
| Less: Total As-Is Profits | 1,560,018 |
| **Total PV of Lost Profits** | **$12,995,620** |

Notes:

Source: Document 4h - 4q, 1c

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Nevium Intellectual Property Consultants

**Mr. Schnatter's Lost Profits from Reimbursable Expenses**

*Schedule 2c*

| Reimbursable Expense - As-Is | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Admin Assistant Expenses | | | | | | 74,775 | 51,947 | | | | | |
| Security Expenses | 40,000 | 549,768 | 669,191 | 450,923 | 616,934 | 324,650 | 243,314 | | | | | |
| Total As-Is Reimbursements from Papa John's | **$40,000** | **$549,768** | **$669,191** | **$450,923** | **$616,934** | **$399,425** | **$295,261** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Reimbursable Expenses - But-for | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Total | $40,000 | $549,768 | $669,191 | $450,923 | $616,934 | $399,425 | 560,873 | 534,004 | 427,520 | 449,915 | 457,960 | 393,350 |
| Period | | | | | | | | | | | | |
| Discount Factor | | | | | | | | | | | | |
| PV of But-for Reimbursable Expenses | **$40,000** | **$549,768** | **$669,191** | **$450,923** | **$616,934** | **$399,425** | **$560,873** | **$534,004** | **$427,520** | **$449,915** | **$457,960** | **$393,350** |

| Lost Profits | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Total As-Is | | | | | | | 295,261 | 0 | 0 | 0 | 0 | 0 |
| Total But-For | | | | | | | 560,873 | 534,004 | 427,520 | 449,915 | 457,960 | 393,350 |
| Total Lost Profits | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$265,612** | **$534,004** | **$427,520** | **$449,915** | **$457,960** | **$393,350** |

Notes:

Data for As-Is Reimbursable Expenses are from Schedule 2d.

Data for But-For Reimbursable Expenses are from Schedule 2d and Schedule 2e.

But-for expenses from 2024 through 2033 represent the average but-for expenses from 2012 through 2023.

Reimbursable Expenses are projected through 2033 because that is the year the Chairman Agreement would have ended.

Nevium Intellectual Property Consultants

**Mr. Schnatter's Lost Profits from Reimbursable Expenses**

*Schedule 2c*

| Reimbursable Expense - As-Is | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Agreement/Type | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **2032** | **2033** |
| Admin Assistant Expenses | | | | | | | | | | |
| Security Expenses | | | | | | | | | | |
| Total As-Is Reimbursements from Papa John's | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

| Reimbursable Expenses - But-for | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **2032** | **2033** |
| Total | 462,489 | 462,489 | 462,489 | 462,489 | 462,489 | 462,489 | 462,489 | 462,489 | 462,489 | 462,489 |
| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Discount Factor | 0.93 | 0.87 | 0.82 | 0.76 | 0.71 | 0.66 | 0.62 | 0.58 | 0.54 | 0.51 |
| PV of But-for Reimbursable Expenses | **$432,071** | **$403,654** | **$377,105** | **$352,303** | **$329,132** | **$307,485** | **$287,262** | **$268,369** | **$250,718** | **$234,229** |

| Lost Profits | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **2032** | **2033** |
| Total As-Is | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total But-For | 432,071 | 403,654 | 377,105 | 352,303 | 329,132 | 307,485 | 287,262 | 268,369 | 250,718 | 234,229 |
| Total Lost Profits | **$432,071** | **$403,654** | **$377,105** | **$352,303** | **$329,132** | **$307,485** | **$287,262** | **$268,369** | **$250,718** | **$234,229** |

| | |
|---|---|
| Total PV of But-For Profits | 6,065,950 |
| Less: Total As-Is Profits | 295,261 |
| **Total PV of Lost Profits** | **$5,770,690** |
| Discount Rate | **7.04%** |

Notes:

Data for As-Is Reimbursable Expenses are from Schedule 2d.

Data for But-For Reimbursable Expenses are from Schedule 2d and Schedule 2e.

But-for expenses from 2024 through 2033 represent the average but-for expenses from 2012 through 2023.

Reimbursable Expenses are projected through 2033 because that is the year the Chairman Agreement would have ended.

Nevium Intellectual Property Consultants

**Mr. Schnatter's Historical Reimbursable Expenses (Pre Termination)** *Schedule 2d*

**Total Expenses (2017-2018)**

| Year | Total |
|---|---|
| 2012 | $40,000 |
| 2013 | $549,768 |
| 2014 | $669,191 |
| 2015 | $450,923 |
| 2016 | $616,934 |
| 2017 | $399,425 |
| 2018 (Partial Year) | $295,261 |
| **Average** | **$431,643** |

**Admin Assistant Expenses**

| Year | Payments by Papa John's | Payments by Evergreen | Total Admin Compensation | John Schnatter Reimbursement | Net Paid by Papa John's |
|---|---|---|---|---|---|
| 2017 | $102,275 | $0 | $102,275 | $27,500 | $74,775 |
| 2018 | $58,822 | $49,283 | $108,105 | $6,875 | $51,947 |

Notes:

Source: Document 23d

Evergreen Real Estate, LLC is wholly owned by John Schnatter.

