## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

JOHN H. SCHNATTER                         PLAINTIFF

v.                                     NO. 3:20-CV-3-BJB

247 GROUP, LLC D/B/A LAUNDRY            DEFENDANT
SERVICE

***** 

## OPINION & ORDER

The parties' accusations in this case tell a sordid tale of racially charged comments and unseemly behavior among public figures and corporate professionals who should know better. John Schnatter, the former CEO and chairman of Papa John's International, Inc., sued Laundry Service, the company's former PR firm, for allegedly causing his ignominious departure from his namesake company in 2018. Schnatter's resignation followed a Forbes Magazine revelation of comments he made during a May 2018 conference call that the company and many others perceived as (at best) racially insensitive and damaging to the Papa John's brand. Laundry Service, Schnatter says, leaked his private remarks out of context and in breach of a nondisclosure agreement—all in a cynical attempt to save face before being terminated and force Papa John's to cough up unpaid fees.

Years later, this dispute poses two questions for the Court, neither of which bears much on these he-said/they-leaked allegations. Rather, as is often the case in litigation, the threshold question is "who decides." Dueling motions—one from Laundry Service and another from Schnatter—seek to compel or stay arbitration of the parties' claims and counterclaims, respectively. According to Schnatter, the parties agreed to arbitrate any disputes, but Laundry Service waited too long to compel arbitration after Schnatter sued instead. According to Laundry Service, the parties never agreed to *anything*, but Schnatter can't avoid arbitrating under the contract that he says controls.

On this procedural point, positioned far from the merits of the underlying dispute, Schnatter is right: Laundry Service's motion to compel comes too late. Almost half a decade, tens of thousands of pages of discovery, and handfuls of motions (some dispositive) came and went before it filed a motion to arbitrate. Most important, Laundry Service has already attempted—unsuccessfully—to win in court on the very issues it now says the arbitrator, not the judge, must decide. Because that litigation conduct was inconsistent with an intent to arbitrate, it amounts to a constructive waiver of Laundry Service's rights, and the Court denies Laundry Service's motion to compel. But Laundry Service didn't pursue its counterclaims in court with equal vigor, so the Court denies Schnatter's parallel motion to stay their arbitration.

1

That leaves the second question: did the non-disclosure agreement bind Laundry Service in the first place?  If not, nothing is left to litigate *or* arbitrate and the case is over—because the Court has already dismissed the rest of Schnatter's claims.  After a bench trial on this threshold question, the Court finds that the contract does bind Laundry Service and was supported by adequate consideration. The nondisclosure agreement is therefore valid and binding—though that only raises, not decides, the ultimate question whether Laundry Service breached the agreement.

## History of this Dispute

The business relationship between Laundry Service and Papa John's lasted a far shorter time than this litigation has persisted.  In October 2017, Papa John's announced Laundry Service's hiring as the company's public-relations agency. Announcement (DN 247-16) at 2.  That January, Laundry Service began its work in that role and conducted testing on perceptions of John Schnatter's role in the company's ads.  In April, Laundry Service's chief marketing officer signed a nondisclosure agreement covering Schnatter and his family.  In May, Laundry Service employees prepped Schnatter for media interviews in the wake of his controversial comments regarding racial-justice protests and the NFL.  On that call, which someone apparently recorded, Schnatter used the n-word and made a series of racially charged remarks, which he says were taken out of context and others say were offensive.  Conference Call Tr. (DN 247-33) at 43:13–44:7.  Soon after the conference call, Laundry Service and Papa John's parted ways.  White Email (DN 247-39) at 2.  Nine days later, Forbes published Schnatter's conference-call comments.  Forbes Article (DN 247-41).  That same day, Papa John's and Schnatter announced his resignation.  Motion for Summary Judgment (DN 247) at 3.

Schnatter believed someone from Laundry Service leaked the contents of the conference call.  So in December 2019, Schnatter sued Laundry Service and Wasserman Media Group[1]—Laundry Service's parent company—in state court for breach of the master services agreement, tortious interference with prospective economic advantage, and intentional infliction of emotional distress.  Complaint (DN 1-1) ¶¶ 40–65.  The Defendants quickly removed to federal court (DN 1) and moved to dismiss (DN 18).

Vigorous litigation filled the nearly four-year period between Laundry Service's removal and its motion to compel arbitration.  By the time it filed that motion, the Magistrate Judge had ordered the parties to begin discovery, Schnatter had moved to amend his complaint, the parties had exchanged a tremendous amount of written discovery, seven witnesses had sat for depositions, the case had passed

---

[1] For simplicity's sake, the Court primarily refers to the Defendants collectively as "Laundry Service."  Its erstwhile co-defendant, Wasserman, largely litigated this case in tandem with Laundry Service until the Court dismissed Schnatter's claims against it. *See* DNs 279, 280.

between four different district judges, defense counsel had filed three motions to compel discovery. *See* DNs 29, 48, 110; Motion to Compel Arbitration (DN 289) at 5–6. After the Court granted leave, Schnatter's first amended complaint added four new claims: breach of the covenant of good faith and fair dealing, tortious interference with Schnatter's Papa John's contract, "prima facie tort," and breach of the NDA. The Court dismissed without prejudice everything except Schnatter's NDA claim.[2]

The first mention of arbitration came in Laundry Service's second motion to dismiss (DN 119), filed in August 2021. It argued that the NDA didn't bind Laundry Service because it never signed the contract—and that even if it *had*, "this cause of action" should "be sent to arbitration" instead of proceeding in federal court. Second Motion to Dismiss at 17–19. Laundry Service confirmed it hadn't "moved formally to compel arbitration" yet by "formally fil[ing] a separate motion under the Federal Arbitration Act." Motion to Dismiss Tr. (DN 221) at 14:1–16. If Laundry Service *did* move to compel arbitration, the Court noted that this would present a "tricky … question ... this deep into a complex and hard-litigated dispute." *Id.* at 14:16–24.

The parties had continued with discovery while Laundry Service's second motion to dismiss remained pending. Defense counsel raised concerns that Schnatter had been withholding communications and possibly hadn't turned over relevant text messages. Aug. 2021 Status Conference Tr. (DN 192) at 6:15–8:9. Eventually, Laundry Service filed a motion for sanctions (DN 151) alleging that Schnatter had destroyed evidence subject to a litigation hold. The Court agreed in part and imposed sanctions in Laundry Service's favor. *See* Report & Recommendation (DN 194); Order Adopting Report & Recommendation (DN 219).

By now nearing the close of discovery, defense counsel asked whether "a potential motion to compel" arbitration should be "combined with the potential summary judgment briefing." MTD Tr. at 69:20–24. On that question the Court deferred to the parties, noting that nothing called for a "fire drill" instead of an orderly briefing schedule. *Id.* at 70:11–18 (the "increment of time between today and when

---

[2] The Court dismissed Schnatter's MSA and good-faith-and-fair-dealing claims because Schnatter was not a party to the MSA and the terms of the contract expressly disclaimed third-party-beneficiary liability. Motion to Dismiss Tr. (DN 221) at 8:16–23, 61:10–16. The Court gave two possible reasons for dismissing both of Schnatter's tortious interference claims. First, under Kentucky law, the existence of a contract between Schnatter and Papa John's defeated the interference-with-prospective-advantage claim and the lack of an alleged breach on Papa John's part defeated the interference-with-contract claim. *Id.* at 28:19–29:14. And second, Schnatter hadn't pled "actual malice" as required to overcome First Amendment concerns with torts that under the presented facts are functionally equivalent to a defamation suit. *Id.* at 61:1–2; *see Higgins v. Kentucky Sports Radio, LLC*, 951 F.3d 728, 733 (6th Cir. 2020) (applying First Amendment analysis to torts related to "unfavorable statements" about the plaintiff). Finally, the Court dismissed Schnatter's prima facie tort claim because Kentucky courts had not recognized the tort. *Id.* at 61:3–9.

you all file a briefing proposal or when you actually file a motion to compel" is not worth "creating a fire drill"). Given the pace and complexity of the litigation up to that point, the Court emphasized the need to handle dispositive motions with care, avoid unnecessary haste and expense, and facilitate the orderly presentation of multiple interrelated motions and arguments. *See also* MSJ Scheduling Conf. Tr. (DN 283) at 18:5–21 (Plaintiff's counsel waiving "any timeliness or procedural objections to hearing affirmative defenses," while preserving the right to raise "substantive objection[s] to an affirmative defense"). This discussion of a briefing schedule on arbitration and summary judgment, among other things, surely didn't prejudge (or waive opposition to) any subsequent motion to compel that might follow as part of the briefing to come.

