UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JOHN H. SCHNATTER,                    ) Case No. 3:20-CV-3-BJB
                                      )
          Plaintiff,                  )
                                      )
vs.                                   )
                                      )
247 GROUP, d/b/a                      )
LAUNDRY SERVICE, and                  )
WASSERMAN MEDIA GROUP, LLC,           )
                                      ) January 26, 2026
          Defendants.                 ) Louisville, Kentucky


*****************************************
TRANSCRIPT OF REMOTE HEARING
BEFORE HONORABLE BENJAMIN BEATON
UNITED STATES DISTRICT JUDGE
*****************************************


APPEARANCES:

For Plaintiff:        Jennifer M. Barbour
                      Elisabeth S. Gray
                      Augustus S. Herbert
                      Dennis D. Murrell
                      Gray Ice Higdon, PLLC
                      3939 Shelbyville Road, Suite 201
                      Louisville, KY 40207

For Defendants:       Michael P. Abate
                      Kaplan Johnson Abate & Bird, LLP
                      710 West Main Street, Suite 400
                      Louisville, KY 40202



                      Terri L. Horton, RMR, CRR
                      Official Court Reporter
                      133 U.S. Courthouse
                      501 Broadway
                      Paducah, KY 42001

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES (Continued):

For Defendants:          Bert H. Deixler
                         David Freenock
                         Patrick J. Somers
                         10100 Santa Monica Boulevard, Suite 2500
                         Los Angeles, CA 90067


(All participants present via Zoom teleconference.)

(Begin proceedings at 2:14 p.m.)

THE COURT: Terri, let's go on the record in Civil Case 3:20-3, Schnatter against 247 Group. Who is here for the plaintiff?

MS. BARBOUR: Jennifer Barbour on behalf of the plaintiff, along with Dennis Murrell, Libby Gray, and Gus Herbert.

THE COURT: Okay. Welcome.

And for the defendant?

MR. DEIXLER: Bert Deixler of Kendall Brill & Kelly, and I am joined by Patrick Somers and our new partner, David Freenock.

THE COURT: Okay.

MR. ABATE: Yes, Judge. Thank you. Mike Abate as well for the defendant.

THE COURT: I thought Mr. Deixler just made you a partner of Kendall Brill, Mike. That would have been exciting to hear.

MR. ABATE: If it came with a pay raise, that sounds good.

THE COURT: Let's move on before we get any deeper.

So I've reviewed the long-standing objections which I think came on the heel -- just in advance of the arbitration interlude in this case. Just a few questions for you-all. And I appreciate you conveying in advance that you've managed to stay

on track otherwise given the deadlines we're approaching, and I want to make sure that nothing we do here will jeopardize those -- the timeline we worked hard to hammer out.

So I guess my main question for each side is:  How do you think this situation is supposed to play out in the ordinary course of litigation?

You know, let's imagine a world in which everybody is working in good faith to get the information that is discoverable but protect the information that ought to remain confidential under this statute.  When a witness is asked a question that touches on, you know, substance abuse, is the right approach for the defense -- the lawyer defending the deposition to object immediately?  Is the law designed so that you can get testimony but just not records?  Or should parties, you know, work out after the fact how to make discovery clear and accurate without treading on the confidentiality that Congress and HHS have bestowed on these sorts of treatment records?

Ms. Barbour, you want to take that first?

MS. BARBOUR:  Sure, Judge.  Thank you.

Well, I think the issue is addressed to some extent largely in the case that both the defendants and Magistrate Judge Lindsay relied heavily upon, which is the *Fannon vs. Johnston* case.  That case recognized that in civil proceedings that a litigant has very few opportunities to object and really can do

so and refuse to answer questions at a deposition on the basis of privilege.

And while we at times do refer to this statute as affording a privilege, when you look at how both Congress has dealt with it, the Department of Health and Human Services has dealt with it, and the courts have dealt with it, that's a bit of a misnomer.  And so I think the *Fannon* court rightly realizes that once a litigant has been asked those questions at a deposition, they cannot refuse to answer them.  And so I think in the normal course of things how it would have arisen was that if there was an intent to ask these questions that that would have been addressed with counsel in advance of the deposition so that they could properly either hammer out a protective order or ways in which it would be addressed or seek guidance from the Court.

