**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**JOHN H. SCHNATTER,**

**Plaintiff,**

**v.**

**247 GROUP, LLC d/b/a LAUNDRY SERVICE,**

**Defendant.**

**Case No. 3:20-cv-00003-BJB-CHL**

**JUDGE BENJAMIN J. BEATON**

**MAGISTRATE JUDGE COLIN H. LINDSAY**

# DEFENDANT 247 GROUP, LLC d/b/a LAUNDRY SERVICE'S MOTION TO EXCLUDE EXPERT TESTIMONY AND REPORT OF DOUG BANIA REGARDING DAMAGES BASED ON NAMING RIGHTS, REPUTATIONAL HARM, MITIGATION AND REIMBURSABLE EXPENSES, AND COLLATERAL CONTRACTS

KENDALL BRILL & KELLY LLP

Bert H. Deixler (*pro hac vice*)
Email: bdeixler@kbkfirm.com
Patrick J. Somers (*pro hac vice*)
Email: psomers@kbkfirm.com
David T. Freenock (*pro hac vice)*
Email: dfreenock@kbkfirm.com
10100 Santa Monica Blvd., Suite 2500
Los Angeles, California 90067
Telephone: (310) 556-2700
Facsimile: (310) 556-2705

*Counsel for Defendant*

KAPLAN JOHNSON ABATE & BIRD LLP

Michael P. Abate
Email: mabate@kaplanjohnsonlaw.com
710 West Main Street, 4th Floor
Louisville, Kentucky 40202
Telephone: (502) 416-1630
Facsimile: (502) 540-8282

*Counsel for Defendant*

# TABLE OF CONTENTS

**Page**


I. Introduction ..... 1

II. Background ..... 4

III. Legal Standard ..... 4

IV. Argument ..... 6

A. Bania's Testimony on Naming Rights Should Be Excluded ..... 6

1. Bania Is Not Qualified to Opine on Naming Rights Valuation ..... 6

2. Bania's Testimony Rests on a Flawed Premise ..... 7

3. Bania Did Not Rely on Sufficient Facts or Data ..... 9

4. Bania's Methodology Is Unreliable ..... 10

5. Bania's Naming Rights Testimony Is Irrelevant Under Kentucky Law ..... 12

B. Bania's Testimony on Reputational Harm Should Be Excluded ..... 13

1. Bania Did Not Analyze Schnatter's Pre-Article Reputation ..... 13

2. Bania Assumed, Rather Than Analyzed, the Impact of the July 11 Article ..... 15

3. Bania Assumed the July 11 Article Left a "False Impression" ..... 17

C. Bania's Testimony on Expenses Should Be Excluded ..... 18

1. Bania's "Reimbursable" Expense Analysis Is Nonexistent ..... 18

2. Bania's "Mitigation" Expense Analysis Is Nonexistent ..... 19

D. Bania's Testimony on Founder and Chairman Agreement Damages Should Be Excluded ..... 21

1. Bania's Decades-Long Projections Are Pure Speculation ..... 21

2. Bania's Testimony Is Irrelevant Under Kentucky Law ..... 22

E. Bania's Testimony Should Also Be Excluded Under Rule 403 ..... 23

V. Conclusion ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ....7, 8, 9

*Brophy v. Almanzar*,
2020 WL 8175605 (C.D. Cal. Dec. 4, 2020) ....4, 18

*Bruestle v. S & M Motors*,
914 S.W.2d 353 (Ky. App. 1996) ....15

*Chonich v. Wayne Cnty. Cmty. Coll.*,
874 F.2d 359 (6th Cir. 1989) ....24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).... *passim*

*Drayton v. Jiffee Chem. Corp.*,
591 F.2d 352 (6th Cir. 1978) ....24

*Ellipsis, Inc. v. The Color Works, Inc.*,
428 F. Supp. 2d 752 (W.D. Tenn. 2006)....11

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....12, 19, 21

*Gibson v. Kentucky Farm Bureau Mut. Ins. Co.*,
328 S.W.3d 195 (Ky. App. 2010) ....23

*Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854)....14

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
474 F.3d 288 (6th Cir. 2007) ....7

*Johnson v. Manitowoc Boom Trucks, Inc.*,
484 F.3d 426 (6th Cir. 2007) ....8

*Kentucky Consumers Oil Co. v. General Bonded Warehousing Corp.*,
299 Ky. 161 (1945) ....15

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....9

*United States v. L.E. Cooke Co., Inc.*,
991 F.2d 336 (6th Cir. 1993) ....................17

*McLean v. 988011 Ontario, Ltd.*,
224 F.3d 797 (6th Cir. 2000) ....................25

*Navarro v. Procter & Gamble Co.*,
501 F. Supp. 3d 482 (S.D. Ohio 2020) ....................13

*Nelson v. Tenn. Gas Pipeline Co.*,
243 F.3d 244 (6th Cir. 2001) ....................11, 17

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
676 F.3d 521 (6th Cir. 2012) ....................8, 14, 21

*In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*,
93 F.4th 339 (6th Cir. 2024) ....................6

*Pride v. BIC Corp.*,
218 F. 3d 566 (6th Cir. 2000) ....................7, 9

*United States v. Rios*,
830 F.3d 403 (6th Cir. 2016) ....................17

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ....................7

*Staves Mfg. Corp. v. Robertson*,
128 S.W.2d 745 (1939) ....................15

*U.S. Bond & Mortg. Corp. v. Berry*,
249 Ky. 610 (1933) ....................14

*In re Welding Fume Prods. Liab. Litig.*,
2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) ....................8

**Statutes**

Affordable Care Act ....................16

**Rules**

Federal Rules of Evidence 401 ....................3

Federal Rules of Evidence 402 ....................3

Federal Rules of Evidence 403 ....................3, 25, 26, 27

Federal Rules of Evidence 702 ........................................................................................ *passim*

Pursuant to Federal Rules of Evidence 702, 401, 402, 403 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendant 247 Group, LLC d/b/a Laundry Service ("Laundry Service") respectfully moves this Court to exclude the expert testimony and report of Doug Bania regarding naming rights damages, reputational harm damages, mitigation and reimbursable expense damages, and damages based on collateral contracts.