**Security Expenses**

| Year | Paid Directly by PJ | Reimbursed to JHS | Total Paid by PJ |
|---|---|---|---|
| 2012 | $40,000 | $0 | $40,000 |
| 2013 | $160,000 | $51,655 | $211,655 |
| 2014 | $160,000 | $69,888 | $229,888 |
| 2015 | $160,000 | $62,916 | $222,916 |
| 2016 | $160,000 | $58,677 | $218,677 |
| 2017 | $162,570 | $95,390 | $257,960 |
| 2018 | $90,048 | $28,630 | $118,678 |

Notes:

Source: Document 23b

**Security Upgrade Expenses**

| Year | Paid Directly by PJ |
|---|---|
| 2013 | $338,113 |
| 2014 | $439,303 |
| 2015 | $228,007 |
| 2016 | $398,257 |
| 2017 | $66,690 |
| 2018 | $124,636 |

Notes:

Source: Document 23c

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Nevium Intellectual Property Consultants

**Mr. Schnatter's Historical Reimbursable Expenses (Post Termination)**

*Schedule 2e*

| Total Expenses (2018-2023) | |
|---|---|
| **Year** | **Total** |
| 2018 (Partial Year) | $265,612 |
| 2019 | $534,004 |
| 2020 | $427,520 |
| 2021 | $449,915 |
| 2022 | $457,960 |
| 2023 | $393,350 |
| **Average** | **$421,394** |

| Security Expenses (2018-2023) | | | | |
|---|---|---|---|---|
| **Year** | **Gross paid by JHS** | **Hourly Rate** | **9 hr/day for which JHS was responsible** | **Amount to be reimbursed by PJ** |
| 2018 | $255,389 | $31 | $39,060 | $216,329 |
| 2019 | $528,772 | $31 | $101,835 | $426,937 |
| 2020 | $436,173 | $35 | $114,975 | $321,198 |
| 2021 | $440,670 | $35 | $114,975 | $325,695 |
| 2022 | $434,370 | $35 | $114,975 | $319,395 |
| 2023 | $358,704 | $35 | $114,975 | $243,729 |
| | | | **Average** | **$308,881** |

Notes:

Source: Document 23e

2018 includes amounts post August 10, 2018, the date at which PJ's Special Committee voted to terminate JHS's security coverage.

| Executive Assistant Expenses (2018-2023) | | | |
|---|---|---|---|
| **Year** | **Total W-2 Earnings** | **Quarterly Bonuses** | **Base Salary** |
| 2018 | $49,283 | $12,500 | $36,783 |
| 2019 | $107,067 | $25,000 | $82,067 |
| 2020 | $106,322 | $25,000 | $81,322 |
| 2021 | $124,220 | $36,250 | $87,970 |
| 2022 | $138,565 | $45,000 | $93,565 |
| 2023 | $149,621 | $50,000 | $99,621 |
| **Average** | **$112,513** | | |

Notes:

Source: Document 23f

2018 includes amounts post July 15, 2018 the date at which PJ's Special Committee voted to terminate JHS's security coverage.

Nevium Intellectual Property Consultants

**Summary of Invoice Payments**

***Schedule 3a***

**Summary of Expense By Vendor**

| Count | Vendor | Category | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| 1 | Bayard | Legal | $714,499 | $219,548 | $1,243 | | $935,289 |
| 2 | Glaser Weil | Legal | $834,450 | $678,785 | $60,781 | | $1,574,016 |
| 3 | Hunton Andrews Kurth | Legal | | $734,534 | $22,189 | | $756,723 |
| 4 | Innisfree | Consulting | $46,050 | $31,575 | | | $77,625 |
| 5 | Moelis & Company | Investment Bank | $2,708,333 | $6,673,665 | $2,125,000 | | $11,506,998 |
| 6 | Sitrick and Company | Public Relations | $610,790 | $147,605 | $29,760 | | $788,155 |
| 7 | UnitedLex | Legal | $45,303 | $2,386 | | $4,405 | $52,094 |
| | | | | | | | **$15,690,900** |

**Summary of Expense By Category**

| Count | Category | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|
| 1 | Public Relations | $610,790 | $147,605 | $29,760 | $0 | $788,155 |
| 2 | Legal | $1,594,252 | $1,635,254 | $84,212 | $4,405 | $3,318,122 |
| 3 | Consulting | $46,050 | $31,575 | $0 | $0 | $77,625 |
| 4 | Investment Bank | $2,708,333 | $6,673,665 | $2,125,000 | $0 | $11,506,998 |
| | | | | | | **$15,690,900** |

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Nevium Intellectual Property Consultants
**Bayard Invoices**

*Schedule 3b*

**Bayard Invoices**

| Vendor | Invoice Date | For Services Rendered Through | Previous Balance Forward | Payments | Balance Forward | Current Fees | Current Disbursements | Total Current Charges | Total Amount Due |
|---|---|---|---|---|---|---|---|---|---|
| Bayard | 8/9/2018 | 7/31/2018 | | | $0 | $77,503 | $1,198 | $78,701 | $78,701 |
| Bayard | 9/24/2018 | 8/31/2018 | $78,701 | ($78,701) | $0 | $188,877 | $3,034 | $191,910 | $191,910 |
| Bayard | 10/4/2018 | 9/30/2018 | | | $191,910 | $255,292 | $3,789 | $259,081 | $450,991 |
| Bayard | 11/14/2018 | 10/31/2018 | $450,991 | ($450,991) | $0 | $171,360 | $13,448 | $184,807 | $184,807 |
| Bayard | 12/20/2018 | 11/30/2018 | $184,807 | ($184,807) | $0 | $52,239 | $2,224 | $54,463 | $54,463 |
| Bayard | 1/16/2019 | 12/31/2018 | | | $54,463 | $4,209 | | $4,209 | $58,671 |
| Bayard | 2/12/2019 | 1/31/2019 | $58,671 | ($58,671) | $0 | $21,561 | $463 | $22,024 | $22,024 |
| Bayard | 4/29/2019 | 3/31/2019 | $22,024 | ($22,024) | $0 | $113,276 | $7,103 | $120,378 | $120,378 |
| Bayard | 5/17/2019 | 4/30/2019 | | | $120,378 | $2,618 | $4,849 | $7,466 | $127,844 |
| Bayard | 8/5/2019 | 6/30/2019 | $127,844 | ($127,844) | $0 | $6,368 | $716 | $7,083 | $7,083 |
| Bayard | 9/12/2019 | 8/31/2019 | | | | $525 | $10 | $535 | $535 |
| Bayard | 10/18/2019 | 9/30/2019 | | | | $3,390 | | $3,390 | $3,390 |
| Bayard | 11/26/2019 | 10/31/2019 | | | | $825 | | $825 | $4,215 |
| Bayard | 12/12/2019 | 11/30/2019 | | | $4,215 | $158 | | $158 | $4,373 |
| Bayard | 3/10/2020 | 1/31/2020 | $4,373 | ($3,390) | $983 | $260 | | $260 | $1,243 |
| | | | | | | | | **$935,289** | |