Schnatter filed his second amended complaint (DN 238) in January 2023. In this complaint, he realleged his NDA claim and raised new tort claims for intrusion upon seclusion and false light. Laundry Service filed its omnibus motion for summary judgment in April 2023. It still did not move to compel arbitration under the NDA, but did seek summary judgment of Schnatter's NDA claim on the grounds that the contract lacked consideration, didn't bind Laundry Service, and hadn't been breached. Motion for Summary Judgment at 29–39. At argument, the Court orally denied Laundry Service's request for judgment on the NDA claim, MSJ Ruling Tr. (DN 280) at 4:25–7:9, but granted it with respect to Wasserman and also granted judgment for the Defendants on Schnatter's false-light and intrusion-upon-seclusion.[3]

After failing to win the NDA claim on summary judgment, Laundry Service sought to route that claim to arbitration. In August 2023—three-plus years after the litigation began—it informed the Court that it "intend[ed] to file, on an expedited basis" a motion to compel arbitration. Proposed Scheduling Order (DN 282) at 1. It did so a month later, along with an answer (DN 286) and demand for arbitration of several counterclaims (DN 288). Schnatter opposed the motion to compel arbitration (DN 299) and filed a motion to stay the parallel arbitration proceedings (DN 294). To that point, the parties had filed 3 operative complaints, 2 motions to dismiss, 4 discovery motions, 2 sanctions requests, and 7 motions to seal. They also had

---

[3] On the false-light claim, the Court explained that Schnatter hadn't produced evidence of "a false publication" or "actual malice." MSJ Ruling Tr. at 7:13–8:10. On the intrusion-upon-seclusion claim, the Court explained that Schnatter hadn't pointed any "evidence or precedent" that would "allow a jury to reasonably conclude" that Schnatter "had a reasonable expectation of privacy on a crowded business call" such that recording him constituted an "unreasonable intrusion." *Id.* at 9:2–10:2. And most relevantly for present purposes, the Court denied Laundry Service's motion for summary judgment on the NDA claim but granted Wasserman's. *Id.* at 4:8–12. The Court held that summary judgment was inappropriate in light of genuine disputes of material fact concerning consideration, the meaning of "Team Member," and whether Laundry Service breached. *Id.* at 4:25–7:7.

exchanged more than 60,000 pages in discovery, taken 18 depositions, and delivered (at least) 2 oral arguments.

The Court scheduled a jury trial and pretrial deadlines, DN 297, but the parties jointly asked the Court to resolve the waiver issue first.  If the "Court were to find that Defendant did not waive its right to compel arbitration," they requested a bench trial on "the question of contract formation."  DN 322 ¶ 3.  The Court scheduled a bench trial on contract formation for May 2024 and took up the waiver question at the same time.  DNs 324, 329.

Two principal questions are now ripe for review.  First, did Laundry Service's decision to demand arbitration of the NDA claim after litigating for nearly four years (more than two since the NDA claim appeared) and losing its summary judgment motion on that claim effectively waive its right to arbitrate?  Second, did the NDA (which includes the arbitration agreement Laundry Service seeks to enforce) bind it in the first place?

<u>**ARBITRATION**</u>

The NDA in this case provides that "any dispute arising between the Team Member and Company or Founder, including whether any provision of this Agreement has been breached, shall be resolved through confidential mediation or confidential binding arbitration."  Signed NDA (DN 389-25, Def. Ex. 25) ¶ 6.[4]  Now, after years of litigation, Laundry Service has invoked that provision, seeking to compel Schnatter to resolve his claim that Laundry Service breached the NDA in arbitration.  But rights that parties bargain for may later be surrendered: The right to compel arbitration—like many other rights—is waivable.  Here Laundry Service implicitly waived its right to demand arbitration by aggressively litigating this case in court before moving to compel arbitration.

## I. MOTION TO COMPEL ARBITRATION

### A.  Laundry Service Waived Its Right to Compel Arbitration

Waiver "is the intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).  The waiver doctrine "ensure[s] efficiency and fairness by precluding parties from raising arguments"—or invoking contractual rights—"they had previously disavowed."  *Wilkins v. United States*, 598 U.S. 152, 158 (2023).  Parties may "explicitly waive their rights through their statements."  *Mackey v. Rising*, 106 F.4th 552, 565 (6th Cir. 2024) (quotation marks omitted).  Or they "can constructively waive their rights through their conduct" by "tak[ing] actions inconsistent with the right."  *Id.* (quotation marks omitted).

---

[4] All defense trial exhibits are found at DN 389.

As to the right to arbitrate, a "constructive" (or implicit) waiver depends on whether, based on the totality of the circumstances, a party's litigation conduct was "completely inconsistent" with a desire to arbitrate. *Schwebke v. United Wholesale Mortgage LLC*, 96 F.4th 971, 974–75 (6th Cir. 2024). This analysis, according to the Sixth Circuit, isn't reducible to a "bright-line rule." *Id.* at 976 (citing *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713, 719 (6th Cir. 2012)). So courts consider a number of factors in determining whether a party waived arbitration, including: when and how the party raised the arbitration issue, the overall progress of the case (and discovery) when they filed the motion to compel, and whether the party made other "affirmative request[s] for relief" before moving to compel arbitration. *See id.* at 975–76.

In "most of [the Sixth Circuit's] cases finding arbitration waiver, there has been an affirmative request for relief, such as the filing of a dispositive motion." *Id.* at 976 (citing *Solo v. United Parcel Service Co.*, 947 F.3d 968, 975 (6th Cir. 2020); *Gunn v. NPC Int'l, Inc.*, 625 F. App'x 261, 265 (6th Cir. 2015); *Hurley v. Deutsche Bank Tr. Co. Americas*, 610 F.3d 334, 339 (6th Cir. 2010)). This includes affirmative discovery requests that "invok[e] the power of [the] court under the Federal Rules of Civil Procedure" as well as dispositive motions that "affirmatively as[k] the district court to exercise power and decide an issue." *Id.* And although the waiver-analysis eschews bright-line rules, a dispositive motion "that seeks a decision on the merits and an immediate and total victory in the parties' dispute is entirely inconsistent with later requesting that those same merits questions be resolved in arbitration." *Solo*, 947 F.3d at 975. *Solo*, for example, involved a contract-interpretation dispute, and the Court of Appeals held that the defendant had waived the right to arbitrate the dispute because it "sought immediate and total victory" by "asking the court to decide the meaning of the key contractual language." *Id.* (cleaned up).[5]

---

[5] Historically, the Sixth Circuit had applied a two-prong test to assess whether a party constructively waived its right to arbitrate. It asked whether the party had "(1) tak[en] actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) delay[ed] its assertion to such an extent that the opposing party incurs actual prejudice." *See Hurley v. Deutsche Bank Tr. Co. Americas*, 610 F.3d 334, 338 (6th Cir. 2010).

The Supreme Court, however, recently eliminated the prejudice prong: "a federal court assessing waiver does not generally ask about prejudice" and the Federal Arbitration Act does not provide for "a bespoke rule of waiver for arbitration." *Morgan*, 596 U.S. at 417. So now the question is simply whether the party "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right[.]" *Id.* at 419.

Laundry Service suggests that *Morgan* eliminated the *Hurley* analysis altogether. Motion to Compel Reply at 5–6. But the Courts of Appeals that have addressed this question have disagreed. *Morgan* "removed prejudice ... as an element of waiver in the context of arbitration contracts," but "the body of caselaw" applying the rest of the analysis "remains good law following *Morgan*." *Hill v. Xerox Business Services, LLC*, 59 F.4th 457, 460 (9th Cir. 2023).

Against that measure, how does Laundry Service stack up?  By the time it filed its motion to compel arbitration, it had been actively litigating the case for nearly four years.  Discovery was nearly complete.  True, the NDA and its arbitration provision were not initially part of the case; but they appeared in Schnatter's first amended complaint—26 months before Laundry Service sought arbitration.  During that period, when Schnatter's NDA claim was clearly at issue, Laundry Service filed a motion to dismiss (DN 119), a motion for sanctions (DN 151), a request to supplement Schnatter's deposition (DN 240), a motion for summary judgment (DN 247), and its fourth motion to compel production (DN 260).  Under Sixth Circuit caselaw, each of these motions amounted to "an affirmative request" in which Laundry Service asked the Court "to exercise power and decide an issue."  *Schwebke*, 96 F.4th at 975.  And by the time Laundry Service filed its arbitration motion, which came *after* its failed motion for summary judgment, "discovery was *nearly complete.*"  *Id.* (emphasis in original); MSJ Scheduling Conf. Tr. at 6:20–24 (as of November 2022, parties were "quite near the finish line on fact discovery").

The procedural history of this hard-fought, oft-adjudicated litigation strongly suggests Laundry Service intended to litigate this dispute in open court rather than resolve it in private arbitration.  From the Court's perspective, Laundry Service sat on its hands and didn't invoke (or at least clearly reserve) its right to arbitrate soon enough to suggest it sincerely desired to arbitrate.  *See Schwebke,* 96 F.4th at 977 (extensive discovery and a 7-month delay before mentioning arbitration was "completely inconsistent" with reliance on arbitration).

But delay is not the only consideration supporting waiver.  By repeatedly requesting relief in this Court, rather than from an arbitrator, Laundry Service "affirmatively as[ked] the district court to exercise power and decide an issue"— indeed, several issues.  *Schwebke*, 96 F.4th at 976.  In fact, Laundry Service repeatedly asked the Court for affirmative relief on many fronts—regarding sanctions, discovery, and dismissal—before asking to compel arbitration.

Most noteworthy, however, is Laundry Service's motion for summary judgment—including on the claim for breach of the NDA that contains the arbitration provision.  By filing this particular dispositive motion, Laundry Service sought "a decision on the merits and an immediate and total victory in the parties' dispute" in a way that "is entirely inconsistent with later requesting that those same merits questions be resolved in arbitration."  *Solo*, 947 F.3d at 975.  Laundry Service's

---

See also *In re Pawn America Consumer Data Breach Litigation*, 108 F.4th 610, 614 (8th Cir. 2024) ("In sum, our pre-*Morgan* three-part test now has two parts, but otherwise remains the same.").  While the Sixth Circuit has "not yet had an opportunity to consider *Morgan*'s effect on" its prior precedent, it has continued to ask "whether a party's actions are 'completely inconsistent' with reliance on arbitration."  *Schwebke*, 96 F.4th at 974–75.

motion for summary judgment attacked the merits of Schnatter's NDA claim, asking this Court to dismiss it with prejudice—not to send it to arbitration.