And to compound this even further is that at the deposition for Mr. Schnatter, the defendants in this case had apparently issued a subpoena to the program, the Caron Treatment Centers, that would be the entity covered by -- or the records -- or generating the records that would be protected by this statute. They had issued a subpoena and had not really given any opportunity for an objection to be raised to even issuance of that subpoena in advance of Mr. Schnatter's deposition.

So I do think because of the confidentiality that is afforded these records, the very strict manner in which courts are asked to deal with it and to apply some level of

interaction, a meet and confer amongst counsel in advance of the deposition where they intended to ask questions should have occurred so that the parties could either work it out or seek guidance before we end up in the place where we are now, which is the testimony is being used to now say that the protections afforded by the statute have been waived.

THE COURT:  Well, that seems to demand an awful lot of the lawyer taking the deposition who may not have any inkling that this would come up or that such records exist.

Is your position that the confidentiality protection reaches testimony as well as records, or is it limited to records?

MS. BARBOUR:  It's limited to records, but I do think that you cannot use the testimony portion of it to lead to the discovery of whether or not the patient has received the treatment.

And the way I'm driving at that, Your Honor, is when we look at the actual text of the regulations and they talk about -- in the definition section about -- or the applicability section. The applicability section talks about whether or not an entity such as Caron that has received any request for information is even permitted to acknowledge the fact that the patient may or may not have received treatment there.  There's an additional, I think, level of protection there when we look at -- and this is Section 2.12 of the Code of Federal Regulations for this.  They talk about the restrictions will apply to the disclosures if it

would identify a patient as having had or currently having a substance use disorder.

So I think when we look at that coupled with the intent that Congress had that we can derive from the hearings that were held and the passage of this statute Congress was very concerned with the patient not seeking treatment for fear that doing so would subject them to public shame, public humiliation, or very confidential matters becoming public. And so in that regard, I do think, Your Honor, that the testimony portion of it should be restricted and included in the guise of the protections that this statute provides even though it does talk about records not being compelled by court order.

THE COURT: So does the reg say anything at all about testimony, or is it -- does it speak solely in terms of records?

MS. BARBOUR: It speaks in terms of records, but I would point out that the definition of "records" includes information, whether recorded or not. And so that has led to courts to apply it, for instance, when they try to compel the testimony of a treating person, one of the physicians or the counselors at these.

So there's certainly precedent to extend the idea of records to be more than a physical paper record and to include testimony that would confirm whether or not a person has received a diagnosis or treatment or referral for substance abuse disorder treatment.

THE COURT:  Okay.  Mr. Deixler, I presume that you are going to agree that the privilege or protection is limited to provider records and wouldn't extend to testimony?

MR. DEIXLER:  Yes, I agree with that for sure.  But might I --

THE COURT:  If you do --

MR. DEIXLER:  Might I just add -- I'm sorry.

THE COURT:  Well, I just want to keep this -- I promise I'm not trying to take us on a long detour.  I'm just trying to hash out how this works.

I don't read Judge Lindsay's opinion to suggest that answering a question automatically opens the door to document discovery that would overcome the privilege or protection set out in this statute and regulation.  Do you?

That would seem --

MR. DEIXLER:  Yes.

THE COURT:  -- to put a witness in an --

MR. DEIXLER:  Yes, Your Honor.

THE COURT:  You do read it that way?

MR. DEIXLER:  Yes, because 42 CFR 2.63(a)(3), which was cited by Judge Lindsay, specifically provides that offering testimony in the case renders it discoverable.  So I think he absolutely addressed the issue.  I think the CFR is clear on the point.

And I will just drop the footnote that we are now talking

about an issue which didn't really come up, because it was not a suggestion that there are such records, but rather his testimony was he had no involvement in a place where there would have been such records.  So we're dealing -- I recognize you're offering hypotheticals, but in the context in which this discussion arises, we start off with Mr. Schnatter testifying under oath that there was no record, that he wasn't treated, that he didn't even recognize it as a rehabilitation center, that he thought he was at a hotel, and he took his friend there.  So it's a little bit far afield.

But in any event, Judge Lindsay specifically dealt with 42 CFR 2.63(a)(3).