## I. <u>Introduction</u>

Plaintiff John H. Schnatter ("Schnatter") seeks $78.2 million in damages against Laundry Service for a breach of contract. The four categories of damages at issue—(1) "naming rights," (2) reputational harm, (3) mitigation and reimbursable expenses, and (4) damages based on collateral contracts with Papa John's—are premised on the testimony of Doug Bania, whose opinions on each category fail the requirements of Federal Rule of Evidence 702 and the reliability standards established in *Daubert* and applied by the Sixth Circuit.

*First*, Schnatter claims $37,614,255 in naming rights damages based on Bania's opinion that the naming rights Schnatter held under a charitable gift agreement, not a licensing agreement, with the University of Louisville were worth $47.1 million when Schnatter and the University agreed to terminate the agreement. Bania reached this conclusion by identifying twelve purportedly "comparable" commercial sports sponsorship agreements, averaging their annualized value ($2.22 million), multiplying that figure across the remaining term (23 years) of the charitable gift agreement, and subtracting the $9.5 million Schnatter received from the University for terminating his rights. Declaration of Patrick J. Somers ("Somers Decl."), Ex. A, Expert Report of Doug Bania ("Report") ¶¶ 192-198.[1]

[1] "Ex. __" refers to an exhibit attached to the declaration of Patrick J. Somers.

This analysis is fatally flawed under Rule 702 and *Daubert*: Bania lacks any qualifications to value commercial sports sponsorships and stadium naming rights; his methodology rests on the false premise that a tax-deductible charitable gift agreement is equivalent to a commercial sports sponsorship; he relies on unverified data from unknown sources and sponsorship agreements he never reviewed; and he arbitrarily selected "comparables." Moreover, the damages Schnatter claims are not recoverable under Kentucky contract law because Schnatter did not provide notice of the charitable gift agreement to Laundry Service, and he terminated his rights for $9.5 million.

*Second*, Schnatter claims $6,106,436 in reputational harm damages based on Bania's opinion of the cost to repair Schnatter's reputation through a hypothetical Google Ads campaign. Report ¶ 186, Fig. 14. Bania tallied the total number of unique page views of the July 11, 2018 *Forbes* article (1,313,212), multiplied that by the average cost per click of a Google search ad ($1.55), and invented an "attitude change multiplier" of three. Report ¶¶ 176-186.

This opinion fails Rule 702 and *Daubert*: Bania did not analyze Schnatter's reputation before or after the July 11 article; he assumed without analysis that every reader of the article came away with a false impression of Schnatter; he could not identify what information in the article was false; and the corrective website at the center of his model does not exist and has not been designed or written. A federal court previously excluded Bania's methodological approach in *Brophy v. Almanzar*, 2020 WL 8175605 (C.D. Cal. Dec. 4, 2020).

*Third*, Schnatter claims $5,770,690 in "reimbursable" expense damages for his personal security and personal assistant and $4,106,277 in "mitigation" expense damages for legal and public relations fees. Report Schedule 2c, Schedule 3a. Bania opines that Schnatter is entitled to reimbursement for *personal* security and administrative assistant expenses because he was previously entitled to reimbursement of expenses incurred in connection with *company* business.

Schnatter was no longer conducting company business after departing Papa John's. Bania further opines Schnatter is entitled to reimbursement for the legal and public relations fees Schnatter incurred in bringing two Delaware lawsuits *against Papa John's*—(1) a books-and-records action under 8 Del. C. § 220 ("Section 220") and (2) a shareholder derivative action—neither of which served a personal rehabilitative or mitigation purpose.

This opinion fails to satisfy Rule 702 and *Daubert*: Bania performed no analysis of either category of expense; he did not review Papa John's reimbursement policy, did not analyze whether the expenses qualified for reimbursement, did not know what the Delaware lawsuits were or why they were filed, did not review line items in invoices, and admitted he does not know whether the fees are reasonable.

*Fourth*, Schnatter claims $12,995,620 in damages from the termination of the Founder and Chairman Agreements. Bania opines that Schnatter is entitled to lost income through 2033 for the Chairman Agreement and through 2042 for the Founder Agreement based on when Schnatter expected to retire as Chairman and when Bania expects Schnatter to die. Report ¶¶ 30, 141.

This opinion is also unreliable under Rule 702 and *Daubert*: Bania projected damages decades into the future on the assumption that nothing else would ever disrupt Schnatter's agreements, without any analysis to justify that assumption. Moreover, the damages Schnatter claims are not recoverable under Kentucky contract law because Schnatter did not provide notice of the Chairman or Founder Agreements to Laundry Service.

Each of Bania's four opinions is an exercise in speculation dressed in the trappings of expert testimony. The Court should exclude them.

## II. **Background**

Schnatter is the founder and former Chairman and CEO of the pizza chain Papa John's. On May 22, 2018, Schnatter used the "N-word" on a crowded conference call attended by a number of executives and employees of Papa John's and Laundry Service. In articles dated July 11 and July 19, 2018, *Forbes* reporter Noah Kirsch reported on Schnatter's use of the "N-word" and the toxic culture at Papa John's. The July 11 article acknowledged Schnatter's remarks were intended to "convey his antipathy to racism" and included Schnatter's admission confirming his use of the language and apologizing: "News reports attributing the use of inappropriate and hurtful language to me during a media training session regarding race are true. Regardless of the context, I apologize. Simply stated, racism has no place in our society." Schnatter alleges Laundry Service was the source of information provided to *Forbes* regarding the May 22 call and therefore breached a nondisclosure agreement. Laundry Service denies it was the source.