**Other Documents - Bank Statements showing Payment of Bayard Invoices**

| Entity | Statement Date | Activity Date[1] | Type | Amount |
|---|---|---|---|---|
| PNC | 8/17/2018 - 9/18/2018 | 8/30/2018 | Transfer | $78,701 |
| UBS | Oct-18 | 10/9/2018 | Transfer | $191,910 |
| UBS | Nov-18 | 11/5/2018 | Transfer | $259,081 |
| UBS | Dec-18 | 12/18/2018 | Transfer | $184,807 |
| UBS | Jan-19 | 1/31/2019 | Transfer | $58,671 |
| UBS | Mar-19 | 3/5/2019 | Transfer | $22,024 |
| UBS | Jun-19 | 6/6/2019 | Transfer | $127,844 |
| Morgan Stanley | Aug-19 | 8/22/2019 | Check | $7,083 |
| Morgan Stanley | Oct-19 | 9/26/2019 | Check | $535 |
| Morgan Stanley | Dec-19 | 12/12/2019 | Check | $3,390 |
| Morgan Stanley | Jun-20 | 6/12/2020 | Check | $1,243 |
| | | | | **$935,289** |

Notes:

Source: Document 8a - 8z

1) Activity date of checks are based on when the check was written

Nevium Intellectual Property Consultants
**Glaser Weil Invoices** *Schedule 3c*

| Glaser Weil Invoices | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Vendor** | **Invoice Date** | **For Services Rendered Through** | **Current Billing** | **Previous Balance** | **Credit Applied** | **Interest** | **Total Amount** |
| Glaser Weil | 8/23/2018 | 7/31/2018 | $155,134 | $0 | | | $155,134 |
| Glaser Weil | 9/20/2018 | 8/31/2018 | $192,702 | $0 | | | $192,702 |
| Glaser Weil | 10/22/2018 | 9/30/2018 | $203,985 | $0 | | | $203,985 |
| Glaser Weil | 11/27/2018 | 10/31/2018 | $282,628 | $0 | | | $282,628 |
| Glaser Weil | 12/21/2018 | 11/30/2018 | $133,619 | $0 | | | $133,619 |
| Glaser Weil | 1/25/2019 | 12/31/2018 | $112,130 | $133,619 | ($111,130) | | $245,749 |
| Glaser Weil | 2/28/2019 | 1/31/2019 | $128,468 | $113,887 | | | $242,355 |
| Glaser Weil | 3/22/2019 | 2/28/2019 | $110,511 | $131,225 | | | $241,736 |
| Glaser Weil | 4/24/2019 | 3/31/2019 | $79,690 | $113,290 | | | $192,980 |
| Glaser Weil | 5/30/2019 | 4/30/2019 | $27,247 | $79,690 | ($17,878) | | $89,060 |
| Glaser Weil | 6/21/2019 | 5/31/2019 | $34,600 | $9,370 | ($14,788) | | $43,970 |
| Glaser Weil | 7/23/2019 | 6/30/2019 | $25,655 | $19,908 | | | $45,563 |
| Glaser Weil | 8/28/2019 | 7/31/2019 | $8,786 | $26,011 | ($8,786) | | $26,011 |
| Glaser Weil | 9/23/2019 | 8/31/2019 | $50,517 | $0 | ($36,956) | | $13,562 |
| Glaser Weil | 10/22/2019 | 9/30/2019 | $13,626 | $13,562 | | | $27,188 |
| Glaser Weil | 11/22/2019 | 10/31/2019 | $8,726 | $27,188 | | | $35,914 |
| Glaser Weil | 12/20/2019 | 11/30/2019 | $40,126 | $36,223 | ($24,867) | | $76,349 |
| Glaser Weil | 1/22/2020 | 12/31/2019 | $25,522 | $76,040 | | | $101,562 |
| Glaser Weil | 1/31/2020 | | | | | $920 | |
| Glaser Weil | 2/20/2020 | 1/31/2020 | $4,381 | $51,701 | | | $56,083 |
| Glaser Weil | 2/29/2020 | | | | | $560 | |
| Glaser Weil | 3/18/2020 | 2/29/2020 | $100 | $56,642 | | | $56,742 |
| Glaser Weil | 3/31/2020 | | | | | $575 | |
| Glaser Weil | 4/30/2020 | | | | | $545 | |
| Glaser Weil | 5/31/2020 | | | | | $563 | |
| Glaser Weil | 6/17/2020 | | | | | $253 | |
| Glaser Weil | 7/21/2020 | | | | | $506 | |
| Glaser Weil | 8/17/2020 | | | | | $402 | |
| Glaser Weil | 8/21/2020 | 8/21/2020 | | $49,587 | | | $49,587 |
| Glaser Weil | 9/11/2020 | | | | | $372 | |
| Glaser Weil | 10/21/2020 | 9/30/2020 | | $49,959 | | $595 | $50,554 |
| Glaser Weil | 11/18/2020 | 10/31/2020 | | $50,554 | | $402 | $50,956 |

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Nevium Intellectual Property Consultants
**Glaser Weil Invoices**