The summary-judgment motion sought victory in litigation on many of the same grounds that Laundry Service, now having lost in court, would apparently like to raise in arbitration. It did so on four grounds—three of which it subsequently re-raised in the evidentiary hearing it requested on arbitrability. First, Laundry Service argued that the NDA didn't bind it in the first place. That is, Laundry Service was not a "part[y] to the Team Member NDA, and therefore Schnatter's breach of contract claim fails as a matter of law." Motion for Summary Judgment at 35. Second, it argued that "the plain terms of the agreement" suggest that "the Team Member NDA does not apply to ... Laundry Service." *Id.* at 35–36. Third, it argued that the contract was invalid because it was "not supported by consideration." *Id.* at 37–39. And fourth, Laundry Service argued that "Schnatter cannot show Laundry Service breached the Team Member NDA" because "[t]here is no admissible evidence to support Schnatter's claim that Defendants provided details of the May 22, 2018 conference call to Kirsch or Forbes." *Id.* at 29.

The first three arguments Laundry Service could have presented to an arbitrator—and may yet try to do so depending on the outcome of its motion to compel. The same three arguments were in fact raised in the evidentiary hearing on arbitrability even though the Court and parties had already trod much of the same ground in response to the motion for summary judgment. So Laundry Service's decision to "see[k] a decision on the merits and an immediate and total victory in the parties' dispute is entirely inconsistent with later requesting that those same merits questions be resolved in arbitration." *Solo*, 947 F.3d at 975. A "party may not use a [dispositive] motion ... to see how the case is going in federal district court, while holding arbitration in reserve for a second chance in another forum." *Id.* (cleaned up). But that's precisely what Laundry Service did in its motion for summary judgment.

Taken together, Laundry Service's approach throughout this litigation has been "completely inconsistent" with an intent to exercise its right to arbitrate this dispute. Laundry Service actively litigated the NDA claim for 26 months before moving to compel arbitration. It actively requested discovery and filed 3 discovery-related motions after Schnatter raised the NDA claim. And it filed 2 dispositive motions aimed at an "immediate and total victory" on the merits. That is plenty to warrant a waiver finding.

### B. Laundry Service's Counterarguments

Laundry Service offers three principal responses, none of which suffices to overcome the bases for waiver identified above.

*First*, it argues that Laundry Service couldn't (or needn't) have compelled arbitration earlier. Motion to Compel Arbitration at 21–24. Moving to compel arbitration under a contract whose validity it challenged, it contends, would've required "abandon[ing] its right to challenge the issue of contract formation." *Id.* at 21. But Laundry Service hasn't pointed to any caselaw that would've put it to this stark choice. And there's no logical or precedential reason it couldn't have at least reserved its right to challenge contract formation if the dispute went to arbitration or, conversely, to compel arbitration while litigating the early stages of this case.

Its principal support is *PolyOne Corp. v. Westlake Vinyls, Inc.*, 937 F.3d 692 (6th Cir. 2019). This decision, it asserts, required it to litigate contract formation in court before initiating arbitration, or else be "found to have abandoned its right to challenge the issue of contract formation." Motion to Compel Arbitration at 21. But the Sixth Circuit's decision in that case is not the straitjacket Laundry Service fears; its ruling focused primarily on the estoppel that followed from a party's decision to initiate arbitration and then, disappointed with the result, challenge the lawfulness of the arbitration it commenced. PolyOne filed an arbitration claim against Westlake, necessarily asserting that the two sides had agreed to a valid and enforceable arbitration agreement. *PolyOne Corp.*, 937 F.3d at 695. In an apparent effort to escape the competing arbitration claim filed by Westlake, PolyOne sued in federal court, claiming that Westlake's claims weren't arbitrable. The district court disagreed and sent the parties to arbitrate Westlake's claims. Unsatisfied, PolyOne sued again in federal court, this time claiming that the arbitration provisions were unenforceable. *Id.* This about-face was too much for the court of appeals: PolyOne waived this argument, the panel held, when it initially relied on the agreement's validity to drag Westlake into arbitration. *Id.* at 698. Having "initiated the arbitration that gave rise to this dispute—and waited to challenge the Agreement's arbitration provisions until after the arbitration was in motion," PolyOne "missed the chance to come back later, before a court, and deny that a valid agreement to arbitrate existed." *Id.* (quotation omitted). The decision said nothing about challenges to contract formation or reservation of rights—though it *does* teach something about the risks of asking one adjudicator for a ruling if you later decide you'd prefer a different decision or decisionmaker.

Laundry Service is wrong that filing a motion to compel arbitration would've necessarily conceded the existence of a contract. Motion to Compel Arbitration at 8 ("[E]nforcing an arbitration provision against Schnatter would have forfeited" Laundry Service's "right to challenge contract formation."). Laundry Service identifies no caselaw stating this directly. *PolyOne*, as discussed above, is hardly on all fours: Laundry Service didn't initially initiate the dispute, is the party urging rather than resisting arbitration, and even expressed willingness to allow the arbitrator rather than the Court to decide the question of contract formation. Motion to Compel Arbitration at 4 n.2 (expressing willingness to arbitrate its formation

challenge along with the breach question in the interest of "efficiency"). Certainly nothing in *PolyOne* forecloses the party initiating arbitration from challenging the validity of the contract before the arbitrator.

As the Supreme Court and Sixth Circuit has recognized, "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales*, 586 U.S. 63, 67–68 (2019). Contract formation—which Laundry Service disputes here—is a gateway question. *See Anderson v. Charter Communications*, 860 F. App'x 374, 377 (6th Cir. 2021) (The argument that a party "never entered into the contract containing the arbitration clause" is a "gateway questio[n]" of "formation.").

True, gateway questions like contract formation do not default to an arbitrator; they are presumptively "for judicial determination." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). But a default is not a mandate. Parties may and regularly do overcome this presumption with "clear and unmistakable' evidence that the parties agreed to have an arbitrator decide" gateway questions. *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844 (6th Cir. 2020) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

That certainly appears to be what happened here: Paragraph 6 of the signed NDA states that any arbitration shall be accomplished "pursuant to [the American Arbitration Association]'s then-current Employment (or other applicable) Arbitration Rules and Mediation Procedures." And courts including the Sixth Circuit have read incorporation of the AAA Rules as "clear and unmistakable evidence" of an intent to delegate gateway arbitrability questions to the arbitrator. *Id.* at 845–46; *see also id.* at 848 ("AAA Rules clearly empower an arbitrator to decide questions of 'arbitrability,'" which include the question of "his or her own jurisdiction."). Here, that means the arbitrator can—and arguably must—decide gateway arbitrability questions. *See id.* at 849 ("[T]he AAA Rules are best read to give arbitrators the exclusive authority to decide questions of 'arbitrability.'").

To be sure, some precedent in different contexts speaks in absolute terms about how courts "must" or "always" decide the threshold contract-formation issue. *See, e.g.*, *In re StockX Customer Data Security Breach Litigation*, 19 F.4th 873, 879 (6th Cir. 2021); *Anderson*, 860 F. App'x at 377 (collecting cases). But many of those opinions (all but one from out of circuit) don't discuss the AAA rules at all, and the ones that do don't consider the separate line of authority (most notably *Blanton*) authorizing or even requiring arbitrators to decide such questions. *See, e.g.*, *Berkeley County Sch. Dist. v. Hub Int'l Unlimited*, 944 F.3d 225, 234 n.9 (4th Cir. 2019) (invoking the AAA rules does not "preclude a court from deciding … an arbitrability issue"); *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 514 n.2 (5th Cir. 2019

("[W]e need not determine whether" an arbitration clause invoking the AAA rules "'clearly and unmistakably' delegates arbitrability to the arbitrator," "including the *existence* or validity of th[e] contract") (emphasis added)).

In *Blanton*, by contrast, the Sixth Circuit held that invocation of the AAA rules is clear and unmistakable evidence that the parties want an arbitrator to decide arbitrability. That includes questions of contract formation. *See* 962 F.3d at 845 (acknowledging AAA arbitrator's "power to rule on his or her own jurisdiction, including any objections with respect to the *existence, scope, or validity* of the arbitration agreement") (emphasis added). And unlike here, in the decisions Laundry Services cites, the party resisting—not urging—arbitration was the one attacking the arbitrator's jurisdiction. This litigation offers the flipside: Schnatter supports contract formation but resists (late) arbitration, while Laundry Service rejects contract formation but resists (continued) litigation. Finally, applying those cases here would be inconsistent with the linchpin of federal arbitration: private ordering consistent with the parties' agreement, enforced by courts "[o]n the same footing as other contracts." *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 271 (1995). Here, both parties have at least recognized the arbitrator's authority over this dispute by incorporating the AAA rules.