THE COURT:  I'm sure I'm being unclear here, but that's not what I'm getting at.  I'm trying to understand if this privilege is ever to apply to protect some records, then what is the deponent supposed to do?  Answer the question and then, you know, offline explain that there may be records but you're asserting privilege?  Do you --

MR. DEIXLER:  I think -- I'm sorry.

THE COURT:  Do you have the deposition go forward and then address this separately?

It's easier for me to reconcile this in practice if I can -- if there's a distinction between the testimony that's compelled and the records that are protected such that one doesn't necessarily defeat the other.  That's what I'm trying to work

out here.

MR. DEIXLER:  Yeah.  So I think the path is clear.  I think the path is that one objects to the question.  You then have perhaps a discussion between and among the lawyers.  If necessary, you suspend the deposition and seek a protective order or other assistance of the Court.

What you don't get to do is lie under oath, one.  And, two, if you testify without objection, as was the case here, because of the CFR, offering the testimony renders everything discoverable.

THE COURT:  Could you tell me again what aspect of the 2.64 you say ties the disclosure to testimony?

MR. DEIXLER:  Sure.  2.64(a)(3) from Judge Lindsay's opinion.  The disclosure is in connection -- this is the waiver section.  The disclosure is in connection with litigation or an administrative proceeding in which the patient offers testimony or other evidence pertaining to the content of the confidential communications.

MS. BARBOUR:  And, Your Honor, you guys are talking about Section 2.64.  The part that Mr. Deixler just read to you is from 2.63.

THE COURT:  Yeah.  2.63(a)(3).

Well, I still don't know that that goes so far as to say that automatically the answer to a question under oath could automatically -- could open up all these records.  I don't know

that the content of the confidential communications is even necessarily implicated by the questions here.

I mean, look, my bottom line is I don't think this question is necessarily as clear-cut as Judge Lindsay did. I think he's probably right. I have some concern about the lawyer or witness who's not sensitive to this inadvertently opening up records that Congress meant to remain confidential.

Are we -- Mr. Deixler, how, if at all, would you plan to use these records either to lead to admissible -- other admissible evidence or would this information be relevant at trial? I'm sorry. I should say admissible at trial.

MR. DEIXLER: Yeah. So it's a little hard, I guess, to answer that. What I think it does now will demonstrate, when we receive the record, that the plaintiff in the case testified falsely under oath repeatedly in two sessions of his deposition. I think that will be a critical determiner in this particular case where I think credibility of the plaintiff is very, very important.

Conversely, if there are no documents because the witness testified truthfully and we're able to ascertain that because we'll get a response that there are no documents, then we will be able to focus our energies upon the five separate witnesses who testified to having had knowledge of the CEO and a board member having taken Mr. -- or insisted that Mr. Schnatter receive these treatments because it will play into what

Mr. Schnatter has offered was the conspiracy theory between Board Member Shapiro, Mr. Ritchie, and others who were trying to rid themselves of this -- I'll describe them meddlesome board member.  And so that will help us, because our position is that the leak in this case came from Papa John's, not from us.

So either way, when we get this information, not only does it meet the discovery standard, but there are multiple ways we can introduce it into evidence.  But assuming that there are documents and assuming that he was a beneficiary of this facility in Wernersville, we will be in a position to demonstrate to the jury that he is not a truth teller.  So that's, off the top of my head, one of the ways I can think of using this information, whatever it may be.

THE COURT:  Okay.  Well --

MR. DEIXLER:  Of course, I don't know what the content is, so I'm really flying blind at the moment.  As Judge Lindsay said, you know, assume the truth of what the witness testified to.

THE COURT:  Well, I'm not sure that you or Judge Lindsay was assuming the truth in actuality.  But I just want to flag that there's a big difference between a credibility use and others at trial and other purposes that might get further afield, and nothing about this motion to compel, to my likes, forecloses admissibility discussions we may have in the future.

MS. BARBOUR:  Your Honor, if I may, just briefly, on

the argument that Mr. Deixler made.

THE COURT: Sure.

MS. BARBOUR: I think the big issue that we take, Your Honor, with this claim that it goes to credibility, of course, I'm sure you're aware that credibility is not -- as you alluded to, it doesn't mean that everything gets admitted at trial, particularly when we're talking about collateral issues. Whether or not Mr. Schnatter did, in fact, use alcohol or have a substance abuse problem with alcohol I think would be a collateral issue for sure. And, you know, as you're alluding to, we would definitely have to cross that bridge about admissibility at trial.