## III. **Legal Standard**

"The party proffering the expert (here plaintiffs) bears the burden of showing by a preponderance of the evidence that the expert satisfies Rule 702." *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024).

Rule 702, which codifies *Daubert*, governs the admissibility of expert testimony. Under Rule 702, an expert qualified by knowledge, skill, experience, training, or education may provide opinion testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The U.S. Supreme Court has made clear that the trial court has a "gatekeeping" function under Rule 702 and has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In performing this gatekeeping function, trial courts undertake three inquiries before permitting expert testimony to be presented to the jury.

"First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702). This is not an abstract inquiry; the court must assess whether the expert's qualifications "provide a foundation for [the expert] to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

"Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *In re Scrap Metal*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). "[T]he expert's testimony … must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride v. BIC Corp.*, 218 F. 3d 566, 578 (6th Cir. 2000).

"Third, the testimony must be reliable." *In re Scrap Metal*, 527 F.3d at 529. In determining whether the proffered testimony has a sufficiently reliable foundation, the court should consider the indicia of reliability identified in Rule 702, "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007). This reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and

the link between the facts and the conclusion. The Sixth Circuit has identified "[r]ed flags" that caution against admitting expert testimony, including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

Additionally, testimony "prepared solely for purposes of litigation" should be "viewed with some caution." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007). When an expert is a "quintessential expert for hire," the party proffering the expert "must show some objective proof … supporting the reliability of the expert's testimony." *Id.* at 435.

Applying this framework, the Court should exclude Bania's testimony.

## IV. Argument

### A. Bania's Testimony on Naming Rights Should Be Excluded

#### 1. Bania Is Not Qualified to Opine on Naming Rights Valuation

The threshold inquiry under Rule 702 is "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry*, 25 F.3d at 1351. "An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge." *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at *5 (N.D. Ohio Aug. 8, 2005).

Bania's self-described qualifications as a "Certified Licensing Professional" and an "intellectual property expert," whose experience lies in "IP valuation, management, damage calculations, and internet and social media analytics evaluation," do not provide a foundation for his opinion on naming rights. Report ¶ 3. As Bania conceded, this case does not involve trademarks, copyrights, patents, or the right of publicity, nor valuation of intellectual property. Ex.

B, March 9, 2026, Deposition Transcript of Doug Bania ("Dep. Tr.") at 12:21-13:1; 14:2-10. Bania values commercial sports sponsorship agreements and stadium naming rights, but admits that he has no experience doing so. He did not recall having ever been hired "to value naming rights to an athletic stadium." Dep. Tr. at 154:5-6. He admitted he does not know how to perform the analysis a company would use to determine the value of naming rights, Dep. Tr. at 158:17, and conceded: "I'm not telling the jury that I'm some professional that goes out and runs the analytics and consults with people how much they should pay for their name on a stadium." Dep. Tr. at 159:1-3. He affirmatively disclaimed the expertise his opinion requires: "Well, let's remember that I am not claiming that I am a naming rights expert…. So I don't think that knowing all those features of every deal is relevant." Dep. Tr. at 155:15-21.

A witness is not a qualified expert "simply because he claims to be," *Pride*, 218 F.3d at 577 (internal citation omitted), and here Bania admits that he is not an expert. Further, Bania's qualifications do not "provide a foundation" for answering the "specific question" of commercial sports sponsorships and stadium naming rights valuation. *Berry*, 25 F.3d at 1351.

**2. <u>Bania's Testimony Rests on a Flawed Premise</u>**

An expert must "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Where, as here, an expert's testimony rests on a fundamentally flawed premise, the analysis is unreliable.

The entire foundation of Bania's $37.6 million naming rights damages estimate presumes that Schnatter's arrangement with the University of Louisville was equivalent to a commercial sports sponsorship agreement whose fair market value can be determined by comparison to other commercial sports sponsorship agreements. This premise is false. The agreement between

Schnatter and the University was, by its express terms, a charitable gift—not a commercial sports sponsorship—structured such that Schnatter did not receive a personal material benefit.

Schnatter was designated as a "Contributor" whose donation was "[f]or the sole purpose of assisting University in constructing and equipping the Stadium." Ex. C, Charitable Gift Agreement § 1. The agreement expressly provided that "contributions to the University qualify for the maximum charitable income tax deduction as provided in section 170, or a successor provision, of the Internal Revenue Code." *Id.* § 4(a). The University would have been in breach of the agreement if it "refuses or fails to characterize the contribution made under this Agreement as a charitable contribution by Contributor without the receipt of compensation." *Id.* § 13(b). The amendments to the charitable gift agreement reinforced this fact, requiring the University to provide a charitable contribution letter "acknowledging the contribution as required by section 170(f)(8) of the Internal Revenue Code of 1986, as amended, indicating that University did not provide any goods or services in consideration, in whole or in part, for the contribution." Ex. D, First Amendment to Charitable Gift Agreement § 4; Ex. E, Second Amendment to Charitable Gift Agreement § 4. Schnatter's charitable gift agreement was structured such that Schnatter did not receive a personal material benefit, which is what rendered his contributions tax deductible.