*Schedule 3c*

**Glaser Weil Invoices**

| Vendor | Invoice Date | For Services Rendered Through | Current Billing | Previous Balance | Credit Applied | Interest | Total Amount |
|---|---|---|---|---|---|---|---|
| Glaser Weil | 12/9/2020 | | | | | $327 | |
| Glaser Weil | 12/15/2020 | 11/30/2020 | | $50,956 | | $327 | $51,283 |
| Glaser Weil | 1/15/2021 | | | | | $551 | |
| Glaser Weil | 2/22/2021 | 1/31/2021 | | $51,834 | | $491 | $52,325 |
| Glaser Weil | 3/17/2021 | 2/28/2021 | | $52,325 | | $402 | $52,727 |
| | | | | | | | **$2,770,324** |

**Other Documents - Bank Statements showing Payment of Glaser Weil Invoices**

| Entity | Statement Date | Activity Date[1] | Type | Amount |
|---|---|---|---|---|
| PNC | 8/17/2018 - 9/18/2018 | 8/30/2018 | Transfer | $155,134 |
| UBS | Oct-18 | 10/10/2018 | Transfer | $192,702 |
| UBS | Nov-18 | 11/5/2018 | Transfer | $203,985 |
| UBS | Dec-18 | 12/18/2018 | Transfer | $282,628 |
| UBS | Jan-19 | 1/31/2019 | Transfer | $133,619 |
| UBS | Mar-19 | 3/5/2019 | Transfer | $111,130 |
| UBS | Mar-19 | 3/27/2019 | Transfer | $139,879 |
| UBS | May-19 | 5/2/2019 | Transfer | $118,119 |
| UBS | Jun-19 | 6/6/2019 | Transfer | $117,280 |
| UBS | Jul-19 | 7/2/2019 | Transfer | $24,158 |
| UBS | Aug-19 | 8/15/2019 | Transfer | $34,600 |
| UBS | Feb-20 | 2/13/2020 | Transfer | $50,781 |
| Morgan Stanley | Jun-20 | 6/12/2020 | Check | $10,000 |
| | | | | **$1,574,016** |

Notes:

Source: Document 9a - 9am

1) Activity date of checks are based on when the check was written

Nevium Intellectual Property Consultants
**Hunton Andrews Kurth Invoices** *Schedule 3d*

**Hunton Andrews Kurth Invoices**

| Vendor | Invoice Date | For The Period Ending | Current Fees | Current Charges | Current Invoice Amount Due | Outstanding Balance | Total Amount Due |
|---|---|---|---|---|---|---|---|
| Hunton Andrews Kurth | 12/13/2018 | 11/30/2018 | $218,486 | $3,790 | $222,276 | | |
| Hunton Andrews Kurth | 1/9/2019 | 12/31/2018 | $41,670 | $3,139 | $44,809 | $222,276 | $267,085 |
| Hunton Andrews Kurth | 2/7/2019 | 1/31/2019 | $47,238 | $1,029 | $48,266 | | |
| Hunton Andrews Kurth | 3/13/2019 | 2/28/2019 | $187,254 | $1,873 | $189,127 | | |
| Hunton Andrews Kurth | 4/8/2019 | 3/31/2019 | $67,438 | $923 | $68,361 | | |
| Hunton Andrews Kurth | 5/7/2019 | 4/30/2019 | $55,409 | $621 | $56,030 | | |
| Hunton Andrews Kurth | 6/10/2019 | 5/31/2019 | $44,633 | $825 | $45,457 | | |
| Hunton Andrews Kurth | 7/8/2019 | 6/30/2019 | $6,828 | $0 | $6,828 | | |
| Hunton Andrews Kurth | 8/15/2019 | 7/31/2019 | $8,520 | $138 | $8,658 | $6,828 | $15,485 |
| Hunton Andrews Kurth | 9/11/2019 | 8/31/2019 | $22,040 | $383 | $22,423 | $8,658 | $31,081 |
| Hunton Andrews Kurth | 11/7/2019 | 10/31/2019 | $21,766 | $534 | $22,300 | | |
| Hunton Andrews Kurth | 12/12/2019 | 11/30/2019 | $8,570 | $251 | $8,821 | | |
| Hunton Andrews Kurth | 1/16/2020 | 12/31/2019 | $2,088 | $0 | $2,088 | $8,821 | $10,909 |
| Hunton Andrews Kurth | 3/6/2020 | 2/29/2020 | $5,038 | $0 | $5,038 | $10,909 | $15,946 |
| Hunton Andrews Kurth | 4/20/2020 | 3/31/2020 | $6,243 | $0 | $6,243 | $5,038 | $11,280 |
| | | | | | **$756,723** | | |

**Other Documents - Bank Statements showing Payment of Hunton Andrews Kurth Invoices**

| Entity | Statement Date | Activity Date[1] | Type | Amount |
|---|---|---|---|---|
| UBS | Jan-19 | 1/10/2019 | Transfer | $222,276 |
| UBS | Jan-19 | 1/31/2019 | Transfer | $44,809 |
| UBS | Mar-19 | 3/5/2019 | Transfer | $48,266 |
| UBS | Mar-19 | 3/27/2019 | Transfer | $189,127 |
| UBS | May-19 | 5/2/2019 | Transfer | $68,361 |
| UBS | Jun-19 | 6/6/2019 | Transfer | $56,030 |
| UBS | Jul-19 | 7/2/2019 | Transfer | $45,457 |
| Morgan Stanley | Aug-19 | 8/22/2019 | Check | $6,828 |
| UBS | Oct-19 | 10/3/2019 | Transfer | $31,081 |
| UBS | Dec-19 | 12/18/2019 | Transfer | $22,300 |
| Morgan Stanley | Apr-20 | 3/26/2020 | Check | $10,909 |
| Morgan Stanley | Jun-20 | 6/12/2020 | Check | $11,280 |
| | | | | **$756,723** |

Notes:

Source: Document 10a -10aa

1) Activity date of checks are based on when the check was written

Nevium Intellectual Property Consultants

**UnitedLex Invoices** ***Schedule 3e***

| UnitedLex Invoices | | | | |
|---|---|---|---|---|
| **Vendor** | **Invoice Date** | **Total** | **Credits Applied** | **Balance Due** |
| UnitedLex | 8/31/2018 | $45,303 | $0 | $45,303 |
| UnitedLex | 6/30/2019 | $929 | $0 | $929 |
| UnitedLex | 7/31/2019 | $304 | $0 | $304 |
| UnitedLex | 8/31/2019 | $304 | $0 | $304 |
| UnitedLex | 9/30/2019 | $304 | $0 | $304 |
| UnitedLex | 10/31/2019 | $304 | $0 | $304 |
| UnitedLex | 11/30/2019 | $304 | $0 | $304 |
| UnitedLex | 12/31/2019 | $304 | $0 | $304 |
| UnitedLex | 1/31/2020 | $304 | $0 | $304 |
| UnitedLex | 2/29/2020 | $304 | $0 | $304 |
| UnitedLex | 3/31/2020 | $304 | $0 | $304 |
| UnitedLex | 4/30/2020 | $304 | $0 | $304 |
| UnitedLex | 5/31/2020 | $304 | $0 | $304 |
| UnitedLex | 6/30/2020 | $304 | $0 | $304 |
| UnitedLex | 7/31/2020 | $374 | $0 | $374 |
| UnitedLex | 8/31/2020 | $985 | $0 | $985 |
| UnitedLex | 9/30/2020 | $304 | $0 | $304 |
| | | | | **$51,550** |

| Other Documents - Bank Statements showing Payment of UnitedLex Invoices | | | | |
|---|---|---|---|---|
| **Entity** | **Statement Date** | **Activity Date[1]** | **Type** | **Amount** |
| UBS | Oct-18 | 10/9/2018 | Transfer | $45,303 |
| Morgan Stanley | Oct-19 | 9/26/2019 | Check | $543 |
| Morgan Stanley | Nov-19 | 11/7/2019 | Check | $1,843 |
| Morgan Stanley | Feb-21 | 2/18/2021 | Check | $4,405 |
| | | | | **$52,094** |

Notes:

Source: Document 14a - 14u

1) Activity date of checks are based on when the check was written

Nevium Intellectual Property Consultants

**Innisfree Invoices** *Schedule 3f*

**Innisfree Invoices**

| Vendor | Invoice Date | For The Month Commencing | Project Fees | Total Reimbursable Expenses | Service Fee | Invoice Total |
|---|---|---|---|---|---|---|
| Innisfree | 8/16/2018 | | | | | $25,000 |
| Innisfree | 10/4/2018 | 10/10/2018 | $10,000 | $500 | $25 | $10,525 |
| Innisfree | 11/7/2018 | 11/10/2018 | $10,000 | $500 | $25 | $10,525 |
| Innisfree | 12/7/2018 | 12/10/2018 | $10,000 | $500 | $25 | $10,525 |
| Innisfree | 1/7/2019 | 1/10/2019 | $10,000 | $500 | $25 | $10,525 |
| Innisfree | 2/7/2019 | 2/10/2019 | $10,000 | $500 | $25 | $10,525 |
| | | | | | | **$77,625** |

**Other Documents - Bank Statements showing Payment of Innisfree Invoices**

| Entity | Statement Date | Activity Date[1] | Type | Amount |
|---|---|---|---|---|
| PNC | 8/17/2018 - 9/18/2018 | 8/30/2018 | Transfer | $25,000 |
| UBS | Nov-18 | 11/5/2018 | Transfer | $10,525 |
| UBS | Dec-18 | 12/18/2018 | Transfer | $10,525 |
| UBS | Jan-19 | 1/31/2019 | Transfer | $21,050 |
| Morgan Stanley | May-19 | 5/17/2019 | Check | $10,525 |
| | | | | **$77,625** |

Notes:

Source: Document 11a - 11k

1) Activity date of checks are based on when the check was written

Nevium Intellectual Property Consultants

**Moelis & Company Invoices**

*Schedule 3g*

**Moelis & Company Invoices**

| Vendor | Invoice Date | Retainer Fee | Monthly Retainer | Out-of-Pocket Expenses | Sales Transaction Fee | Total Fees Payable |
|---|---|---|---|---|---|---|
| Moelis & Company | 11/30/2018 | $2,500,000 | $208,333 | | | $2,708,333 |
| Moelis & Company | 1/4/2019 | | $208,333 | $853 | | $209,186 |
| Moelis & Company | 2/4/2019 | | $208,333 | $999 | | $209,332 |
| Moelis & Company | 3/1/2019 | | $208,333 | $1,812 | | $210,145 |
| Moelis & Company | 4/16/2019 | | $208,333 | $2,183 | | $210,516 |
| Moelis & Company | 5/15/2019 | | $208,333 | $1,153 | | $209,486 |
| Moelis & Company | 6/27/2019 | | $208,333 | | | $208,333 |
| Moelis & Company | 7/19/2019 | | $208,333 | | | $208,333 |
| Moelis & Company | 8/26/2019 | | $208,333 | | | $208,333 |
| Moelis & Company | 10/30/2019 | | $624,999 | | | $624,999 |
| Moelis & Company | 11/7/2019 | | | | $6,500,000 | $6,500,000 |
| | | | | | | **$11,506,997** |