*Second*, Laundry Service argues that its conduct was "consistent" with the FAA's requirement that courts "determin[e] whether 'a valid agreement to arbitrate exists between the parties'" before "ordering any party to arbitrate." Motion to Compel Arbitration at 22 (quoting *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004)). But this conflates "a challenge to the validity of an arbitration agreement" with "a challenge to the validity of the entire contract in which it appears"—even though the Supreme Court has expressly instructed courts to treat those two questions "separately." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 112 (2019) (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010)). Throughout the early stages of this litigation, Laundry Service made arguments to the Court addressing several arbitrable issues regarding *the NDA's* validity—namely, that it was invalid for lack of consideration and due to a mistake and that Schnatter can't prove breach. But Laundry Service did *not* challenge the validity of the arbitration clause itself. Because of the severability principle explained above, therefore, "[u]nless a party specifically challenges the validity of the agreement to arbitrate, both sides may be required to take all their disputes—including disputes about the validity of their broader contract—to arbitration." *Id.*

That's the situation the parties find themselves in now. Laundry Service's failure to challenge the validity of the arbitration clause specifically means the Court never had the obligation to pass on that question. And because Laundry Service instead raised (arbitrable) challenges to the NDA's validity its conduct was inconsistent with the right to arbitrate.

*Third*, Laundry Service argues that Schnatter expressly waived opposition to this motion on the basis of delay. During the motion-to-dismiss hearing, Laundry Service's counsel raised the possibility of filing a motion to compel arbitration alongside "potential summary judgment briefing" rather than rushing to file something sooner. MTD Tr. at 69:20–24. In a comment focused solely on the need for a sensible briefing schedule, the Court put to rest any anxiety about needing to file a motion to compel on a rushed basis before the parties even worked out a briefing schedule: "whatever increment of time between [the hearing] and ... when you actually file a motion to compel ... probably is irrelevant ... and I don't see any good in creating a fire drill in which you need to file a motion to compel ... in ten days." *Id.* Schnatter's lawyer agreed. *Id.* Several weeks later, Laundry Service's counsel again sought to ensure that filing a motion for summary judgment before or alongside an answer wouldn't waive any defenses. MSJ Scheduling Conf. Tr. at 16:16–18:3. To allay those fears and ensure the rational progression of a complex case, the Court confirmed that Schnatter would not "have any problem waiving any timeliness or procedural objections" regarding the interplay of affirmative defenses and summary judgment. *Id.* at 18:5–8. Schnatter's attorney agreed that Laundry Service wasn't "waiving anything by waiting" to file its answer, but reserved his client's right to challenge affirmative defenses once Laundry Service raised them. *Id.* at 18:9–21.

All of this amounts to typical docket management and professional courtesy, not "the intentional relinquishment or abandonment of a known right." *Morgan*, 596 U.S. at 417 (quoting *Olano*, 507 U.S. at 733). Laundry Service is wrong that Schnatter's current opposition to the motion to compel arbitration—on the ground that Laundry Service waited too long and doesn't deserve a second bite at the apple with respect to the NDA claim—is not the type of "timeliness or procedural objection" that Schnatter waived. Motion to Compel Reply at 3. Laundry Service cannot insist with a straight face that it "relied on the waiver" when it decided to take a shot at summary judgment before moving to compel arbitration. To the contrary, the parties and the Court specifically discussed whether, consistent with the waiver caselaw discussed above, a motion to compel arbitration would be filed before or alongside a motion for summary judgment. MTD Tr. at 69:20–70:21. Laundry Service instead "sought immediate and total victory" on the NDA claim, but didn't get it; now it inappropriately seeks to use arbitration as "a second chance in another forum." *Solo*, 947 F.3d at 975.

*Finally*, Laundry Service argues that Schnatter waived the right to a jury trial by "agreeing to arbitrate any dispute related to the Team Member NDA." Motion to Compel Arbitration at 25. But Laundry Service doesn't cite any authority requiring that outcome. Relying on *Burden v. Check Into Cash of Kentucky, LLC*, it argues that "the loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate." *Id.* (quoting 267 F.3d 483, 492 (6th Cir. 2001)). That line was merely the court's rejection of an argument that an arbitration agreement was

invalid because it didn't include an express jury-trial waiver. 267 F.3d at 492. It hardly renders an otherwise enforceable arbitration clause unenforceable—instead merely describing what would've happened if Laundry Services had pursued rather than waived its arbitration right. So *Burden* doesn't support Laundry Service's conclusion. Nor does *Robert Bosch Corp. v. ASC Inc.*, which rejected a seemingly identical argument. 195 F. App'x 503, 507 (6th Cir. 2006) ("Finally, the loss of the right to a civil jury trial is a 'fairly obvious consequence' of failing to object to an arbitration clause and, therefore, does not require an express waiver as ASC contends.").

Schnatter, on the other hand, identified persuasive authority to show that when a party "waives the right to arbitrate by proceeding in a judicial forum, that waiver obviously and necessarily ends the implicit waiver of the right to trial by jury." Motion to Compel Response (DN 296) at 14 (quoting *Silc v. Crossetti*, 956 F. Supp. 2d 957, 960 (N.D. Ill. 2013)). As the *Silc* court explained, "not only would it be illogical, but exceedingly inequitable to allow the defendant to insist that an indivisible component of the arbitration agreement that [it] has waived nonetheless continues to be operative against the plaintiff." 956 F. Supp. 2d at 960. Laundry Service has not given the Court any reason to reach a different result here.

The Court, therefore, finds that Laundry Service waived its right to compel arbitration and denies the motion to compel (DN 289).

## II. MOTION TO STAY ARBITRATION

In parallel with Laundry Service's motion to compel arbitration, Schnatter has moved to stay the parallel arbitration proceeding Laundry Service initiated. Motion to Stay Arbitration (DN 294). That arbitration apparently remains paused in deference to this Court's decision on the motion to compel; Laundry Service says it agreed "to voluntarily stay the Arbitration" until the Court resolved its motion. MTS Response (DN 301) at 8 n.3.

Not content with the temporary pause, Schnatter seeks a court order staying the parallel proceeding. The premise of his motion is that federal courts enjoy "inherent" authority to enjoin a competing or duplicative arbitration proceeding.

Many courts have assumed such authority exists, though its provenance is hardly clear. As is the legal standard for when a stay is warranted: Schnatter cites no rule or standard to guide the Court's decision-making, while Laundry Service points to a single unpublished district court decision. *Id.* at 6 (citing *Smith v. Servicemaster Holding Corp.*, No. 2:11-cv-02943, 2013 WL 2244628, at *3 (W.D. Tenn. May 21, 2013)). And unlike superficially similar situations involving injunctions in aid of a court's jurisdiction, staying an arbitration doesn't mitigate the same res judicata threat to a court's authority and also runs up against the Federal Arbitration Act's insulation of arbitration from judicial attack. Indeed, "[t]he Court's authority

to enjoin arbitration proceedings is limited by the Federal Arbitration Act to situations where the underlying arbitration agreement is invalid or nonbinding." *McIntire v. China MediaExpress Holdings, Inc.*, 113 F. Supp. 3d 769, 775 (S.D.N.Y. 2015). In other words, the Federal Arbitration Act gives judges precious little discretion to enjoin a legitimate arbitration. Assuming a valid arbitration agreement, therefore, "a court must determine whether to stay parallel arbitration proceedings through the same analysis that is used to determine whether a claim is subject to arbitration: (1) whether the parties have entered into an agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *Streamlined Consultants, Inc. v. Forward Financing LLC*, No. 21-civ-10838, 2022 WL 766233, at *2 (S.D.N.Y. Mar. 14, 2022) (citation omitted).[6]

Schnatter doesn't contest the validity of the arbitration clause itself. Nor does he contest that Laundry Service's counterclaims fit within the scope of the NDA's arbitration clause. Instead, his motion raises three separate arguments for a stay: (1) Laundry Service waived the right to arbitrate its breach and improper-disclosure claims, (2) those claims are "compulsory counterclaims" that Laundry Service surrendered when it failed to plead them in its answer, and (3) to further efficiency and avoid inconsistency, the Court should exercise its inherent power to stay the arbitration. But none of these arguments succeeds.

The first argument obviously draws on Schnatter's argument and the Court's agreement above that Laundry Service waived the right to compel arbitration concerning *Schnatter's* claims for breach of the NDA. Schnatter only cites two precedents to address this situation: *Gunn v. NPC Int'l, Inc.*, 625 F. App'x 261, 265–66 (6th Cir. 2015) (affirming denial of motion to compel arbitration); *Hurley v. Deutsche Bank Trust Co. Americas*, 610 F.3d 334, 340 (6th Cir. 2010) (same). But that doesn't necessarily mean Laundry Service also waived the right to arbitrate *its own* claims against Schnatter. As one court of appeals has held, "waivers of arbitral rights are evaluated on a claim-by-claim basis." *Forby v. One Technologies, L.P.*, 13 F.4th 460, 462 (5th Cir. 2021). That approach is consistent with other aspects of

---

[6] In addition, the Sixth Circuit (in an unpublished decision addressing an arbitration-stay request) has emphasized the relevance of traditional stay factors including "the balance of hardships," a showing that the moving party "will suffer irreparable injury if the case moves forward, and that the non-moving party will not be injured by a stay." *Int'l Bhd. of Elec. Workers v. AT&T Network Sys.*, No. 88-3895, 1989 WL 78212, at *8 (6th Cir. July 17, 1989); *see also Smith*, 2013 WL 2244628, at *3 (citing *Int'l Bhd. of Elec. Workers*, 1989 WL 78212, at *8). But that opinion didn't mention the Federal Arbitration Act at all, much less grapple with the ways in which that statute limits a federal court's authority to sidestep a legitimate arbitration agreement. In the arbitration context, a district court's "discretion" to grant a stay—even to "avoid piecemeal, duplicative litigation," *id.*—is severely limited by Congress's mandate that courts shall enforce arbitration agreements on "equal footing" with other contracts. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

waiver doctrine (appellate rights and attorney-client privilege, for example) and with the law's narrow construction of waiver generally. *Cf. In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005) (noting, in the privilege context, that "[i]mplied waivers are consistently construed narrowly").