But I think more importantly, when we're looking at that issue, what I would like to highlight for the Court is that there is this reference to perjury, his credibility, him lying under oath. And even if we accepted that as true, which I think if you look at Mr. Schnatter's testimony, he certainly -- the way that it's been characterized today is not at all what he testified to.

But even if we take their arguments at their face that that is what he testified to and they were able to show that, it does not still rise to the level of the exceptions that we see in, for instance, the regulation that was just cited to you, 2.63(a)(1) . That section requires that the crime that could be at issue has to be one that would result in threat of life or

serious bodily injury.  Perjury under oath is not anywhere akin to that.

So I think even if we assume the worst about Mr. Schnatter's testimony, we still don't rise to a level where they are entitled to discovery of the full breadth of all of the records that would be maintained at Caron, assuming there are records at Caron.  They would not be entitled to the full dearth of those because the confidential communications have this heightened level of protection within the regulations.

THE COURT:  I'm not sure I understand why (a)(1) is necessary here.

MS. BARBOUR:  I'm just using it as a way to interpret what the Congressional and Department of Health and Human Services' intent would be, that if we're going to say that we have to have a crime, we can overcome the privilege through a crime, but the crime has to be one that poses a threat of life or serious bodily injury.  Then even perjury would not amount to that, which is essentially what Mr. Deixler is saying that Mr. Schnatter did.  And, in fact, it goes so far to say on the first page of their response to our objection that he committed perjury.

THE COURT:  Okay.  Well, that's not the main argument I'm hearing from the other side, and I don't think we need to focus on that.  They're saying disclosure is necessary in connection with the patient testimony in a civil proceeding.

So, look, I think it's -- the request clears the bar of, you know, being -- having the potential to lead to discoverable and admissible evidence, and I am just taking care to reserve judgment on what, if any, of this would actually be admissible at trial.  And I take Mr. Deixler to say let's not worry too much about that before we actually see what's out there and how it could or couldn't be used.  So that all makes sense to me.

I gather, Ms. Barbour, you-all have not -- well, have you explained the plaintiff's position on this to the other side?  In other words, do we have any -- have we had any sort of advanced discussion or reconciliation of what was said in testimony and what we think the records may show, or is it still the plaintiff's position that there will be no records because there was no such visit?

MS. BARBOUR:  Well, I don't think anyone has ever said there will be no records because there is no such visit.  So, you know, that was kind of one of the points I'd highlighted to raise here is that Mr. Schnatter's testimony was that he did go to the Caron, which is a treatment facility.  He described it as a hotel.  His understanding was he was there to take Kent Taylor, who needed treatment.  There are five other individuals who Laundry Service has obtained testimony from who understood that this was a staged intervention on the part of Mr. Schnatter's behalf.

And so I do think there is a very large potential that there

are records that Caron would have that were maintained on Mr. Schnatter, and so our big concern there is turning those over carte blanche, which is what Judge Lindsay ordered to be done, regardless of whether or not they are purely objective data or they're confidential communications.  There's no protections on them.

And in a case that I'm sure you can appreciate where the allegations are that someone took information that was disclosed under the guise of being confidential in a room of people he expected confidentiality from and released that to, quote, put him out to pasture, that the use of these records that we don't even know what's in them -- because from Mr. Schnatter's perspective, he was there to have his friend treated, not himself.  That, you know, having those released in real time to people who do not have his best interests at heart without any protections whatsoever runs the risk of further harm to his reputation.  And so that --

THE COURT:  May I ask -- I was unclear on this from Judge Lindsay's order.  But, Mr. Deixler, are you-all requesting just records that Schnatter has at this point, or is there a second or independent request to the facility?

MR. DEIXLER:  We have asked for the records that Mr. Schnatter has.  We have also served a subpoena on the facility, Caron.  We're happy to stage this in some way.  We can receive Schnatter's documents first and we can assess whether we

need to go beyond it.

But I must say the characterization of the testimony is inconsistent with the transcript, which I have open in front of me. And so rather than get into it further, unless the Court would like me to, suffice it to say that this gentleman was unequivocal that he was never checked in as a patient or the equivalent of a patient to the facility in Wernersville, Pennsylvania. He said "no" to that question.