Bania never verified Schnatter treated the naming rights as an economic asset and conceded Schnatter could not sell the naming rights on the open market. Dep. Tr. at 198:3-11; 197:14-16. Bania admitted he does not know the difference between a gift arrangement and a sponsorship agreement: "Do I know the difference between those two? No." Dep. Tr. at 170:5-7, 19-22.

Commercial sports sponsorship agreements include a vast array of tangible and intangible assets the sponsor exploits to its benefit, extending far beyond the name on the stadium. As rebuttal expert Matt Murphy, whose daily business is sports sponsorship agreements, explains, tangible

assets include "stadium name signage, team and stadium multimedia, on-site retail space, team merchandise, in-game promotions, tickets and hospitality, sideline access, Super Bowl tickets, television and radio advertising, website features, exclusive content for customers, social media mentions, title sponsorship of team programming, product literature in team mailings, player/coach/owner appearances, use of stadium for private events, [and] team practice jersey patch," while intangible assets include "category exclusivity, official designation, pass-through rights, use of team logos and marks, retail promotional rights, [and] product testimonial from team." Ex. F, Murphy Expert Report ¶ 36. Charitable gift agreements are fundamentally different. By definition, the donor's only benefit is a right to deduct the gift as a charitable contribution. An expert who does not know the difference between gift agreements and commercial sponsorships cannot reliably opine on the value of either.

### 3. <u>Bania Did Not Rely on Sufficient Facts or Data</u>

Even if fair market value were a proper framework—which it is not—Bania's analysis is not "based on sufficient facts or data." Fed. R. Evid. 702(b). The Sixth Circuit has cautioned against admitting opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Where "the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006) (internal quotation marks omitted).

Bania's twelve "comparable" commercial sports sponsorship agreements were not derived from any recognized industry database, from actual deal contracts, or from any reliable source. Instead, his data came from internet website printouts of unknown provenance, including a website

called "businessofcollegesports.com." When shown this source, Bania could not identify who compiled its data or vouch for its reliability: "I don't know." Dep. Tr. at 177:3-4. He conceded he did not attempt to verify any of the data. Dep. Tr. at 177:14-16. Beyond the topline figures pulled from websites, Bania did no further diligence. He did not obtain, review, or request any of the twelve purportedly "comparable" sponsorship agreements, and thus did not know whether the data was accurate: "I did not look at any of the details of these deals…. I'm taking at word that these are accurate." Dep. Tr. at 191:14-22.

Bania's sources contained demonstrably inaccurate information about Schnatter's own agreement. Bania admitted the reported length of the deal and final year (52 years and 2039) and the amount of the deal ($15 million) were all wrong. Dep. Tr. at 180:4-8; 19-24. These inaccuracies called into question the reliability of the data for the twelve "comparables" Bania relied upon, none of which he verified. For example, when informed that the purported LA Coliseum comparable—the second-highest-value deal in his set at $4.7 million per year—was actually a failed deal that "never happened" due to "severe public backlash," Bania admitted he "wasn't aware of that." Dep. Tr. at 193:1-4.

**4. <u>Bania's Methodology Is Unreliable</u>**

Rule 702 requires that expert testimony be "the product of reliable principles and methods" and reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d). When an opinion is based on the *ipse dixit* of the expert, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Where an expert's conclusions amount to "assumptions," the expert "has not used a weak methodology; he has used no methodology at all." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 492 (S.D. Ohio 2020).

Bania's methodology for calculating $37.6 million in naming rights damages consisted of identifying twelve purportedly "comparable" sports sponsorship agreements and averaging their annualized values. Report ¶¶ 192-194, Schedule 5b. When asked how he determined these sponsorship agreements were "comparable," Bania did not know: "I don't recall exactly the process of doing that." Dep. Tr. at 174:10-12. When asked what makes a deal "comparable," his answer was remarkable in its inadequacy: "A comparable is another stadium that somebody pays to have their name on." Dep. Tr. at 186:9-10. The only criterion Bania applied was whether a deal involved naming rights of any kind, for any stadium, in any market, under any terms. He performed no analysis of the differences in deal terms, stadiums, or markets, despite selecting "comparables" that include professional stadiums in the largest media markets in the country.

Bania did not know basic facts about the stadiums he selected as "comparable." When asked about the University of Miami comparable—the highest-value deal in his set at $7.5 million per year—Bania could not identify what sports were played at the stadium: "So you're going to go beyond my sports-fan knowledge. I don't know." Dep. Tr. at 187:14-16. He was unaware that the stadium also hosted the NFL's Miami Dolphins and the MLB's Miami Marlins and did not consider whether this increased the value of the naming rights. Dep. Tr. at 187:20-23; 188:7-11. Bania agreed the "prominence in being featured on television might play a role on the value of its rights" but did not account for this in his analysis. Dep. Tr. 188:7-11.

Because Bania reviewed none of the underlying "comparable" agreements, he did not know what assets were purchased and did not value those assets as compared to Schnatter's charitable gift agreement. Bania confirmed he was ignoring the value of additional rights and assets: "Yeah. But in order to get the name on the stadium, yes, you may be given other little bundles of rights.

I'm not aware of those." Dep. Tr. at 184:6-10. Bania was unable to even identify the other assets and rights included in typical commercial sports sponsorships. Dep. Tr. at 154:12-156:16.

The spread of Bania's data itself refutes comparability: the twelve deals span from an annualized value of $333,333 (Arkansas State/Centennial Bank) to $7,500,000 (University of Miami/Sun Life Financial), a spread of more than twenty-two to one. Report ¶¶ 192-194, Schedule 5b. This range demonstrates that these deals are not comparable in any meaningful sense. Comparable deals would cluster within a range that reflects similar market conditions, similar assets and rights, and similar stadiums. Faced with this spread, Bania's analytical response was to take a simple average, but averaging dissimilar data points does not render them comparable.