**Other Documents - Bank Statements showing Payment of Moelis & Company Invoices**

| Entity | Statement Date | Activity Date | Type | Amount |
|---|---|---|---|---|
| UBS | Dec-18 | 12/4/2018 | Transfer | $2,708,333 |
| UBS | Jan-19 | 1/18/2019 | Transfer | $209,186 |
| UBS | Mar-19 | 3/5/2019 | Transfer | $209,332 |
| UBS | Mar-19 | 3/27/2019 | Transfer | $210,145 |
| UBS | May-19 | 5/2/2019 | Transfer | $210,516 |
| UBS | Jun-19 | 6/6/2019 | Transfer | $209,486 |
| UBS | Jul-19 | 7/2/2019 | Transfer | $208,333 |
| UBS | Aug-19 | 8/15/2019 | Transfer | $208,333 |
| UBS | Nov-19 | 11/1/2019 | Transfer | $208,333 |
| UBS | Dec-19 | 12/6/2019 | Transfer | $5,000,000 |
| UBS | Jan-20 | 1/29/2020 | Transfer | $2,125,000 |
| | | | | **$11,506,998** |

Notes:

Source: Document 12a - 12v

Nevium Intellectual Property Consultants
**Sitrick and Company Invoices**

***Schedule 3h***

**Sitrick and Company Invoices**

| Vendor | Invoice Date | Services and Expenses Through | Professional Fees | Expenses | Current Professional Fees and Expenses | Previous Balance | Payments | Balance Due |
|---|---|---|---|---|---|---|---|---|
| Sitrick and Company | 8/2/2018 | 7/21/2018 | $114,523 | $2,356 | $116,879 | | ($77,356) | $39,523 |
| Sitrick and Company | 9/7/2018 | 8/25/2018 | $279,358 | $11,023 | $290,381 | $39,523 | ($47,166) | $282,737 |
| Sitrick and Company | 10/4/2018 | 9/22/2018 | $117,964 | $2,008 | $119,972 | $282,737 | | $402,709 |
| Sitrick and Company | 11/2/2018 | 10/20/2018 | $81,405 | $2,154 | $83,559 | $402,709 | ($282,737) | $203,531 |
| Sitrick and Company | 12/6/2018 | 11/24/2018 | $23,145 | $101 | $23,246 | $203,531 | ($119,972) | $106,805 |
| Sitrick and Company | 1/9/2019 | 12/22/2018 | $7,536 | $35 | $7,571 | $106,805 | ($83,559) | $30,817 |
| Sitrick and Company | 2/1/2019 | 1/19/2019 | $12,245 | $41 | $12,286 | $30,817 | ($30,817) | $12,286 |
| Sitrick and Company | 3/8/2019 | 2/23/2019 | $52,698 | $35 | $52,733 | $12,286 | ($12,286) | $52,733 |
| Sitrick and Company | 4/4/2019 | 3/23/2019 | $27,774 | $1,070 | $28,844 | $52,733 | | $81,576 |
| Sitrick and Company | 5/2/2019 | 4/20/2019 | $10,931 | $35 | $10,966 | $81,576 | ($28,844) | $63,699 |
| Sitrick and Company | 6/3/2019 | 5/25/2019 | $11,925 | $35 | $11,960 | $63,699 | | $75,659 |
| Sitrick and Company | 7/1/2019 | 6/22/2019 | $6,161 | $35 | $6,196 | $75,659 | ($10,966) | $70,889 |
| Sitrick and Company | 8/1/2019 | 7/20/2019 | $2,385 | $79 | $2,464 | $70,889 | ($64,693) | $8,660 |
| Sitrick and Company | 9/4/2019 | 8/24/2019 | $7,751 | $35 | $7,786 | $8,660 | ($6,196) | $10,250 |
| Sitrick and Company | 10/1/2019 | 9/21/2019 | $40,584 | $35 | $40,619 | $10,250 | | $50,869 |
| Sitrick and Company | 10/15/2019 | 10/12/2019 | $4,174 | $0 | $4,174 | $50,869 | | $55,042 |
| Sitrick and Company | 10/29/2019 | 10/19/2019 | $4,373 | $0 | $4,373 | $55,042 | | $59,415 |
| Sitrick and Company | 12/3/2019 | 11/23/2019 | $0 | $105 | $105 | $59,415 | | $59,520 |
| | | | | | **$824,112** | | | |

**Other Documents - Bank Statements showing Payment of Sitrick and Company Invoices**

| Entity | Statement Date | Activity Date | Type | Amount |
|---|---|---|---|---|
| PNC | 7/19/2018 - 8/16/2018 | 7/20/2018 | Transfer | $85,000 |
| PNC | 8/17/2018 - 9/18/2018 | 8/30/2018 | Transfer | $39,523 |
| UBS | Oct-18 | 10/9/2018 | Transfer | $282,737 |
| UBS | Nov-18 | 11/5/2018 | Transfer | $119,972 |
| UBS | Dec-18 | 12/18/2018 | Transfer | $83,559 |
| UBS | Jan-19 | 1/31/2019 | Transfer | $30,817 |
| UBS | Mar-19 | 3/5/2019 | Transfer | $12,286 |
| UBS | May-19 | 5/2/2019 | Transfer | $28,844 |
| UBS | Jun-19 | 6/6/2019 | Transfer | $10,966 |
| UBS | Jul-19 | 7/11/2019 | Transfer | $64,693 |
| UBS | Feb-20 | 2/13/2020 | Transfer | $29,760 |
| | | | | **$788,155** |

Notes:

Source: Document 13a - 13ac

Nevium Intellectual Property Consultants

**Reputational Harm Damages** *Schedule 4a*

**Pay-Per-Click Analysis**

| Count | Search terms | Source: | CPC (Low End) | CPC (Top End) |
|---|---|---|---|---|
| 1 | john schnatter | Document 18a: Google Keyword Planner | N/A | N/A |
| 2 | john schnatter n word | Document 18a: Google Keyword Planner | N/A | N/A |
| 3 | papa johns n word | Document 18a: Google Keyword Planner | N/A | N/A |
| 4 | papa john founder | Document 18a: Google Keyword Planner | $0.37 | $2.73 |
| 5 | papa john ceo | Document 18a: Google Keyword Planner | N/A | N/A |
| 6 | schnatter | Document 18a: Google Keyword Planner | N/A | N/A |
| | | Average | $0.37 | $2.73 |