Nothing in the record or in Schnatter's filings explains why Laundry Service's waiver of its arbitration rights regarding Schnatter's NDA claim should surrender its rights with respect to distinct counterclaims as well. Those claims concern different breaches and different facts: the alleged leaked of racially charged comments to Forbes back in May 2018, on the one hand, and claims that post-date the Forbes leak and concern Schnatter's litigation conduct, on the other. Those are separate and distinct claims. Laundry Service, through its litigation conduct, waived the right to arbitrate the former. But that conduct doesn't bear on its right to arbitrate the latter. And neither of the opinions Schnatter cites (*Gunn* and *Hurley*, see above) say nothing about whether a waiver of *some* arbitrable claims reaches other, separate-but-also-arbitrable claims.

Second, Schnatter argues that because Laundry Service's claims are compulsory counterclaims, it was required to plead those claims in litigation rather than seek to arbitrate them. MTS at 3–5. The stay motion relies on Federal Rule of Civil Procedure 13(a)(1), which requires a defendant to assert in a responsive pleading any claims it has that arise out of the same "transaction or occurrence" as the plaintiff's claims. *See In re Rebel Coal Co., Inc.*, 944 F.2d 320, 332 (6th Cir. 1991). But this rule dictates what claims may be asserted or lost in a civil lawsuit; the rule's text and precedent don't purport to limit which claims may be brought and when in other forums. Courts have recognized this in the arbitration context: "Case law indicates that 'neither the doctrine of *res judicata* nor the rules of compulsory counterclaims prevents the arbitration of the issues omitted as compulsory counterclaims that were subject to arbitration." *Data Processing Sciences v. Lemenate Tech., LP*, No. 1:14-cv-740, 2014 WL 7412014, at *4 (S.D. Ohio Dec. 31, 2014) (cleaned up) (quoting *Bristol Farmers Market v. Arlen Realty & Devel. Corp.,* 589 F.2d 1214 (3rd Cir. 1978)). The contrary rule Schnatter seeks would perversely allow civil plaintiffs to create a race to the courthouse that might force counterparties who enjoy arbitration rights nevertheless not to pursue them for fear of a federal stay order. *See Local Union No. 11, Int'l Brotherhood of Elec. Workers, AFL-CIO v. G.P. Thompson Elec., Inc.*, 363 F.2d 181, 185 (9th Cir. 1966) (allowing a party to "force his opponent to bypass arbitration and assert counterclaims as to controversies otherwise arbitrable" would "effectively frustrat[e]" "the desired intent and purpose of arbitration agreements").[7]

---

[7] Whether a counterclaim must be pled or lost in litigation is of course a separate question from whether asserting a compulsory counterclaim in litigation evinces an intent to litigate

In any event, it's hardly clear (and Schnatter does little to *make* clear) that Laundry Service's counterclaim to enforce arbitration was compulsory in the first place. Courts ask whether "the issues of law and fact raised by the claims are *largely the same* and whether *substantially the same evidence* would support or refute both claims." *Bauman v. Bank of Am., N.A.*, 808 F.3d 1097, 1101 (6th Cir. 2015) (citation omitted). While Schnatter's and Laundry Service's claims all concern disclosures of some sort and all allege a breach of the NDA, they also concern different contexts and different evidence: pre-suit leak and disparagement allegations on the one hand and post-leak litigation conduct on the other. Schnatter is correct that parallel proceedings would generate some evidentiary overlap, but overstates the degree of that overlap. And "a partial overlap in issues of law and fact does not compel a finding that two claims are" compulsory counterclaims. *Id.* (citation omitted). Thus the efficiency and consistency goals of Rule 13 wouldn't obviously be furthered by forcing Laundry Service's claims into the same vehicle as Schnatter's.

Third, Schnatter argues that the Court should exercise its "inherent" authority to stay an arbitration proceeding. MTS at 5–6. As noted above, however, the source and scope of that authority is hardly clear. "There is no provision in the [Federal Arbitration] Act for a stay of arbitration." *Tai Ping Ins. Co., Ltd. V. M/V Warschau*, 731 F.2d 1141, 1144 (5th Cir. 1984). Nonetheless, courts consider "the power to stay proceedings [a]s incidental to the power inherent in every court to control the disposition of the causes on its docket." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). As with anti-suit and other injunctions against other legal proceedings, though, "a court must tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay." *Ohio Environmental Council v. U.S. Dist. Court, S. Dist. of Ohio, Eastern Div.*, 565 F.2d 393, 396 (6th Cir. 1977). That's especially true in the arbitration context, where the "liberal federal policy favoring arbitration" encourages courts to enforce "private contractual agreements" to arbitrate. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quotation marks omitted).

Aside from the obvious efficiency benefits of proceeding in one forum instead of two, the legal basis for this Court to enjoin the exercise of bargained-for arbitration rights is uncertain at best. The claims Laundry Service brings are arbitrable under the contract: Laundry Service hasn't litigated these claims and therefore didn't waive its rights by deciding not to. Absent a legal reason to the contrary, the FAA requires the Court "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).

None of Schnatter's precedents undermines this reasoning. The court in *Thomas Global Group LLC v. Watkins* enjoined an arbitration proceeding until it could resolve whether the parties had entered into an enforceable arbitration

---

rather than arbitrate for waiver purposes. *See Schwebke*, 96 F.4th at 976 (asserting compulsory counterclaim wouldn't count toward waiver).

agreement.  No. 13-cv-4864, 2014 WL 1371719, at *4 (D.N.J. Apr. 8, 2014) ("Indeed, the only real dispute in this case is whether TGG and any of the Defendants entered into an enforceable arbitration agreement in the first place.").  On those facts, "a court is 'obliged to enjoin an arbitration' where it is determined 'that a valid arbitration agreement does not exist....'"  *Id.* (quoting *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990)).  That's not the situation here,  however, because Schnatter doesn't contest the validity of the arbitration agreement.  And in *Trustees of Soft Drink Industry Industry-Local Union No. 744 Pension Fund v. Royal Crown Bottling Co.*, the court stayed the arbitration based on the (ultimately winning) argument the issue wasn't arbitrable.  No. 08-cv-502, 2009 WL 310896, at *1, 4 (N.D. Ill. Feb. 9, 2009).  None of Schnatter's other authorities granted a stay or provide much guidance regarding when one might be appropriate—much less that Schnatter is entitled to one here.

Given Schnatter's burden to justify the appropriateness of a stay, he hasn't overcome the presumption of arbitrability and shown an entitlement to a stay.  So the Court denies without prejudice Schnatter's motion to stay arbitration (DN 294).

### DOES THE NDA BIND LAUNDRY SERVICE?

Schnatter asserts that the NDA bound Laundry Service to not disclose sensitive information about him; Laundry Service contends the NDA doesn't bind it at all.  As discussed above, Laundry Service previously teed up both issues with its motion for summary judgment: it urged the Court to reject this claim for lack of evidence of breach, lack of consideration, and lack of any obligations that bound Laundry Service.  Motion for Summary Judgment at 29–38.  Because the record evidence created a genuine issue of material fact about whether the parties had agreed to a contract and whether Laundry Service caused a breach, however, the Court denied summary judgment.  Transcript of Summary Judgment Ruling (DN 280) at 6:1–15.  The pending motion to compel arbitration revisits this issue—asking the Court to conclude, as a matter of fact after a bench trial on contract formation (or "mini-trial"), that "the NDA does not bind Laundry Service."  Def. Pretrial Br. (DN 345) at 1.

A binding contract requires "offer and acceptance, full and complete terms, and consideration."  *Energy Home v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (quotation marks omitted).  Laundry Service concedes the completeness of the NDA's terms but contends it never accepted any offer or received any consideration from Schnatter.  Def. Pretrial Br. at 5–8.

These are mixed questions of fact and law, 17A AM. JUR. 2D *Contracts* § 18 (2024), which the Court decides based on Kentucky law[8] and the evidence presented

---

[8] The NDA specifies that it "shall be governed by, and construed and enforced in accordance with the laws of Kentucky."  Signed NDA ¶ 7(c). But most courts have held that

at trial.   Laundry Service relies heavily on the parol evidence rule in attempting to exclude consideration of facts explaining to why its chief marketing officer signed a contract drafted for a "Team Member" rather than a vendor like Laundry Service. But that rule of contract *interpretation* doesn't apply to this question of contract *formation*.   And determining whether parties agreed to a valid contract necessarily requires looking beyond the four corners of the instrument.   *See id.* § 29 ("[T]he circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence.").   That's why parties challenging the formation of an agreement purporting to require arbitration may do so in a "mini-trial" of the sort Laundry Service requested here.   *See, e.g.*, *Alvarez v. T-Mobile USA, Inc.*, No. 2:10-cv-2373, 2011 WL 6702424, at *8 (E.D. Cal. Dec. 21, 2011) ("If doubts as to the formation of an agreement to arbitrate exist, the matter should be resolved through an evidentiary hearing or mini-trial.") (citations omitted).