And so to understand that there are records -- if it is like a hotel where it shows that he had room service on one day, that would be one kind of record, but if it shows that he was checked into the facility and he had some sort of treatment, that would be something quite different. We'd like to see that and know, and then we can assess whether there's anything further that we want from Caron.

THE COURT: Okay. So this motion to compel is just covering records that Schnatter has; correct?

MR. DEIXLER: Correct. Yes, Your Honor.

THE COURT: And then there's a subpoena that Caron has not responded to and that you-all haven't pursued pending this decision presumably; is that right?

MR. DEIXLER: Yes.

THE COURT: Okay. And so, Ms. Barbour, I thought I heard you suggest that you didn't know what might be in the records, but I think we're just talking today about ones that

the plaintiff has.  So there's not a question of surprise, but maybe you just meant you're concerned about the lawyers on the other side not keeping them protected or -- is that your concern?

MR. DEIXLER:  Judge, while counsel ponders that, I do want to make it clear I do think that Mr. Schnatter has an obligation to collect the records that pertain to him.  I don't know where exactly they might be.  They could be at the facility.  They could be with his physician.  It could be with his agents or his advisors.

But, you know, I would think I'd be disappointed if he said, "Well, I don't have it here, and, therefore, I have no ability to collect it or turn it over."  I don't think we're seeking that kind of narrow inquiry here.

THE COURT:  Sorry.

MR. DEIXLER:  So it's custody and control kinds of issues and certainly doing what he can.

THE COURT:  Does the patient have --

(Simultaneous speaking not reportable.)

THE COURT:  Hold on.  Does the patient have custody or control over records that are maintained at a facility?

MR. DEIXLER:  I would certainly think so.  In my own experience, if I want something from a doctor, they send it to me.

THE COURT:  Sure.  But that could be true of any

number of records that you normally go to the custodian, and we wouldn't consider a party to be the custodian.

Mr. Abate or Mr. Murrell, you guys have probably litigated this question before.  Do you know the practical answer?

MR. MURRELL:  I do not know the answer to that question because I don't usually deal in the world of medical claims.

MS. BARBOUR:  So that's why I've been asked to argue this, Your Honor, because in my past life this is primarily what I did.

So the answer is:  In the context of traditional health records, yes, there's a body of case law out there that says the patient has custody and control because they have the right to request and receive them.  There is a catch, a minor catch, in regards to this particular type of records.  The facility does have the right to refuse to produce them if the treater feels that doing so would be harmful to the physician-patient relationship.

So I don't think that would necessarily be at issue here though because, one, Mr. Schnatter does not believe he ever had a physician-patient relationship because he does not think he was there for the purposes of treatment.  But then, two, the person who would raise that issue would be someone at Caron, not Mr. Schnatter.

MR. DEIXLER:  Well, let me just say Caron has already

sent a consent form which was presented to him in the second of his depositions and which Mr. Schnatter, through his lawyer, has declined to sign.  So Caron has no individual or expressed objection to it.  They sent the consent form.

THE COURT:  I don't know that I would read that much into the sending of a consent form.

Look, this makes me think that we may not be just one step away from putting this to bed as a matter of discovery, and I'm very mindful of the clock.  So I would like -- I'm going to overrule the objection on the understanding that at least initially what we're talking about is the documents that Schnatter has now.  And if you-all disagree over the what and how that extends to Caron documents, well, then I would beg you to work together in good faith to apply the law correctly and get there.  And we shouldn't let this one issue sidetrack what I'm sure are otherwise intense preparations on many other fronts.

But I'm certainly not in a position to detail the order of operations as between Schnatter and Caron and the defense in terms of, you know, getting this timely and properly disclosed. At least not today.

MR. DEIXLER:  Your Honor, we'll proceed.  We'll work constructively, I'm sure, with counsel.

And should an issue arise, I wondered whether the Court would want us to go back to Judge Lindsay, or would you be

willing to entertain a kind of informal discussion, or would we need to do it on a more formal notice basis just so we can do our own planning?

And not to be overly pessimistic, because I do think we'll be able to work well together.

THE COURT:  Hope springs eternal.

I would say let's avoid -- let's try to economize time by just you-all coming back here in some -- you know, maybe like 14 days after you -- or within 14 days of disclosing the sort of core documents that are available to Mr. Schnatter.  Maybe just request a time for a follow-up telephonic with me and we can see where things stand.