The Sixth Circuit's *Newell* "red flags" are all present here: reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity. Bania's naming rights opinion should be excluded.

### 5. <u>Bania's Naming Rights Testimony Is Irrelevant Under Kentucky Law</u>

Even if Schnatter could meet his burden under Rule 702, Bania's naming rights testimony should be excluded as irrelevant for two independent reasons.

First, Laundry Service had no notice of the charitable gift agreement at the time of contracting. Under Kentucky law, damages recoverable for a breach of contract must be foreseeable. The rule, first articulated in *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854), and adopted by Kentucky courts, recognizes that "in order to recover special damages the party sought to be charged must have had notice of such circumstances at the time the contract is made." *U.S. Bond & Mortg. Corp. v. Berry*, 249 Ky. 610, 620 (1933). Kentucky courts deem damages arising from a collateral agreement as special damages requiring notice of the collateral agreement at the time of contracting. *See Kentucky Consumers Oil Co. v. General Bonded Warehousing Corp.*, 299

Ky. 161, 166 (1945) (holding contract damages "growing out of an existing collateral or subordinate agreement may be recovered where they were within the contemplation of the parties when the original contract was made; but, as in other cases of special damage, the defendant must have had notice of such collateral contract at that time"). The charitable gift agreement was executed on May 16, 1996, more than two decades before the nondisclosure agreement was signed on April 9, 2018, and there is no evidence that Schnatter provided Laundry Service with notice of the charitable gift agreement. The naming rights damages are unforeseeable special damages not recoverable under Kentucky contract law.

Second, Schnatter terminated his naming rights in exchange for $9.5 million from the University on October 24, 2019, more than a year after the *Forbes* articles. Schnatter agreed the $9.5 million constituted "good and valuable consideration," was paid "in satisfaction of the 23 years remaining on the agreement," and was "fair and equitable." Ex. G, Mutual Termination Agreement § B and Exhibit A. He cannot seek an additional $37.6 million from Laundry Service for the rights he agreed to terminate for $9.5 million. *See Staves Mfg. Corp. v. Robertson*, 128 S.W.2d 745, 751 (1939) (holding damages that are "remote, conjectural, and speculative … cannot be said to be the direct and unavoidable result of the breach and cannot be recovered"); *Bruestle v. S & M Motors*, 914 S.W.2d 353, 354-355 (Ky. App. 1996) (affirming summary judgment based on the doctrines of accord and satisfaction where the plaintiff had "actively negotiated" a settlement and "voluntarily agreed to" accept consideration in satisfaction of her claim).

**B. <u>Bania's Testimony on Reputational Harm Should Be Excluded</u>**

**1. <u>Bania Did Not Analyze Schnatter's Pre-Article Reputation</u>**

Bania acknowledged that Schnatter was involved in various public controversies prior to the July 11 article, including his controversial comments about the Affordable Care Act, criticism

of the NFL National Anthem protests, and allegations of workplace misconduct. Report ¶¶ 89-115. Bania conceded Schnatter's NFL National Anthem protests criticism "appeared to have impacted his reputation" and claimed Laundry Service was hired to "rebuild Mr. Schnatter's reputation and image." Report ¶ 79. He likewise conceded there was a "backlash" to the Obamacare comments that led Schnatter to hire a PR firm to "assist in restoring his image." Report ¶ 98. Despite these concessions, Bania declared, without analysis, that those pre-existing events "do[] not bear relevance to my calculation of reputational harm." Report ¶ 116. Bania's entire pre-article reputational assessment consists of two data points: a May 2, 2018, shareholder vote in which Schnatter received approximately 99.77% of "FOR" votes for re-election to the Board, and the testimony of a single Board member, Sonya Medina.

A shareholder vote does not measure public reputation. Bania admitted he is "not a corporate governance expert" and has "no idea what goes into a Board decision." Dep. Tr. at 34:4-8; 213:12-13. He could not identify a single case in which he had relied on a shareholder vote to determine reputation, nor could he point to any literature supporting this approach. Dep. Tr. at 28:10; 27:5-12. Even on its own terms, the shareholder vote is deeply flawed: Schnatter himself owned approximately 30% of the voting shares, and the remaining shareholders were "several" institutional investors—not representative of millions of members of the general public. Dep. Tr. at 30:17-19; 31:2-9.

As for Sonya Medina, Bania could not explain how one person's testimony provides a reliable basis for assessing a public figure's overall reputation. When asked directly: "What principles of calculating economic damages permit you to rely solely on a single person's testimony to make an evaluation of what their overall reputation in the public was?" Bania could not identify any principle. Dep. Tr. at 24:7-25:14. A Board member's perspective on Schnatter's

standing within the company is categorically different from an assessment of how millions of members of the general public perceived him.[2]

This is not a methodology. It is the very sort of "subjective belief or unsupported speculation" that Rule 702 is designed to screen out. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) (quoting *Daubert*, 509 U.S. at 590). "Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony." *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 342 (6th Cir. 1993). Bania's opinion that any reputational harm to Schnatter was caused by the July 11 article—without any analysis of what his reputation was before the article—is such speculation. It should be excluded.