**Average of Low and Top End CPC:** **$1.55**

| Summary of Findings | |
|---|---|
| Total Unique Visitors to the Forbes Article | 1,313,212 |
| CPC Price | $1.55 |
| Attitude Change Multiplier | 3 |
| Reputational Harm Damages | **$6,106,436** |

Notes:

Total Unique Visitors to the Forbes Article: Document 24a

Nevium Intellectual Property Consultants
**Evidence of Reputational Harm**

*Schedule 4b*

**Examples of Organizations that Suspended Contracts or Cut Ties with Papa John's/Mr. Schnatter Following the Release of the Forbes Article**

| Count | Organization | Date of Statement | Statement | Source Doc |
|---|---|---|---|---|
| 1 | NAACP (National Association for the Advancement of Colored People) | 7/11/2018 | "Much to our dismay it is now reported that a community business leader and member of the University of Louisville Board of Trustees has used the word which should not be in his vocabulary and never voiced anywhere, public or private. While the culture and climate of his company may allow the use of such language, the University of Louisville Board of Trustees is not the place for an individual holding views denoted by such word usage. We, the Louisville Branch NAACP call on John Schnatter to step down from the U of L Board of Trustees or be removed. In the place where high ideals are developed, taught, practiced and expected to be emulated and modelled, there is no place or role for a person who uses the n-word knowing what its usage has denoted." | 18c |
| 2 | Miami Marlins | 7/12/2018 | "Mr. Schnatter's derogatory and insensitive comments are not at all reflective of the values of our organization. As such, the Marlins are immediately suspending our relationship and promotions with the Papa John's brand." | 18d |
| 3 | Houston Astros | 7/12/2018 | "The Astros are incredibly disappointed with the statements made by Papa John's founder John Schnatter. We do not condone discrimination in any context and his comments do not reflect the mission, vision and values of our organization. The Astros are proud of our 10-year partnership with Houston Pizza Venture, a local Houston business and owner of the local franchises. We feel confident that the local franchisees and their employees share the Astros commitment to diversity and inclusiveness." | 18e |
| 4 | AMB Sports and Entertainment (Atlanta Falcons, Atlanta United, and Mercedes-Benz Stadium) | 7/12/2018 | "The divisive comments made and acknowledged by the company's founder are reprehensible and do not align with our core values." | 18f |
| 5 | New York Yankees | 7/13/2018 | "In response to the reprehensible remarks made by Papa John's founder and owner, the New York Yankees are suspending their relationship with the company." | 18g |
| 6 | Seattle Mariners | 7/13/2018 | "Mr. Schnatter's comments were offensive and inexcusable. They do not in any way represent what we stand for at the Seattle Mariners. As a result, we have indefinitely suspended our relationship with Papa John's." | 18h |
| 7 | DC Breeze | 7/13/2018 | "We consider the statements made by the newly former Papa John's corporate CEO & Chairman of the Board related to African Americans to be unacceptable and beyond disrespectful." | 18i |
| 8 | Monumental Sports and Entertainment (owner of Washington, D.C. sports teams such as Capitals, Wizards, Mystics) | 7/13/2018 | "These comments are reprehensible and unacceptable and in no way reflect our values as an organization. We are currently assessing our relationship with the company and will determine how to proceed. While we are appalled by John Schnatter's comments, we have had a long relationship with our local Washington-area franchise ownership and appreciate working with them as partners in our community." | 18j |
| 9 | Orlando Magic | 7/13/2018 | "We in no way, shape or form condone the reported actions and are monitoring the situation in light of the fact that the company's chairman has been replaced." | 18j |
| 10 | FC Dallas | 7/13/2018 | Suspend all of its advertising and promotions with the pizza maker immediately | 18k |
| 11 | Texas Rangers | 7/13/2018 | Suspend all of its advertising and promotions with the pizza maker immediately | 18k |
| 12 | Major League Baseball (MLB) | 7/13/2018 | Indefinitely suspended its Papa Slam promotion with Papa John's following the escalation of the race controversy involving the pizza chain's founder John Schnatter. | 18l |
| 13 | Washington Nationals | 7/16/2018 | "The Washington Nationals do not condone discrimination of any kind," the Nationals said in a statement. "Therefore, we have suspended our partnership with Papa John's. However, we remain supportive of our local operators who have been fantastic partners for more than eleven years." | 18m |
| 14 | Oregon State | 7/16/2018 | "The derogatory and insensitive comments made by Papa John's founder John Schnatter are not reflective of Oregon State University's values and the inclusive environment we strive to foster throughout the university community and within OSU Athletics for all student-athletes and fans." | 18n |
| 15 | Tampa Bay Rays | 7/18/2018 | "We support the recent actions taken by Papa John's corporate headquarters to remove John Schnatter from the company. Racism has no place in society, and we condemn Mr. Schnatter's remarks" | 18o |
| 16 | Utah Jazz | 7/19/2018 | The Utah Jazz have notified Papa John's Pizza of their intent to end their relationship with the company. | |
| 17 | University of Utah | 7/19/2018 | "The University of Utah strives to be a welcoming and inclusive place for people of all backgrounds. As a result, the University of Utah is reviewing its Papa John's contract and evaluating other options for the Union food court. Additionally, the U. has taken immediate action to remove all images of John Schnatter from the location and is working to replace the pizza boxes featuring his image." | 18p |
| 18 | Kansas City Royals | 7/12/2018 | "The promotion has been suspended indefinitely, and we are reviewing the matter with Major League Baseball as Papa John's is also an MLB partner" | 18q |
| 19 | Baltimore Orioles | 7/13/2018 | The Baltimore Orioles is discontinuing the "5 Runs Or More" online promotion with Papa John's | 18r |
| 20 | Purdue University | 8/3/2018 | "The Purdue Board of Trustees has decided that the name of the university's economics center, named in April 2018 the John H. Schnatter Center for Economic Research at Purdue, should revert to the Purdue University Research Center in Economics. Purdue will offer to return the funds associated with the naming. The board believes this action is necessary to avoid distraction from the center's work, counterproductive division on the campus, and any inference of any deviation from the university's often stated stance on tolerance and racial relations." | 18s |