## I.  OFFER & ACCEPTANCE

### A.  <u>Findings of Fact</u>

The NDA at issue protected the company and its founder/chairman/pitchman John Schnatter by obliging persons who dealt with him not to appropriate or disclose any information "of a personal or business nature regarding [Schnatter] or his immediate family members."  Signed NDA (DN 389-25, Def. Ex. 25) ¶ 1(a).  Recent events at the company—which led to (among other developments) Laundry Service's hiring—made the NDA's confidentiality requirement especially important during the winter of 2017–18.   During a recent Papa John's earnings call, Schnatter had described the NFL's handling of high-profile and culturally sensitive racial-justice protests as a "debacle."  2017 Earnings Call (DN 247-4) at 4.  The League's protest

---

a choice-of-law provision "does not apply when the question is whether a contract exists at all." *In re Murray Energy Holdings Co.*, 641 B.R. 355, 373 (Bankr. S.D. Ohio 2022) (collecting cases looking to the law of the forum state instead).  Even so, looking to the law of the forum state yields the same result here: "[W]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally … should apply ordinary state-law principles that govern the formation of contracts." *Dixon v. Daymar Colleges Grp., LLC*, 483 S.W.3d 332, 342 (Ky. 2015).  And Kentucky choice-of-law principles dictate that the law of the "state [which] has the most significant relationship to the transaction and the parties" governs the interpretation and validity of contracts. *Lykins Enterprises, Inc. v. Felix*, No. 2006-sc-142, 2007 WL 4139637, at *6 (Ky. Nov. 21, 2007).  This appears to be Kentucky law, which is consistent not only with the choice-of-law clause but also the parties' assumptions and argumentation throughout this case. *See Barber v. Arch Ins. Co.*, 494 F. Supp. 3d 450, 456 (W.D. Ky. 2020), ("The parties by their arguments agree that Kentucky law governs."), *aff'd*, 852 F. App'x 210 (6th Cir. 2021) (citation omitted).

response, according to Schnatter, had hurt the sales of Papa John's pizza—at the time the official pizza of the NFL. *Id.*

These comments didn't go over well with many people. Laundry Service "observed" responses on social media in which "people were … saying [Schnatter] was racist." White Dep. (DN 384-17) at 74:20–75:03. Laundry Service relied on those reactions and public-perception testing to offer a touchy recommendation of its own: to "improve the sentiment around Papa John's as a brand, it's necessary to either improve John Schnatter's image or separate him from the conversation entirely." Def. Ex. 8, Owner Perception Report (DN 389-8) at 10; Def. Ex. 18, March 17 Email from Randi White (DN 389-18) at 1.

By then, Laundry Service had been on the job three months but had not signed an NDA. About two weeks later, Papa John's vice president of advertising, Katie Wollrich, asked the agency to sign one. Def. Ex. 21 (DN 389-21) at 1. Papa John's kept and used two versions of this form contract, known internally as the "Founder Agreement": one for vendors and another for team members (typically Papa John's employees). Confusion over Papa John's use of the wrong version underlies much of Laundry Service's argument that the NDA doesn't bind it.

That's because Wollrich emailed the wrong NDA form to Randi White, Laundry Service's vice president of client services. (Wollrich and White were the two primary day-to-day contacts for the Laundry Services-Papa John's engagement. *See* White Dep. (DN 384-17) at 6:15–22; Wollrich Dep. (DN 389-38) at 15:08–09, 123:08–10.) Wollrich asked White to "hav[e] LS sign at [her] convenience." Def. Ex. 21 at 1. Wollrich initially sent a copy of the "vendor" agreement, as would've been appropriate for an outside PR firm. But the form was obsolete: it still listed Schnatter as the CEO and Chairman of the Board, despite his recent resignation as CEO. *Id.* at 2. So Wollrich followed up with a "slightly revised" version that listed Schnatter as "the Founder, and Chairman of the Board." Def. Ex. 20 (DN 389-20) at 1–2. This version differed in some other respects, though—it was a team-member NDA that the company normally would've used for employees, not vendors. The vendor version included a signature block that called for the signor's title, for example, while the team-member version included spaces for the employee's name, ID number, and initials. Both NDAs, however, included similar language routing disputes to AAA arbitration (though the team-member form specified "Employment (or other applicable)" rules would apply) and included largely the same boilerplate "confidentiality, non-disparagement and dispute resolution agreement." *Compare* Def. Ex. 21 (vendor version), *with* Def. Ex. 20 (team-member version).

Despite those irregularities, Laundry Service's chief market officer, Mike Mikho, signed the "slightly revised" agreement tailored toward "Team Member[s]" the next day. Signed NDA at 4. He later testified that he "had the authority to execute" the NDA on Laundry Service's behalf, Day 1 Transcript (DN 373) at 136:2–

7, and Laundry Service points to no evidence that would contradict this. Indeed, at the outset of the relationship, Mikho and his counterpart at Papa John's had signed a different contract—the "Master Services Agreement"—expressly binding the two companies through their signatures. Master Services Agreement (389-1); Day 1 Transcript at 117:12–17, 122:18–123:6. Mikho's signature appears on that agreement under "247 Group, LLC" and lists his title as "CMO." Master Services Agreement at 10. The team-member NDA he signed, however, never mentions the name of the vendor he worked for—Laundry Service. But after Mikho signed, White sent the NDA back to Wollrich with a note: "Please see our signed agreement attached." Def. Ex. 27 (DN 389-27) at 1. Apparently no one remarked at the time on the use of the team-member rather than vendor version of the Founders Agreement. *See* Schnatter's Trial Brief (DN 346) at 4.

### B.  Conclusions of Law

**1.** Though this exchange is hardly a model for establishing important business agreements, neither is it entirely unfamiliar to complex and fast-moving organizations. And under standard contract-law principles and the facts found here, Mikho's signed acceptance of the NDA suffices to bind Laundry Service to the agreement.

That agreement "manifest[ed]" Laundry Service's intent to be bound, 17A AM. JUR. 2D *Contracts* § 18, and shows the company's "voluntary, complete assent" to the contract, *Conners v. Eble*, 269 S.W.2d 716, 717–18 (Ky. 1954). Mikho instructed his Laundry Service assistant to affix his signature to the NDA, White returned "our [Laundry Service's] signed agreement" to Wollrich, and White did so in response to the Papa John's request that she have "LS sign" it. Def. Ex. 24 (DN 389-24); Def. Ex. 27 at 1. All of this evidence aligns with the conclusion that Mikho's assent bound Laundry Service. The signature of an agent with actual or "apparent authority is sufficient to bind the principal with respect to third parties." *Mark D. Dean, P.S.C. v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 508 (Ky. 2014) (citation omitted). No one disputes the authority of Mikho, who previously signed the Master Services Agreement on Laundry Service's behalf, to bind the company to the NDA as well.

True, Mikho signed the NDA on a line labeled for a "Team Member," Signed NDA at 4, which introduces some degree of ambiguity regarding the intent of the counterparties and meaning of the contract. But the inclusion of some stray and inapposite text from a form contract doesn't plainly render the agreement ineffective against anyone who was not a Papa John's employee, as Laundry Service contends. Def. Pretrial Br. at 4 n.1; Motion for Summary Judgment at 36. None of the evidence at trial and no facts found by the Court suggests that the parties intended an otherwise binding agreement to self-destruct, like some note to Inspector Gadget, anytime it landed in the hands of an outsider.

Laundry Service notes that the NDA doesn't even include its name or any reference to the vendor. When "an individual signs a contract without reference to a corporation or corporate title," it contends, "the agreement is not binding on the corporation unless the body of the contract so states." Def. Pretrial Br. at 3. To support this position, Laundry Service cites *Pannell v. Shannon*, 425 S.W.3d 58 (Ky. 2014)—but overstates its holding. That Kentucky Supreme Court decision held that an officer or agent of a corporation "cannot be held personally liable solely because of her signature" on a contract that binds the corporation. *Id.* at 65. It didn't purport to impose a magic-words requirement to protect corporate defendants and shunt liability to employees or agents instead. To the contrary, *Pannell* would protect Mikho as an agent from liability based on a breach by Laundry Service, the principal. Kentucky precedent, involving analogous facts concerning ambiguous principal/agent signatures, has looked to extrinsic evidence to determine whether an agent who signed a contract "without disclosing their principal" intended to bind the unnamed principal or herself. *See, e.g.*, *G.C. Riordan v. Thornsbury*, 198 S.W. 920, 922 (Ky. 1917). This is entirely consistent with the conclusion that Mikho's signature binds Laundry Service based on the parties' intent and Mikho's actual and apparent authority.