MR. DEIXLER:  Very well.

And will the Court set a time for the delivery of these documents to us, if any there be, so that we can move quickly? A week, ten days, something.  Doesn't seem like it's going to be terribly voluminous if it exists -- if they exist.

THE COURT:  Ms. Barbour, do you need me to give you a homework deadline here, or can you propose something?

MS. BARBOUR:  Yeah.  I think -- I mean, I can affirmatively state Mr. Schnatter has none in his possession today, so I anticipate in the next day or two we'll be reaching out to the other side to try and work out the extent to which any records would be requested and then turned over from Caron. So I would think, you know, ten days.

THE COURT:  How about this:  Why don't we just set a time now to get back on the horn?  Maybe like the week of -- get back on the horn and just see where things stand, and I would expect that you guys will make serious progress between now and then.  You know, not just handing over something limited but actually thinking about how to bring this in for a landing.

MS. BARBOUR:  Yes, Your Honor.  And I apologize.  Sorry.  My speakers cut out when you gave us when we would come back.

THE COURT:  Maybe, say, February 12th, something like that.

MS. BARBOUR:  Okay.

MR. DEIXLER:  And that works for us, Your Honor.  Thank you.

MS. BARBOUR:  Yes, Your Honor, that works.

THE COURT:  So that will give you time to, I guess, formally confirm there are no records, then get with the provider, exchange whatever is available, and talk about what, if any, steps remain.

And probably, you know, all of this needs to occur against the backdrop of how additional information would be, you know, used at trial or in preparation for trial.  In other words, I don't want this to become its own sideshow.  Let's pursue this issue with a view toward the actual contest, okay?

MS. BARBOUR:  Understood.

THE COURT:  Would -- is 10:30 a.m. Eastern a problem for our California friends, or is that --

MR. DEIXLER:  No.  7:30 in the morning is a bit early, but we'd be happy to accommodate the Court's schedule.

THE COURT:  I have a trial scheduled for that week, and my time is a little limited that afternoon.

MR. DEIXLER:  Not a problem.  Not a problem, Your Honor.

THE COURT:  Let's say 11:00.  That is a little more reasonable.  But I'll have a hard stop, it looks like, around 11:30, though I don't think we'll need that much time.

MR. DEIXLER:  Very well.

THE COURT:  Is that fine with plaintiff?

MR. MURRELL:  It is, Your Honor.

MS. BARBOUR:  Yes.

THE COURT:  Okay.  On the attorney fee front, none of the numbers have been produced or litigated yet; correct?

MR. DEIXLER:  Correct.

THE COURT:  Okay.  Well, not that there's a perfect overlap here, but as I mentioned, I do think there are sensitive issues.  And while I think Judge Lindsay is right, I don't know that the position was totally, you know, out to sea.  So I'm gonna show high deference to him on these issues that he has handled directly, but I just -- I hope that the magnitude and voracity of this sanctions question, fee question doesn't get

bigger than it needs to.

Anything else that we need to address today, Mr. Deixler?

MR. DEIXLER:  No, I don't think so.  I think we can work out other scheduling issues when we meet and confer with counsel.  So I think we're covered and appreciate it.

THE COURT:  Okay.  Ms. Barbour?

MS. BARBOUR:  No, Your Honor.

THE COURT:  Okay.  And I apologize that I didn't ask you the question first about confidentiality -- or custody and control, I should say.

MS. BARBOUR:  That's okay.

THE COURT:  You know, there are many practical questions in which I'm used to deferring to Mr. Murrell and Mr. Abate because their knowledge is vaster than my own, so I just defaulted to them.

MS. BARBOUR:  I do the same.

THE COURT:  All right.  Well, thank you all very much, and we'll look forward to chatting on the 12th.  If schedules change or if you guys are ready to move ahead sooner, just let us know and we can work something out.  Because as I've said at least two times already today, one of my overarching goals here is to keep us on track and to not let things pile up in advance of trial deadlines, okay?

MR. DEIXLER:  Very well.

MS. BARBOUR:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Have a good day.

(Proceedings concluded at 2:55 p.m.)


C E R T I F I C A T E

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


___s/Terri L. Horton_____              _February 4, 2026____
Terri L. Horton, RMR, CRR                 Date
Official Court Reporter