**2. <u>Bania Assumed, Rather Than Analyzed, the Impact of the July 11 Article</u>**

The centerpiece of Bania's reputational harm analysis is his claim that "[i]ndividuals who read the Forbes Article were led to believe a narrative that portrayed Mr. Schnatter in a negative light." Report ¶ 173. Bania assumed every one of the 1,313,212 unique page views was a person whose opinion of Schnatter was damaged and who therefore needed to be reached by a corrective advertising campaign to correct their "false impression" of Schnatter. But Bania performed no analysis of whether readers *actually* changed their perception of Schnatter based on the article. He conducted no survey, poll, focus group, or study to analyze whether perceptions of Schnatter changed for better, worse, or remained the same. When asked what he did "to determine that the people who viewed that article, every single one of them concluded it was harmful," Bania admitted: "I did not do that analysis." Dep. Tr. at 23:5-7. Bania simply took the raw number of

---

[2] Moreover, Bania is not permitted to mirror the testimony of a fact witnesses as his "analysis." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) ("[A] district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses …." (quoting *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994))).

page views and assumed that each view equaled reputational harm. But the mere fact that the article reached readers does not mean it changed their perceptions of Schnatter.

This is the same methodological approach that led to the exclusion of Bania's testimony in *Brophy v. Almanzar*, 2020 WL 8175605 (C.D. Cal. Dec. 4, 2020). In *Brophy*, a right-of-publicity case involving the rapper Cardi B, Bania concluded that every dollar earned from downloads and streams of an album resulted from the use of the plaintiff's tattoo on the cover. The court excluded Bania's testimony, holding that "[t]his conclusion is simply not the product of any reliable principle or method." *Id.* at *6. The court emphasized that Bania did not "cite to any survey, poll, focus group, or other study where listeners—much less 100% of listeners—stated that the sole driver of their decision of what music to listen to is cover art." *Id.* The court explained that "Bania fails to consider even the possibility that Defendants may have earned revenue on the streaming services that display the album cover for reasons other than Plaintiff's tattoo." *Id.* at *7.

The parallel to this case is striking. In *Brophy*, Bania assumed 100% of album listens on services displaying the cover art were attributable to the tattoo, without any analysis of whether the cover art actually drove listening decisions. Here, Bania assumes 100% of the 1,313,212 unique visitors came away with a false impression of Schnatter, without any analysis of whether or how the article's content actually affected readers' perceptions. In both cases, Bania identified a gross metric—total streams there, total page views here—and assumed the entire metric represented harm, without analysis of the key causal question.

The analytical gap between Bania's data and his opinion is vast. His data consists of a single number: 1,313,212 unique page views. His opinion is that every one of those views produced reputational harm to Schnatter, and that the cost to remedy that harm is $6,106,436. Between those two points, there is no analysis—no impact assessment, no study of reader

reactions, no survey data, no examination of the article's content, and no analysis of whether readers' perceptions were changed. The only thing connecting the data to the opinion is "the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. That is not enough.

### 3. Bania Assumed the July 11 Article Left a "False Impression"

Although Bania's entire damages model depends on a "corrective website" that would change people's "false impression" of Schnatter, he could not identify what information actually needed to be corrected. Report ¶¶ 177-78. He admitted: "I did not go through this word by word or sentence by sentence. That's not part of my opinion." Dep. Tr. at 117:24-118:1. When confronted with the fact that much of the information he proposed to "correct" was already contained in the article itself, he could only respond that the website would "tell the whole story of what's going on. And then depending—and this is the reason why this hasn't been created yet—depending on how the case fleshes out, that narrative will be explained to the reader and that story will be told." Dep. Tr. at 119:15-22.

This is speculation: seeking over $6 million in damages to fund a website whose content has not been determined, based on a narrative that has not been written, to correct information that the expert has not identified. Bania conceded he is "not a PR professional" and is "not going to be the PR firm that is going to build that website." Dep. Tr. at 156:14-15, 123:23-25. He admitted he is "not opining on whether or not it is going to change the public's perception of who [Schnatter] is." Dep. Tr. at 311:16-17. Bania's opinion fundamentally requires the jury to accept that a corrective website would actually change public perceptions of Schnatter, yet Bania himself disclaims any ability or willingness to make that determination.

### C. Bania's Testimony on Expenses Should Be Excluded

#### 1. Bania's "Reimbursable" Expense Analysis Is Nonexistent

Bania opines that Schnatter is entitled to $5,770,690 in reimbursable expense damages, representing the present value of reimbursements for security and an administrative assistant projected through 2033. Report ¶¶ 30, 169. Bania admitted that the Founder and Chairman Agreements entitled Schnatter to reimbursement only for "expenses incurred in connection with Company business pursuant to Company policy." Report ¶ 72; Dep. Tr. at 258:9-15. Thus, to be reimbursable, an expense must be incurred for company business pursuant to the reimbursement policy, not for personal purposes. Bania did not recall whether he ever reviewed the company's reimbursement policy and could not define what constitutes "company business" for purposes of reimbursement. Dep. Tr. at 258:14-22; 259:1.

Despite acknowledging Schnatter was "no longer incurring expenses for company business" after the Founder and Chairman Agreements were terminated and Schnatter departed Papa John's, Bania simply "looked at the reimbursed amounts" Schnatter provided without analyzing whether any expenses would qualify for reimbursement. Dep. Tr. at 260:17-20; 261:3. Bania was unable to explain how Schnatter could possibly incur reimbursable expenses "for company business" through 2033 when Schnatter no longer conducted company business. He did not know whether the expenses were personal expenses and admitted he made no "determination of what work needed to be done for company business to be reimbursed versus what work was personal." Dep. Tr. at 260:24-261:3.