Nevium Intellectual Property Consultants

**Termination of Naming Rights Damages** *Schedule 5a*

| Damages Resulting from the Termination of Naming Rights | Value |
|---|---|
| Yearly Value of Comparable Naming Rights | $2,222,083 |
| Remaining Years in Term After Termination | 21.2 |
| Total Lost Value | $47,114,255 |
| Mr. Schnatter's Payments Upon Termination | $9,500,000 |
| **Termination of Naming Rights Damages** | **$37,614,255** |

| Remaining Years in Term | |
|---|---|
| Start of Term | 5/16/1996 |
| End of Term | 12/31/2040 |
| Date of Termination Agreement | 10/24/2019 |
| Remaining Years in Term After Termination | 21.2 |

Notes:

Source: Start of Term: Document 2a; End of Term: Document 2e; Date of Termination: Document 2h

Nevium Intellectual Property Consultants

**Football Stadium Naming Rights Deals** *Schedule 5b*

| Football Stadium Naming Rights | | | | | | | |
|---|---|---|---|---|---|---|---|
| **College** | **Sponsor** | **Year of Purchase** | **Length of Contract (years)** | **Cost** | **Payment Frequency** | **Yearly Value** | **Source Doc** |
| The University of Miami | Sun Life Financial | 2010 | 5 | $7,500,000 | Yearly | $7,500,000 | 19a |
| University of Minnesota, Twin Cities | TCF Bank | 2008 | 25 | $35,000,000 | One time | $1,400,000 | 19a |
| University of Houston | TDECU | 2014 | 10 | $15,000,000 | One time | $1,500,000 | 19b |
| Arkansas State | Centennial Bank | 2012 | 15 | $5,000,000 | One time | $333,333 | 19b |
| Rutgers | High Point Solutions | 2021 | 10 | $6,500,000 | One time | $650,000 | 19b |
| The University of Washington | Alaska Airlines | 2015 | 10 | $41,000,000 | One time | $4,100,000 | 19c |
| Boise State | Albertsons | 2014 | 15 | $9,000,000 | One time | $600,000 | 19c |
| University of Kentucky | Kroger | 2017 | 12 | $22,200,000 | One time | $1,850,000 | 19d |
| University of Southern California | L.A. Coliseum | 2016 | 15 | $70,000,000 | One time | $4,666,667 | 19d |
| University of North Texas | Apogee | 2010 | 20 | $20,000,000 | One time | $1,000,000 | 19d |
| University of Central Florida | Charter Communications | 2007 | 15 | $15,000,000 | One time | $1,000,000 | 19d |
| University of Louisville | L&N Federal Credit Union | 2023 | 20 | $41,300,000 | One time | $2,065,000 | 19e |
| | | | **Average Yearly Value:** | | | $2,222,083 | |
| **Papa John's Cardinal Stadium** | | | 7 | $6,000,000 | One time | $857,143 | 2e |
| | | | **Mr. Schnatter Yearly Value:** | | | **$857,143** | |

Notes:

Papa John's Cardinal Stadium values are based on the Second Amendment to the Stadium Agreement executed in 2007. I use 7 years because the amendment included an extension of the term by 7 years.

Document 2b: Amendment to Agreement, 9/26/2000. "'Term' shall mean the period beginning with the date of this Agreement and ending on December 31, 2033."

Document 2e: Second Amendment to Agreement, 8/27/2007. "'Term' shall mean the period beginning with the date of this Agreement and ending on December 31, 2040."

CONFIDENTIAL ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Nevium Intellectual Property Consultants

**Chairman Comparable to John Schnatter** *Schedule 6*

| Comparable Individuals | | | |
| --- | --- | --- | --- |
| **Company** | **Name** | **Position** | **Age** |
| The Cheesecake Factory | David Overton | Chairman | 76 |
| Domino's Pizza | David A. Brandon | Executive Chairman | 70 |
| Texas Roadhouse | Gregory N. Moore | Chairman | 73 |
| The Wendy's Company | Nelson Peltz | Chairman | 81 |
| Denny's Corporation | Brenda J. Lauderback | Chair | 71 |
| Cracker Barrel Old Country Store, Inc. | William W. McCarten | Chair | 74 |
| **Average** | | | **74** |

Notes:

Source: Document 22a - 22f.

Nevium Intellectual Property Consultants

**ISS Governance QualityScore**

*Schedule 7*

| ISS Governance QualityScore | | | | | | |
|---|---|---|---|---|---|---|
| **Company Name** | **Date of Score** | **Audit** | **Board** | **Shareholder Rights** | **Compensation** | **Overall Score** |
| The Cheesecake Factory, Inc. | 10/27/2018 | 1 | 5 | 5 | 1 | 3 |
| Chipotle Mexican Grill, Inc. | 2/1/2019 | 5 | 9 | 4 | 8 | 8 |
| Domino's Pizza, Inc. | 10/8/2018 | 2 | 4 | 5 | 5 | 4 |
| Jack in the Box Inc. | 10/11/2018 | 1 | 3 | 1 | 3 | 1 |
| Texas Roadhouse, Inc. | 2/1/2019 | 2 | 6 | 2 | 5 | 3 |
| The Wendy's Company | 10/4/2017 | 1 | 5 | 1 | 1 | 1 |
| Papa John's International, Inc. | 2/20/2018 | 1 | 2 | 3 | 3 | 2 |
| **Average** | | **2** | **5** | **3** | **4** | **3** |

Notes:

Source: Document 7a - 7g.