**2.** Laundry Service resists this conclusion by insisting that the Court shouldn't consider "parol evidence" like Mikho's testimony or Wollrich's and White's emails. Rather, the Court must "look only as far as the four corners of the document to determine the parties' intentions." Def. Pretrial Br. at 2 (quoting *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 695 (Ky. 2016)). According to Laundry Service, the NDA's use of the term "Team Member" means that the contract could only bind an individual Papa John's employee and not a vendor like Laundry Service. *Id.* at 1–4

But the parol evidence rule doesn't limit the evidence a court may consider when analyzing whether a party assented to the terms of a contract. None of the precedents that Laundry Service cites has applied that rule to a contract-formation question.[9] Many such questions—whether an agent could bind a principal or whether

---

[9] *See Mostert v. Mostert Group, LLC*, 606 S.W.3d 87, 91 (Ky. 2020) ("The primary issue in this case turns on construction of the Contribution Agreement and the Security Agreement, both executed by the parties on October 31, 2003."); *Wehr Constructors, Inc. v. Assurance Co. of America*, 384 S.W.3d 680, 681 (Ky. 2012) (disputing meaning of term within existing contract); *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 692–93 (Ky. 2016) (same); *Davis v. Siemens Medical Solutions USA, Inc.*, 399 F. Supp. 2d 785, 791–92 (W.D. Ky. 2005) (same); *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky. 1954) ("The sole question before the court below, and now before us, is the construction of that contract."); *Hensley v. Gadd*, 560 S.W.3d 516, 521 (Ky. 2018) ("The issues in this case revolve around a proper interpretation of the Deed of Restrictions."); *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 783 (Ky. 2017) ("examining the instrument that governed [the

a party signed under duress, for example—necessarily turn on proof about how an agreement was reached, not just interpretation of what the agreement said. Indeed, Kentucky courts have considered parol evidence in determining whether counterparties intended the signature to bind a principal or only the signer. *See Simpson v. Heath & Co.*, 580 S.W.2d 505, 506 (Ky. App. 1979). The point is not to reinterpret unambiguous terms through unexpressed intent, *see, e.g.*, *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 590–94 (Ky. 2012), but rather to assess whether those terms bind the parties in the first place.

Regardless, even if the Court were to follow Laundry Service's approach and consider the terms of the NDA in a purely interpretive manner, they would be textually ambiguous—as the Court previously ruled. *See* MSJ Ruling Tr. at 6:1–12. As a purely linguistic matter, the term "Team Member" is subject to either of two textually permissible meanings: a narrow reference to a Papa John's W-2 employee or a broader reference to anyone working with the company. Ultimately the proper interpretation would turn on the parties' expressed intent given the instrument's text and context. *See, e.g.*, *Veech v. Deposit Bank of Shelbyville*, 128 S.W.2d 907, 911 (Ky. 1939) (interpreting contract based on "its terms, taking into consideration the entire context of the agreement" to carry out "the intention of the parties"). This requires examining more than the mere ten letters Laundry Service isolates. Mikho signed the NDA under the "team member" title, to be sure, but elsewhere he left blank the blocks for "team member" name and initials and for "team member ID#." And nothing in the contract states expressly what Laundry Service so desperately wants to infer: that the agreement is ineffective if anyone but an employee signs. So even assuming it's necessary to interpret the term "team member" to decide whether the NDA encompasses a vendor like Laundry Service, the text is ambiguous. That means the parol evidence rule wouldn't bar Schnatter from relying on proof outside the four corners of the agreement. *See Pannell*, 425 S.W.3d at 64 ("ambiguous" document "subject to clarification through parol evidence").

**3.** Contract law supplies still more reasons to avoid Laundry Service's strict reading of Team Member to nullify any agreement with a vendor or non-employee. The law disfavors interpretations that result in nullities. Kentucky courts long ago recognized that "it is unlikely that parties would consume time and expense" negotiating "vain" contracts that aren't binding. *Coles v. Morrison*, 261 S.W. 600, 601 (Ky. 1924). So "when an agreement is susceptible of two constructions, one of which would render it enforceable and the other unenforceable, the former construction will prevail." *Id.* If Laundry Service's contrary approach prevailed, the whole exchange between Wollrich, White, and Mikho—quite obviously meant to secure Laundry

---

parties'] relationship"); *First Commonwealth Bank of Prestonburg v. West*, 55 S.W.3d 829, 831–32 (Ky. App. 2000) (same).

Service's agreement not to disclose sensitive information—would've all been for naught.

Nor would this construction require a "reformation" of the definition of Team Member. According to Laundry Service, a court may only redefine a term if the plaintiff pleads "a reformation claim based on mutual mistake," which Schnatter did not. Day 1 Tr. at 7:6–10; Def. Post-trial Br. at 4–6. True, the Papa John's ethics code defines "Team Member" as "all officers, directors and employees of the Company, unless otherwise indicated." Def. Pretrial Br. at 1–2. This plausibly (but not necessarily) excludes vendors—"unless" context "otherwise indicate[s]," of course—as Mikho's signature and exchange arguably did here. True, the team-member NDA (but not the vendor NDA) refers to the ethics code. Signed NDA ¶ 5. But it does *not* incorporate that code by reference in a way that would appear to bind Laundry Service, which concedes it never received the ethics code, *see* Day 1 Tr. at 125:7–16.

In any event, Laundry Service's reformation argument misunderstands the question before the Court: Did Papa John's and Laundry Service form a contract? Reformation presumes a contract *does* exist and serves to correct a mutual mistake when two parties "executed … a contract that did not conform to their shared intent." *Nichols v. Zurich Am. Ins. Co.*, 423 S.W.3d 698, 704 (Ky. 2014). Reformation is not used "to make a new contract between the parties" or to "suppl[y] an agreement that was never made." 66 AM. JUR. 2D *Reformation of Instruments* § 1 (2024) (footnotes omitted).

This does not, as Laundry Service suggests, "transform the Team Member NDA into the Vendor NDA." Def. Post-trial Br. at 10. There are other differences between the two versions of the contract. *Compare* Def. Ex. 21 at 3 (vendor version), *with* Def. Ex. 20 at 3 (team-member version). To the extent that any of these differences are material, the signed version of the NDA governs. But contrary to Laundry Service's contention, "Schnatter is not seeking to enlarge or modify the obligations of the NDA." Schnatter Post-Trial Br. (DN 387) at 9. Rather, "he is seeking to enforce Laundry Service's obligations under the NDA." *Id.*

## II. CONSIDERATION

Consideration is "'the reason which moves contracting parties to enter into [an] undertaking'" and "can be 'either a benefit to the party promising, or a loss or detriment to the party to whom the promise is made.'" *Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 S.W.3d 803, 814 (Ky. App. 2017) (quoting *Cassinelli v. Stacy*, 38 S.W.2d 980, 983 (1931); *Phillips v. Phillips*, 171 S.W.2d 458, 464 (1943)). Under Kentucky law, consideration demands little. Contracts "must be supported by a consideration, but the adequacy of the consideration cannot be inquired into if there is something of detriment to one party or benefit to the other, however slight." *Posey v. Lambert–Grisham Hardware Co.*, 247 S.W. 30, 33 (1923). And "[m]utual promises

23

constitute adequate consideration *if* a benefit is conferred to the promisor or a detriment is incurred by the promisee." *Energy Home v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013).

In response to Laundry Service's summary-judgment motion, the Court decided that consideration supported the NDA under Kentucky law. That decision rested on two findings regarding the record evidence the parties put forth: (1) both sides gave up the right to pursue remedies in court by submitting to arbitration and (2) Laundry Service received specialized knowledge in exchange for the non-disclosure agreement. MSJ Ruling Tr. at 4:25–5:25. Laundry Service sought to revisit this question at the bench trial on contract formation. Laundry Service Trial Br. (DN 382) at 13–15; Schnatter Post-Trial Br. (DN 387) at 5–7. The full record presented at the evidentiary hearing reinforced the Court's earlier decision that consideration exists. In addition to giving Laundry Service the right to arbitrate contract-related claims, the NDA opened the door for Laundry Service employees to have important meetings and conversations with Schnatter—a condition essential to the ongoing business relationship. The right to arbitrate, the rights it afforded with respect to Schnatter himself (as opposed to the company), the personal access to Schnatter, and the resulting ability to extend the business relationship all represent benefits to Laundry Service that support consideration.

Laundry Service nevertheless argues that the NDA fails for lack of consideration on two grounds. First, because it purportedly received no benefit from the NDA beyond what the MSA already provided, Schnatter's agreement to arbitrate alone is insufficient to count as consideration. Motion for Summary Judgment at 38–39; Laundry Service's Supplemental Briefing on Consideration (DN 270-2) at 1–6. Second, Laundry Service contends that Schnatter's failure to comply with the arbitration clause amounts to "a substantial failure of consideration," even if the clause would otherwise provide it. Laundry Service Trial Br. at 14–15. That is, even if consideration once existed, it eventually "failed" because Schnatter didn't comply with the arbitration provision. Neither argument comports with the factual record, however.

A.   **Factual Findings**

The record before the Court shows that Schnatter and Laundry Service mutually benefited from the promises in the NDA.

By agreeing to the NDA, Laundry Service promised not to appropriate or disclose confidential information and not to disparage Schnatter or his family. Signed NDA ¶¶ 1(a), 1(c). The benefit to Papa John's and John Schnatter was obvious. *See* Wollrich Depo. (DN 252-4) at 45:6–46:6 ("people involved closest to John and … who were more likely to be working with John were signing it … to avoid risk of leaked information about John to the public"). In return, Laundry Service received

otherwise-restricted access to Schnatter and the resulting knowledge necessary to do (and keep) its job. Day 1 Transcript at 73:22–74:8 (without a signed NDA, John Matter, former Papa John's senior counsel, testified that Papa John's may not have "proceeded forward" with a vendor).