Bania also failed to account for—and was unaware of—the obvious alternative cause for the termination of Schnatter's security reimbursements. Papa John's did not cancel Schnatter's security when he resigned as Chairman on July 11, 2018, or when the Founder Agreement was

terminated on July 15, 2018. Dep. Tr. at 268:14-21. Rather, the reimbursements were terminated because Schnatter defied the Special Committee's directive and appeared on the Papa John's campus with an armed security guard. Dep. Tr. at 267:6-17. When asked what would have happened if Schnatter had not violated the directive, Bania could not say: "I don't know what the details were, how long they were going to continue to pay for his security. I didn't see an agreement." Dep. Tr. at 268:7-12. When asked whether Schnatter had "actually made the harm worse" by defying the Special Committee and having "his security detail revoked," Bania could only respond that he would "need more details to understand that part of the damages bucket." Dep. Tr. at 270:2-271:8. Bania did not obtain or review any such details, and instead "decided to put that as an entire category of damages assigned to" Laundry Service. Dep. Tr. at 271:10-13

Bania's reimbursable expense opinion exhibits all the *Newell* "red flags:" no analysis or testing to determine what expenses qualify for reimbursement; assumption that all expenses were reimbursable; improper extrapolation to a period when Schnatter was no longer conducting company business; and failure to consider the obvious alternative cause for the termination of the reimbursements. The result is an opinion connected to the existing data only by "the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

**2. <u>Bania's "Mitigation" Expense Analysis Is Nonexistent</u>**

Bania opines that Schnatter is entitled to $4,106,277 in mitigation expenses for legal and public relations fees incurred in connection with lawsuits Schnatter filed against Papa John's in Delaware. Report ¶ 171. Bania characterizes these fees as incurred for "rehabilitation and protection of Mr. Schnatter." Report ¶ 76. But Bania knows nothing about Delaware corporate law, did not know what the lawsuits were or why they were filed, performed no analysis of them, and simply assumed—without any basis—that they constituted mitigation expenses. When asked

what was the reason Schnatter "filed a lawsuit against Papa John's," Bania admitted he "did not analyze his lawsuits towards Papa John's." Dep. Tr. at 291:3-4. He conceded: "I don't know the details of each suit…. I did not look into those legal details." Dep. Tr. at 269:2–7.

Had Bania actually analyzed the lawsuits, he would have discovered that neither of Schnatter's Delaware lawsuits sought mitigation of personal harm. Schnatter's Section 220 action sought access to Papa John's books and records. Under Delaware law, a Section 220 action requires a "proper purpose," which is one reasonably related to the director's interest in that capacity; a personal purpose like image rehabilitation or protection is improper. In his own court filings, Schnatter represented to the Delaware court that his purposes were: (1) "to inform myself so that I may fulfill my fiduciary duties," and (2) "to ensure that other members of the board are fulfilling their fiduciary duties." Dep. Tr. at 288:24-289:4. These are fiduciary purposes, not rehabilitative ones. Bania did not know this.

Schnatter also filed a shareholder derivative action against members of the Papa John's Board. Derivative suits are brought on behalf of the corporation, not for personal purposes. Bania did not know this either, and he did not analyze the purpose of the derivative action. Dep. Tr. at 269:2-7. There is no basis in law for the proposition that a shareholder derivative suit brought on behalf of a corporation constitutes a personal "mitigation" expense. When confronted with the actual work of the law firms—"pursuing Mr. Schnatter's rights as the director of Papa John's, to inspect its books and records, and potentially commencing litigation against Papa John's and the members of the board of directors"—Bania could not reconcile this with personal "rehabilitation." Dep. Tr. at 284:22-285:3.

Even setting aside these fundamental deficiencies, Bania did not review the invoices underlying his figures, does not know what work was performed or why, and made no assessment

of whether the fees were reasonable. When asked whether he analyzed the invoices "to make a determination as to whether the expenses should be properly attributed to Laundry Service," Bania conceded he did not recall doing so. Dep. Tr. at 287:11-15. He admitted he is "not an expert on legal fees," is not "able to understand whether legal fees are reasonable," and "did not look at what rates are being charged." Dep. Tr. at 282:23-24; 283:1-2; 283:15-16.[3]

### D. Bania's Testimony on Founder and Chairman Agreement Damages Should Be Excluded

#### 1. Bania's Decades-Long Projections Are Pure Speculation

Even assuming the July 11 article was the sole cause of the termination of the Chairman and Founder Agreements, Bania's projections of damages spanning 15 to 24 years into the future are speculation. Bania assumes with 100% certainty that Schnatter would act as Chairman through 2033 (age 71 or 15 years following the July 11 article) and fulfill founder duties through 2042 (age 81.5 or 24 years following the July 11 article). He does not consider the possibility that Schnatter might not be re-elected Chairman in any given year. He does not consider whether Schnatter's health, behavior, or other controversies might have caused termination of the agreements at any point during those decades. He does not consider whether Papa John's might have exercised its contractual right to terminate the Founder Agreement. He simply assumes, without analysis, that nothing would ever happen in 30 years that could impact the earnings stream.

The Sixth Circuit has cautioned that "economic experts" opining on future damages" must "keep such extrapolations within reasonable bounds and insure that they conform to the evidence."

[3] Bania's damages calculation is also prohibited as a matter of law. Under Kentucky law, attorneys' fees are categorically *not* recoverable as compensatory damages. *See Gibson v. Kentucky Farm Bureau Mut. Ins. Co.*, 328 S.W.3d 195, 204 (Ky. App. 2010) ("Attorney fees … do not compensate the plaintiff for any wrong done by the defendant."). Bania acknowledged he was unfamiliar with this rule and could not identify any claim "that entitle[s] you to attorneys' fees as damages." Dep. Tr. at 278:1-13.

*Drayton v. Jiffee Chem. Corp.*, 591 F.2d 352, 362 (6th Cir. 1978) (internal quotation marks omitted). Bania is not an economic expert. Dep. Tr. 81:5-6 ("Q: And are you an economist? A: No."). And his assumption that nothing would ever change, with no analysis to justify that assumption, is not reliable. *Chonich v. Wayne Cnty. Cmty. Coll.*, 874 F.2d 359, 369 (6th Cir. 1989) (doubting the "effectiveness and relevance" of expert testimony failing to consider potential "uncertainty" of continued employment in a "particular job").