The evidence shows that Schnatter didn't become personally involved with Laundry Service until after the NDA was signed. Shortly after the NDA was signed, Schnatter and his company's new PR agency began interacting more closely. Schnatter made his first trip to the Laundry Service office a month after the NDA was signed. Day 1 Transcript at 134:14–16. During that meeting, Schnatter told Laundry Service that he wanted to do interviews to prove he wasn't a racist—the sort of candid discussions that participants might hope, for obvious reasons, to remain confidential. Wollrich Dep. at 64:21–65:19. Laundry Service and Schnatter continued working together, including during the fateful conference call that led to this litigation. *See* Motion for Summary Judgment at 16–17; May 18 Email from White to Wollrich (DN 247-29) at 1 (describing Laundry Service's plans for future interviews with Schnatter); May 21 Email from White to Wollrich (DN 247-31) at 1 (same). These events show that Laundry Service benefited from the sort of channel for frank interactions that opened with Schnatter after Laundry Service agreed to the NDA. Without that access, Laundry Service would have been unable to perform the work Papa John's hired it to do. *See* Signed NDA at 1 (making confidentiality a condition of Laundry Service's "contact with and work with Schnatter").

The NDA's arbitration clause provided Laundry Service at least two separate benefits as well. Through it, the "parties agree[d] that ... any dispute arising between Team Member and Company or Founder, including whether any provision of this Agreement has been breached, shall be resolved through confidential mediation or confidential binding arbitration." Signed NDA at ¶ 6. So the NDA—as has proved highly relevant to this litigation—gave either side the option to initiate private arbitration rather than public litigation over any disputes emerging from the relationship (provided, of course, that the party didn't effectively waive that right). And the NDA for the first time created a binding contractual relationship between Laundry Service and Schnatter himself, as opposed to just the company. As Laundry Service has elsewhere argued with great success, the MSA with Papa John's didn't create rights as between it and the founder. The NDA, for better or worse, afforded those two additional rights and remedies that both sides have asserted—whether in arbitration or litigation.

### B.   <u>Conclusions of Law</u>

The benefits Laundry Service received in exchange for its non-disclosure promise support consideration under Kentucky law.

*First,* the "specialized knowledge" Laundry Service obtained to do its job has been recognized by Kentucky courts as supporting consideration. *See Charles T. Creech, Inc. v. Brown*, 433 S.W.3d 345, 353–54 (Ky. 2014) (access to "specialized knowledge" can be consideration to support an NDA). Indeed, this was the "reason which move[d]" the parties to sign the NDA in the first place. *Alph C. Kaufman, Inc.*, 540 S.W.3d at 814; *see also Lendell James Dev. Grp., LLC v. Price*, No. 8:20-cv-513, 2021 WL 2352284, at *6 (D. Md. June 9, 2021) ("The NDA specifically provides that LJDG would provide Confidential Information to the Defendants in exchange for the Defendants' agreement to abide by the terms of the NDA. This is valid consideration for the NDA to be an enforceable contract."). So Laundry Service's agreement to abide by the terms of the NDA and Schnatter's agreement to share information are adequate consideration.

Laundry Service, however, contends that "where, as is alleged here, the parties to a contract already had an existing contractual relationship, the key question is whether the 'relationship between the parties changed' in some material way because of the new contract." Def's Pretrial Br. 5–6; *see Creech*, 433 S.W.3d at 354. And because Laundry Service contends it already had specialized knowledge about Schnatter under the MSA, it maintains that the NDA didn't provide new consideration to support "a material alteration in the terms of [the] existing agreement." Def. Pretrial Br. at 5 (quoting *Martin v. Pack's Inc.*, 358 S.W.3d 481, 484 (Ky. App. 2011) (citation omitted)). But this ignores the fact that Schnatter wasn't a party to the MSA, so the NDA was not just "a material alteration" to an existing relationship. Rather, it represented an entirely new contractual relationship that conferred benefits on each party. The NDA, after all, assured Schnatter that Laundry Service wouldn't disclose confidential information about him, and that in turn allowed Laundry Service to have more candid interactions with Schnatter regarding the sensitive issues facing him and the company. And it gave each side rights (including a right to private arbitration) if the relationship went sideways. That access and privity weren't available after Papa John's and Laundry Service entered the MSA—only the NDA made it possible.

*Second*, Kentucky caselaw also arguably supports another, independent basis for consideration: both parties received a benefit from the NDA's dispute-resolution provisions. "Mutual promises constitute adequate consideration *if* a benefit is conferred to the promisor or a detriment is incurred by the promisee" *Energy Home v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) ("[A]n arbitration clause requiring both parties to submit equally to arbitration constitutes adequate consideration.") (citations omitted). And one party's contractual promise is "fair consideration for the [other's] mutual promise to submit disputes to arbitration." *Id.*

This gave Schnatter *and* Laundry Service the benefit of being able to resolve disputes through "confidential mediation" or "confidential arbitration." Signed NDA

¶ 6. This adds to the benefit and therefore the consideration each received as a consequence of signing the NDA. Indeed, Laundry Service's considerable effort devoted toward routing this dispute toward private arbitration surely supports the notion that the arbitration provisions of the NDA carried value for it as well as Schnatter. A key feature of the dispute-resolution clause is that any dispute was to "be resolved through *confidential* mediation or *confidential* binding arbitration." *Id.* at 3 (emphasis added). In fact, the "parties agree[d] to keep confidential both the fact that any mediation/arbitration has or will take place between them, all facts related thereto, and any resolution thereunder." *Id.* Laundry Service nevertheless argues that a "mere agreement to arbitrate is not, by itself, valid consideration for the contract as a whole" because "courts have found that even contracts with arbitration clauses fail for lack of consideration." Def. Pretrial Br. at 7. But the cases Laundry Service cites don't stand for the proposition that it asserts.[10]

Separately, Laundry Service argues the NDA is unenforceable due to a "failure of consideration." Def. Pretrial Br. at 8 (citing *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 845 (Ky. 1968)). That means "a valid contract was formed, but it became unenforceable because the bargained-for performance was not provided." 17A AM. JUR. 2D *Contracts* § 635 (2024). If one party fails to perform, and that failure "goes to the essence of the agreement," the other party may assert the defense of "failure of consideration" to avoid performing. *Id.* Schnatter's decision to sue rather than arbitrate, Laundry Service contends, means arbitration rights can't serve as consideration.

It's hardly clear that dispute-resolution rights, however valuable, truly go to the "essence of th[is] agreement," whose primary focus after all is nondisclosure, not nonarbitration. And the *option* to compel arbitration—not the *act* of arbitrating— was the valuable consideration supporting the parties' NDA. *Cf. Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 285 (6th Cir. 2016) ("[A]n option to file a claim

---

[10] Two of these decisions are from out of state, one is from out of circuit, all are approximately 20–40 years old, and none stands for the proposition Laundry Service purports to extract. In *General Electric Co. v. Anson Stamping Co.*, the court addressed whether a judge had authority to act as arbitrator over two contracts he found to be unenforceable. No. 3:04-cv-401, 2005 WL 8175118, at *6 (W.D. Ky. May 9, 2005). The court never addressed whether the arbitration clauses failed for lack of consideration—only that the judge who said so had the authority to arbitrate the case. *See id.* at *12. Next, in *Jacada (Europe), Ltd. v. Int'l Marketing Strategies, Inc.*, the arbitrator didn't find that the contract lacked consideration but rather construed the language of the contract to ensure the party received the bargained-for consideration. No. 1:02-cv-479, 2003 WL 24267645, at *4 (W.D. Mich. Oct. 22, 2003). Finally, *Three States Trucking, Inc. v. Arco Leasing Corp. upheld* an arbitrator's award, dismissing the defendant's arguments "interpret[ing] the arbitrator's award … to have held that there was no consideration to support an agreement." 470 F. Supp. 1075, 1076–77 (E.D. Mo. 1979).

creates a prospective value, even if the option is never exercised." (quotation omitted)).    That remained true regardless of whether either party ultimately exercised that option to arbitrate claims.

Even assuming Schnatter's conduct constituted a failure of consideration (as opposed to a mere breach of a promise), moreover, Laundry Service itself never invoked that right until filing the motion to compel that is finally at issue.    And a finding of failed consideration wouldn't get Laundry Service out from under the NDA; it would merely afford the opportunity to sue to rescind the contract.    *See O.P. Link Handle Co.*, 429 S.W.2d at 845 ("A substantial failure of consideration ordinarily justifies rescission.").    That has not happened and could not have happened until Schnatter objected to arbitration at this late stage of the lawsuit.    So this argument, however creative, fails to unwind the NDA that Laundry Service agreed to.

### Conclusion

The Court denies Laundry Service's motion to compel (DN 289) because the NDA binds Laundry Service, adequate consideration supports the NDA, and Laundry Service constructively waived its right to compel arbitration.    The Court also denies, without prejudice, Schnatter's motion to stay arbitration (DN 294).    Finally, the Court directs the parties to confer and file a joint status report, on or before October 21, 2024, discussing the next steps in this litigation and a potential scheduling order.    The parties may also request a status conference with the District Judge or Magistrate Judge at any time before the October 21 deadline.