Bania's speculation is further undermined by his treatment of the July 19, 2018, *Forbes* article—a lengthy exposé, based on interviews with 37 current and former Papa John's employees, detailing allegations of a toxic workplace culture, sexual harassment, and racial insensitivity involving Schnatter. The July 19 article was published just eight days after the July 11 article, and its author, Noah Kirsch, wrote that he had "spent months piecing [the story] all together." Bania admitted that in his "but for" world, he assumes the July 19 article would not have been published at all. When asked the basis for that opinion, Bania conceded: "I think it's highly unlikely the 19th article would have come out if the 11th article didn't come out." Dep. Tr. at 202:8-10. He speculated that "the July 11th article gave permission" for the July 19 article. Dep. Tr. at 202:18. But when pressed, Bania admitted his opinion was just "a hypothetical" and "a possibility." Dep. Tr. at 204:18-21. He acknowledged he is not a journalist, has never worked for a news publication, and has no editorial experience. Dep. Tr. at 203:17-19, 203:25-204:4. Bania's opinion that he can ignore the impact of the July 19 article—and all other futures events—in projecting lost income over decades is "subjective belief and unsupported speculation." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-801 (6th Cir. 2000). It should be barred from the courtroom.

**2. <u>Bania's Testimony Is Irrelevant Under Kentucky Law</u>**

Bania's testimony suffers from another foundational deficiency: there is no evidence that Laundry Service was ever provided with the Founder and Chairman Agreements. When asked

whether he was "aware of whether Laundry Service was provided a copy of the founder agreement at any point in time prior to July 11, 2018," Bania answered: "No." Dep. Tr. at 104:20. Asked the same question about the Chairman Agreement, Bania again answered: "No." Dep. Tr. at 104:24. When asked whether he had "any evidence" that Laundry Service "would have been aware of the existence of these two agreements prior to the publication of the July 11, 2018, Forbes article," Bania could offer only: "I would certainly hope that Laundry understands that Mr. Schnatter is in a contract or several contracts, whether or not they knew they were these exact." Dep. Tr. at 105:5-9. Bania's only basis for attributing $12,995,620 in damages to Laundry Service on account of these agreements is that he "hopes" Schnatter provided notice of them to Laundry Service.

This is not expert analysis. Without any evidence that Schnatter provided Laundry Service notice of the Chairman and Founder Agreements, the special damages based on them are not foreseeable and therefore not recoverable under Kentucky law. *See supra* pp. 12-13.

### E. Bania's Testimony Should Also Be Excluded Under Rule 403

Each of Bania's four damages opinions should independently be excluded under Federal Rule of Evidence 403 because the danger of unfair prejudice, confusion of the issues, and misleading the jury substantially outweighs whatever minimal probative value the testimony might have. Fed. R. Evid. 403. As the Supreme Court recognized in *Daubert*, "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 595.

Bania's naming rights testimony presents a precise figure—$37,614,255—derived from a purported "market value" approach that, on its face, appears methodical but which masks the

absence of any genuine comparability analysis, reliance on unverified data, and the fundamental mismatch between charitable gift agreements and commercial sports sponsorships.

His reputational harm testimony presents another precise figure—$6,106,436—derived from a series of calculations that appear methodical but mask the fact that the model invites the jury to treat a raw count of website page views as proof of reputational damage, a proposition no expert has validated and Bania himself did not test. Moreover, the corrective website at the center of the model does not exist, and Bania does not know whether it would even work.

His Founder and Chairman Agreement testimony presents another precise figure—$12,995,620—projecting lost income across decades on the unexamined assumption that nothing would ever disrupt those agreements. Bania performed no analysis of whether the agreements would have continued for decades, nor could he point to any evidence that Schnatter provided notice of the agreements to Laundry Service.

His mitigation and reimbursable expenses testimony attributes millions in damages for personal security, administrative assistants, and Delaware litigation fees to Laundry Service's alleged breach, when the expenses are either personal in nature, arose from Schnatter's own defiance of the Papa John's Special Committee, or were incurred in corporate fiduciary actions having nothing to do with personal rehabilitation or mitigation. Under Kentucky law, it is nonsensical to suggest Laundry Service would have foreseen that breach of the nondisclosure agreement would result in $5.77 million in damages for Schnatter's *personal security expenses*, or $4.1 million in damages for Schnatter to *file lawsuits against Papa John's*. These are special damages arising from collateral agreements and voluntary litigation choices that were nowhere within the contemplation of the parties when the nondisclosure agreement was signed.

Injecting these irrelevant and unreliable damages calculations would invite a substantial danger of misleading the jury. Therefore, Bania's testimony should be barred under Rule 403.

## V. **Conclusion**

For the foregoing reasons, the Court should exclude Bania's testimony regarding (1) naming rights damages, (2) reputational harm damages, and (3) reimbursable and mitigation expense damages; and (4) damages based on collateral contracts with Papa John's.

Dated: April 16, 2026

/s/ *Patrick J. Somers*
Patrick J. Somers (*pro hac vice*)
Email: psomers@kbkfirm.com

Bert H. Deixler (*pro hac vice*)
Email: bdeixler@kbkfirm.com
David T. Freenock (*pro hac vice*)
Email: dfreenock@kbkfirm.com
KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd., Suite 2500
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Michael Abate
Email: mabate@kaplanjohnsonlaw.com
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, Suite 500
Louisville, Kentucky 40202
Telephone: 502.416.1630

*Counsel for Defendant*